## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated,

Plaintiff(s),

v.

LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN,

Defendants.

Civil Action No. 2:16-cv-05932-WB

**<u>CLASS ACTION</u>**

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**<u>JURY TRIAL DEMANDED</u>**

**Table of Contents**

                                                                        **Page(s)**

NATURE OF THE ACTION ................................................................................ 1

JURISDICTION AND VENUE .......................................................................... 5

PARTIES ............................................................................................................. 5

FACTUAL ALLEGATIONS ............................................................................... 7

    I.    Lannett was in Desperate Need of Capital to Begin and Maintain the Individual
Defendants' Growth By Acquisition Strategy ........................................... 7

    II.    The Generic Drug Market ....................................................................... 12

    III.    Lannett Colluded with Competitors to Fix the Price of Generic Drugs ......................... 14

    IV.  Lannett and its Co-Conspirators are Under Multiple Governmental Investigations for
Anticompetitive Price-Fixing ................................................................. 37

LANNETT'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND
OMISSIONS ISSUED DURING THE CLASS PERIOD ........................................... 49

LANNETT'S CLASS PERIOD SEC FILINGS WERE MATERIALLY MISSTATED .......... 135

ADDITIONAL ALLEGATIONS OF SCIENTER .................................................... 138

CLASS ACTION ALLEGATIONS ........................................................................ 142

LOSS CAUSATION ............................................................................................ 143

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
DOCTRINE) ...................................................................................................... 148

NO SAFE HARBOR ............................................................................................ 150

COUNT I ........................................................................................................... 151

COUNT II .......................................................................................................... 154

COUNT III.......................................................................................................... 155

PRAYER FOR RELIEF ...................................................................................... 156

JURY TRIAL DEMANDED................................................................................. 157

Lead Plaintiff the University of Puerto Rico Retirement System ("UPR" or "Plaintiff") and plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by their undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things a review of the Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lannett Company, Inc. ("Lannett" or the "Company"), analysts' reports and advisories about Lannett, information obtainable from the internet, and drug pricing and market share information from proprietary databases.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Lannett's common stock between May 9, 2013, and November 3, 2016, both dates inclusive (the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Lannett and certain of its top officers. Defendants made false statements and omissions to investors which concealed that Lannett colluded with its industry peers to fix the prices of Generic Drugs (defined below). Defendants also made false statements and omissions to investors about the impact of competition and price erosion on its sales of certain key Generic Drugs.

2.      Lannett primarily derives its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires ("Generic Drugs").

3.      From at least the beginning of the Class Period, Lannett, at the direction of its Chief Executive Officer ("CEO"), defendant Arthur Bedrosian, and its Chief Financial Officer ("CFO"), defendant Martin Galvan, has engaged in acquisitions that have caused the Company's debt to increase substantially to unprecedented levels.

4.      To finance the acquisition binge started by the Individual Defendants (defined below), Lannett colluded with its industry peers to fix the prices of at least four of its Generic Drugs, Digoxin, Ursodiol, Levothyroxine and Acetazolimide (the "Price Fixed Drugs"). This collusion allowed Lannett to reap substantially higher profits and more easily secure the financing necessary to make these huge acquisitions.

5.      The structure of the markets for the Price Fixed Drugs made them highly vulnerable for collusive activity because (i) they were dominated by a small group of generic drug companies; (ii) the demand for the Price Fixed Drugs was highly inelastic (iii) only a small group of companies controlled a substantial share of the market for the drugs; (iv) the only distinguishing factor for purchasers was price; (v) the drugs did not have viable, lower-priced substitutes; (vi) there was a high barrier to entry for these drugs; and (vii) information sharing and price discovery were common. All of these factors facilitated Lannett's collusion and made it substantially easier for the members of this price-fixing cartel to monitor each other and coordinate their price increases.

6.      The evidence that Lannett engaged in this anticompetitive collusion to fix the prices of the Price Fixed Drugs is prodigious. In addition to Lannett's prices for the drugs increasing in lock-step with its competitors, Arthur Bedrosian explicitly signaled price increases on conference calls with analysts.

7.      The only reasonable explanation for these sudden, synchronized price increases is

collusion. At no point in the Class Period was there a supply shortage, production problem, or sharp increase in demand for these drugs and no competitors left the market.

8.      Lannett, and its executives, routinely misled investors about the competition Lannett faced, the viability of its reported sales figures, and the sources of its revenues. Defendants repeatedly informed investors that the market for Generic Drugs was highly competitive. Instead, the market for Generic Drugs that Lannett participated in was collusive and lacked any competition. Lannett's sales figures and other measures of Lannett's financial performance were therefore misleading. Based on Defendants' false and misleading statements, investors reasonably assumed that Lannett's sales figures relating to its Generic Drugs were an accurate representation of the success of Lannett's products in a competitive market. Actually, those sales figures were highly inflated as a result of Lannett's anti-competitive conduct, and did not reflect the sales Lannett would have been able to achieve absent its price-fixing activity. Reasonable investors would have wanted to know the true competitive environment for Lannett's sales, and the risks involved if the price-fixing scheme was exposed. Defendants denied that this risk existed and told investors that Lannett had done nothing wrong, repeatedly offering false and misleading explanations for its pricing practices.

9.      Lannett's false and misleading statements were made in SEC Filings, including that the Company's actions have improved its competitive cost position. But they did not disclose that the Company's drug pricing relied on unsustainable methodologies. Lannett also failed to disclose that the Company lacked effective disclosure controls regarding its drug pricing methodologies.

10.      The extent of Lannett's fraud was revealed slowly throughout the Class Period, substantially harming investors through a series of partial disclosures. The partial disclosures

began on July 16, 2014, when Lannett announced that it had received an inquiry from the Connecticut Attorney General regarding its pricing of Digoxin. On this news the price of Lannett shares fell $10.13 per share over two trading days to close at $36.96 per share on July 17, 2014.

11.     On December 8, 2014, during aftermarket hours, the Company filed a Form 8-K with the SEC revealing that "the Company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." On this news shares of Lannett fell $6.08 per share to close at $41.92 per share.

12.     From the time that price fixing was first alleged while Lannett continued to become the focus of multiple government investigations, Bedrosian attempted to stave off concerns from analysts. Bedrosian addressed the inquiry from the Connecticut Attorney General on his August 27, 2014 earnings call. On that call, Bedrosian maintained that "price increases are opportunistic things... we know we've done nothing wrong, so we're going to continue to operate our business regardless of any investigation." Bedrosian continued to disparage the subpoena and Lannett's collusive conduct at the Oppenheimer Healthcare Conference on December 8, 2014 when he told an audience member "[T]he Connecticut Attorney General decided to investigate the price increases, assuming [...] that we meet in hotel rooms with competitors and do things like that, which is nonsensical[.]"

13.     As a consequence of Bedrosian's denials and as a consequence of Lannett's collusive activity, the Company's stock price soared to a Class Period high of $71.15 per share. Thereafter, although Lannett's scheme to collude regarding the Price Fixed Drugs continued to artificially inflate the Company's earnings, and its stock price, other factors, such as overall reduced demand for certain products, including some of the Price Fixed Drugs, lack of product

4

diversity, the loss of a large customer from one of its acquired companies and high debt, resulted in the decline of Lannett's stock price from its Class Period high.

14.     On November 3, 2016, *Bloomberg* published an article titled "U.S. Charges in Generic Drug Probe to be filed by Year-End", revealing that in connection with the Department of Justice's (the "DOJ") investigation of a dozen companies, including Lannett, U.S. Prosecutors might file criminal charges by the end of 2016 for suspected price collusion. On this news shares of Lannett fell $6.25 per share to close at $17.25 per share.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business in this District and maintains its headquarters in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Lead Plaintiff, the UPR, as set forth in the certification previously filed with this

Court, purchased Lannett common stock at artificially inflated prices during the Class Period and was damaged by the federal securities law violations as alleged herein.

20.     Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, as set forth in the certification previously filed with this Court, purchased Lannett common stock at artificially inflated prices during the Class Period and was damaged by the federal securities law violations as alleged herein.

21.     Defendant Lannett develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas. Lannett also produces, through its subsidiary Cody Laboratories, Inc., active pharmaceutical ingredients. Lannett primarily derives the majority of its revenue from the sale of Generic Drugs.

22.     Defendant Arthur P. Bedrosian ("Bedrosian") has been the CEO of Lannett since January 3, 2006 and served as its President from May 2002 to December 1, 2014. Prior to becoming President, Bedrosian served as the Vice President of Business Development at Lannett from January 2002 to April 2002, and as a Director from February 2000 to January 2002.

23.     Defendant Martin P. Galvan ("Galvan") has been the CFO and Vice President of Finance and Treasurer at Lannett since August 8, 2011.

24.     Defendants Bedrosian and Galvan are sometimes referred to herein as "Individual Defendants."

25.     Each of the Individual Defendants

   a.   Directly participated in the management of the Company;

   b.   Was directly involved in the day-to-day operations of the Company at the highest levels;

c.  Was privy to confidential proprietary information concerning the Company and its business and operations;

d.  Was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

e.  Was directly or indirectly involved in the oversight or implementation of the Company's disclosure controls;

f.  Was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  Approved or ratified these false and misleading statements in violation of the federal securities laws.

26.     Lannett is liable for the acts of the Individual Defendants and their employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and the agents of Lannett are similarly imputed to Lannett under *respondeat superior* and agency principles.

28.     Defendant Lannett and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## FACTUAL ALLEGATIONS

I.    **Lannett was in Desperate Need of Capital to Begin and Maintain the Individual Defendants' Growth By Acquisition Strategy**

29.     Bedrosian joined Lannett in 2000 as a Director and served in that capacity until January 2002. He then became the Vice President of Business Development before serving as the Lannett's President and later CEO. Bedrosian is involved in all aspects of the Company and plays a substantial role in the pricing of Lannett's Generic Drugs. In 2005 Bedrosian created the

"gloom and doom" PowerPoint, as named by Bedrosian, in which it was argued that Lannett, on its present track, had no future in the generic drug industry if it did not find an area of medicine to specialize in and start challenging branded drug patents.

30. Challenging branded drug patents is an incredibly resource and capital intensive process. Under the Hatch-Waxman Act, a company can seek approval from the Food and Drug Administration ("FDA") to market a generic version of a branded drug prior to the expiration of the patent that covers the branded drug. Lannett, or a comparable generic drug company seeking to follow this process would need to submit an Abbreviated New Drug Application ("ANDA") with the FDA and certify in the ANDA that the patent for the branded drug is invalid. Lannett (or another generic company) would then need to notify the holder of the patent (*i.e.* the branded drug maker) that an ANDA was submitted for their drug prior to the patent's expiration. The branded drug maker could then file an infringement suit against Lannett (or other generic company), and the introduction of the generic drug would then be postponed for 30 months, unless, before that time, the patent expires or is judged to be invalid or not infringed.[1]

31. Early in the Class Period it seemed that Bedrosian's "gloom and doom" PowerPoint was prophetic. By 2013, Lannett, and its CEO, were under a tremendous amount of pressure to provide consistent growth to its investors. In November 2013, Lannett was viewed by analysts as a "below average" company that was likely to "underperform the market."[2] This type of assessment further pushed Bedrosian to start challenging branded drug patents and launch his growth by acquisition strategy.

---

[1] *Paragraph IV Drug Patent Challenge Notifications*, U.S. FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplicat ions/AbbreviatedNewDrugApplicationANDAGenerics/ucm147166.htm (last visited May 19, 2017).

[2] SADIF Investment Analytics SA, *Will Lannett, Company Inc. Burn Out Over the Long Term*, SADIF, November 18, 2013.

32.     To attempt to prevent Lannett from underperforming the market, Bedrosian created a three part strategy. First, Lannett was going to engage in a growth by acquisition strategy to build a pharmaceutical empire and increase its product offering by absorbing the acquired companies' product lines. Next, Lannett, would use its increased size and resources to challenge existing drug patents. Finally, Lannett, would develop a vertically integrated controlled substances division. The controlled substances division would allegedly increase Lannett's profitability by allowing it to tap into the multi-billion dollar pain control and opioid industry with patent protections for Lannett's vertically integrated products.

33.     Setting this strategy in motion required Lannett needed to make acquisitions, for which Lannett borrowed funds.  Consequently, Bedrosian's strategy resulted in Lannett taking on a large amount of debt, as demonstrated by the chart below. To both entice lenders to loan Lannett this amount of debt, which was unprecedented for it, and to avoid breaching the debt covenants in the associated financing agreements, Lannett needed to ensure that it had significantly higher sales, and revenue numbers. Lannett was able to raise both their total sales and revenues by entering into a cartel to control the prices of the Price Fixed Drugs.  The below chart shows how Lannett's "total long-term debt, less current portion, net" grew from between $839,000 to $6,125,000 from March 1, 2013 to September 1, 2015, and then increased to $1,014,877,000 by December 1, 2015.



**A. Lannett's Class Period Acquisition Binge**

34.     During the Class Period, Lannett spent over $1 billion in cash, stock, and warrants to engage in acquisitions of products, or other companies. Defendants spent more money on acquisitions during the Class Period than at any other point in the Company's 75 year history.

35.     Two of the three acquisitions were fueled by exchanging large amounts of Lannett common stock. One of the transactions required Lannett to enter into the largest credit facility in the Company's history. To effectuate these transactions the Defendants needed to keep the price of Lannett's stock high and ensure constant income from their product lines.

**1. Jerome Stevens Pharmaceuticals Transaction**

36.     The first key acquisition by Lannett during the Class Period was between Lannett and Jerome Stevens Pharmaceuticals ("JSP"). Prior to the Class Period, in 2004, Lannett and JSP originally entered into a contract where Lannett agreed to distribute three of JSP's products.

Those products were Butalbital, with Aspirin, Caffeine and Codeine Phosphate Capsules, Digoxin Tablets, and Levothyroxine Tablets. In exchange for the exclusive right to distribute these drugs, Lannett granted JSP 4,000,000 shares of Lannett common stock. This exclusive contract was due to expire in March 2014.

37.     On August 19, 2013, Defendants announced that they had extended Lannett's contract with JSP, which now provided that Lannett would be the exclusive distributor in the United States for Butalibital, with Aspirin, Caffeine, Codeine Phosphate Capsules, Digoxin Tablets and Levothyroxine Tablets until March 2024. In exchange for the contract extension Defendants gave JSP 1,500,000 shares of restricted common stock in Lannett.

38.     It was crucial that Lannett effectuate this extension to their distribution agreement with JSP. The three drugs that Lannett exclusively distributes for JSP accounted for a substantial amount of Lannett's gross profit. In 2013, just two of JSP's drugs accounted for 56% of Lannett's sales.

### 2.  The Silarx Acquisition

39.     On May 18, 2015, Lannett entered into a definitive agreement to acquire Silarx Pharmaceuticals ("Silarx") for $42 million in an all-cash deal. The acquisition closed on June 2, 2015.

40.     Silarx was a manufacturer and marketer of liquid generic pharmaceutical products.

### 3.  Kremers Urban Pharmaceutical Acquisition

41.     On November 27, 2015, Lannett completed its acquisition of Kremers Urban Pharmaceuticals ("Kremers") for $1.23 billion. Kremers was a specialty generic drug manufacturer and developed generic versions of pharmaceutical products. The deal required

Lannett to pay Kremer's parent, UCB, $1.03 billion in cash, and $200 million senior unsecured notes issued to UCB by Lannett. UCB also received warrants to purchase shares of Lannett common stock.

## II.    The Generic Drug Market

42.    Generic Drugs are exact copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.[3] Generic Drugs must contain the same active ingredient(s) in the same dosage form and in the same strength, and must be bioequivalent to the reference listed drug.

43.    Generic Drugs play a critical role in the nation's healthcare system and are intended to save consumers and the healthcare system billions of dollars annually. In order to promote the development of more Generic Drugs, Congress passed the Hatch-Waxman Act which eliminated the requirement that generic drug companies file a New Drug Application ("NDA") to achieve FDA approval. Instead, companies can file an ANDA and rely on the data provided by the original NDA holder.

44.    As a further incentive to spur generic companies to provide alternatives to branded drugs, the first generic drug manufacturer to file a substantially complete and certified ANDA is allowed to market its generic drug free from competing generic manufacturers for a set period of time. Typically, this first generic manufacturer will enter the market at a price lower than the branded drug manufacturer and capture a large market share.

45.    Generic drug manufacturers that are first in the market enjoy substantial profits as a result of the lack of generic competition and can usually price their drug up to 75% of the price

---

[3] Generic Drugs, FOOD AND DRUG ADMINISTRATION,
https://www.fda.gov/Drugs/resourcesforyou/consumers/buyingusingmedicinesafely/understandinggenericdrugs/default.htm (last visited May 2, 2017).

of the branded drug and still encourage customers to switch from the branded drug to the generic. However, once the exclusivity period ends and a second generic drug manufacturer enters the market, the generic price of the drug is typically dropped to nearly half of the brand name price. As more generic manufacturers begin selling the generic drug, the prices of the drug usually plummet to approximately 20% of the price of the branded drug or lower.

46. Over the past several years the price dynamic has changed for Generic Drugs. Prices of dozens of Generic Drugs have spiraled to new heights for no apparent reason. Generic drug manufactures, like Lannett, publicly argue that the price increases are a result of, *inter alia,* industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug lines. Regulators, though, have alleged that the true reason for these price increases is rampant collusion in the generic drug industry.

47. In *Connecticut v. Aurobindo Pharma USA, Inc.*, No: 3:16-cv-02056, Amended Complaint (Dkt No. 168), (D. Conn. Mar. 1, 2017), an action filed by the attorneys general of 40 states following a substantial investigation into generic drug price increases, it is alleged that generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors. The companies allegedly exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events to develop relationships and sow the seeds for their illegal agreements. *Id.* at ¶ 11. The anticompetitive agreements, according to the attorneys general complaint, are further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties and numerous and frequent telephone calls, emails and text messages. *Id.* at ¶¶ 11, 48-66.

48. The number of trade associations help to structure the generic drug market in a

way that has allowed Lannett to interact and communicate with other generic drug companies directly and in person on a frequent basis. The investigative subpoena issued to Lannett in connection with the generic drug investigation focuses on communications or correspondence with competitors regarding the sale of generic prescription medications.

49.     As these regular trade meetings were ongoing, the prices for over a thousand generic pharmaceutical drugs skyrocketed during the Class Period. One report noted, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014." During this time, Lannett met and interacted frequently with its competitors at trade shows and conferences hosted by the Generic Pharmaceutical Association, the National Association of Chain Drug Stores, Healthcare Distribution alliance, and Efficient Collaborative Retail Marketing. At these shows and conferences, representatives from generic drug manufacturers, including Lannett and its competitors, interacted with each other and discussed their respective businesses and customers, and were provided with ample opportunity to discuss, devise, and implement anticompetitive schemes.

### III.     Lannett Colluded with Competitors to Fix the Price of Generic Drugs

#### A.  Lannett Colluded to Fix the Price of Digoxin

50.     Digoxin is used to treat heart failure and chronic atrial fibrillation. The drug is used primarily by elderly patients for the treatment of rapid rhythm disturbance. The World Health Organization has classified Digoxin as an essential medicine. No effective substitute exists for many patients with heart disease, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume. Millions of people in the U.S. rely on the pill every day. During 2013, the overall market for Digoxin was $198 million. Sales by Impax

Pharmaceuticals ("Impax")[4] and Lannett represented a substantial portion of the generic market.

51.     Figure 1 breaks down the total market for Digoxin by percentage of total sales. Figure 1 clearly illustrates that the total sales of generic Digoxin were concentrated among Lannett, and Impax during the Class Period with Par Pharmaceutical ("Par") beginning to enter the market later in the Class Period. Figure 1.1 further breaks down the generic Digoxin market share for the years of 2013 and 2014.

**Figure 1[5]**



Digoxin Tablets: Total WAC Sales %

Source: Symphony Health Solutions

---

[4] Global Pharma and Impax Pharmaceuticals are the same company. Global Pharma was the publicly traded company that Impax merged with prior to the Class Period. *See* Investor FAQ, Impax Laboratories (http://investors.impaxlabs.com/Investor-Relations/Investor-FAQ/default.aspx). References to Impax refer to Global Pharma and references to Global Pharma refer to Impax.

[5] The Wholesale Acquisition Cost ("WAC") is the manufacturers reported list price of the drug when sold to the wholesaler. WAC does not represent actual transcation prices as it does not include prompt pay, rebates or other discounts in price, but it does form the baseline price at which wholesalers purchase drugs.

15

Figure 1.1



52.     From October 28, 2013, to October 30, 2013, Impax, Lannett and Par attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland. GPhA is a trade association for generic drug manufacturers and distributors.

53.     Immediately following the October 2013 GPhA conference, Lannett and Impax sent Digoxin prices skyrocketing over 700% in lock-step in November 2013. This increase marked the first significant price increase for this essential drug in more than four years. Figure 2 below illustrates this price hike.

**Figure 2**



Source: Symphony Health Solutions

54.     High market concentration enabled Impax and Lannett to immediately benefit from the price hikes as together they controlled approximately 96 percent of the market for Digoxin and therefore their purchasers had no alternatives. This collusion was so profitable that in 2014, market sales of Digoxin increased almost three-fold to $577 million from $198 million in 2013 as a result of this price fixing. Lannett, along with its co-conspirators, maintained this price increase through 2015 when the total sales of Digoxin was $505 million. The sales increase was solely attributable to the November 2013 price hike as the quantity of Digoxin Tablets sold remained relatively stable.

55.     The Digoxin price increase was the result of collusive price-fixing. This type of

massive price hike had never occurred before for this drug. Moreover, these abnormal price moves by Lannett and Impax were correlated with an unusual degree of uniformity, registering at 99% correlation.[6] At the time of the coordinated price hike, Digoxin had no supply or production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent. Thus, none of the typical reasons for a price increase existed at the time Lannett and Impax increased the price of Digoxin substantially. In fact, when Par became a new entrant to the Digoxin market less than six weeks after Lannett and Impax's coordinated price hike, Par set its Digoxin price at the same level fixed by the two seasoned companies despite Par's need to build market share from scratch, a highly unusual move for a new entrant into a market.

56. Even with an additional generic drug maker entering the market for Digoxin, Defendant Bedrosian was not worried. His reason for remaining calm was because the competitor was a member of the price-fixing agreement and, as Bedrosian recognized during Lannett's February 6, 2014 earnings call, Par was not going to upset the pricing:

> **February 6, 2014:**
>
> Oppenheimer & Co. Analyst [Rohit Vanjani]: Hi guys congrats on the quarter, again. On digoxin *you said that Par is a rational competitor.* Are you seeing anything on the pricing front from them, in terms of discounting?
>
> Lannett Co, Inc. [Bedrosian]: Well with discounting to our price, no. We've seen their prices discounted to the brand of course, but

---

[6] A correlation is a numerical representation of the degree of relationship between two variables. *See* (https://www.socialresearchmethods.net/kb/statcorr.php). In cartels, or collusive markets, there is often a higher correlation between competitors' prices than in competitive markets. *See Hide and seek: the effective use of cartel screens*, OXERA, http://www.oxera.com/getmedia/210bc5bc-0cc9-40ea-8bc9-6c8b2406b485/Cartel-screens.pdf.aspx?ext=.pdf (last visited May 17, 2017).

***we're not troubled by their pricing*** in the marketplace, not at all [emphasis added].

57.     Were Lannett and its co-conspirators not engaged in collusion they would have lowered their prices as the price increase is against their self-interest. Typically when a competitor has a massive price increase the rational response would be for the other competitors to keep prices lower than the competitor that raised prices and capture their market share.

58.     Generic Drugs, like Digoxin, are a commodity, with any generic drug substitutable for another, and differentiated competitively with each other primarily based on price. In a market without collusion, if Hypothetical Competitor A ("HCA") raised its prices significantly above those of Hypothetical Competitor B ("HCB") then HCA would lose market share. The market for generic Digoxin was mature; competitors could almost only gain market share by competing on price. Yet, Lannett and Impax increased the price of Digoxin substantially, never undercutting each other, and both maintained the majority of their market share as evident in Figure 1.

59.     The Digoxin market is highly vulnerable to anticompetitive conduct due to a combination of factors. Generally, factors that make a market vulnerable to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) a standardized product with a high degree of interchangeability between the goods of cartel participants; (5) absence of a competitive fringe of sellers; and (6) inter-competitor contacts and communications. All of these factors are present in the market for Digoxin, as they were in November 2013.

60.     Market Concentration. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Lannett's, and its competitors, dominance in the Digoxin market is illustrated by examining the Herfindahl-

Hirschman Index ("HHI") for Digoxin. HHI is a standard measure of the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry. A HHI score of 0 indicates perfect competition whereas a score of 10,000 indicates a monopoly. The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is in excess of 2,500 to be "highly concentrated." The HHI for Digoxin ranged from 3,975 to 7091 throughout the Class Period, which shows a highly concentrated market approaching monopoly levels.

61.     Barriers to Entry. Abnormally high prices in a market will normally attract additional competitors that want to take advantage of the high profitability. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, and regulatory and intellectual property barriers to entry.

62.     Demand Elasticity. The elasticity of demand is the relationship between a change in quantity demanded for a product or service and a change in price for the same product. More simply, it is a measure of the responsiveness of a change in price on the quantity demanded. Demand is considered inelastic if an increase in price yields only a small decrease in the quantity sold. Digoxin is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (or others) offers it. Thus, demand for Digoxin is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

63.     High Degree of Interchangeability. Digoxin is a commodity-like product. A commodity-like product is a product that is standardized across suppliers and allows for a high

degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Digoxin made by Lannett and its competitors was chemically identical.

64.    <u>Absence of Competitive Sellers</u>. Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy significantly more difficult. There is (and was) no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Digoxin market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

65.    <u>Contacts and Communication Opportunities</u>. Collusion requires a level of trust among the conspirators. Collaboration fostered through industry associations facilitates relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Lannett and its competitors are members of, or participants in, the GPhA which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry.[7] Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

**B.  Lannett Colluded to Fix the Price of Levothyroxine Sodium Tablets**

66.    Levothyroxine Sodium ("Levothyroxine") replaces a hormone (thyroxine) the

---

[7] *See* http://www.gphaonline.org/about/membership (last accessed May. 23, 2017).*See also* http://www.gphaonline.org/events/2013-cmc-workshop-past-attendees (last accessed May 23, 2017)

body would normally produce in the thyroid gland. Levothyroxine is the preferred treatment for hypothyroidism, which afflicts approximately 10 million Americans. Treatment consists of daily consumption of the oral tablet form of Levothyroxine. It is also used to treat goiters, nodular thyroid disease, thyroid cancer and myxedema coma.

67. Levothyroxine is on the World Health Organization's core list of essential medicines. These are medicines that are necessary to meet the minimum needs for a basic health-care system.

68. The market for Levothyroxine was highly concentrated among four manufacturers. Abbvie US LLC, which sold a branded version, controlled approximately 37-51% of the market during the Class Period. Mylan N.V. ("Mylan"), a generic manufacturer, controlled approximately 33% of the market for Levothyroxine. Lannett controlled approximately 16% of the market for Levothyroxine.[8] Figure 3 clearly illustrates the severely concentrated nature of this market.

**Figure 3**



Levothyroxine Sodium Tablets: Total Sales %

---

[8] Sandoz began to gain a more than minimal market share early in the Class Period.

Figure 3 also shows how the market share of the three generic drug producers equalized once they began fixing the price of Levothyroxine. From 2014 through the remainder of the Class Period, Lannett had between 14% and 17% of the market for Levothyroxine while Sandoz had between 13% and 15% and Mylan had approximately 32%.

69.     The highly concentrated nature of this market made it substantially easier for Defendants to manipulate the price of Levothyroxine. As Figure 4 demonstrates, the WAC of Levothyroxine significantly increased approximately 100% from about August 2013 to August 2014.

**Figure 4**



70.     Lannett's collusion regarding Levothyroxine is even more apparent when the price increases of each competitor is viewed together. Figure 5 breaks down the price increase by competitor and the lock-step manner in which they raised their prices. It also clearly shows that

Lannett's and the others' price hikes all happened shortly after GPhA meetings or conferences where they had the opportunity to collude with one another and develop a strategy for their price hikes.

**Figure 5**



Source: Symphony Health Solutions, Fideres' Calculations

71.     These substantial price increases could only be reasonably explained as the result of collusion. If the market for generic Levothyroxine was rational, then as the Defendants raised Lannett's price, competitors would have stepped in to offer Levothyroxine at a lower price and capture market share from its competitors.

72.     The Levothyroxine price increase was the result of collusive price-fixing. This type of massive price hike for Levothyroxine had never occurred before. Moreover, these abnormal price moves by Lannett, Mylan and Sandoz were correlated with an unusual degree of uniformity. Lannett's degree of uniformity **registered at 99.9% correlation**.

73.     At the time of the coordinated price hike, Levothyroxine had no supply or production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patents. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Levothyroxine substantially.

74.     Further there was also an incredibly low variance between the Levothyroxine prices for Lannett, and its competitors. The variance between firm prices tends to be lower among cartel members. At the beginning of the Class Period, Lannett's prices had an average variance of 1.33% (compared to Mylan and Sandoz).[9] By the end of the Class Period, Lannett's price variance compared to Mylan and Sandoz was **only 0.02%**. This is a decrease in variance of approximately **98.49%**.

75.     While there was a shortage reported for Levothyroxine during the Class Period that shortage was not reported by Lannett. Instead, the shortage was reported by Pfizer Inc. ("Pfizer"). Pfizer is not a major market player in the Levothyroxine market and all other

---

[9] One effective screening mechanism for price-fixing is testing whether pricing in a market is stable (*i.e.* whether there is a low and consistent price variance). *See* Haider & Hunter, *Screening and Testing for Collusive Conduct in the Absence of a Smoking Gun,* NERA Economic Consulting, http://www.nera.com/content/dam/nera/publications/2010/NL_AT_Insights_1010.pdf (last visited May 17, 2017). Collusion tends to diminish price movements because competing firms are coordinating their prices and less likely to react to changes in their costs of production to avoid upsetting their co-conspirators. *See Id.*

manufacturers did not report a shortage. Thus, this reported shortage by a minor Levothyroxine supplier should not have had a material effect on prices.

76. The Levothyroxine market is highly vulnerable to anticompetitive conduct due to a combination of factors that make a market vulnerable to collusion. As shown below, all of these factors are present in the market for Levothyroxine.

77. Market Concentration. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Lannett, and its competitors, dominance in the Levothyroxine market is illustrated by examining the HHI for Levothyroxine. The HHI for Levothyroxine ranged from 4,777 to 5,709 throughout the Class Period which shows a highly concentrated market.

78. Barriers to Entry. Abnormally high prices in a market will normally attract additional competitors that want to take advantage of the high profitability. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market, such as for Levothyroxine, there are significant capital requirements, high manufacturing costs, and regulatory, and intellectual property barriers to entry.

79. Demand Elasticity. Levothyroxine is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (or others) offers it. Thus, demand for Levothyroxine is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

80. High Degree of Interchangeability. Levothyroxine is a commodity-like product. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor

these prices effectively. The Levothyroxine made by Lannett and its competitors was chemically identical.

81.     Absence of Competitive Sellers. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Levothyroxine market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

82.     Contacts and Communication Opportunities. Lannett and its competitors for Levothyroxine are members of or participants in the GPhA, which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals and suppliers of other goods and services to the generic industry. Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

## C. Lannett Colluded to Fix the Price of Acetazolamide

83.     Acetazolamide is a medication used to treat glaucoma, epilepsy, altitude sickness, paralysis and heart failure. The World Health Organization has classified Acetazolamide as an essential medicine.

84.     The market for the Acetazolamide is divided into a market for Tablets and a market for sustained release Capsules.[10] The market for Acetazolamide Tablets was worth approximately $276.9 million during the Class Period where the market for the sustained release Capsules was worth approximately $201.6 million.

85.     The market for generic Acetazolamide is highly concentrated. For the majority of

---

[10] Throughout this complaint, unless otherwise noted, Acetazolamide only refers to the tablet form of Acetazolamide.

the Class Period the only two producers of Acetazolamide were Lannett and Taro Pharmaceuticals ("Taro"). Figure 6 below illustrates the highly concentrated nature of this market as close to 100% of the total sales were distributed between Lannett and Taro.

**Figure 6**



*Source: Symphony Health Solutions, Fideres Calculations*

Prior to the Class Period, Lannett had roughly 20% of the market share for Acetazolamide. However, as evidenced by the above Figure 6, from January 2009 through July 2011 Lannett's market share significantly increased, almost doubling within two years. Figure 7 shows the reason for this rapid increase in market share. Lannett **had dropped its price to grab market share** away from Taro. In fact, Lannett's prices moved in the complete opposite direction of Taro's price prior to the Class Period with a –99% correlation.[11] Once the Class Period started

---

[11] The main result of a correlation is called a correlation coefficient and it ranges from -100% to 100% (some studies use -1.0 to +1.0). If the correlation coefficient is closer to 0 there is no relationship between the variables. If the correlation coefficient is positive then, for example, as one variable gets larger the other gets larger. If, however, the correlation coefficient is negative then, for example, as one variable gets larger the other gets smaller.

Lannett's and Taro's prices for Acetazolamide had a 98% correlation.

**Figure 7**



86.     The high market concentration of Acetazolamide enabled Lannett and Taro to immediately benefit from their lock-step price increases. As evidenced by Figure 8, the price of Acetazolamide jumps nearly 500% at the start of the Class Period and immediately following the October 2013 GPhA meeting.

**Figure 8**



Acetazolamide Tablets: Average Price

*Source: Symphony Health Solutions, Fideres Calculations*

87.     The Acetazolamide price increases could only reasonably be explained as the result of collusive behavior. If this market behaved rationally, or the competitors behaved rationally, once Lannett raise its prices, Taro would have undercut Lannett and attempted to capture Lannett's market share. This did not happen. Instead, Taro and Lannett colluded to raise their prices simultaneously so that their customers did not have any other options.

88.     The Acetazolamide price increases were the result of collusive price-fixing. This type of massive price hike had never occurred before. In fact these abnormal price moves by Lannett and Taro were correlated with an unusual degree of uniformity, registering at 98% correlation. At the time of the coordinated price hike, Acetazolamide had no supply or

production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Acetazolamide substantially.

89.     The Acetazolamide market is highly vulnerable to anticompetitive conduct due to a combination of factors that make a market vulnerable to collusion.  As shown below, all of these factors are present in the market for Acetazolamide.

90.     <u>Market Concentration</u>. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Lannett, and its competitors, dominance in the Acetazolamide market is illustrated by examining the HHI for Acetazolamide. The HHI for Acetazolamide ranged from 7,014 to 7,019 during the Class Period which shows a highly concentrated market.

91.     <u>Barriers to Entry</u>. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, regulatory, and intellectual property barriers to entry.

92.     <u>Demand Elasticity</u>. Acetazolamide is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett or others offers it. Thus, demand for Acetazolamide is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

93.     <u>High Degree of Interchangeability</u>. Acetazolamide is a commodity-like product.

When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Acetazolamide made by Lannett and its competitors was chemically identical.

94.    <u>Absence of Competitive Sellers</u>. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Acetazolamide market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

95.    <u>Contacts and Communication Opportunities</u>. Lannett and its competitors are members of or participants in the GPhA, which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry. Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

### D.  Lannett Colluded to fix the Price of Ursodiol

96.    Generic Ursodiol, or Ursodeoxycholic Acid, in capsule form ("Ursodiol")[12] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution. Urosdiol is a widely prescribed drug in the United States, particularly for older Americans.  Ursodiol has been available on the generic market since 2000. Annual sales of Ursodiol in capsule form for 2015 were $433 million.

97.    The market for Ursodiol is divided between capsule and tablet forms. The

---

[12] Ursodiol only refers to the Ursodiol Capsule market. If references are made to the Ursodiol Tablet market that will be specifically noted.

Ursodiol Capsule market is dominated by Lannett, Actavis Generics ("Actavis") and Epic Pharma ("Epic"). The tablet though is manufactured by a different group of companies. The total market for Ursodeoxycholic Acid is divided between tablets and capsules.

98.     Lannett, with Actavis and Epic, dominated the Urosdiol market. Lannett's Ursodiol sales in 2014 were $86.8 million, Actavis's sales of Ursodiol exceeded $155.2 million, and Epic's Ursodiol sales exceeded $60.7 million. As Figure 9 shows, these three companies controlled substantially all of the Ursodiol Capsule market.

**Figure 9**



99.    Prior to the Class Period, the price of Ursodiol had remained somewhat stable at approximately $2 per capsule. Following two generic pharmaceutical manufacturers meetings attended by Actavis, Lannett and Epic, in February and June of 2014, the price of Ursodiol shot up over 200% from $2 a unit to $5-$6 per unit. Figure 10 displays the Wholesale Acquisition Cost, which Lannett raised over 200% from the end of April to the end of June 2014.

**Figure 10**



100.    In sharp contrast to the pricing of Ursodiol the Ursodiol Tablets prices remained largely unchanged throughout the Class Period. The key difference between Ursodiol and the Ursodiol Tablets is the manufacturers. This phenomenon is illustrated in Figure 11.

**Figure 11**



Ursodiol Price per Unit

101.    These dramatic and uniform price hikes in Ursodiol have no reasonable explanation absent collusion. There were no supply shortages of urdeoxycholic acid prior to, after or during mid-2014. The FDA reported no ursodeoxycholic acid shortages, there were no new patents or formulations, no labelling changes, and once in production, ursodeoxycholic acid is not difficult to make. Lannett never provided a meaningful explanation for the coordinated price rise. There were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Ursodiol substantially.

102.    The Ursodiol market is highly vulnerable to anticompetitive conduct due to a combination of factors that are present in the market for Ursodiol.

103.    Market Concentration. Lannett's and its competitors' dominance in the Ursodiol market is illustrated by comparing the HHI for Ursodiol. The HHI for Ursodiol ranged from 5,077 to 7,507 during the Class Period which shows a highly concentrated market.

104.    Barriers to Entry. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, regulatory, and intellectual property barriers to entry.

105.    Demand Elasticity. Ursodiol is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (and others) offers it. Thus, demand for Ursodiol is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

106.    High Degree of Interchangeability. Ursodiol is a commodity-like product. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Ursodiol made by Lannett and its competitors was chemically identical.

107.    Absence of Competitive Sellers. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Ursodiol market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

108.    Contacts and Communication Opportunities. Lannett and its competitors are members of or participants in the GPhA. Therefore, representatives from Lannett had the

opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

**IV.    Lannett and its Co-Conspirators are Under Multiple Governmental Investigations for Anticompetitive Price-Fixing**

109.   Lannett and its co-conspirators were among the first generic drug manufacturers to be investigated by the Connecticut Attorney General, Congressional Committees and the DOJ.

110.   On July 16, 2014, Lannett disclosed that it had received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into the pricing of Digoxin.

111.   On October 2, 2014 Senator Bernard Sanders and Representative Elijah E. Cummings sent Defendant Bedrosian a letter regarding their investigation into "the recent staggering price increases for Generic Drugs used to treat everything from common medical conditions to life-threatening illnesses." In connection with this investigation Senator Sanders and Representative Cummings requested:

> Documents and information for the time period covering January 1, 2012, to the present regarding:
>
> (1) total gross revenues from the company's sales of these drugs;
>
> (2) the dates, quantities, purchasers, and prices paid for all sales of these drugs;
>
> (3) total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;
>
> (4) sales contracts or purchase agreements for active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity, if applicable;
>
> (5) a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of these drugs;

(6) any cost estimates, profit projects, or other analyses relating to the company's current and futures sales of these drugs;

(7) prices of these drugs in all foreign countries or markets, including price information or the countries paying the highest and lowest prices; and

(8) the identity of company official(s) responsible for setting the prices of these drugs over the above time period.

112.    On November 6, 2014, Lannett disclosed, in a Form 10-Q filed with the SEC, that the "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."

113.    On November 7, 2014, one of Lannett's competitors in the Digoxin market, Impax, announced that one of its sales representatives had received a grand jury subpoena from the DOJ's Antitrust Division concerning the sale of Generic Drugs.

114.    On December 5, 2014, the DOJ's Antitrust Division issued a grand jury subpoena to Par and requested documents relating to Digoxin

115.    On November 3, 2016, media outlets reported that DOJ prosecutors might file criminal charges by the end of 2016 against Lannett and several other generic pharmaceutical companies for unlawfully colluding to fix generic drug prices. *Bloomberg* specifically named Lannett as one of the manufacturers implicated through Digoxin. In the article titled "U.S. Charges in Generic-Drug Probe to be Filed by Year-End," *Bloomberg* reported, in relevant part (emphasis added):

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

38

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceuticals Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, **Lannett Co.**, Impax Laboratories, Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

116. On this news, Lannett's share price fell $6.25 per share, or approximately 27% from its previous closing price to close at $17.25 per share on November 3, 2016.

117. On December 14, 2016, the State of Connecticut and nineteen other states filed an original complaint ("AG Complaint") – subsequently amended on March 1, 2017 to include 20 additional states – against six generic drug manufacturers for illegal schemes involving market share allocation and anticompetitive price inflation. At the same time, the DOJ unsealed criminal charges against the CEO and President of Heritage Pharmaceuticals, Inc. ("Heritage"). On January 9, 2017, and January 10, 2017, respectively, Heritage's CEO Jeffrey Glazer, and its Vice President of Commercial Operations, Jason Malek, pleaded guilty to price-fixing charges.

118. Governmental investigations are ongoing. According to the AG Complaint, "[i]n July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. The information developed through that investigation, which is ongoing, uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic

pharmaceuticals in the United States." The AG Complaint filed was only an "initial civil action" to be followed by additional filings as the states "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors [that] will be acted upon at the appropriate time."

119.    In an interview with a reporter for the *New York Times* published on December 15, 2016, Connecticut's Attorney General George Jepsen stated that there were more lawsuits to come:

> "We believe that this is just the tip of the iceberg . . . . I stress that our investigation is continuing and it goes way beyond the two drugs in this lawsuit, ***and it involves many more companies*** than are in this lawsuit."

> (emphasis added)

120.    The DOJ has also stated that its investigations are ongoing. In a motion to stay discovery in a civil antitrust case concerning the drug propranolol, filed on February 24, 2017, the DOJ emphasized the broad-ranging nature of its ongoing investigation, the "numerous corporations and individuals" implicated, and the "plethora of evidence" amassed against these corporations and individuals:

> The Complaints refer to the United States' criminal investigation into the generic pharmaceutical industry as part of the factual basis for their antitrust claims...

> The United States unsealed the first criminal information in that investigation on December 14, 2016... the two executives – Jeffrey Glazer and Jason Malek – pled guilty to these charges on January 9, 2017, and both are cooperating with the United States' ongoing criminal investigation.

> Although, to date, the United States has filed charges against only Glazer and Malek, as described in this Memorandum and detailed more fully in the Grundvig declaration, the criminal investigation into the generic pharmaceutical industry is ongoing and broad-ranging, and it has already implicated numerous corporations and

individuals. Additional corporations and individuals may be implicated as the investigation continues to develop

\* \* \*

Thus, absent a stay, discovery in these cases should sweep up evidence related to other drugs that the United States is currently investigating.

\* \* \*

Broad civil discovery in these cases would threaten the United States' ongoing investigation because subjects of the investigation will gain access to a plethora of evidence that they could not otherwise obtain.

\* \* \*

[T]he United States is conducting sensitive negotiations with potential criminal defendants and has a considerable interest in limiting sworn testimony given by its cooperators. (*See* Grundvig Decl., ¶ 13.)[13]

121.    The DOJ has intervened in numerous other civil actions involving different drugs and generic manufacturers. In particular, on January 5, 2017, the Antitrust Division's Washington Criminal I Section submitted an Uncontested Motion of the United States to Intervene in the *In re Generic Digoxin and Doxycycline Antitrust Litigation*, in which Lannett, Jeffrey Glazer, Jason Malek, Heritage, Impax, Par, West-Ward, Sun Pharmaceutical Industries Ltd. ("Sun"), Actavis, Mayne Pharma Group Ltd., and Mylan are named as defendants. In its motion, the DOJ asserted that "this litigation shares common questions of law and fact with an ongoing federal criminal investigation. Continued litigation of this consolidated action is likely to result in the disclosure of information that will harm the ongoing criminal antitrust investigation." On January 6, 2017, United States District Judge Cynthia Rufe granted the DOJ's uncontested motion to intervene.

122.    On May 3, 2017, Perrigo Company plc ("Perrigo") disclosed that federal

---

[13] Memorandum of Law in Support of the United States' Motion for Reconsideration of Its Motion for a Limited Stay of Certain Discovery, *Castillo v. Actavis Elizabeth, LLC, et al.*, No. 1:16-cv-009901 (S.D.N.Y. Feb. 24, 2017), Dkt No. 62. The Grundvig Declaration, which was filed with the Memorandum of Law, was filed under seal.

authorities had raided their office as part of a probe into potential price-fixing. Perrigo was not previously named in either the Connecticut Attorney General original or amended complaint nor had any Perrigo executives entered into plea agreements with the DOJ.

**A. Lannett's Survival as a Company Depended on these Unsustainable Drug Prices**

123.    In connection with its acquisition of Kremers, Lannett acquired a substantial amount of debt. In fact, Lannett acquired more debt in connection with its purchase of Kremers than at any other time during the Class Period. *See* ¶ 30 *Infra*.

124.    Lannett's Amended Senior Secured credit facility contains a financial performance covenant that is triggered when the aggregate principal amount of the outstanding Revolving Credit Facility and outstanding letters of credit as of the last day of the most recent fiscal quarter is greater than 30% of the aggregate commitments under the Revolving Credit Facility.

125.    On January 18, 2017, an article on Lannett appeared on *SeekingAlpha*[14] which stated, among other things, that if even modest price cuts were imposed on Lannett's main drugs, the Company would violate those debt covenants. The article stated that Lannett was heavily leveraged and extremely dependent on the windfall profits from a small group of drugs to generate enough revenue to service its debt. Indeed, the article stated that the debt load was based on an assumption of unrestrained drug price increases. The article further stated that new court filings conclusively showed Lannett "conspired to fix drug pricing."

126.    The extent of Lannett's reliance on a small group of drugs is more clearly demonstrated in Figures 12-15. These figures display the product mix as a percentage of Lannett's total sales as listed in various Lanett Form 10-Ks as filed with the SEC. These charts

---

[14] SeekingAlpha is a crowd-sourced content service for financial markets. Article and research covers a broad range of stocks, asset classes, ETFS and investment strategies.

clearly show that the Price Fixed Drugs make up a substantial portion of Lannett's total product

mix from 2013 to 2016.

**Figure 12**



## Figure 13



**LANNETT'S PRODUCT MIX 2014**

## Figure 14



**LANNETT'S PRODUCT MIX 2015**

**Figure 15**



Lannett provided a chart in its Form 10-K which showed the medical indication of the drugs and the name of Lannett's affiliated product.[15] This chart has been reproduced from Lannett's 2016 Form 10-K as Figure 16 below.

---

[15] The chart also includes the equivalent brand name of the drug but that row has been intentionally left out.

**Figure 16**

| | Name of Product(1) | Medical Indication |
|---|---|---|
| 1 | Acetazolamide Tablets | Glaucoma |
| 2 | Butalbital, Acetaminophen and Caffeine Tablets | Migraine |
| 3 | Butalbital, Aspirin and Caffeine Capsules | Migraine |
| 4 | C-Topical ® Solution | Anesthetic |
| 5 | Digoxin Tablets* | Congestive Heart Failure |
| 6 | Glycolax Rx | Gastrointestinal |
| 7 | Isosorbide Mononitrate CR | Cardiovascular |
| 8 | Levothyroxine Sodium Tablets* | Thyroid Deficiency |
| 9 | Methylphenidate HCL CD | Central Nervous System |
| 10 | Methylphenidate ER | Central Nervous System |
| 11 | Nifedipine CR | Cardiovascular |
| 12 | Omeprazole DR | Gastrointestinal |
| 13 | Oxbutynin ER | Urinary |
| 14 | Pantoprazole DR | Gastrointestinal |
| 15 | Pilocarpine HCl Tablets | Dryness of the Mouth |
| 16 | Triamterene w/Hydrochlorothiazide Capsules | Hypertension |
| 17 | Ursodiol Capsules | Gallstone |

127.    As Figures 12-15 illustrate, Lannett was highly dependent on a very small group of drugs to generate a disproportionate amount of its annual sales. In fact, the Price Fixed Drugs made up approximately **56% to 72% of Lannett's total annual sales from 2013 to 2016**. Thus a substantial amount of Lannett's sales were dependent on maintaining high prices among the Price Fixed Drugs.

128.    Lannett's reliance on the Price Fixed Drugs to generate a substantial amount of its profit was noted by *Forbes*. On October 6, 2016, *Forbes* published an article titled "Another Drug Company That Raises Prices Like Crazy." In that article, Lannett's pricing strategy was noted:

> Lannett's aggressive pricing strategy first centered largely around three popular drugs covered by Medicare—digoxin, ursodiol, and levothyroxine. At one of four offered dosage*s, the average manufacturer price for Lannett's digoxin, a lifesaving treatment used for congestive heart failure, rose by 857%* to 50 cents per pill from April 2013 to April 2015, according to Lannett's AMP pricing list. By September 2014, Lannett had received a subpoena from Connecticut's attorney general about the company's pricing practices for digoxin. The company maintains that it acted in compliance with all applicable laws and is cooperating with the investigation. ***Starting around April 2013, Lannett increased the***

46

*price of levothyroxine, a widely used thyroid medicine, by 158%* in two years to 14 cents per pill. Between December 2013 and October 2014*, Lannett boosted the price of a generic drug for gallstones, ursodiol, by 700% to $286 per prescription,* IMS Health data shows. Ursodiol recently cost $2.29 per pill.

Product price increases contributed $157.3 million of revenue in Lannett's fiscal 2015, an SEC filing says*. Levothyroxine and ursodiol accounted for half of Lannett's revenue in its fiscal 2015, according to research from Deutsche Bank.*

(emphasis added)

129.    The Levothyroxine price increase alone added approximately $78 million to Lannett's revenue and its Earnings Before Interest, Tax, Depreciation and Amoritization ("EBITDA") during the Class Period.

130.    Thus, Lannett's need to service its huge debt created a motive to enter into collusive drug pricing arrangements in violation of United States antitrust laws to generate the revenue to service its debt.

### B.  The Individual Defendants Controlled the Price Hikes

131.    Many of the generic pharmaceutical industry price-fixing schemes were "conceived and directed by executives at the highest level," as stated in the AG Complaint. The Company's senior executives admitted that exploitation of pricing was a Company focus and core strategy for Lannett.

132.    Defendant Bedrosian admitted at the Morgan Stanley Healthcare Conference on September 8, 2014 that "I will sit here in front of all you and *tell you that two people in Lannett made the decision on the price increase of digoxin*. My sales Vice President Kevin Smith was the one who came to me when Kogas bought the brand. He suggested we raise the price on the generic. [...] *I said there's a good likelihood that they will not try to grab market share, but follow us and raise the price. So we raised our price[.]*"

133. The above statement clearly shows that the only two people at Lannett who controlled pricing were CEO Bedrosian and his Vice President of Sales Kevin Smith. Thus, Bedrosian oversaw and authorized each and every price increase as he participated in the generic drug cartel.

134. In addition, the former Director of National Accounts for Lannett from October 2014 to December 2015 ("CW1"), who reported directly to Kevin Smith ("Smith"), stated that drug prices, including price increases, were determined by Smith and Bedrosian. CW1 further stated Smith reported directly to Bedrosian and that "***nothing is done without [Bedrosian's] knowledge***. It's not ask for forgiveness rather than approval. You need approval to do anything." (Emphasis added).

135. CW1 also stated that Kevin Smith, who set the prices for Lannett's drugs along with Bedrosian, frequently attended healthcare conferences and other industry events, which were also attended by executives from other generic drug companies, such as Par, Impax, Mylan, Sun, and West-Ward.

136. Bedrosian and other generic drug company CEOs would signal price increases to each other. These actions ensured that each member of the cartel could raise their prices accordingly and the cartel could command a substantial premium for their drugs.

137. In Lannett's September 10, 2013 earnings call, Bedrosian was asked for his reaction to Mylan increasing the price of Levothyroxine significantly. Bedrosian replied, "***You mean after I sent them the thank you note***?" He continued: "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices... So I'm grateful to see price increases." During the same call, Bedrosian also provided his view on whether there would be

new competitors in the generic Levothyroxine market. Bedrosian stated that there were two possible competitors but "hopefully, both companies turn out to be responsible companies and don't go into the marketplace. We're seeing more responsibility on the part of all of our competitors, I believe, because all of us are facing the same costs... So I would expect that all the companies are not going to behave like they have in the past. ***And I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that.***" (Emphasis added).

138.    Defendant Bedrosian used the same September 10, 2013, conference call to provide signals to competitors to raise their prices and to guarantee that Lannett would act "responsibly" and do the same. Bedrosian stated: "I am finding a climate out there has changed dramatically and ***I see more price increases coming from our competing competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit. If they don't that's their issue. But our plan is to raise prices on any product that we think we can or haven't raised a price.***" (Emphasis added).

139.    On November 3, 2014, Bedrosian, during an earnings conference call, described Mylan as "***one of those rational competitors so we're not really expecting anything crazy from them***." The price increases were compared to a "***rocket ship [that] is leveling off now that its broken through the atmosphere***." Mylan was described as "not [an] irrational player[], I don't see them just going out and trying to grab market share." (Emphasis added).

## LANNETT'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### a.  Third Quarter 2013 Form 10-Q

140.    The Class Period begins on May 9, 2013. On this date the Company filed with the

SEC a Form 10-Q for the quarter ending March 31, 2013 signed by the Individual Defendants.

The Company reported a gross profit of $15.1 million, earnings per common share of $0.14, on

$39.022 million of revenue compared to net income of $3.963 million.

141.    In the May 2013 10-Q Lannett stated, in part:

> While the Company is continuously striving to keep product costs
> low, there can be no guarantee that profit margins will stay
> consistent in future periods.  Pricing pressure from competitors and
> costs of producing or purchasing new drugs may also fluctuate in
> future periods.  Changes in the future sales product mix may also
> occur.
>
> *        *        *
>
> Sales of drugs in the antibiotic medical indication increased by
> $1,834,000 primarily as a result of both volume and price increases
> on selected key products within the medical indication.  Sales of
> drugs used for the treatment of thyroid deficiency increased by
> $1,481,000 primarily as a result of increased volumes.  Sales of
> drugs used for cardiovascular treatment increased by $938,000,
> driven by increased volumes partially offset by price decreases
> related to additional rebates on certain products within the medical
> indication.
>
> *        *        *
>
> Gross profit margins for the third quarter of Fiscal 2013 and Fiscal
> 2012 were 39% and 35%, respectively.  Gross profit percentage
> increased primarily due to a change in the mix of products sold as
> discussed above.  While the Company is continuously striving to
> keep product costs low, there can be no guarantee that profit
> margins will stay consistent in future periods.  Pricing pressure
> from competitors and costs of producing or purchasing new drugs
> may also fluctuate in future periods.  Changes in the future sales
> product mix may also occur.

142.    By virtue of the facts alleged in ¶¶ 29-139 the statements referenced above were

materially false and misleading.  Considered as a whole, Defendants' representations misled

investors by presenting a materially false and misleading picture of Lannett's business,

financials, operations and compliance policies by, among other things, failing to disclose and

actively concealing that Lannett had colluded with its competitors to fix the price of the Price

Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal, anti-competitive conduct;

b.      The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

c.      Lannett's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities along with the attendant negative financial and reputation harm; and

d.      Lannett's revenues and income as stated above were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs.

### B.  Fiscal Year 2013 Form 10-K

143.    On September 12, 2013, Lannett filed its Form 10-K with the SEC for the year ended June 20, 2013 ("2013 10-K"), which was signed by the Individual Defendants. In the 2013 10-K the Defendants stated in part:

**Key Products**

Levothyroxine Sodium tablets are produced and marketed with 12 varying potencies.  In addition to generic Levothyroxine Sodium tablets, we also market and distribute Unithroid® tablets, a brand version of Levothyroxine Sodium tablets, which is produced and marketed with 11 varying potencies.  Both generic Levothyroxine

Sodium and Unithroid® tablets are manufactured by JSP. Levothyoxine Sodium tablets remain one of the most prescribed drugs in the U.S. and are used by patients of various ages and demographic backgrounds for the treatment of thyroid deficiency. Net sales of Levothyroxine Sodium and Unithroid® tablets totaled $58.0 million in 2013. In our distribution of these products, we compete with two brand Levothroxine Sodium products—Abbott Laboratories' Synthroid® and Monarch Pharmaceutical's Levoxyl®— as well as generic products from Mylan and Sandoz.

Digoxin tablets are produced and marketed with two different potencies. This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement. Digoxin tablets are used to treat congestive heart failure in patients of various ages and demographics. Net sales of this product totaled $11.7 million in 2013. In our distribution of these products, we compete with two similar generic products from Impax and West-Ward and the brand Lanoxin from Covis.

*     *     *

Competition from new and other market participants for the manufacture and distribution of certain products would likely affect our market share with respect to such products as well as force us to reduce our selling price for such products due to their increased availability. As a result, we believe that our success depends on our ability to properly assess the competitive market of new products, including market share, the number of competitors and the generic unit price erosion. We intend to reduce our exposure to competitive influences that may negatively affect our sales and profits, including the potential saturation of the market for certain products, by continuing to emphasize maintenance of a strong research and development ("R&D") pipeline.

*     *     *

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. ***Competition is based primarily on price***. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have

improved our competitive cost position over the past five years.

\*       \*       \*

**The generic pharmaceutical industry is highly competitive.**

We *face strong competition* in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

\*       \*       \*

**Our gross profit may fluctuate from period to period depending upon our product sales mix, our product pricing and our costs to manufacture or purchase products.**

Our future results of operations, financial condition and cash flows depend to a significant extent upon our product sales mix.  Our sales of certain products that we manufacture tend to create higher gross margins than do the products we purchase and resell.  As a result, our sales mix will significantly impact our gross profit from period to period.

Factors that may cause our sales mix to vary include:

· the amount of new product introductions;

· marketing exclusivity, if any, which may be obtained on certain new products;

· the level of competition in the marketplace for certain products;

· the availability of raw materials and finished products from our suppliers; and

· the scope and outcome of governmental regulatory action that may involve us.

The profitability of our product sales is also dependent upon the prices we are able to charge for our products, the costs to purchase products from third parties, and our ability to manufacture our products in a cost effective manner.

\*    \*    \*

**Financial Summary**

For the fiscal year ended June 30, 2013, net sales increased to $151.1 million from $123.0 million for the fiscal year ended June 30, 2012.  Gross profit rose to $57.4 million from $38.9 million. As a percentage of net sales, gross margin was 38% compared with 32% for the prior year.   R&D expenses were $16.3 million compared with $11.8 million for fiscal 2012.   SG&A expenses were $22.4 million compared with $20.2 million for the prior year. Operating income was $18.8 million compared to $6.9 million for fiscal 2012.  Net income attributable to Lannett Company, Inc. was $13.3 million, or $0.46 per diluted share, compared to $3.9 million, or $0.14 per diluted share for the prior year.   A more detailed discussion of the Company's financial results can be found below.

\*    \*    \*

**Results of Operations — Fiscal 2013 compared to Fiscal 2012**

Net sales increased 23% from $123.0 million in Fiscal 2012 to $151.1 million in Fiscal 2013.

\*    \*    \*

Sales of drugs for cardiovascular treatment increased by $7.7 million primarily due to increased volumes related to a product used for the treatment of hypertension which commenced shipping at the end of December 2011.  Sales of drugs used for the treatment of thyroid deficiency increased by $7.1 million, primarily as a result of both volume and price increases on key products within this medical indication.   Increased sales of drugs used for gout treatment, resulting from additional volume, also contributed an additional $4.6 million to the overall increase in sales.  Sales of drugs in the antibiotic medical indication increased by $2.4 million primarily as a result of increased volumes on selected key products

within the medical indication. Sales of drugs used for the treatment of glaucoma increased by $2.2 million mainly due to price increases on key products within the medical indication.

\* \* \*

The sales to wholesaler/distributor increased primarily as a result of increased net sales in a variety of products including the gout and thyroid deficiency medical indications as discussed above. Retail chain sales increased primarily as a result of increased sales for the treatment of thyroid deficiency medical indication as discussed above. Mail-order pharmacy sales increased primarily as a result of increased sales of products in the cardiovascular and thyroid deficiency medical indications.

\* \* \*

**Disclosure Controls and Procedures**

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2013. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported as specified in Securities and Exchange Commission rules and forms. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

(emphasis added)

144. The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting.

145. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for some or all of the Price Fixed Drugs was the product of illegal price fixing;

b. The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for Price Fixed Drugs was collusive and lacked true competition;

c. The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

d. The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

e. The statement referred to above about Lannett competing with Impax was materially false and misleading because the defendants were colluding with Impax to fix the price of generic Digoxin;

f. The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

g. The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

h. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

i. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

j. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**C. November 4, 2013, Form 8-K**

146. On November 4, 2013, the Company filed a Form 8-K with the SEC preliminarily announcing its financial results for the first quarter of 2014 ("1Q2014 8-K"). In that filing the Company stated:

> For the prior year first quarter, net sales were $35.3 million and diluted earnings per share attributable to Lannett Company were $0.10, which included a favorable pre-tax litigation settlement of $1.3 million, equal to $0.02 per diluted share. Excluding the JSP

contract renewal charge, the company said the improved performance was driven by strong sales of existing and new products, price increases and favorable product mix.

147. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance being driven by strong sales of existing and new products was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b. The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs; and

c. The statements referred to above regarding the Company's improved performance being driven by a favorable product mix were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs.

### d. November 7, 2013, Form 8-K

148. On November 7, 2013, the Company filed a Form 8-K announcing "Lannett Reports record Net Sales for Fiscal 2014 Quarter." This filing contained more detailed financial

information about the Company than the previous 1Q2014 8-K and guidance for the remainder of the 2014 fiscal year. In this filing the Company stated:

> "We continued our positive momentum in the fiscal 2014 first quarter with record net sales," said Arthur Bedrosian, president and chief executive officer of Lannett. "In addition, excluding the impact of the non-recurring JSP contract renewal charge, our gross profit and bottom-line were the highest in the company's history. Our excellent financial performance was driven by strong sales of existing products, price increases and favorable product mix."
>
> Bedrosian added, "The recently completed contract extension with Jerome Stevens will allow us to continue to market several important medications that have been key drivers of our positive financial performance. Moreover, last month we successfully closed on a stock offering in which we received net proceeds of approximately $71.5 million. We intend to use the net proceeds from this offering for potential acquisitions, strategic partnerships and general corporate purposes."

149. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance being driven by strong sales of existing products was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b. The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it failed

to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs; and

c.     The statements referred to above regarding the Company's improved performance being driven by a favorable product mix were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs.

### d.  First Quarter 2014 Form 10-Q

150.   On November 8, 2013, the Company filed a Form 10-Q with the SEC for the first quarter of 2014 ("1Q2014 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the first quarter of Fiscal 2014, net sales increased to $45.8 million representing 30% growth over the prior year period. Gross profit declined to $1.3 million compared to the prior year period as a result of the nonrecurring $20.1 million charge related to the JSP contract renewal. The JSP contract renewal charge caused a 44% point reduction in gross profit percentage, which declined to 3% in the first quarter of Fiscal 2014 from 39% in the first quarter of Fiscal 2013. R&D expenses increased 26% to $4.7 million compared to the first quarter of Fiscal 2013 while SG&A expenses increased 16% to $7.2 million from $6.2 million. Operating loss for the first quarter of Fiscal 2014 was $10.6 million compared to operating income of $3.7 million in the first quarter of Fiscal 2013. The operating loss in the first quarter of Fiscal 2014 included the nonrecurring charge related to the JSP contract renewal. Net loss for the first quarter of Fiscal 2014 was $6.0 million, or $0.20 per diluted share, and included the $20.1 million pre-tax charge ($0.42 per diluted share) related to the JSP contract renewal. Comparatively, net income in the prior year was $2.9 million, or $0.10 per diluted share.

> *      *      *

> Sales of drugs used for the treatment of thyroid deficiency increased by $6.4 million, primarily as a result of both price and volume increases on products within the medical indication. Additional volumes of drugs used for gout treatment also

contributed an additional $1.9 million to the overall increase in sales. Sales of drugs in the antibiotic medical indication increased by $1.7 million primarily as a result of both increased price and volumes on selected products.

*     *     *

The sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for gout and thyroid deficiency as discussed above. Retail chain sales increased primarily as a result of increased sales of drugs for the treatment of thyroid deficiency as discussed above. Mail-order pharmacy sales declined primarily as a result of price pressures on products in the cardiovascular medical indication, partially offset by increased sales in the thyroid deficiency medical indication.

*     *     *

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

151.    The 1Q2014 10-Q contained signed certifications pursuant to SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2014 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

152.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.     The statements referred to above about the Company's improved performance, specifically with regards to a 30% growth in net sales, were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.     The statements referred to above regarding the increase of $6.4 million in the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increases in both price and volume on products within the medical indication. In reality the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

c.     The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increased sales in a variety of products was materially false and misleading because they do not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

d.     Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

e.    Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**E.  November 7, 2013 Conference Call**

153.    In an earnings call on November 7, 2013, Defendants Bedrosian and Galvan made the following statements:

> Lannett [Bedrosian]: The primary drivers for our outstanding first quarter performance were the combination of strong sales of existing products, a favorable product mix, and price increases on key products.
>
> *        *        *
>
> Lannett [Galvan]: As Arthur noted, we have raised our guidance for the year due to anticipated strong sales of our existing product portfolio, and improved gross profit resulting from favorable sales mix, and price increases.
>
> *        *        *
>
> BoA Merrill Lynch [Kulkarni]: And one more before I hop back into the queue. On your gross margins, how sustainable are they beyond the fiscal year?
>
> [Bedrosian]: It's hard to say but I would believe they are sustainable as we're not expecting any changes that we anticipate this point. But we're in a commodity business, so it's always hard to determine when you're going to get **additional competition** or when prices will erode as they generally do.
>
> *        *        *
>
> [Bedrosian] Lannett: Thanks, Robert, and good afternoon, everyone. Today I have the pleasure of reporting another quarter of record financial results. Our positive momentum continued into our fiscal 2014 first quarter with net sales increasing 30% to $46 million from $35 million in the first quarter of last year. And excluding the charge relating to the contract extension with Jerome Stevens Pharmaceuticals, our first quarter adjusted net income of $6.7 million, or $0.22 per diluted share was significantly higher than expectations. **The primary drivers for our outstanding first quarter performance were the combination of strong sales of existing products, a favorable product mix, and price increases on key products.**

*     *     *

[Bedrosian] <u>Lannett:</u> I wouldn't think -- when you say lowest, I'm just not sure if we're both understanding the question the right way. The brand products are usually the ones that are preferred by surgeons, let's say. And then everybody reimburses for prescriptions. They prefer the generic but they have to pay for it. We still see a tremendous use of generics for this product. We don't see that changing. We do see a decline overall in the market for Digoxin, brand and generic, because the physicians that are prescribing this for new patients, this is the product that's being continually used on older patients or those who've already been placed on a product. And I'm presuming that because the kind of heart failure that the older people have is not the same that they're experiencing -- as you know, they've made a lot of strides in preventing heart attacks.

So the decline of Digoxin in prescription volume continues every year. ***However, we've been successful in benefitting from the difficulties of our competitors who have left the market. And as a result, our market share has continued to grow. We've had a recent price increase on a product as well because we're now only one of two people in the market. And as a result, I expect that product to do very well. We do believe some of the other competitors, they come back into the market.*** We're anticipating that. But we're not expecting any particular difficulties with the product because they have to face their FDA issues and make sure that their products, when they're re-introduced in the market, are not going to cause any harm. This is a very serious drug. It's a (inaudible) therapeutic index drug. And there's been allegations against some of those companies with the obese tablets that they have caused the deaths of some people. So this is a serious drug for these companies to reintroduce. So I believe the FDA will be scrutinizing those companies very carefully. So I don't see any particular issues in that particular product going forward except the general decline in prescription value.

(emphasis added)

154.     By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and

64

actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above regarding the primary drivers of Lannett's success being a combination of strong sales of existing products, a favorable product mix and price increases on key products were materially false and misleading because they did not include the impact that Defendants' role in a cartel to fix the price of the Price Fixed drugs played in Lannett's first quarter performance;

b. The statements referred to above about the Company's primary drivers for their first quarter performance being a "***combination of strong sales of existing products, a favorable product mix, and price increases on key products***" were materially false and misleading because it fails to disclose that the Company's involvement in a cartel to fix the price of the Price Fixed Drugs was a substantial driver of their performance;

c. The statements referred to above regarding the reasons why Defendants raised their guidance for the 2014 fiscal year were materially false and misleading because they never mentioned that the Company's participation in a cartel to fix the price of the Price Fixed Drugs; and

d. The statements referred to above regarding the entry of competition into the market and the timing of price erosion were materially false and misleading as a result of the Defendants' involvement in a cartel to fix the price of Price Fixed Drugs. Due to the Defendants involvement in this cartel they knew precisely when new companies would enter their market and what prices the new entrants would charge.

**F. December 19, 2013 Form 8-K**

155. On December 19, 2013, the Company filed with the SEC a Form 8-K detailing its

entry into a material definitive agreement. As an exhibit to that 8-K, Lannett included the agreement which was a credit agreement between Lannett and Citibank. In the credit agreement Lannett stated:

> **SECTION 6.9     Compliance with Laws, etc.**  Each Loan Party and each of its Domestic Subsidiaries is in compliance with all Laws (including, without limitation, all food and drug and health care and medical related Laws) applicable to it or its properties, except where the failure to be in compliance, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

156.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Lannett's and Bedrosian's representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Lannett and Bedrosian knew or recklessly disregarded that:

a.    The statement referred to above regarding the Defendants being in compliance with all laws applicable to Lannett or its properties was materially false or misleading because the Defendants, at the time this agreement was signed, were in violation of the United States Antitrust Laws. Thus, Lannett could not have been in compliance with all laws applicable to it.

### G.  February 6, 2014 Form 8-K

157.    On February 6, 2014 the Company filed an 8-K announcing "Lannett Reports Record Financial for Fiscal 2014 Second Quarter."("2Q2014 8-K") This filing contained more detailed financial information about the Company for the Second Quarter and guidance for the remainder of the 2014 fiscal year. In this filing the Company stated:

For the fiscal 2014 second quarter, net sales rose 84% to $67.3 million from $36.6 million in last year's second quarter. Gross profit more than tripled to $41.0 million, or 61% of net sales, from $13.4 million, or 37% of net sales, for the fiscal 2013 second quarter. Research and development (R&D) expenses increased to $5.8 million from $3.6 million for the fiscal 2013 second quarter. Selling, general and administrative (SG&A) expenses were $9.9 million, compared with $5.2 million in the same quarter of the prior year. Operating income grew substantially to $25.4 million from $4.7 million for the second quarter of fiscal 2013. Net income attributable to Lannett Company grew nearly six-fold to $16.6 million, or $0.46 per diluted share, from $2.9 million, or $0.10 per diluted share.

"For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history," said Arthur Bedrosian, president and chief executive officer of Lannett. "Our excellent financial performance was driven by price increases, strong sales of existing products and favorable product mix. The successful recent stock offering and newly established $50 million credit facility provide liquidity to fund our future growth, which includes the development of our deep pipeline as well as potential acquisitions. We continue to believe our company's future is very bright."

Bedrosian added, "We have now recorded five consecutive quarters of record sales, crossed the billion dollar market cap threshold and, in December, began trading on the New York Stock Exchange."

For the first six months of fiscal 2014, net sales rose 57% to $113.2 million from $71.9 million for the first six months of fiscal 2013. Cost of sales for the first six months of fiscal 2014 included a non-recurring, pre-tax charge of $20.1 million related to the previously announced contract extension with JSP, Inc. (JSP) to continue as the exclusive distributor in the United States of three JSP products. Accordingly, gross profit was $42.3 million, or 37% of net sales. Excluding the JSP contract renewal charge, gross profit was $62.4 million, or 55% of net sales, compared with $27.0 million, or 38% of net sales, for the first six months of fiscal 2013. R&D expenses increased to $10.5 million, compared with $7.3 million for the fiscal 2013 period. SG&A expenses increased to $17.1 million, compared with $11.3 million in the same period of the prior year. Operating income was $14.7 million. Excluding the JSP contract renewal charge, operating income grew to $34.8 million from $8.4 million in the first half of fiscal 2013.

For the first six months of fiscal 2014, net income attributable to Lannett Company grew to $10.6 million, or $0.31 per diluted share. Adjusted net income, which excludes the impact of the non-recurring JSP contract renewal charge equal to $12.6 million after-tax, was $23.2 million, or $0.69 per diluted share, compared to net income attributable to Lannett Company of $5.8 million, or $0.20 per diluted share, for the first six months of the prior year. The first six months of fiscal 2013 included a favorable pre-tax litigation settlement of $1.3 million, equal to $0.03 per diluted share.

158. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance being driven by strong sales of existing products was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b. The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs; and

c. The statements referred to above regarding the Company's improved performance begin driven by a favorable product mix were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs.

### H. Second Quarter 2014 Form 10-Q

159.     On February 7, 2014, the Company filed a 10-Q with the SEC for the second quarter of 2014 ("2Q2014 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the second quarter of Fiscal 2014, net sales increased to $67.3 million representing 84% growth over the prior year period. Gross profit increased $27.6 million to $41.0 million, compared to the prior year period. R&D expenses increased 62% to $5.8 million compared to the prior year period while SG&A expenses increased 92% to $9.9 million from $5.2 million. Operating income for the second quarter of Fiscal 2014 was $25.4 million compared to $4.7 million in the prior year period. Net income for the second quarter of Fiscal 2014 was $16.6 million, or $0.46 per diluted share. Comparatively, net income in the prior year was $2.9 million, or $0.10 per diluted share.

> For the first six months of Fiscal 2014, net sales increased to $113.2 million representing 57% growth over the prior year period. Gross profit increased $15.3 million to $42.3 million, compared to the prior year period, and included the $20.1 million charge related to the JSP contract renewal. The JSP contract renewal charge equated to an 18 percentage-point reduction in gross profit percentage. R&D expenses increased 44% to $10.5 million compared to the prior year period while SG&A expenses increased 51% to $17.1 million from $11.3 million. Operating income for the first six months of Fiscal 2014 was $14.7 million compared to $8.4 million in the prior year period. Net income for the first six months of Fiscal 2014 was $10.6 million, or $0.31 per diluted share, and included the $20.1 million pre-tax charge ($0.38 per diluted share) related to the JSP contract renewal. Comparatively, net income in the prior year was $5.8 million, or $0.20 per diluted share.

> *     *     *

> Net sales increased 84% to $67.3 million for the three months ended December 31, 2013.

> *     *     *

> Product price increases contributed $25.5 million to the overall increase in net sales, while increased volumes added $5.3 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing

trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

*      *      *

***Thyroid Deficiency.***  Net sales of drugs used for the treatment of thyroid deficiency increased by $11.8 million, primarily as a result of price increases on key products.

***Cardiovascular.***  Net sales of drugs used for cardiovascular treatment increased by $9.7 million, primarily as a result of price increases on products used to treat congestive heart failure.  The increase in net sales was partially offset by a decrease in net sales on products used to treat hypertension due to pricing pressures.

***Antibiotic.***  Net sales of antibiotics increased by $3.3 million.  The increase in net sales was primarily attributable to increased volumes across various products.

*      *      *

Net sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for gout, thyroid deficiency and cardiovascular, as discussed above.  Retail chain net sales increased primarily as a result of increased sales of drugs for the treatment of thyroid deficiency and cardiovascular, as discussed above.

*      *      *

***Cost of Sales.***  Cost of sales for the second quarter of Fiscal 2014 increased $3.1 million to $26.3 million.  The increase primarily reflected the impact of the increase in sales volumes, offset by changes in the mix of products sold.  Amortization expense included in cost of sales totaled $467 thousand for the second quarter of Fiscal 2014 and $470 thousand for the second quarter of Fiscal 2013.

***Gross Profit.***  Gross profit for the second quarter of Fiscal 2014 increased 206% to $41.0 million or 61% of net sales.  In comparison, gross profit for the second quarter of Fiscal 2013 was $13.4 million or 37% of net sales.  The second quarter Fiscal 2014 gross profit percentage increase was mainly attributable to product price increases and changes in the mix of products sold, as discussed above.

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods.  Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.  Changes in future product sales

mix may also occur.

\* \* \*

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

160. The 2Q2014 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

161. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.      The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

c.      The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because it does not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

d.       Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

e.      Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**I.    May 7, 2014, Form 8-K**

162.    On May 7, 2014, the Company filed a Form 8-K with the SEC preliminarily announcing its financial results for the third quarter of 2014 ("3Q2014 8-K"). In that filing the company stated:

For the fiscal 2014 third quarter, net sales doubled to $80.0 million from $39.0 million in last year's third quarter.  Gross profit more than tripled to $56.1 million, or 70% of net sales, from $15.2 million, or 39% of net sales, for the fiscal 2013 third quarter. Research and development (R&D) expenses increased to $10.6 million from $5.2 million for the fiscal 2013 third quarter.  Selling, general and administrative (SG&A) expenses were $9.6 million, compared with $5.2 million in the same quarter of the prior year. Operating income rose substantially to $36.0 million from $4.7 million for the third quarter of fiscal 2013.  Net income attributable to Lannett Company grew nearly six-fold to $23.0 million, or $0.63 per diluted share, from $3.9 million, or $0.14 per diluted share.

"The fiscal 2014 third quarter represents the sixth consecutive quarter of record net sales, as well as the ninth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, president and chief executive officer of Lannett.  "Our excellent financial performance was largely driven by price increases across multiple product categories and strong sales of existing products.  We are pleased to have recently received approval for Diazepam Oral Solution (Concentrate) and expect our 19 product applications pending at FDA combined with an additional five ANDAs planned for submission by June 30, 2014 to position us well for continued long-term growth."

For the first nine months of fiscal 2014, net sales rose 74% to $193.2 million from $110.9 million for the first nine months of fiscal 2013.  Cost of sales for the first nine months of fiscal 2014 included a non-recurring, pre-tax charge of $20.1 million related to the previously announced contract extension with JSP, Inc. (JSP) to continue as the exclusive distributor in the United States of three JSP products.  Accordingly, gross profit was $98.5 million, or 51% of net sales.  Excluding the JSP contract renewal charge, gross profit was $118.6 million, or 61% of net sales, compared with $42.2 million, or 38% of net sales, for the first nine months of fiscal 2013.  R&D expenses increased to $21.1 million, compared with $12.6 million for the fiscal 2013 period.  SG&A expenses increased to $26.6 million, compared with $16.6 million in the same period of the prior year.  Operating income was $50.7 million.  Excluding the JSP contract renewal charge, operating income grew to $70.8 million from $13.1 million in the first nine months of fiscal 2013.

For the first nine months of fiscal 2014, net income attributable to

Lannett Company grew to $33.6 million, or $0.97 per diluted share. Adjusted net income, which excludes the impact of the non-recurring JSP contract renewal charge equal to $12.6 million after-tax, was $46.2 million, or $1.34 per diluted share, compared to net income attributable to Lannett Company of $9.8 million, or $0.34 per diluted share, for the first nine months of the prior year. The first nine months of fiscal 2013 included a favorable pre-tax litigation settlement of $1.3 million, equal to $0.03 per diluted share.

163. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.     The statements referred to above about the Company's improved performance being driven by strong sales of existing products was materially false and misleading because it failed to disclose that the company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b.     The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it fails to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

c.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

d.     Lannett failed to make required disclosures regarding the impact of the

artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### J.  Third Quarter 2014 Form 10-Q

164.    On May 9, 2014, the Company filed its Form 10-Q with the SEC for the third quarter of 2014 ("3Q2014 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the third quarter of Fiscal 2014, net sales increased to $80.0 million representing 105% growth over the prior year period. Gross profit increased $41.0 million to $56.1 million, compared to the prior year period.  R&D expenses increased 102% to $10.6 million compared to the prior year period while SG&A expenses increased 82% to $9.6 million.  Operating income for the third quarter of Fiscal 2014 was $36.0 million compared to $4.7 million in the prior year period.  Net income for the third quarter of Fiscal 2014 was $23.0 million, or $0.63 per diluted share. Comparatively, net income in the prior year period was $3.9 million, or $0.14 per diluted share.
>
> For the first nine months of Fiscal 2014, net sales increased to $193.2 million representing 74% growth over the prior year period. Gross profit increased $56.3 million to $98.5 million, compared to the prior year period, and included the $20.1 million charge related to the JSP contract renewal.  The JSP contract renewal charge equated to a 10 percentage-point reduction in gross profit percentage.  R&D expenses increased 68% to $21.1 million compared to the prior year period while SG&A expenses increased 61% to $26.6 million.  Operating income for the first nine months of Fiscal 2014 was $50.7 million compared to $13.1 million in the prior year period.  Net income for the first nine months of Fiscal 2014 was $33.6 million, or $0.97 per diluted share, and included the $20.1 million pre-tax charge ($0.36 per diluted share) related to the JSP contract renewal.  Comparatively, net income in the prior year period was $9.8 million, or $0.34 per diluted share.
>
> *        *        *
>
> Net sales increased 105% to $80.0 million for the three months ended March 31, 2014.
>
> *        *        *
>
> Product price increases contributed $42.5 million to the overall increase in net sales.  A decrease in volumes slightly offset the

overall increase in net sales by $1.6 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

*    *    *

***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $14.3 million, primarily as a result of price increases on key products.

***Cardiovascular.*** Net sales of drugs used for cardiovascular treatment increased by $14.3 million, primarily as a result of price increases on products used to treat congestive heart failure, partially offset by lower volumes. The increase in net sales was also partially offset by a decrease in net sales on products used to treat hypertension due to pricing pressures and lower volumes.

***Migraine***. Net sales of drugs used to treat migraines increased by $3.5 million. The increase in net sales was primarily attributable to price increases on key products within the indication as well as volume increases.

*    *    *

Net sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for thyroid deficiency and cardiovascular, as discussed above.

*    *    *

***Cost of Sales***. Cost of sales for the third quarter of Fiscal 2014 was flat quarter over quarter at $23.9 million. Amortization expense included in cost of sales totaled $467 thousand for the third quarter of Fiscal 2014 and $471 thousand for the third quarter of Fiscal 2013.

***Gross Profit.*** Gross profit for the third quarter of Fiscal 2014 increased 270% to $56.1 million or 70% of net sales. In comparison, gross profit for the third quarter of Fiscal 2013 was $15.2 million or 39% of net sales. The third quarter Fiscal 2014 gross profit percentage increase was mainly attributable to product price increases and changes in the mix of products sold.

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales

mix may also occur.

*   *   *

Product price increases contributed $73.3 million to the overall increase in net sales, while increased volumes added $9.0 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

*   *   *

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

165. The 3Q2014 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

166. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business,

77

financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.   The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.   The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

c.   The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because it does not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

d.   Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

e.   Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**K.  August 27, 2014, Form 8-K**

167.     On August 27, 2014, the Company filed a Form 8-K with the SEC preliminarily

announcing their financial results for the fourth quarter of 2014. In that filing the company

stated:

> For the fiscal 2014 fourth quarter, net sales doubled to $80.6 million from $40.2 million in last year's fourth quarter. Gross profit more than tripled to $55.9 million, or 69% of net sales, from $15.2 million, or 38% of net sales, for the fiscal 2013 fourth quarter. Research and development (R&D) expenses increased to $6.6 million from $3.7 million for the fiscal 2013 fourth quarter. Selling, general and administrative (SG&A) expenses were $12.0 million, compared with $5.8 million in the same quarter of the prior year. Operating income rose dramatically to $37.4 million from $5.7 million for the fourth quarter of fiscal 2013. Net income attributable to Lannett Company grew more than six-fold to $23.5 million, or $0.64 per diluted share, from $3.6 million, or $0.12 per diluted share.
>
> "The fiscal 2014 fourth quarter represents the seventh consecutive quarter of record net sales, as well as the tenth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, president and chief executive officer of Lannett. "Our excellent financial results are due, in large part, to our loyal and supportive customers, as well as our dedicated employees, who are committed to making Lannett a formidable force in the generic drug industry.
>
> "Looking ahead, we have recently received approvals for Oxycodone Hydrochloride, Diazepam and Codeine Sulfate, completed two product acquisitions and formed strategic relationships, all of which will further expand our offering. We also have a robust pipeline with 23 ANDAs, including four with a Paragraph IV certification, currently pending at the FDA and several product applications nearing submission. Importantly, our plans also include the continued and significant investment in R&D to drive future growth."
>
> For the full year of fiscal 2014, net sales rose 81% to $273.8 million from $151.1 million for fiscal 2013. Cost of sales for fiscal 2014 included a non-recurring, pre-tax charge of $20.1 million related to the previously announced contract extension with Jerome Stevens Pharmaceuticals, Inc. (JSP) to continue as the exclusive distributor in the United States of three JSP products. Accordingly, gross profit was $154.4 million, or 56% of net sales.

Excluding the JSP contract renewal charge, gross profit was $174.5 million, or 64% of net sales, compared with $57.4 million, or 38% of net sales, for fiscal 2013. R&D expenses increased to $27.7 million, compared with $16.3 million for fiscal 2013. SG&A expenses increased to $38.6 million, compared with $22.4 million in the prior year. Operating income was $88.1 million. Excluding the JSP contract renewal charge, operating income grew to $108.2 million from $18.8 million in fiscal 2013.

For fiscal 2014, net income attributable to Lannett Company grew to $57.1 million, or $1.62 per diluted share. Adjusted net income, which excludes the impact of the non-recurring JSP contract renewal charge equal to $12.6 million after-tax, was $69.7 million, or $1.98 per diluted share, compared to net income attributable to Lannett Company of $13.3 million, or $0.46 per diluted share, for the prior year. Fiscal 2013 included a favorable pre-tax litigation settlement of $1.3 million, equal to $0.03 per diluted share.

168. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance being driven by customers and employees was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

c. Lannett failed to make required disclosures regarding the impact of the

artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### L. Fiscal Year 2014 Form 10-K

169.    On August 29, 2014, Lannett filed a Form 10-K with the SEC for the fiscal year of 2014 ("2014 10-K"), which was signed by the Individual Defendants. In that 10-K the Defendants stated in part:

> *       *       *

> *Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships*. We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.

> *       *       *

> Levothyroxine Sodium tablets are produced and marketed with 12 varying potencies. Levothyroxine Sodium tablets are manufactured by JSP. Levothyroxine Sodium tablets remain one of the most prescribed drugs in the U.S. and are used by patients of various ages and demographic backgrounds for the treatment of thyroid deficiency. Net sales of Levothyroxine Sodium tablets totaled $102.2 million in fiscal year 2014. In our distribution of these products, we compete with two brand Levothyroxine Sodium products—AbbVie's Synthroid® and Pfizer's Levoxyl®— as well as generic products from Mylan and Sandoz.

> Digoxin tablets are produced and marketed with two different potencies. This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement. Digoxin tablets are used to treat congestive heart failure in patients of various ages and demographics. Net sales of this product totaled $54.7 million in fiscal year 2014. In our distribution of these products, we compete with a generic product from Impax and expect to compete against West-Ward, Caraco and the brand Lanoxin from Covis.

> *       *       *

> Competition

> The manufacturing and distribution of generic pharmaceutical

products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors.

*      *      *

| Product | Primary Competitors |
|---|---|
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Actavis and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Alternative products including Lidocaine and Epinephrine |
| Digoxin Tablets | Impax, West-Ward, Caraco, and Covis |
| Doxycycline Hyclate and Monohydrate Tablets | Par, Mylan, Sandoz and Ranbaxy |
| Hydromorphone HCl Tablets | Mallinckrodt, Roxane and Purdue |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Morphine Sulfate Oral Solution | Caraco, Paddock, Roxane, Mallinckrodt and Vista |
| Primidone Tablets | Actavis, Qualitest and Amneal |
| Rifampin Capsules | Lupin, Sandoz and Versapharm |
| Triamterene w/Hydrochlorothiazide Capsules | Sandoz and Mylan |
| Ursodiol Capsules | Epic, Mylan and Actavis |

*      *      *

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals

on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

\*        \*        \*

For Fiscal 2014, net sales increased to $273.8 million representing 81% growth over the prior year period. Gross profit increased $97.0 million to $154.4 million, compared to the prior year period, and included the $20.1 million charge related to the JSP contract renewal. The JSP contract renewal charge equated to a 7 percentage-point reduction in gross profit percentage. R&D expenses increased 71% to $27.7 million compared to the prior year period while SG&A expenses increased 72% to $38.6 million. Operating income for Fiscal 2014 was $88.1 million compared to $18.8 million in the prior year period. Net income attributable to Lannett for Fiscal 2014 was $57.1 million, or $1.62 per diluted share, and included the $20.1 million pre-tax charge ($0.36 per diluted share) related to the JSP contract renewal. Comparatively, net income attributable to Lannett in the prior year was $13.3 million, or $0.46 per diluted share, which included a favorable pre-tax litigation settlement of $1.3 million ($0.03 per diluted share).

\*        \*        \*

Net sales increased 81% to $273.8 million for the fiscal year ended June 30, 2014.

\*        \*        \*

Product price increases contributed $115.1 million to the overall increase in net sales, while increased volumes added $7.6 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

\*        \*        \*

***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $44.3 million, primarily as a result of price increases on key products.

***Cardiovascular.*** Net sales of drugs used for cardiovascular treatment increased by $36.2 million, primarily as a result of price increases on products used to treat congestive heart failure. The increase in net sales was partially offset by a decrease in net sales on products used to treat hypertension due to pricing pressures and modest volume decreases on several products within the indication.

*     *     *

Net sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for gout, thyroid deficiency and cardiovascular, as discussed above. Retail chain net sales increased primarily as a result of increased sales of drugs for the treatment of thyroid deficiency and cardiovascular, as discussed above.

***Cost of Sales.*** Cost of sales for the fiscal year ended June 30, 2014 increased $25.7 million to $119.4 million, which included the $20.1 million charge related to the JSP contract renewal. The remaining increase primarily reflected the impact of the increase in sales volumes. Amortization expense included in cost of sales totaled $1.4 million for the fiscal years ended June 30, 2014 and 2013.

***Gross Profit.*** Gross profit for the fiscal year ended June 30, 2014 increased 169% to $154.4 million or 56% of net sales. In comparison, gross profit for the fiscal year ended June 30, 2013 was $57.4 million or 38% of net sales. The gross profit percentage change for the fiscal year ended June 30, 2014 was mainly attributable to changes in the mix of products sold and product price increases, as discussed above, offset by the charge related to the JSP contract renewal, which negatively impacted gross margin by 7 percentage-points.

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

*     *     *

***Thyroid Deficiency.*** Sales of drugs used for the treatment of thyroid deficiency increased by $7.1 million, primarily as a result

of both volume and price increases on key products within this medical indication.

**_Cardiovascular._** Sales of drugs for cardiovascular treatment increased by $7.7 million primarily due to increased volumes related to a product used for the treatment of hypertension which commenced shipping at the end of December 2011.

**_Antibiotic._** Sales of drugs in the antibiotic medical indication increased by $2.4 million primarily as a result of increased volumes on selected key products within the medical indication.

\*      \*      \*

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2014. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported as specified in Securities and Exchange Commission rules and forms. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include, among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

170.     The 2014 10-K contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

171.     By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular, Defendants knew or recklessly disregarded that:

         a.     The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal price-fixing;

         b.     The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

         c.     The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

         d.     The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants

were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

e.     The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin was materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

f.     The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

g.     The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

h.     Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

i.     Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

j.     Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**M. November 4, 2014, 8-K**

172.     On November 4, 2014, the Company filed an 8-K announcing "Lannett Reports

Net Sales of $93 Million, EPS of $0.94 for Fiscal 2015 First Quarter." This filing contained more

detailed financial information about the Company for the First Quarter of 2015. In this filing the

Company stated:

> For the fiscal 2015 first quarter, net sales doubled to $93.4 million from $45.8 million in last year's first quarter. Gross profit was $71.6 million, or 77% of net sales. This compares with fiscal 2014 first quarter gross profit of $1.3 million, or 3% of net sales, which included a non-recurring pre-tax charge of $20.1 million related to the contract extension with Jerome Stevens Pharmaceuticals, Inc. (JSP). Excluding the JSP contract renewal charge, gross profit was $21.4 million, or 47% of net sales. Research and development expenses increased to $6.4 million from $4.7 million for the fiscal 2014 first quarter. Selling, general and administrative expenses were $10.6 million, compared with $7.2 million in the same quarter of the prior year. Operating income was $54.7 million versus an operating loss of $10.6 million for the prior year first quarter. Excluding the JSP contract renewal charge, operating income for the fiscal 2014 first quarter was $9.5 million. Net income attributable to Lannett Company was $34.9 million, or $0.94 per diluted share, versus net loss attributable to Lannett of $6.0 million, or $0.20 per share. Adjusted net income, which excludes the impact of the JSP contract renewal charge equal to $12.7 million after-tax, was $6.7 million, or $0.22 per diluted share, in the first quarter of fiscal 2014.
>
> "The fiscal 2015 first quarter represents the eighth consecutive quarter of record net sales, as well as the eleventh consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, president and chief executive officer of Lannett. "Strong sales across a number of product categories, including cardiovascular, gallstone, glaucoma, migraine and thyroid deficiency, drove our excellent financial results. The quarter also benefited from increased sales of our C-Topical® and recently launched Oxycodone HCl Oral Solution products."

173. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled

investors by presenting a materially false and misleading picture of Lannett's business,

financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about the Company's improved performance being driven by strong sales was materially false and misleading because it failed to disclose that the company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b.      The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

c.      Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

d.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

e.      Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### N.  First Quarter 2015 Form 10-Q

174.    On November 6, 2014, the Company filed a Form 10-Q with the SEC for the second quarter of 2015 ("1Q2015 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

For the first quarter of Fiscal Year 2015, net sales increased to $93.4 million, representing 104% growth over the first quarter of Fiscal Year 2014. Gross profit increased to $71.6 million compared to $1.3 million in the prior year period and gross profit percentage increased to 77% compared to 3% in the prior year period. The first quarter of Fiscal Year 2014 included the impact of the nonrecurring JSP contract renewal charge which lowered gross profit by $20.1 million and the related gross profit percentage by 44% points, respectively.

R&D expenses increased 34% to $6.4 million compared to the first quarter of Fiscal Year 2014 while SG&A expenses increased 47% to $10.6 million from $7.2 million. Operating income for the first quarter of Fiscal Year 2015 was $54.7 million compared to an operating loss of $10.6 million in the first quarter of Fiscal Year 2014. The operating loss in the prior year period included the nonrecurring charge related to the JSP contract renewal. Net income for the first quarter of Fiscal Year 2015 was $34.9 million, or $0.94 per diluted share. Comparatively, net loss in the prior year was $6.0 million, or $0.20 per diluted share, and included the $12.7 million after-tax charge ($0.42 per diluted share) related to the JSP contract renewal. A more detailed discussion of the Company's financial results can be found below.

\*　　\*　　\*

Net sales increased 104% to $93.4 million for the three months ended September 30, 2014.

\*　　\*　　\*

Product price increases contributed $52.4 million to the overall increase in net sales, partially offset by decreased volumes of $4.8 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

\*　　\*　　\*

***Cardiovascular.*** Net sales of drugs used for cardiovascular treatment increased by $14.4 million, primarily as a result of price increases on products used to treat various cardiac conditions. The increase in net sales was partially offset by volume decreases on several products within the indication.

***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $13.3 million, primarily as a result of price increases on key products, partially offset by decreased

volumes. Above average customer purchases in the fourth quarter of Fiscal Year 2014, in anticipation of a price increase effective in the first quarter of Fiscal Year 2015, led to lower volumes in the first quarter of Fiscal Year 2015. The Company expects volumes to normalize in the remaining quarters of Fiscal Year 2015.

***Gallstone.*** Net sales of drugs used for gallstones increased by $10.4 million. The increase in net sales was primarily attributable to price increases, partially offset by decreased volumes.

***Glaucoma.*** Net sales of drugs used for the treatment of Glaucoma increased by $3.2 million. The increase in net sales was primarily attributable to price increases.

\*      \*      \*

Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency, gallstones and cardiovascular, as discussed above. Additionally, the increase in net sales to wholesaler/distributor was impacted by the strategic partnership between Amerisource Bergen and Walgreens, whereby Amerisource Bergen began product distribution on behalf of Walgreens in third quarter of Fiscal Year 2014. Mail-order pharmacy net sales increased primarily as a result of increased sales of drugs used for the treatment of thyroid deficiency, as discussed above.

\*      \*      \*

***Cost of Sales.*** Cost of sales for the first quarter of Fiscal Year 2015 decreased $22.7 million to $21.8 million. The decrease was primarily attributable to the nonrecurring $20.1 million charge related to the JSP contract renewal recorded in the first quarter of Fiscal Year 2014. The remaining decrease primarily reflected the impact of decreased volumes, partially offset by increased provisions for excess and obsolete inventory totaling $889 thousand related to certain products. Amortization expense included in cost of sales totaled $20 thousand for the first quarter of Fiscal Year 2015 and $470 thousand for the first quarter of Fiscal Year 2014.

***Gross Profit.*** Gross profit percentages for the first quarter of Fiscal Year 2015 and 2014 were 77% and 3%, respectively. The charge related to the JSP contract renewal negatively impacted gross margin percentage by 44% points in the first quarter of Fiscal Year 2014. The remaining increase in gross profit percentage was due to product price increases.

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages

will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

\* \* \*

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

175.    The 2Q2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

176.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.      The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

c.      The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products was materially false and misleading because they did not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

d.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

e.      Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**O. February 6, 2015, Form 8-K**

177.    On February 6, 2015, the Company filed a Form 8-K announcing Lannett's preliminary results for the Second Quarter of 2015. In this filing the Company stated:

For the fiscal 2015 second quarter, net sales rose 71% to $114.8 million from $67.3 million in last year's second quarter. Gross profit doubled to $87.2 million, or 76% of net sales, from $41.0 million, or 61% of net sales. Research and development (R&D) expenses increased to $7.8 million from $5.8 million for the fiscal 2014 second quarter. Selling, general and administrative (SG&A) expenses were $12.8 million, compared with $9.9 million in the same quarter of the prior year. Operating income more than doubled to $66.5 million from $25.4 million for the prior year second quarter. Net income attributable to Lannett Company grew 170% to $44.8 million, or $1.21 per diluted share, from $16.6 million, or $0.46 per diluted share.

"Strong sales and gross margin across a number of product categories drove our record financial results," said Arthur Bedrosian, chief executive officer of Lannett. "The fiscal 2015 second quarter represents the ninth consecutive quarter of record net sales, as well as the twelfth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period. Looking ahead, we expect our momentum in the first half of the year to continue into the second half."

For the first six months of fiscal 2015, net sales rose 84% to $208.2 million from $113.2 million in the comparable prior-year period. Gross profit was $158.8 million, or 76% of net sales. This compares with gross profit for the first six months of fiscal 2014 of $42.3 million, or 37% of net sales, which included a non-recurring pre-tax charge of $20.1 million related to the contract extension with JSP, Inc. (JSP). Excluding the JSP contract renewal charge, gross profit was $62.4 million, or 55% of net sales. R&D expenses increased to $14.2 million from $10.5 million for the fiscal 2014 first six months. SG&A expenses were $23.4 million, compared with $17.1 million in the same period of the prior year. Operating income was $121.2 million compared with $14.7 million for the first six months of the prior year. Excluding the JSP contract renewal charge, operating income for the prior-year period was $34.8 million. Net income attributable to Lannett Company was $79.7 million, or $2.15 per diluted share, compared with $10.6 million, or $0.31 per diluted share. Adjusted net income, which excludes the impact of the JSP contract renewal charge equal to $12.6 million after-tax, was $23.2 million, or $0.69 per diluted share, in the first six months of fiscal 2014.

178. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled

investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about the Company's improved performance being driven by strong sales was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b.      The statements referred to above about the Company's improved performance was driven by gross margins was materially false and misleading because it fails to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

c.      The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

d.      Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

e.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

f.      Lannett failed to make required disclosures regarding the impact of

artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### P. Second Quarter 2015 Form 10-Q

179.    On February 6, 2015, the Company filed its Form 10-Q with the SEC for the second quarter of 2015 ("2Q2015 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the second quarter of Fiscal Year 2015, net sales increased to $114.8 million, representing 71% growth over the second quarter of Fiscal Year 2014. Gross profit increased to $87.2 million compared to $41.0 million in the prior-year period and gross profit percentage increased to 76% compared to 61% in the prior-year period. R&D expenses increased 35% to $7.8 million compared to the second quarter of Fiscal Year 2014 while SG&A expenses increased 30% to $12.8 million from $9.9 million. Operating income for the second quarter of Fiscal Year 2015 was $66.5 million compared to $25.4 million in the second quarter of Fiscal Year 2014. Net income for the second quarter of Fiscal Year 2015 was $44.8 million, or $1.21 per diluted share compared to $16.6 million or $0.46 per diluted share in the second quarter of Fiscal Year 2014.
>
> For the first six months of Fiscal 2015, net sales increased to $208.2 million representing 84% growth over the prior-year period. Gross profit increased $116.4 million to $158.8 million, compared to the prior-year period which included the $20.1 million charge related to the JSP contract renewal. Gross profit percentage increased to 76% compared to 37% in the prior-year period. R&D expenses increased 35% to $14.2 million compared to the prior-year period while SG&A expenses increased 37% to $23.4 million from $17.1 million. Operating income for the first six months of Fiscal 2015 was $121.2 million compared to $14.7 million in the prior-year period. Net income attributable to Lannett Company, Inc. for the first six months of Fiscal 2015 was $79.7 million, or $2.15 per diluted share. Comparatively, net income attributable to Lannett Company, Inc. in the prior year was $10.6 million, or $0.31 per diluted share and included the $20.1 million pre-tax charge related to the JSP contract renewal.
>
> *    *    *
>
> Net sales increased 71% to $114.8 million for the three months

ended December 31, 2014.

\*    \*    \*

Product price increases contributed $50.9 million to the overall increase in net sales, partially offset by decreased volumes of $3.4 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

\*    \*    \*

**Thyroid Deficiency.** Net sales of drugs used for the treatment of thyroid deficiency increased by $18.3 million, primarily as a result of price increases on key products. Increased volumes also added to the increase in net sales.

**Gallstone.** Net sales of drugs used for gallstones increased by $15.6 million. The increase in net sales was primarily attributable to price increases, partially offset by decreased volumes.

**Migraine.** Net sales of drugs used to treat migraines increased by $4.6 million. The increase in net sales was primarily attributable to price increases on key products.

\*    \*    \*

Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency, gallstones and cardiovascular, as discussed above. Additionally, the increase in net sales to wholesaler/distributor was impacted by the strategic partnership between Amerisource Bergen and Walgreens, whereby Amerisource Bergen began product distribution on behalf of Walgreens in third quarter of Fiscal Year 2014. Mail-order pharmacy net sales increased primarily as a result of increased sales of drugs used for the treatment of thyroid deficiency, as discussed above.

**Cost of Sales.** Cost of sales for the second quarter of Fiscal 2015 increased $1.3 million to $27.6 million. The increase primarily reflected additional costs for distributed products and increased compensation-related expenses. Amortization expense included in cost of sales totaled $20 thousand for the second quarter of Fiscal 2015 and $467 thousand for the second quarter of Fiscal 2014.

**Gross Profit.** Gross profit for the second quarter of Fiscal 2015 increased 112% to $87.2 million or 76% of net sales. In comparison, gross profit for the second quarter of Fiscal 2014 was

$41.0 million or 61% of net sales. The second quarter of Fiscal 2015 gross profit percentage increase was mainly attributable to product price increases and changes in the mix of products sold, as discussed above.

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

\*     \*     \*

## Results of Operations - Six months ended December 31, 2014 compared with the six months ended December 31, 2013

Net sales increased 84% to $208.2 million for the six months ended December 31, 2014. [...]
Product price increases contributed $103.2 million to the overall increase in net sales, partially offset by decreased volumes of $8.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

\*     \*     \*

### *Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and

procedures were effective as of the end of the period covered by this report.

180. The 2Q2015 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2015 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

181. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

c. The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products was materially false and misleading because they did not attribute the increased sales, in whole

or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

d.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

e.      Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

## Q.   May 7, 2015, Form 8-K

182.    On May 7, 2015, the Company filed a Form 8-K announcing their results for the Third Quarter of 2015. In this filing the Company stated:

> For the fiscal 2015 third quarter, net sales rose 24% to $99.4 million from $80.0 million in last year's third quarter. Gross profit increased 35% to $75.6 million, or 76% of net sales, from $56.1 million, or 70% of net sales. Research and development (R&D) expenses decreased to $9.2 million from $10.6 million for the fiscal 2014 third quarter. Selling, general and administrative (SG&A) expenses were $12.2 million, compared with $9.6 million. Operating income grew 51% to $54.3 million from $36.0 million. Net income attributable to Lannett Company increased 58% to $36.2 million, or $0.97 per diluted share, from $23.0 million, or $0.63 per diluted share, for the prior year third quarter.
>
> "We have now reported thirteen consecutive quarters in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, chief executive officer of Lannett. "Our third quarter performance reflects higher sales and gross margin across a number of product categories, partially offset by lower sales of our cardiovascular products, which as expected faced new entrants in the market. With our strong third quarter and outlook for a solid fourth quarter, we have raised our fiscal 2015 full-year guidance."
>
> For the first nine months of fiscal 2015, net sales rose 59% to $307.6 million from $193.2 million in the comparable prior-year

period. Gross profit was $234.4 million, or 76% of net sales. This compares with gross profit for the first nine months of fiscal 2014 of $98.5 million, or 51% of net sales, which included a non-recurring pre-tax charge of $20.1 million related to the contract extension with Jerome Stevens Pharmaceuticals, Inc. (JSP). Excluding the JSP contract renewal charge, gross profit was $118.6 million, or 61% of net sales. R&D expenses increased to $23.4 million from $21.1 million. SG&A expenses were $35.6 million, compared with $26.6 million. Operating income was $175.5 million compared with $50.7 million for the first nine months of the prior year. Excluding the JSP contract renewal charge, operating income for the prior-year period was $70.8 million. Net income attributable to Lannett Company was $116.0 million, or $3.13 per diluted share, compared with $33.6 million, or $0.97 per diluted share, for the first nine months of fiscal 2014. Adjusted net income, which excludes the impact of the JSP contract renewal charge equal to $12.6 million after-tax, was $46.2 million, or $1.34 per diluted share, in the first nine months of fiscal 2014.

183. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's improved performance being driven by higher sales were materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b. The statements referred to above about the Company's performance being driven by higher gross margins were materially false and misleading because they failed to disclose that the price increases and improved performance were actually a result of the

Company's participation in a cartel to fix the price of the Price Fixed Drugs;

c. The statements referred to above regarding the Company's improved performance being driven by a favorable product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

d. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

e. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

f. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### R. Third Quarter 2015 Form 10-Q

184. On May 8, 2015, the Company filed a 10-Q with the SEC for the third quarter of 2015 ("3Q2015 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the third quarter of Fiscal Year 2015, net sales increased to $99.4 million, representing 24% growth over the third quarter of Fiscal Year 2014. Gross profit increased to $75.6 million compared to $56.1 million in the prior-year period and gross profit percentage increased to 76% compared to 70% in the prior-year period. R&D expenses decreased 13% to $9.2 million compared to the third quarter of Fiscal Year 2014 while SG&A expenses increased 28% to $12.2 million from $9.6 million. Operating income for the third quarter of Fiscal Year 2015 was $54.3 million

compared to $36.0 million in the third quarter of Fiscal Year 2014. Net income attributable to Lannett Company, Inc. for the third quarter of Fiscal Year 2015 was $36.2 million, or $0.97 per diluted share compared to $23.0 million or $0.63 per diluted share in the third quarter of Fiscal Year 2014.

For the first nine months of Fiscal 2015, net sales increased to $307.6 million representing 59% growth over the prior-year period. Gross profit increased $135.9 million to $234.4 million, compared to the prior-year period which included the $20.1 million charge related to the JSP contract renewal. Gross profit percentage increased to 76% compared to 51% in the prior-year period. R&D expenses increased 11% to $23.4 million compared to the prior-year period while SG&A expenses increased 34% to $35.6 million from $26.6 million. Operating income for the first nine months of Fiscal 2015 was $175.5 million compared to $50.7 million in the prior-year period. Net income attributable to Lannett Company, Inc. for the first nine months of Fiscal 2015 was $116.0 million, or $3.13 per diluted share. Comparatively, net income attributable to Lannett Company, Inc. in the prior year was $33.6 million, or $0.97 per diluted share and included the $20.1 million pre-tax charge related to the JSP contract renewal.

*    *    *

## Results of Operations - Three months ended March 31, 2015 compared with the three months ended March 31, 2014

Net sales increased 24% to $99.4 million for the three months ended March 31, 2015. [...]

Product price increases contributed $29.5 million to the overall increase in net sales, partially offset by decreased volumes of $10.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue. [...]

*Gallstone.* Net sales of drugs used for gallstones increased by $19.5 million. The increase in net sales was primarily attributable to price increases on key products. Higher volumes also contributed to the increase in net sales.

*Thyroid Deficiency.* Net sales of drugs used for the treatment of thyroid deficiency increased by $8.4 million, primarily as a result of price increases on key products.

103

***Migraine.***  Net sales of drugs used to treat migraines increased by $1.9 million.  The increase in net sales was primarily attributable to price increases on key products.

***Glaucoma.***  Net sales of drugs used for the treatment of Glaucoma increased by $1.2 million.  The increase in net sales was primarily attributable to price increases on key products. [...]

***Cost of Sales.***  Cost of sales for the third quarter of Fiscal 2015 decreased slightly to $23.7 million.  The decrease is primarily related to lower amortization and other regulatory expenses partially offset by increased provisions for excess and obsolete inventory.  Amortization expense included in cost of sales totaled $20 thousand for the third quarter of Fiscal 2015 and $467 thousand for the third quarter of Fiscal 2014.

***Gross Profit.***  Gross profit for the third quarter of Fiscal 2015 increased 35% to $75.6 million or 76% of net sales.  In comparison, gross profit for the third quarter of Fiscal 2014 was $56.1 million or 70% of net sales.  The third quarter of Fiscal 2015 gross profit percentage increase was mainly attributable to product price increases and changes in the mix of products sold, as discussed above.

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods.  Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.  Changes in future product sales mix may also occur.

*        *        *.

## Results of Operations - Nine months ended March 31, 2015 compared with the nine months ended March 31, 2014

Net sales increased 59% to $307.6 million for the nine months ended March 31, 2015. [...]
Product price increases contributed $133.5 million to the overall increase in net sales, partially offset by decreased volumes of $19.1 million.  The Company experienced favorable trends in product pricing on several key products during the period, as discussed below.  Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue. [...]

***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $40.0 million, primarily as a result of price increases on key products.

***Gallstone.*** Net sales of drugs used for gallstones increased by $45.5 million. The increase in net sales was primarily attributable to price increases on key products.

***Migraine.*** Net sales of drugs used to treat migraines increased by $9.6 million. The increase in net sales was attributable to price increases on key products, partially offset by decreased volumes. [...]

***Cost of Sales.*** Cost of sales for the first nine months of Fiscal 2015 decreased $21.5 million to $73.2 million. The decrease was primarily attributable to the nonrecurring $20.1 million charge related to the JSP contract renewal recorded in the first quarter of Fiscal Year 2014. The remaining decrease primarily reflected the impact of decreased volumes and lower amortization, partially offset by increased provisions for excess and obsolete inventory. Amortization expense included in cost of sales totaled $61 thousand for the first nine months of Fiscal 2015 and $1.4 million for the first nine months of Fiscal 2014.

***Gross Profit.*** Gross profit for the first nine months of Fiscal 2015 increased 138% to $234.4 million or 76% of net sales. In comparison, gross profit for the first nine months of Fiscal 2014 was $98.5 million or 51% of net sales. The charge related to the JSP contract renewal negatively impacted gross margin percentage by 10% points in the first nine months of Fiscal Year 2014. The remaining increase in gross profit percentage was due to product price increases.

\*     \*     \*

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the

SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

185.    The 3Q2015 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2015 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

186.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.    The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.    The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increases in price, but fail to disclose the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with

conspirators to fix the price of the Price Fixed Drugs;

        c.    The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because it does not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

        d.    Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

        e.    Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### S. August 26, 2015, Form 8-K

187.    On August 26, 2015, the Company filed a Form 8-K. In this filing the Company stated:

> For the fiscal 2015 fourth quarter, net sales rose 23% to $99.3 million from $80.6 million in last year's fourth quarter. Gross profit increased 29% to $72.0 million, or 72% of net sales, from $55.9 million, or 69% of net sales. Research and development (R&D) expenses increased to $7.0 million from $6.6 million for the fiscal 2014 fourth quarter. Selling, general and administrative (SG&A) expenses were $13.9 million, which included $1.6 million of acquisition-related expenses, compared with $12.0 million. Operating income grew 37% to $51.0 million from $37.4 million. Net income attributable to Lannett Company increased 44% to $33.9 million, or $0.91 per diluted share, from $23.5 million, or $0.64 per diluted share, for the prior year fourth quarter.

> "Our fourth quarter performance was in line with expectations and reflects higher sales and gross margin across a number of product categories," said Arthur Bedrosian, chief executive officer of Lannett. "We have now reported fourteen consecutive quarters in which net sales and adjusted EPS exceeded the comparable prior-

year period.

"Also during the fourth quarter, we completed the Silarx acquisition, which expands and diversifies our product pipeline, adds greater capacity to manufacture liquid pharmaceuticals and increases our current research and development capabilities. I am pleased to report that we expect the acquisition to be immediately accretive to our fiscal 2016 financial results and the integration of Silarx's operations is proceeding smoothly and is nearly complete."

For the fiscal 2015 full year, net sales rose 49% to $406.8 million from $273.8 million in the prior year. Gross profit was $306.4 million, or 75% of net sales. This compares with gross profit for fiscal 2014 of $154.4 million, or 56% of net sales, which included a non-recurring pre-tax charge of $20.1 million related to the contract extension with Jerome Stevens Pharmaceuticals, Inc. (JSP). Excluding the JSP contract renewal charge, gross profit was $174.5 million, or 64% of net sales. R&D expenses increased to $30.3 million from $27.7 million. SG&A expenses were $49.5 million, compared with $38.6 million. Included in SG&A expenses for fiscal 2015 were $4.3 million in acquisition-related expenses. Operating income was $226.5 million compared with $88.1 million for the prior year. Excluding the JSP contract renewal charge, operating income for the prior-year period was $108.2 million. Net income attributable to Lannett Company was $149.9 million, or $4.04 per diluted share, compared with $57.1 million, or $1.62 per diluted share, for fiscal 2014. Adjusted net income, which excludes the impact of the JSP contract renewal charge equal to $12.6 million after-tax, was $69.7 million, or $1.98 per diluted share, in fiscal 2014.

188. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular, Defendants knew or recklessly disregarded that:

a.    The statements referred to above about the Company's improved

performance reflected higher sales were materially false and misleading because they failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

b.      The statements referred to above about the Company's improved performance was driven by higher gross margins was materially false and misleading because they failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

c.      The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

d.      Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

e.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

f.      Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**T.  2015 Form 10-K**

189.      On August 27, 2015, Lannett filed a Form 10-K with the SEC for the fiscal year of 2015 ("2015 10-K"), signed by the Individual Defendants. In that 2015 10-K the Defendants

stated in part:

*Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships.*

We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.

\*        \*        \*

*Levothyroxine Sodium Tablets*

Levothyroxine Sodium tablets are produced and marketed with 12 varying potencies. Levothyroxine Sodium tablets are manufactured by JSP and we distribute it under the JSP Distribution Agreement. Levothyroxine Sodium tablets remain one of the most prescribed drugs in the U.S. and are used by patients of various ages and demographic backgrounds for the treatment of thyroid deficiency. Net sales of Levothyroxine Sodium tablets totaled $153.5 million in fiscal year 2015. In our distribution of these products, we compete with two brand Levothyroxine Sodium products—AbbVie's Synthroid® and Pfizer's Levoxyl®— as well as generic products from Mylan and Sandoz.

*Digoxin Tablets*

Digoxin tablets are produced and marketed with two different potencies. This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement. Digoxin tablets are used to treat congestive heart failure in patients of various ages and demographics. Net sales of this product totaled $49.0 million in fiscal year 2015. In our distribution of these products, we compete with a generic product from Impax and expect to compete against West-Ward, Caraco, Mylan, Impax and the brand Lanoxin from Covis.

\*        \*        \*

*Ursodiol Capsules*

Ursodiol Capsules are produced and marketed in 300 mg capsules and are used for the treatment of gallstones. Net sales of Ursodiol Capsules totaled $65.3 million in fiscal year 2015. We compete

with a generic product from Mylan and Epic as well as the brand Actigall from Actavis.

\*      \*      \*

## Competition

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products.

\*      \*      \*

| Product | Primary Competitors |
| --- | --- |
| Acetazolomide Tablets | Taro |
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Actavis and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Alternative products including using Lidocaine and Epinephrine combined |
| Digoxin Tablets | Mylan, Impax, West-Ward, Caraco, and Covis |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Ursodiol Capsules | Epic, Mylan and Actavis |

\*      \*      \*

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As

competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

\*       \*       \*

## Financial Summary

For Fiscal 2015, net sales increased to $406.8 million representing 49% growth over the prior year period. Gross profit increased $151.9 million to $306.4 million, compared to the prior year period which included the $20.1 million charge related to the JSP contract renewal. The JSP contract renewal charge equated to a 7 percentage point reduction in gross profit percentage. R&D expenses increased 9% to $30.3 million compared to the prior year period while SG&A expenses increased 28% to $49.5 million. Operating income for Fiscal 2015 was $226.5 million compared to $88.1 million in the prior year period. Net income attributable to Lannett Company, Inc. for Fiscal 2015 was $149.9 million, or $4.04 per diluted share. Comparatively, net income attributable to Lannett Company, Inc. in the prior year was $57.1 million, or $1.62 per diluted share, and included the $20.1 million pre-tax charge ($0.36 per diluted share) related to the JSP contract renewal.

\*       \*       \*

## Results of Operations — Fiscal 2015 compared to Fiscal 2014

Net sales increased 49% to $406.8 million for the fiscal year ended June 30, 2015.

\*       \*       \*

Product price increases contributed $157.3 million to the overall increase in net sales, partially offset by decreased volumes of $24.2 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and there can be no assurances that volume increases will be sufficient to fully offset any price decreases. Any

112

price decreases that occurred during Fiscal 2015 will have a full year impact on Fiscal 2016 net sales. The Company expects any full year impact from price decreases to be partially offset by increased volumes. The Company is currently not forecasting any further price decreases during Fiscal 2016.

*    *    *

***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $51.2 million, primarily as a result of price increases on key products.

***Gallstone.*** Net sales of drugs used for gallstones increased by $58.7 million. The increase in net sales was primarily attributable to price increases on key products.

***Migraine.*** Net sales of drugs used to treat migraines increased by $11.2 million. The increase in net sales was primarily attributable to price increases on key products, partially offset by decreased volumes.

***Glaucoma.*** Net sales of drugs used for the treatment of Glaucoma increased by $9.2 million. The increase in net sales was primarily attributable to price increases on key products.

*    *    *

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2015. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported as specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management to allow timely decisions regarding required disclosures. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include, among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

190.    The 2015 10-K contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

191.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.    The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal price-fixing;

b.    The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and

lacked true competition;

        c.      The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

        d.      The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

        e.      The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin were materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

        f.      The statements referred to above about Lannett competing in the Ursodiol marketplace were materially false or misleading because Lannett had entered into a cartel to fix the price of generic Ursodiol and other Price Fixed Drugs;

        g.      The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

        h.      The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

        i.      Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state

and federal antitrust authorities;

j.      Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

k.      Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### U.  First Quarter 2016 Form 10-Q

192.    On November 5, 2015, the Company filed its Form 10-Q with the SEC for the first quarter of 2016 ("1Q2016 10-Q"), signed by the Individual Defendants. In this filing the Company stated that:

> For the first quarter of Fiscal Year 2016, net sales increased to $106.4 million, representing 14% growth over the first quarter of Fiscal Year 2015.  Gross profit increased to $77.4 million compared to $71.6 million in the prior-year period and gross profit percentage decreased to 73% compared to 77% in the prior-year period.  R&D expenses increased 3% to $6.5 million compared to the first quarter of Fiscal Year 2015 while SG&A expenses increased 48% to $15.5 million from $10.5 million.  Acquisition-related expenses increased to $3.9 million from $70 thousand in the prior-year period.  Operating income for the first quarter of Fiscal Year 2016 was $51.4 million compared to $54.7 million in the first quarter of Fiscal Year 2015.  Net income attributable to Lannett Company, Inc. for the first quarter of Fiscal Year 2016 was $33.2 million, or $0.89 per diluted share compared to $34.9 million or $0.94 per diluted share in the first quarter of Fiscal Year 2015.
>
> *       *       *
>
> **Results of Operations - Three months ended September 30, 2015 compared with the three months ended September 30, 2014**
>
> Net sales increased 14% to $106.4 million for the three months ended September 30, 2015.

*       *       *.

Increased volumes contributed $20.9 million to the overall increase in net sales, partially offset by product price decreases of $7.9 million. The Company has experienced favorable trends in product pricing on several key products over the past several quarters. Although the Company has benefited in the past several quarters from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

*       *       *

***Thyroid Deficiency.***  Net sales of drugs used for the treatment of thyroid deficiency increased by $7.8 million, primarily as a result of increased volumes compared to the prior-year period due to above average customer purchases in the fourth quarter of Fiscal Year 2014 in anticipation of a price increase effective in the first quarter of Fiscal Year 2015, which led to lower than average volumes in the first quarter of Fiscal Year 2015. The increase in volumes was partially offset by pricing pressures.

*       *       *.

Net sales to wholesaler/distributor and retail chain increased as a result of increased sales in a variety of products for thyroid deficiency and gallstones, as discussed above. Mail-order pharmacy net sales decreased primarily as a result of decreased sales of cardiovascular drugs, as discussed above.

***Cost of Sales, including amortization of intangibles.***  Cost of sales for the first quarter of Fiscal Year 2016 increased 33% to $29.0 million from $21.8 million in the same prior-year period. The increase was primarily attributable to increased sales and product royalties, as well as changes in our product sales mix. Product royalties expense included in cost of sales totaled $1.3 million for the first quarter of Fiscal Year 2016 and $42 thousand for the first quarter of Fiscal Year 2015. Amortization expense included in cost of sales totaled $187 thousand for the first quarter of Fiscal Year 2016 and $20 thousand for the first quarter of Fiscal Year 2015. The increase in product royalties and amortization expense was attributable to the acquisition of Silarx on June 1, 2015.

***Gross Profit.***  Gross profit percentages for the first quarter of Fiscal Year 2016 and 2015 were 73% and 77%, respectively. The decrease was primarily attributable to pricing pressures, an increase in product royalties as well as changes in the product sales mix.

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors, changes in product mix and the costs of producing or purchasing new drugs may also fluctuate in future periods.

\*     \*     \*

### *Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

193.    The 1Q2016 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2016 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

194.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In

particular Defendants knew or recklessly disregarded that:

a.      The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.      The statements referred to above about the Company being unable to predict the level of competition in the marketplace were materially false and misleading because the Company was involved in a cartel to fix the price of the Price Fixed Drugs and control the level of competition in the marketplace;

c.      The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they primarily attribute the increase to increases in price, but failed to disclose the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

d.      The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because they did not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

e.      The statements referred to above regarding Lannett's cost of sales and gross profits were materially false and misleading because they omit information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

f.      Lannett's revenue and income, as stated above, were inflated in part as a

result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

g.     Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

## V.   Second Quarter 2016 Form 10-Q

195.   On February 9, 2016, the Company filed its Form 10-Q with the SEC for the second quarter of 2016 ("2Q2016 10-Q"), signed by the Individual Defendants. In this filing the Company stated that:

> For the second quarter of Fiscal Year 2016, net sales increased to $127.1 million, which included $26.1 million of net sales from the recently acquired KUPI. Excluding the impact of KUPI, net sales decreased 12% as compared to the same prior-year period primarily due to pricing pressures and increased competition, partially offset by increased volumes. Gross profit decreased to $71.6 million compared to $87.2 million in the prior-year period and gross profit percentage decreased to 56% compared to 76% in the prior-year period. Excluding the impact of KUPI, gross profit as a percentage of net sales decreased to 72%. R&D expenses increased 16% to $9.1 million compared to $7.8 million in the second quarter of Fiscal Year 2015 while SG&A expenses increased 36% to $14.7 million from $10.8 million. Acquisition-related expenses increased to $17.6 million from $2.0 million in the prior-year period. Operating income for the second quarter of Fiscal Year 2016 was $30.3 million compared to $66.5 million in the second quarter of Fiscal Year 2015. Net income attributable to Lannett Company, Inc. for the second quarter of Fiscal Year 2016 was $13.5 million, or $0.36 per diluted share compared to $44.8 million or $1.21 per diluted share in the second quarter of Fiscal Year 2015.

> For the first six months of Fiscal 2016, net sales increased to $233.5 million, which included $26.1 million of net sales from the recently acquired KUPI. Excluding the impact of KUPI, net sales were consistent with the same prior-year period as decreases related to pricing pressures and increased competition were offset by increased volumes. Gross profit decreased $9.7 million to

$149.1 million, compared to $158.8 million in the prior-year period. Gross profit percentage decreased to 64% compared to 76% in the prior-year period. Excluding the impact of KUPI, gross profit as a percentage of net sales decreased to 72%. R&D expenses increased 10% to $15.6 million compared to $14.2 million in the first six months of Fiscal 2015 while SG&A expenses increased 42% to $30.2 million from $21.3 million. Acquisition-related expenses increased to $21.5 million from $2.1 million in the prior-year period. Operating income for the first six months of Fiscal 2016 was $81.7 million compared to $121.2 million in the prior-year period. Net income attributable to Lannett Company, Inc. for the first six months of Fiscal 2016 was $46.7 million, or $1.25 per diluted share compared to $79.7 million or $2.15 per diluted share in the prior-year period.

\*     \*     \*

**Results of Operations - Three months ended December 31, 2015 compared with the three months ended December 31, 2014**

Net sales increased 11% to $127.1 million for the three months ended December 31, 2015.

\*     \*     \*.

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report. Our evaluation excluded Kremers Urban Pharmaceuticals, which was acquired on November 25, 2015.

196.    The 2Q2016 10-Q contained signed certifications pursuant to the SOX by

Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2016 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

197.     By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.     The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.     The statements referred to above regarding Lannett's net sales and gross profits were materially false and misleading because they omitted information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

c.     Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

d.     Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### W. Third Quarter 2016 Form 10-Q

198.    On May 10, 2016, the Company filed its Form 10-Q with the SEC for the third

quarter of 2016 ("3Q2016 10-Q"), which was signed by the Individual Defendants. In this filing

the Company stated that:

> For the third quarter of Fiscal Year 2016, net sales increased to $163.7 million, which included $69.9 million of net sales from the recently acquired KUPI.  Excluding the impact of KUPI, net sales decreased 6% as compared to the same prior-year period primarily due to pricing pressures and increased competition, partially offset by increased volumes.   Total net sales, which included a $23.6 million reduction for a settlement agreement, increased to $140.1 million from $99.4 million in the prior-year period.  Gross profit, including the $23.6 million settlement agreement, decreased to $57.5 million compared to $75.6 million in the prior-year period and gross profit percentage decreased to 41% compared to 76% in the prior-year period.  Excluding the impact of KUPI and the settlement agreement, gross profit as a percentage of net sales decreased to 71%.  R&D expenses increased 80% to $16.5 million compared to $9.2 million in the third quarter of Fiscal Year 2015 while SG&A expenses increased 39% to $16.2 million from $11.6 million.  Acquisition and integration-related expenses increased to $1.5 million from $587 thousand in the prior-year period.  Restructuring expenses increased to $4.7 million as a result of implementing the 2016 Restructuring Program.  Operating income for the third quarter of Fiscal Year 2016 was $18.6 million compared to $54.3 million in the third quarter of Fiscal Year 2015.  Net loss attributable to Lannett Company, Inc. for the third quarter of Fiscal Year 2016 was $5.5 million, or $0.15 per share compared to net income attributable to Lannett Company, Inc. of $36.2 million or $0.97 per diluted share in the third quarter of Fiscal Year 2015.
>
> For the first nine months of Fiscal 2016, net sales increased to $397.2 million, which included $96.1 million of net sales from the recently acquired KUPI.  Excluding the impact of KUPI, net sales decreased 2% as compared to the same prior-year period primarily due to pricing pressures and increased competition, partially offset by increased volumes.   Total net sales, which included a $23.6 million reduction for a settlement agreement, increased to $373.6 million from $307.6 million in the prior-year period.  Gross profit, including the $23.6 million settlement agreement decreased to $206.6 million compared to $234.4 million in the prior-year period and gross profit percentage decreased to 55% compared to 76% in the prior-year period.   Excluding the impact of KUPI and the

settlement agreement, gross profit as a percentage of net sales decreased to 72%. R&D expenses increased 37% to $32.1 million compared to $23.4 million in the first nine months of Fiscal 2015 while SG&A expenses increased 41% to $46.4 million from $32.9 million. Acquisition and integration-related expenses increased to $23.0 million from $2.7 million in the prior-year period. Restructuring expenses increased to $4.7 million as a result of implementing the 2016 Restructuring Program. Operating income for the first nine months of Fiscal 2016 was $100.4 million compared to $175.5 million in the prior-year period. Net income attributable to Lannett Company, Inc. for the first nine months of Fiscal 2016 was $41.2 million, or $1.10 per diluted share compared to $116.0 million or $3.13 per diluted share in the prior-year period.

*     *     *

## Results of Operations - Three months ended March 31, 2016 compared with the three months ended March 31, 2015

Total net sales, which included a $23.6 million reduction for a settlement agreement (see Note 24), increased to $140.1 million from $99.4 million in the prior-year period.

Net sales increased 65% to $163.7 million for the three months ended March 31, 2016.

*     *     *.

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

199.    The 3Q2016 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2016 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting.

200.    By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a.    The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

b.    The statements referred to above regarding Lannett's net sales and gross profits were materially false and misleading because they omitted information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

c.    Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

d.    Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation

of SEC disclosure rules.

## X. 2016 Form 10-K

201.    On August 29, 2016, Lannett filed its Form 10-K with the SEC for the fiscal year

of 2016 ("2016 10-K"), which was signed by the Individual Defendants. In that 10-K the

Defendants stated in part:

> *Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships.*
>
> We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.
>
> We have four strategies for expanding our product offerings: (1) deploying our experienced R&D staff to develop products in-house; (2) entering into product development agreements or strategic alliances with third-party product developers and formulators; (3) purchasing ANDAs from other generic manufacturers; and (4) marketing drugs under brand-names. We expect that each strategy will facilitate our identification, selection and development of additional pharmaceutical products that we may distribute through our existing network of customers.
>
> *            *            *
>
> **Key Products**
>
> *Levothyroxine Sodium Tablets*
>
> Levothyroxine Sodium tablets, which are used for the treatment of thyroid deficiency by patients of various ages and demographic backgrounds, is the second most prescribed drug in the United States. The product is manufactured by JSP and distributed by us under the JSP Distribution Agreement and is produced and marketed in 12 potencies. Net sales of Levothyroxine Sodium tablets totaled $162.4 million in fiscal year 2016. Levothyroxine is a narrow therapeutic index drug and very difficult to formulate which results in a less competitive market environment for this

molecule. In our distribution of these products, we compete with two brand Levothyroxine Sodium products, AbbVie's Synthroid and Pfizer's Levoxyl, as well as generic products from Mylan and Sandoz.

*Digoxin Tablets*

Digoxin tablets, which are used to treat congestive heart failure in patients of various ages and demographics, are produced and marketed with two different potencies. This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement. Net sales of this product totaled $23.9 million in fiscal year 2016. The product is highly potent based on Environment, Health & Safety ("EHS"), regulations and its API availability is limited given there are only two active suppliers, based on the FDA Drug Master File ("DMF") list. In our distribution of these products, we compete with generic products from Mylan, Impax, West-Ward and until recently Sun, as well as the brand product Lanoxin distributed by Concordia.

*Acetazolamide Tablets*

Acetazolamide tablets are used for the treatment of glaucoma. The product is a carbonic anhydrase inhibitor that reduces fluid pressure in the eyeball. It also increases the removal of water from the body by the kidneys and may block certain nerve discharges that may contribute to seizures. Net sales of Acetazolamide tablets totaled $25.3 million in fiscal year 2016. Currently, our primary generic competitor for this drug is Taro Pharmaceutical Industries.

\*       \*       \*

*Ursodiol Capsules*

Ursodiol Capsules are produced and marketed in 300 mg capsules and are used for the treatment of gallstones. Net sales of Ursodiol capsules totaled $67.3 million in fiscal year 2016. We compete with a generic product from Epic and Mylan, as well as the brand product Actigall distributed by Actavis.

\*       \*       \*

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and

dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position. We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products:

| Product | Primary Competitors |
|---------|---------------------|
| Acetazolamide Tablets | Taro |
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Watson and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Compounding pharmacies and alternative drugs |
| Digoxin Tablets | Mylan, Impax, West-Ward, Sun and Concordia |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Methylphenidate ER Tablets | Janssen, Mallinckrodt and Actavis |
| Omeprazole Capsules | Sandoz, Dr. Reddy's and Zydus |
| Ursodiol Capsules | Epic, Mylan and Actavis |

\*      \*      \*

**The generic pharmaceutical industry is highly competitive.**

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing

approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

*        *        *

For Fiscal 2016, net sales increased to $566.1 million, which included $165.6 million of net sales from the recent KUPI acquisition in November 2015. Excluding the impact of KUPI, net sales decreased 2% as compared to Fiscal 2015 primarily due to pricing pressures and increased competition, partially offset by increased volumes. Total net sales, which included a $23.6 million reduction for a settlement agreement, increased to $542.5 million from $406.8 million in the prior year period.

Gross profit, including the $23.6 million settlement agreement, decreased $19.9 million to $286.5 million, compared to the prior year period and gross profit percentage decreased to 53% compared to 75% in Fiscal 2015. Excluding the impact of KUPI and the settlement agreement, gross profit as a percentage of net sales decreased to 71%. R&D expenses increased 48% to $45.1 million compared to the prior year period while SG&A expenses increased 51% to $68.3 million. Acquisition and integration-related expenses increased to $27.2 million from $4.3 million in the prior year period. Restructuring expenses increased to $7.2 million as a result of implementing the 2016 Restructuring Program. Operating income for Fiscal 2016, which included an $8.0 million intangible asset impairment charge, was $130.8 million compared to $226.5 million in the prior year period. Net income attributable to Lannett Company, Inc. for Fiscal 2016, which included a $3.0 million loss on extinguishment of debt, was $44.8 million, or $1.20 per diluted share. Comparatively, net income attributable to Lannett Company, Inc. in the prior year was $149.9 million, or $4.04 per diluted share.

*        *        *

## Results of Operations — Fiscal 2016 compared to Fiscal 2015

Total net sales, which included a $23.6 million reduction for a settlement agreement, increased to $542.5 million from $406.8 million in the prior year period. The settlement agreement relates to a Settlement Agreement Release and Mutual Release with one of the Company's former customers. Refer to Note 22 "Settlement Agreement" for additional information.

Net sales increased 39% to $566.1 million for the fiscal year ended June 30, 2016.

*        *        *

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2016. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported as specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management to allow timely decisions regarding required disclosures. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include, among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

202. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

203. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal collusion and anticompetitive conduct;

b. The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

c. The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

d. The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

e. The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin were materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

f. The statements referred to above about Lannett competing in the Ursodiol

marketplace were materially false or misleading because Lannett had entered into a cartel to fix the price of generic Ursodiol and the other Price Fixed Drugs;

g. The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

h. The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

i. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

j. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

k. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### Y.  First Quarter 2017 Form 10-Q

204. On November 4, 2016, the Company filed its Form 10-Q with the SEC for the first quarter of 2017 ("1Q2017 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

**Financial Summary**

For the first quarter of Fiscal Year 2017, net sales increased to $161.6 million, which included $49.9 million of net sales from the recently acquired KUPI.  Excluding the impact of KUPI, net sales increased 5% as compared to the same prior-year period primarily due to price increases and, to a lesser extent, increased volumes from additional product launches.  Gross profit increased to $81.9 million compared to $77.4 million in the prior-year period and gross profit percentage decreased to 51% compared to 73% in the prior-year period.  Excluding the impact of KUPI, gross profit as a percentage of net sales decreased to 72%.  R&D expenses increased 90% to $12.4 million compared to $6.5 million in the first quarter of Fiscal Year 2016 while SG&A expenses increased 37% to $21.3 million from $15.5 million.  Acquisition and integration-related expenses decreased to $1.4 million from $3.9 million in the prior-year period.  Restructuring expenses increased to $2.1 million as a result of implementing the 2016 Restructuring Program.  Operating loss for the first quarter of Fiscal Year 2017, which included a $65.1 million intangible asset impairment charge, was $20.3 million compared to operating income of $51.4 million in the first quarter of Fiscal Year 2016.  Net loss attributable to Lannett Company, Inc. for the first quarter of Fiscal Year 2017 was $29.4 million, or $0.80 per diluted share compared to net income attributable to Lannett Company, Inc. of $33.2 million or $0.89 per diluted share in the first quarter of Fiscal Year 2016.

\*       \*       \*

**Results of Operations - Three months ended September 30, 2016 compared with the three months ended September 30, 2015**

Net sales increased 52% to $161.6 million for the three months ended September 30, 2016.

\*       \*       \*

Revenues from the KUPI acquisition of $49.9 million, product price increases of $3.8 million and increased volumes of $1.4 million contributed to the overall increase in net sales.  Although the Company has benefited in the past from favorable pricing trends, the trends are stabilizing and in, some instances, beginning to reverse.  The level of competition in the marketplace is constantly changing and the Company cannot predict with certainty that these trends will continue.

\*       \*       \*

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

205. The 1Q2017 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2017 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

206. By virtue of the facts alleged in ¶¶ 29-139, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

a. The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed

Drugs;

b. The statements referred to above regarding Lannett's cost of sales and gross profits were materially false and misleading because they omit information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

c. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

d. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC.

## LANNETT'S CLASS PERIOD SEC FILINGS WERE MATERIALLY MISSTATED

207. As alleged herein, throughout the Class Period Defendants were engaged in price fixing activity for the Price Fixed Drugs.

### A. Lannett Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues

208. During the Class Period, Lannett was engaged in illegal price-fixing activity on the Price Fixed Drugs. SEC Management Discussion and Analysis ("MD&A") disclosure rules required Defendants to disclose the impact of the artificial price increases on Lannett's reported revenues.[16]

---

[16] SEC Financial Reporting Release No. 72, *Commission Guidance Regarding Managements Discussion and Analysis of Financial Condition and Results of Operations:*

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent....

> The purpose of MD&A is not complicated. It is to provide readers information

209.     SEC Staff Accounting Bulletin No. 104 ("SAB 104") required additional MD&A disclosures regarding the impact of the Price Fixed Drugs' price increases, including the origin of the price increases (*i.e.*, illegal price-fixing activity), on Lannett's reported revenues during the Class Period. SAB 104 states:

> ***Changes in revenue*** should not be evaluated solely in terms of volume and price changes, but ***should also include an analysis of the reasons and factors contributing to the increase or decrease.*** **[Emphasis added]**

210.     Additionally, SEC Release No. 33-8350 provides the following analogous disclosure guidance requiring an analysis of volume and price changes affecting the Company's revenues:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[17]

211.     Lannett's reported revenues were impacted by its involvement in a cartel to raise the prices of the Price Fixed Drugs. During the Class Period the Price Fixed Drugs made up

---

"necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:

1.   To provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

2.   To enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

3.   To provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

[17] SEC Release Nos. 33-8350; 34-48960; FR-72

approximately 56% to 72% of Lannett's total annual sales and as such had a substantial effect on Lannett's revenue. Colluding to increase the prices of these drugs, upon which Lannett's net income heavily relied, allowed Lannett to deceive investors into thinking Lannett's financial performance was the result of legal business practices. Moreover, investors were deceived as to the risk that these revenues would continue.

**B. The Misstatements Were Material**

212. The SEC sets out certain methods to determine materiality. In the SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality* ("SEC 1-M") the SEC states: "the omission... of an item in a financial report is material if, in the light of the surrounding circumstances, the magnitude of the items is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion of the item.

213. According to SEC 1-M, when assessing materiality there are both quantitative and qualitative factors that must be examined. Here the above-alleged misstatements are both qualitatively and quantitatively material.

214. The misstatements were quantitatively material to Lannett's financial statements because of the sheer amount of sales, and accordingly revenue, that the Price Fixed Drugs occupied in Lannett's finances.

215. The misstatements were also qualitatively material as they concealed unlawful transactions. According to SEC 1-M: "Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are:...Whether the misstatement involves concealment of an unlawful transaction." While none of these misstatements are "quantitatively small" the fact that the misstatements all hid unlawful transactions should further

support their qualitative materiality.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

216.    Defendants acted with scienter in that Defendants Bedrosian and Galvan knew or recklessly disregarded that the statements issued in the name of Lannett were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.

217.    The Defendants illegal, anticompetitive conduct directly impacted the Company's core operations. Lannett, as a generic drug manufacturer, is primarily engaged in the development and sales of Generic Drugs. The illegal conduct alleged in this complaint affected the prices at which Lannett was selling its drugs. During the Class Period, the Individual Defendants regularly told analysts, and the investing public, of their personal involvement in the pricing of the Price Fixed Drugs. Additionally, there is no doubt that Bedrosian set the prices of the Price Fixed Drugs. As shown above, those prices were undoubtedly set by collusion. Bedrosian as the one who set the prices, knew of and engaged in the collusion.

218.    The Price Fixed Drugs, which made up between 56% and 72% of Lannett's total annual sales during the Class Period, were central to the survival, profitability, and marketability of Lannett. In fact, Levothyroxine and Digoxin were so important to Lannett that if it experienced an interruption in the supply of those drugs or the supply was interrupted, then Lannett's operating results would suffer. Lannett used this language in their 2014 10-K during the Class Period:

> **We materially rely on an uninterrupted supply of finished products from JSP for a majority of our sales. If we were to**

138

**experience an interruption of that supply, our operating results would suffer.**

58% of our fiscal year 2014 net sales are of distributed products, primarily manufactured by JSP. ***Two of these products are Levothyroxine Sodium and Digoxin, which accounted for 37% and 20%, respectively, of our Fiscal 2014 net sales, and 38% and 8%, respectively, of our net sales for Fiscal 2013***. On August 19, 2013, the Company entered into an agreement with JSP to extend its initial contract to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; Levothyroxine Sodium Tablets USP. The amendment to the original agreement extends the initial contract, which was due to expire on March 22, 2014, for five years through March 2019. Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party. If the supply of these products is interrupted in any way by any form of temporary or permanent business interruption to JSP, including but not limited to fire or other naturally-occurring, damaging event to their physical plant and/or equipment, condemnation of their facility, legislative or regulatory cease and desist declaration regarding their operations, FDA action, and any interruption in their source of API for their products, our operating results could be materially adversely affected. We do not have, at this time, a second source for these products.

(Emphasis added)

219. With an incredibly small product mix making up more than half of Lannett's revenue, even small price increases in key products would result in a material return on Lannett's bottom line. The Individual Defendants needed to ensure that their profits from the Price Fixed Drugs remained high so that they could secure funding for their acquisition strategy, which resulted in the Company taking on more debt than it had at any other time in its history. The Company then needed to continue in this illegal, anticompetitive price fixing to pay off the debt that it had incurred and to remain a viable company. The Company also used its common stock, with their prices increased by the price-fixing scheme, and the additional revenue it realized from

the increased prices of the Price Fixed Drugs, to pay for Lannett's acquisitions during the Class Period.

220.    In addition, CW1 stated that it was Bedrosian and Kevin Smith who set the prices for the drugs, including the increases in those prices, and further stated that nothing was done at Lannett without Bedrosian's blessing.

221.    Defendant Bedrosian also capitalized on the inflated stock price caused by Lannett's participation in the cartel to fix the price of the Price Fixed Drugs. Bedrosian sold 70,500 shares of Lannett common stock worth $3,854,410.00 during the Class Period. Bedrosian created, and entered into 10b5-1 plans during the Class Period when he was in possession of material nonpublic information in order to benefit from the artificially increased Lannett stock price.

222.    Thus, Bedrosian was able to siphon out a substantial amount of value from the Company while its stock price was inflated as a result of (i) Bedrosian's and the Company's misleading statements and/or material omissions, and (ii) Lannett's involvement in an illegal price-fixing conspiracy for its key products. The below chart shows Bedrosian's transactions in Lannett's common stock during the Class Period:

| Trade Date | Participants | Net Sell (Shares) | Net Buy (Shares) | Close Price |  |
|---|---|---|---|---|---|
| 12/13/2013 | BEDROSIAN ARTHUR P | | 5,000 | 29.6300 | ($148,150.00) |
| 06/16/2014 | BEDROSIAN ARTHUR P | (5,000) | | 47.4600 | $237,300.00 |
| 07/15/2014 | BEDROSIAN ARTHUR P | (5,000) | | 47.0900 | $235,450.00 |
| 08/18/2014 | BEDROSIAN ARTHUR P | (5,000) | | 40.4000 | $202,000.00 |
| 09/16/2014 | BEDROSIAN ARTHUR P | (5,000) | | 40.6400 | $203,200.00 |
| 10/15/2014 | BEDROSIAN ARTHUR P | (5,000) | | 40.3000 | $201,500.00 |
| 11/17/2014 | BEDROSIAN ARTHUR P | (5,000) | | 46.6400 | $233,200.00 |
| 12/15/2014 | BEDROSIAN ARTHUR P | (5,000) | | 44.0500 | $220,250.00 |
| 01/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 42.5600 | $212,800.00 |
| 02/17/2015 | BEDROSIAN ARTHUR P | (5,000) | | 61.2300 | $306,150.00 |
| 03/16/2015 | BEDROSIAN ARTHUR P | (5,000) | | 65.1000 | $325,500.00 |
| 04/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 67.7400 | $338,700.00 |
| 05/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 52.6000 | $263,000.00 |
| 06/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 56.2800 | $281,400.00 |
| 07/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 61.2400 | $306,200.00 |
| 08/17/2015 | BEDROSIAN ARTHUR P | (5,000) | | 53.5100 | $267,550.00 |
| 09/15/2015 | BEDROSIAN ARTHUR P | (5,000) | | 56.0100 | $280,050.00 |
| 02/05/2016 | BEDROSIAN ARTHUR P | | 4,500 | 24.8200 | ($111,690.00) |
| | TOTALS | (80,000) | 9,500 | | $3,854,410.00 |

223. The fact that Bedrosian continually sold, and never bought, shares of Lannett common stock over a sixteen month period when the stock price was at its highest levels is highly suspicious and strongly indicative of scienter. Bedrosian only purchased shares when the scheme was only beginning to be implemented and its full impact on the Company's stock price had not yet occurred, and then purchased again after sixteen months of selling shares only when the Company's stock price had declined in response to the partial disclosures of the price-fixing scheme.

224. Defendants were also highly motivated to sell 4.25 million shares of Lannett common stock that they issued during the Class Period. These shares yielded net proceeds of $71.5 million. The Defendants needed to ensure there was sufficient demand for these shares and through their price fixing, Defendants were able to craft an image of Lannett as a company whose common stock was highly desirable.

## CLASS ACTION ALLEGATIONS

225. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Lannett's common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lannett's common stock were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Lannett shares were traded publicly during the Class Period on the NYSE. As of May 15, 2017 Lannett had 37.19 million shares of common stock outstanding. Record owners and other members of the Class may be identified from the records maintained by Lannett or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

229. Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  Whether the statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Lannett;

c.  Whether Lannett engaged in collusion to fix prices for the Price Fixed Drugs;

d.  Whether Defendants acted with scienter;  and

e.  To what extent the members of the Class have sustained damages and the proper measure of damages.

230.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

231.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses.  During the Class Period, Plaintiffs and the Class purchased Lannett common stock at artificially inflated prices and were damaged thereby when the price of Lannett common stock declined when the truth was revealed.  The price of

Lannett common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

232.    Specifically, Defendants' materially false and misleading statements and omissions misrepresented, *inter alia*, Lannett's competition, as the Company was not competing as to price regarding certain of its drugs, but instead had colluded with other companies to fix the prices of those drugs.   In addition, Defendants' materially false and misleading statements and omissions misrepresented, *inter alia*, that Lannett was complying with all laws when, in fact, it was violating federal antitrust laws by colluding with other companies to determine prices for certain of its drugs. The materially false and misleading statements and omissions also failed to inform the Class of the risk that Lannett's financial results could not be sustained because they were the result of price-fixing.   Defendants' false and misleading representations and omissions caused and maintained the artificial inflation in the price of Lannett's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market. The timing and magnitude of Lannett's common stock price declines, as detailed herein, negate any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.   The market for the Company's common stock promptly digested current information with respect to Lannett from all publicly available sources and reflected such information in the price of the Company's common stock.

233.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the

market in a series of partial adverse disclosures and third-party reports in the media. When Defendants' prior misrepresentations and omissions were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of Lannett common stock declined because the price inflation was removed. As a result of their purchases of Lannett common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below.

234. On July 16, 2014, Lannett issued a press release revealing that "it has received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin." The press release stated, in part, as follows:

### Lannett Receives Inquiry from Connecticut Attorney General

Lannett Company, Inc. (NYSE: LCI) today announced that it has received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a0 fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.

235. On this news, shares of Lannett decreased $10.13 per share over the next two trading days to close at $36.96 per share on July 17, 2014.

236. On November 6, 2014, the Company filed a Form 10-Q for the period ended September 30, 2014, revealing that a grand jury subpoena had been served on the Company's Senior Vice President of Sales and Marketing relating to a federal investigation of the generic pharmaceutical industry. That Form 10-Q stated, in part, as follows:

<u>Federal Investigation into the Generic Pharmaceutical Industry</u>

On November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.

237. On this news, shares of Lannett decreased $2.98 per share over the next two trading days to close at $50.17 per share on November 7, 2014.

238. On December 8, 2014, after the market closed, Lannett filed a Form 8-K with the SEC, disclosing that it was served with a grand jury subpoena relating to the federal investigation of the generic pharmaceutical industry. The Form 8-K stated, in part, as follows:

On December 5, 2014, the Company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products.

239. On the disclosure of this news, shares of Lannett decreased $6.08 per share over the next two trading days to close at $41.92 per share on December 10, 2014.

240. On November 3, 2016, *Bloomberg* and other media outlets revealed that criminal charges may be filed in connection with the federal investigation into a dozen companies, including Lannett for unlawful price collusion in the generic drug industry. The *Bloomberg* article reported, in part, as follows (emphasis added):

U.S. prosecutors are bearing down on generic

pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceuticals Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, *Lannett Co.*, Impax Laboratories, Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

\*      \*      \*

Digoxin prices increased nearly sevenfold in late 2013. Lannett raised the list price to $1.185 a pill from 17 cents on Oct. 16, 2013, for a 100 pack of 250 microgram tablets, according to data from First Databank complied by Bloomberg. Six days later, Impax matched Lannett's price, up from 14 cents a pill. At the time, the two companies dominated the market.

Par introduced its own version to the market in January 2014, also at $1.185 a pill. In March 2015, Sun Pharma followed suit.

241. On this news, Lannett's share price declined $6.25 per share, or approximately 27%, from its previous closing price to close at $17.25 per share on November 3, 2016.

242. Accordingly, as a result of their purchases of Lannett's publicly traded common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss and damages.

## <u>APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)</u>

243.     The market for Lannett's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Lannett's common stock traded at artificially inflated prices during the Class Period. On April 10, 2015, the Company's stock closed at a Class Period high of $ 71.15 per share. Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Lannett's common stock and market information relating to Lannett, and have been damaged thereby

244.     During the Class Period, the artificial inflation of Lannett's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lannett's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Lannett and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

245.     At all relevant times, the market for Lannett's common stock was an efficient market for the following reasons, among others:

         a.     Lannett stock met the requirements for listing, and was listed, and actively

traded on the NYSE, a highly efficient and automated market;[18]

        b.      As a regulated issuer, Lannett filed periodic public reports with the SEC and/or the NYSE;

        c.      Lannett regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuit of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.      Lannett was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

246.    As a result of the foregoing, the market for Lannett's common stock promptly digested current information regarding Lannett from all publicly available sources and reflected such information in Lannett's public stock price. Under these circumstances, all purchasers of Lannett's common stock during the Class Period suffered similar injury through their purchase of Lannett's common stock at artificially inflated prices and a presumption of reliance applies.

247.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants material omissions. Because this action involves Defendants' failure to disclose material adverse information identified above,

---

[18] During the early portion of the Class Period Lannett was listed on NYSE MKT which is the New York Stock Exchange's Small Cap Equity Market. On December 2, 2013 Lannett announced that it would begin transfer listing its common stock onto the New York Stock Exchange ("NYSE") and it would begin trading on the NYSE from December 13, 2013 onwards.

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material undisclosed facts, including the collusion Lannett engaged in with other generic drug companies, and the consequences of possible criminal proceedings against the Company for its ongoing involvement in a cartel to fix the prices of the Price Fixed Drugs, as set forth above, that requirement is satisfied.

## NO SAFE HARBOR

248. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statements was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lannett who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

249.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

250.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (ii) cause Plaintiffs and the other members of the Class to purchase Lannett's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

251.     Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lannett's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

252.     Defendants, individually and in concert, directly and indirectly. By the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lannett's financial well-being, operations and prospects, as specified herein.

253.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lannett's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lannett and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

254.    Each of the Individual Defendants' primary liability, and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, products, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times, including communications with governmental and regulatory agencies; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

255. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lannett's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

256. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lannett's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Lannett's common stock during the Class Period at artificially high prices and were damaged thereby.

257. At the time of said misrepresentations and/or omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding the criminal enterprise that Lannett was involved in, which was not disclosed by Defendants, the Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Lannett common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

258.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

259.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Against All Defendants

260.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

261.    During the Class Period, Defendants violated SEC Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and the members of the Class with their purchases of Lannett common stock during the Class Period as alleged herein.

262.    During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154

263.     Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading. Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Lannett as specified herein.

264.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Lannett's true financial condition from the investing public and supporting the artificially inflated price of Lannett common stock.

265.     Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lannett common stock. Plaintiffs and the Class would not have purchased Lannett common stock at the prices they paid, or at all, had they been aware that the market prices for the common stock had been artificially inflated by the materially false and misleading statements and omissions alleged herein.

## COUNT III

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

266.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

267.     The Individual Defendants acted as controlling persons of Lannett within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

268.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

269.    As set forth above, Lannett and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Lannett's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows

(a)    Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly or severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 25, 2017                    Respectfully submitted,

By: _____

David M. Promisloff

**PROFY PROMISLOFF & CIARLANTO, P.C.**

David M. Promisloff (ID# 200971)
Jeffrey J. Ciarlanto (ID# 205838)
100 N. 22nd Street, Unit 105
Philadelphia, Pennsylvania 19103
(215) 259-5156 (tel)
(215) 600-2642 (fax)
David@prolawpa.com
Ciarlanto@prolawpa.com

*Liaison Counsel for the Class*

**ABRAHAM, FRUCHTER AND TWERSKY, LLP**
Mitchell M.Z. Twersky (*Pro Hac Vice*)
Atara Hirsch (*Pro Hac Vice* forthcoming)
Lawrence D. Levit (*Pro Hac Vice*)
Todd Kammerman (*Pro Hac Vice*)
Matthew E. Guarnero (*Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050 (tel)
(212) 279-3655 (fax)
MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
TKammerman@aftlaw.com
MGuarnero@aftlaw.com

*Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*Pro Hac Vice*)
Tamar A. Weinrib
600 Third Avenue
New York, New York 10016
(212) 661-1100 (tel)
(917) 463-1044 (fax)
jalieberman@pomlaw.com
taweinrib@pomlaw.com

*Counsel for Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on May 25, 2017, a true and correct copy of the foregoing was filed with the Clerk of the Court.  Plaintiffs' counsel will serve the Amended Complaint on counsel of record via electronic mail on May 25, 2017. Defendants' counsel includes:

Ian M. Comisky (Icomisky@foxrothschild.com)

Matthew D. Lee (Mlee@foxrothschild.com)

David M. Promisloff