**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff(s), | Civil Action No. 2:16-cv-05932-WB |
| v. | |
| LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN, | <u>ORAL ARGUMENT REQUESTED</u> |
| Defendants. | Judge Wendy Beetlestone |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, AND MARTIN P. GALVAN'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

---

FOX ROTHSCHILD LLP
Ian M. Comisky (PA 20634)
Matthew D. Lee (PA 85914)
2000 Market Street, 20th Floor
Philadelphia, PA  19103
Phone: (215) 299-2795, 2765
Fax: (215) 299-2150

September 15, 2017

*Attorneys for Defendants Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

    A.    Lannett and the Individual Defendants ................................................ 2

    B.    The Generic Drugs at Issue ................................................................. 2

        1.    Digoxin ................................................................................... 2

        2.    Levothyroxine ......................................................................... 3

        3.    Acetazolamide ........................................................................ 4

        4.    Ursodiol .................................................................................. 4

    C.    Government Investigations of Anticompetitive Price-Fixing in the Generic Pharmaceutical Industry ................................................................ 5

PROCEDURAL HISTORY ...................................................................................... 6

ARGUMENT ........................................................................................................... 7

I.      THE LEGAL STANDARD GOVERNING A MOTION TO DISMISS ......................... 7

II.     PLAINTIFFS' SECTION 10(b) PRICE-FIXING ALLEGATIONS FAIL TO STATE A CLAIM ................................................................................................ 9

    A.    Plaintiffs Have Failed to Plead a Strong Inference of Scienter ........................... 10

        1.    Plaintiffs' Allegations Regarding Defendants' Alleged Motive and Opportunity Are Insufficient as a Matter of Law to Plead Scienter ......... 11

        2.    Plaintiffs' Trading Allegations Fail to Plead Scienter ............................. 12

        3.    The Scienter Allegations Attributed to a "Confidential Witness" Are Unavailing ................................................................................. 14

    B.    Plaintiffs Have Failed to Plead Loss Causation .................................................. 16

    C.    Plaintiffs Have Failed to Plead a Material Misrepresentation or Omission .......... 18

        1.    Plaintiffs Have Failed to Plead an Actionable Omission ......................... 19

2.      Plaintiffs Have Failed to Allege That Defendants Made Any Misleading
        Statements Regarding Lannett's Earnings ...............................................19

3.      Plaintiffs Have Alleged No Evidence of Illegal Price-Fixing .................21

III.    PLAINTIFFS' SECTION 10(b) PRICE-EROSION ALLEGATIONS FAIL TO
        STATE A CLAIM.......................................................................................25

A.      Plaintiffs Have Failed to Plead a Material Misrepresentation or Omission..........26

B.      Plaintiffs Have Failed to Plead a Strong Inference of Scienter ...........................27

IV.     PLAINTIFFS' SECTION 20(a) ALLEGATIONS FAIL TO STATE A CLAIM............27

CONCLUSION................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ......................................................................... 11, 20

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ...................................................................................9

*In re Almost Family, Inc. Sec. Litig.*,
  No. 3:10-CV-00520-H, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ...................17

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004) .................................................................................10

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ...................................................................................24

*In re Am. Bus. Fin. Serv., Inc., Sec. Litig.*,
  413 F. Supp. 2d 378, 402 (E.D. Pa. 2005) ...................................................... 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 8, 15

*In re Avista Corp. Sec. Litig.*,
  415 F. Supp. 2d 1214 (E.D. Wash. 2005) .............................................................17

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) .................................................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................... 8, 15, 19, 21, 22, 23

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) .................................................................................28

*In re Blood Reagents Antitrust Litig.*,
  No. 09-MD-2081, 2017 WL 3048660 (E.D. Pa. 2017) ........................................23

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997).................................................................................13

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) .................................................................................21

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ................................................................. 9, 14, 15

*Caplin v. Trans1, Inc.*,
    973 F. Supp. 2d 596 (E.D.N.C. 2013) ................................................................. 17

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015) ................................................................. 24

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................. 19

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) ................................................................. 19

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) ................................................................. 13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ................................................................. 19, 24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................. 16

*Dutton v. Harris Stratex Networks, Inc.*,
    270 F.R.D. 171 (D.Del. 2010) ................................................................. 8

*Galati v. Commerce Bancorp, Inc.*,
    220 F. App'x 97 (3d Cir. 2007) ................................................................. 20, 21

*In re Generic Digoxin and Doxycycline Antitrust Litig.*,
    222 F. Supp. 3d. 1341 (J.P.M.L. 2017) ................................................................. 7

*GSC Partners CDO Fund v. Wash.*,
    368 F.3d 228 (3d Cir. 2004) ................................................................. 11

*Health Robotics, LLC v. Bennett*,
    No. 09-0627, 2009 WL 5033966 (E.D. Pa. Dec. 22, 2009) ................................................................. 8

*Heard v. St. Luke's Hosp.*,
    No. 08-5495, 2009 WL 3081513 (E.D. Pa. Sept. 28, 2009) ................................................................. 8

*In re Immucor, Inc. Sec. Litig.*,
    No. 09-cv-2351, 2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) ................................................................. 18

*Inst'l Investors Group v. Avaya, Inc.*,
    564 F.3d 242, 277 (3d Cir. 2009) ................................................................. 10, 11, 12, 13, 14, 15

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...........................................................................21

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ..............................................................15

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003) ...........................................................................21

*Just New Homes, Inc. v. Beazer Homes*,
    293 F.App'x 931 (3d Cir. 2008) ...................................................................23

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................................12

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .......................................................................17

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .........................................................................16

*Martorano v. City of Philadelphia*,
    No. 09-3998, 2009 WL 3353089 (E.D. Pa. Oct. 14, 2009) ...............7, 8

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013).....................................................................17

*In re Micron Techs., Inc. Sec. Litig.*,
    No. 06-cv-085, 2007 WL 576468 (D. Idaho Feb. 21, 2007) ................22

*In re Milestone Scientific Sec. Litig.*,
    103 F. Supp. 2d 425 (D.N.J. 2000) .........................................................8, 28

*In re Mirant Corp. Sec. Litig.*,
    No. 02-cv-1467, 2009 WL 48188 (N.D. Ga. Jan. 7, 2009) ..................19

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .........................................................................................22

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) .....................................................................12, 13

*Papasan v. Allain*,
    478 U.S. 265 (1986) ...........................................................................................8

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) .....................................................12, 27, 28

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006) .......................................................................... 27, 28

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993) .......................................................................................... 23

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) .............................................................................. 17

*In re Prison Realty Sec. Litig.*,
    117 F .Supp. 2d 681 (M.D. Tenn. 2000) ........................................................................ 28

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D.Pa. 2009) ............................................................................. 12

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2016) ........................................................................................... 11

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010) ............................................................................................. 7

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ........................................................................... 20

*Sapssov v. Health Mgmt. Assoc., Inc.*,
    608 F. App'x 855 (11th Cir. 2015) ................................................................................. 17

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ........................................................................................... 13

*In re Sotheby's Holdings, Inc.*,
    No. 00-cv-1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ..................................... 22

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    No. 12-cv-00993, 2016 WL 7117455 (M.D. Pa. Dec. 7, 2016) ...................................... 17

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010) ........................................................................... 23, 24

*Superior Offshore Int'l., Inc. v. Bristow Grp., Inc.*,
    490 F.App'x 492 (3d Cir. 2012) ..................................................................................... 25

*Teachers' Ret. Sys. of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .......................................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................... 8, 9, 10

*Williams v. Globus Med., Inc.*,
   No. 16-3607, 2017 WL 3611996 (3d Cir. Aug. 23, 2017) ................................................9, 20

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04-cv-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)............................................19

## STATUTES

15 U.S.C. § 78u-4(b)(1)..............................................................................................................9

15 U.S.C. § 78u-4(b)(2)..........................................................................................................9, 10

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b) ......................................................................................8, 9

Federal Rule of Civil Procedure 12(b)(6)...................................................................................1

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Lannett Company, Inc., ("Lannett" or the "Company") and Arthur P. Bedrosian and Martin P. Galvan (collectively, the "Individual Defendants"), by and through their undersigned counsel, respectfully seek dismissal of the Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. Entry 57) (the "Amended Complaint" or "AC") filed by the Plaintiffs on May 25, 2017.

## PRELIMINARY STATEMENT

In 2014, Lannett issued a press release and disclosed in two documents filed with the Securities and Exchange Commission ("SEC") that it and one of its employees had received subpoenas and document requests related to ongoing governmental investigations into the generic pharmaceutical industry and possible violations of the Sherman Act. AC at ¶¶ 10-11, 110-112. Two years later, in November, 2016, Bloomberg published an article reporting that U.S. prosecutors *might* file criminal charges by the end of 2016 against several unnamed generic drug companies for illegally colluding to fix drug prices. *Id.* at ¶¶ 14, 115. Shortly thereafter, Plaintiffs filed this putative class action in the hope that such criminal charges would materialize against Lannett and validate their lawsuit. That has not happened.

Neither Lannett nor its executives have been charged. In fact, no charges have been filed by any government agency involving any of the drugs at issue in this litigation. Still Plaintiffs have pressed on, deprived of the factual assist they had hoped the government would provide, filing a 162-page Amended Complaint in a desperate effort to avoid dismissal. Heft, however, is no substitute for substance.

As set forth more fully below, Plaintiffs' Amended Complaint is precisely the sort of underspecified and repetitive pleading ripe for dismissal pursuant to Rule 9(b). The Amended Complaint utterly fails to plead falsity, does not allege *any* particularized facts giving rise to a

1

strong inference of scienter, and fails outright to plead that Defendants' alleged misrepresentations caused Plaintiffs' claimed losses.  Further, Plaintiffs' claims rely on circumstantial factual allegations that courts have rejected as insufficient to support a securities fraud claim.  In short, since Plaintiffs do not come close to stating cognizable claims, their Amended Complaint should be dismissed with prejudice now.

**BACKGROUND**

### A.   Lannett and the Individual Defendants

Lannett is a Delaware corporation that, among other things, develops, manufactures, and distributes generic pharmaceutical products.  AC at ¶ 21. Mr. Bedrosian has served as Lannett's Chief Executive Officer since 2006 and served as Lannett's President from 2002 to 2014.  *Id.* at ¶ 22.  Mr. Galvan is Lannett's Chief Financial Officer and has served as the Company's Vice President of Finance and Treasurer since 2011.  *Id.* at ¶ 23.

### B.   The Generic Drugs at Issue

Though Plaintiffs acknowledge that Lannett produces pharmaceutical products "that address a wide range of therapeutic areas" (*id.* at ¶ 21), their Amended Complaint focuses on just four generic drugs.  Plaintiffs assert, in short, that Lannett "colluded with its industry peers to fix the prices of" those four products in order "[t]o finance the acquisition binge started by the Individual Defendants."  *Id.* at ¶¶ 1, 4.

#### 1.   Digoxin

Digoxin is used to treat heart failure and chronic atrial fibrillation.  *Id.* at ¶ 50.  Plaintiffs allege that at some point during the class period—despite 162 pages of allegations, their Amended Complaint does not specify when, exactly—Lannett and Impax Pharmaceuticals ("Impax"), another manufacturer of generic drugs, "controlled approximately 96 percent of the market for Digoxin."  *Id.* at ¶ 54.  Though they fail to allege any direct evidence of collusion

2

between Lannett and Impax, Plaintiffs nonetheless assert that a November 2013 increase in the price of Digoxin "was the result of collusive price-fixing." *Id.* at ¶¶ 54, 55.

Plaintiffs further assert that the market for Digoxin was "highly vulnerable to anticompetitive conduct." *Id.* at ¶ 59. An alleged "[a]bsence of [c]ompetitive [s]ellers" in the Digoxin market meant, according to Plaintiffs, that "[t]here is (and was) no realistic threat that a fringe of competitive sellers will take market share from Lannett." *Id.* at ¶ 64. Plaintiffs do not attempt to reconcile this allegation with a graphic they included in the Amended Complaint that shows a number of new companies entering the Digoxin market midway through the class period to claim a significant portion of Lannett's market share. *Id.* at ¶ 51.[1]

## 2. **Levothyroxine**

Levothyroxine Sodium ("Levothyroxine") is "the preferred treatment for hypothyroidism." *Id.* at ¶ 66. Plaintiffs allege that during the class period, the market for Levothyroxine was "highly concentrated among four manufacturers": Lannett, Abbvie US LLC ("Abbvie"), Mylan N.V. ("Mylan"), and Sandoz Inc. ("Sandoz"). *Id.* at ¶ 68. Plaintiffs further assert that the average price of Levothyroxine tablets increased "significantly" between August 2013 and August 2014. *Id.* at ¶ 69. Though they cite no direct evidence of collusion regarding those alleged price hikes, Plaintiffs nonetheless assert that "[t]hese substantial price increases could only be reasonably explained as the result of collusion." *Id.* at ¶ 71.

However, as Plaintiffs note elsewhere in the Amended Complaint, "there was a shortage reported for Levothyroxine during the Class Period." *Id.* at ¶ 75. Plaintiffs attempt to minimize the significance of that shortage by arguing that it "should not have had a material effect on

---

[1] According to that graphic, Lannett went from controlling a majority of the market for Digoxin prior to the start of the purported class period, to having lost so much market share that it was in the third position by the close of that period. AC at ¶ 51.

prices" because it was reported by Pfizer, which "is not a major market player in the Levothyroxine market." *Id.* Plaintiffs do not explain why the market share of the company that reported the shortage should determine its economic significance.[2]

### 3. Acetazolamide

Acetazolamide is used to "treat glaucoma, epilepsy, altitude sickness, paralysis, and heart failure." *Id.* at ¶ 83. Plaintiffs allege that for the majority of the class period, Lannett and Taro Pharmaceuticals ("Taro"), another generic manufacturer, accounted for "close to 100% of the total sales" of Acetazolamide. *Id.* at ¶ 85. Plaintiffs further assert that the market price of acetazolamide increased significantly at the start of the alleged class period. *Id.* at ¶ 86. Although they do not allege any direct evidence of collusion between Lannett and Taro, Plaintiffs nonetheless assert that "[t]he Acetazolamide price increases could only be reasonably explained as the result of collusive behavior." *Id.* at ¶ 87.

### 4. Ursodiol

Ursodiol is "a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution." *Id.* at ¶ 96. Plaintiffs allege that the "Ursodiol Capsule market is dominated by Lannett, Actavis Generics ('Actavis'), and Epic Pharma ('Epic')." *Id.* at ¶ 97. Plaintiffs further allege that "[f]ollowing two generic pharmaceutical manufacturers meetings attended by Actavis, Lannett, and Epic, in February and June of 2014, the price of Ursodiol" increased significantly. *Id.* at ¶ 99. Again, while they do not allege any direct evidence of collusion between Lannett, Actavis, and Epic, Plaintiffs nonetheless assert that the "dramatic and uniform price hikes in Ursodiol have no

---

[2] Additionally, according to a graphic included in the Amended Complaint, Sandoz significantly increased its market share to the detriment of other competitors during the alleged class period. AC at ¶ 68.

reasonable explanation absent collusion." *Id.* at ¶ 101.

**C.**     **Government Investigations of Anticompetitive Price-Fixing in the Generic Pharmaceutical Industry**

Plaintiffs allege that on July 16, 2014, Lannett issued a press release stating that it had "'received interrogatories and [a] subpoena from the State of the Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.'" *Id.* at ¶ 234. Plaintiffs allege that Lannett's share price declined in the wake of that announcement. *Id.* at ¶ 235. Plaintiffs also allege that on October 2, 2014, two members of Congress sent a letter to Mr. Bedrosian requesting documents and other information relating to various aspects of Lannett's business. *Id.* at ¶ 111.

The following month, Lannett filed a Form 10-Q with the Securities and Exchange Commission ("SEC") in which it disclosed that the Company's "'Senior Vice President of Sales and Marketing . . . was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.'" *Id.* at ¶ 112. On December 8, 2014, Lannett filed a Form 8-K with the SEC disclosing that it had received a grand jury subpoena "relating to the federal investigation of the generic pharmaceutical industry." *Id.* at ¶ 238. Plaintiffs allege that each of these filings preceded a decline in Lannett's share price. *Id.* at ¶¶ 237, 239.

Nearly two years later, on November 3, 2016, "Bloomberg and other media outlets" reported that "'U.S. prosecutors [were] bearing down on generic pharmaceutical companies'" and that "'the first charges *could* emerge by the end of the year.'" *Id.* at ¶ 240 (emphasis added). Bloomberg's article identified nearly a dozen companies allegedly tied to the federal inquiry, including Lannett. *Id.* Plaintiffs allege that the publication of this Bloomberg article also caused a decline in Lannett's share price. *Id.* at ¶ 241.

What Plaintiffs decline to state explicitly in the Amended Complaint is that, to date—more than *three years* after Lannett's receipt of the first of the aforementioned discovery requests—neither the Department of Justice ("DOJ") nor any other prosecuting body has charged Lannett or any of Lannett's executives with any offenses related to price-fixing.

Indeed, the only criminal charges mentioned in the Amended Complaint are those filed against executives of a *different* pharmaceutical company.  Specifically, Plaintiffs allege that the DOJ has "unsealed criminal charges against the CEO and President of Heritage Pharmaceuticals, Inc." and that "[o]n January 9, 2017, and January 10, 2017, respectively, Heritage's CEO Jeffrey Glazer, and its Vice President of Commercial Operations, Jason Malek, pleaded guilty to price-fixing charges."  AC at ¶ 117.  This apparent effort to tar Lannett by association, however, only lays bare the factual weakness of Plaintiffs' case, as none of the Defendants in *this* Action—unlike the Heritage executives referenced in the Amended Complaint—have been charged with any crimes whatsoever.

## PROCEDURAL HISTORY

Shortly after the publication of the November 3, 2016 Bloomberg article, Plaintiffs filed their initial securities class action complaint against Lannett.  *See* Dkt. Entry 1.  On March 20, 2017, the Court appointed the University of Puerto Rico Retirement System as Lead Plaintiff in the Action.  *See* Dkt. Entry 53.  Plaintiffs filed the Amended Complaint on May 25, 2017.  *See* Dkt. Entry 57.  In this iteration of Plaintiffs' pleading, as in that filed last November, Plaintiffs allege that Defendants "made false statements and omissions to investors which concealed that Lannett colluded with its industry peers to fix the prices of Generic Drugs."  AC at ¶ 2.

Plaintiffs' Amended Complaint also includes a new theory of liability—one in obvious tension with Plaintiffs' repeated assertion that higher prices in a market with fewer participants must be the result of collusion—that Defendants "made false statements and omissions to

investors about the impact of competition and price erosion on its sales of certain key Generic

Drugs." *Id.* at ¶ 1.  As set forth more fully below, Plaintiffs' allegations are insufficient to state a

valid claim on either theory.

By way of additional background, the Court may take notice that earlier this year, in the

wake of numerous plaintiffs filing civil actions against dozens of generic pharmaceutical

manufacturers alleging conspiracy to fix prices, the United States Judicial Panel on Multidistrict

Litigation (the "JPML") created an MDL in this District, before the Honorable Cynthia M. Rufe,

to oversee and coordinate all pre-trial proceedings for these cases.  *See In re Generic Digoxin*

*and Doxycycline Antitrust Litig.*, 222 F. Supp. 3d. 1341 (J.P.M.L. 2017) (centralizing antitrust

price fixing cases in Eastern District of Pennsylvania before Judge Rufe and renaming MDL "In

re: Generic Pharmaceuticals Pricing Antitrust Litigation").  In centralizing the cases here, the

JPML sought to minimize the risk of inconsistent rulings.  *See id.* at 1344.  Judge Rufe has

carefully crafted a structure for the MDL, including a detailed process for determination of

forthcoming motions to dismiss related to eighteen different generic drugs, including three[3] of

the four drugs at issue here.  *See generally* 2:16-md-02724-CMR.

## ARGUMENT

## I.    LEGAL STANDARD GOVERNING A MOTION TO DISMISS

In ruling on a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), courts

construe the complaint in the light most favorable to the plaintiff and treat its well-pleaded

allegations as true, but disregard legal conclusions and recitations of the elements of a cause of

action that are supported by mere conclusory statements.  *See Santiago v. Warminster Twp.*, 629

F.3d 121, 128 (3d Cir. 2010).  In doing so, courts are "not required to blindly accept 'a legal

---

[3] Digoxin, Levothyroxine, and Ursodiol are at issue in the MDL litigation.

conclusion couched as a factual allegation.'" *Martorano v. City of Philadelphia*, No. 09-3998, 2009 WL 3353089, at *1 (E.D. Pa. Oct. 14, 2009) (quoting *Papasan v. Allain*, 478 U.S. 265, 283, 286 (1986)).  The factual allegations in a complaint must have some degree of substance, and "[n]either 'bald assertions' nor 'vague and conclusory allegations' are accepted as true." *Heard v. St. Luke's Hosp.*, No. 08-5495, 2009 WL 3081513, at *2 (E.D. Pa. Sept. 28, 2009) (citations omitted).  Further, the facts alleged in support of a Section 10(b) claim "'must be cogent and compelling' and factual allegations 'from which an inference [only] could be drawn' must be dismissed." *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 180 (D.Del. 2010) (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)); *see also In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 453 (D.N.J. 2000) ("boilerplate and conclusory allegations will not suffice" and "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible") (citations omitted).

A complaint must include enough facts to "'raise a right of relief above the speculative level.'" *Health Robotics, LLC v. Bennett*, No. 09-0627, 2009 WL 5033966, at *2 (E.D. Pa. Dec. 22, 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  *Twombly* and its progeny provide that a plaintiff may satisfy this burden only by demonstrating a right to relief is at least "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Illustrating this demands more than a "'formulaic recitation of the elements of a cause of action.'" *Health Robotics*, 2009 WL 5033966, at *2 (quoting *Twombly*, 550 U.S. at 555).

Additionally, because Plaintiffs' claims sound in securities fraud, they are subject to the heightened pleading standard set forth under Federal Rule of Civil Procedure 9(b).  Under Rule

9(b), "plaintiffs asserting securities fraud claims must specify the who, what, when, where, and how:  the first paragraph of any newspaper story." *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (internal quotation marks omitted).  Further, securities fraud claims brought under Section 10(b) of the Securities Exchange Act of 1934 are subject to two heighted pleading standards set forth in the Private Securities Litigation Reform Act (the "PSLRA"), which require, first, that a plaintiff "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Moreover, where such "an allegation is made on information and belief, [the complaint must plead] all facts supporting that belief with particularity."  *Williams v. Globus Med., Inc.*, No. 16-3607, 2017 WL 3611996, at *3 (3d Cir. Aug. 23, 2017) (citations omitted).  Second, "the complaint shall, with respect to each act or omission alleged to violate [the PSLRA], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *Williams*, 2017 WL 3611996, at *3 (citations omitted).  These are "exacting pleading requirements" and the allegations pleaded must be "cogent and compelling."  *Tellabs*, 551 U.S. at 313.

## II.    PLAINTIFFS' SECTION 10(B) PRICE-FIXING ALLEGATIONS FAIL TO STATE A CLAIM

Plaintiffs bring their first and second counts under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  To survive a motion to dismiss such a claim, a plaintiff must plead each of the following elements:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).  As set forth more fully below, Plaintiffs' Amended Complaint utterly fails to plead scienter, loss causation, and a material

misrepresentation or omission.

**A.**     **Plaintiffs Have Failed to Plead a Strong Inference of Scienter**

Congress has set "exacting pleading requirements" for scienter in securities fraud actions. *Tellabs*, 551 U.S. at 313; *see also* 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs must allege facts supporting an inference of an "intent to deceive" or "highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care,…which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (citation and internal quotation marks omitted), abrogated on other grounds by *Tellabs*, 551 U.S. 308. The requisite "strong" inference of scienter must be pleaded with particularity, 15 U.S.C. § 78u-4(b)(2), and "must be more than merely 'reasonable' or 'permissible'—it must be…cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Allegations that a defendant had both motive and opportunity to commit fraud "may no longer serve as an independent route to [pleading] scienter," and must, in any event, be "stated with particularity." *Inst'l Investors Group v. Avaya, Inc.* 564 F.3d 242, 277, 278 (3d Cir. 2009) (citation omitted).

To state a claim against Defendants here, Plaintiffs must allege not only facts showing that Lannett engaged in illegal price-fixing, but also facts supporting a strong inference that the Individual Defendants were aware of illegal price-fixing by Lannett and knowingly or recklessly omitted this information from Lannett's public statements. The facts alleged in the Amended Complaint, by contrast, support only the opposite conclusion, namely, that Defendants did not deceive, manipulate, or defraud anyone.

1.    __Plaintiffs' Allegations Regarding Defendants' Alleged Motive and Opportunity Are Insufficient as a Matter of Law to Plead Scienter__

Scienter allegations purporting to show that an individual defendant had motive and opportunity to commit fraud "must assert a concrete and personal benefit to the individual defendants" as a result of the fraud, separate and apart from any benefit received from their possession of an ownership interest in the subject company. *GSC Partners CDO Fund v. Wash.*, 368 F.3d 228, 237-38 (3d Cir. 2004) (citations omitted).  The Amended Complaint fails to allege any facts, let alone sufficient facts, establishing that the Individual Defendants had the requisite motive and opportunity to commit securities fraud.

Plaintiffs generally allege that Lannett "needed to ensure that it had significantly higher sales, and revenue numbers" in order to "both entice lenders to loan Lannett [capital]…and to avoid breaching the debt covenants in the associated financing agreements."  AC at ¶ 33.  These conclusory assertions contain no particulars.  Such boilerplate allegations regarding a defendant's interest in maximizing corporate profits or otherwise promoting corporate health are insufficient to show scienter.  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245-46 (3d Cir. 2016) ("'[M]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from th[e] fraud.'") (footnote omitted) (quoting *Avaya* 564 F.3d at 278); *see also In re Am. Bus. Fin. Serv., Inc., Sec. Litig.,* 413 F. Supp. 2d 378, 402 (E.D. Pa. 2005) ("'[B]lanket allegations of motive and opportunity…[and] catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.'") (alterations in original) (quoting *In re Advanta Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)).  Similarly, bare allegations regarding a corporate officer's desire to

11

complete a transaction from which he will reap financial benefits are insufficient to establish motive and/or opportunity. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 608 (E.D.Pa. 2009). Here, as in *In re Am. Bus. Fin. Serv., Inc.*, the Amended Complaint's allegations of generalized motives are insufficient to establish the requisite strong inference of scienter. *Am. Bus. Fin.*, 413 F. Supp. 2d at 402 (quoting *GSC Partners*, 368 F.3d at 238). Nor can Plaintiffs plead scienter based on allegations of government investigations. *See, e.g., Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("[G]overnment investigations cannot bolster allegations of scienter that do not exist, and, as currently pled, the government investigations are just that, investigations"). Plaintiffs have failed to plead scienter.

## 2.   Plaintiffs' Trading Allegations Fail to Plead Scienter

Plaintiffs attempt to buttress their anemic scienter allegations by asserting, under the heading of "ADDITIONAL ALLEGATIONS OF SCIENTER," that Bedrosian's transactions in Lannett stock during the class period are "highly suspicious" and "strongly indicative of scienter." AC at ¶¶ 221-224. However, courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Avaya, Inc.*, 564 F.3d at 279 (3d Cir. 2009) (citations and internal quotation marks omitted). Rather, insider "stock sales may support an inference of scienter only if such sales were 'unusual in scope or timing.'" *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001) (quoting *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000)).

Here, Plaintiffs' cursory allegations regarding Mr. Bedrosian's trades of Lannett stock fail to come even remotely close to showing scienter. First, nothing in Plaintiffs' Amended Complaint suggests that the timing of Mr. Bedrosian's alleged sales was unusual; rather, Plaintiffs allege that Mr. Bedrosian's sales of Lannett stock were the picture of regularity: Mr. Bedrosian sold 5,000 shares of Lannett per month for each of sixteen consecutive months, all of which sales were conducted pursuant to a 10b5-1 plan. AC at ¶¶ 221-222. *See Avaya*, 564 F.3d

at 279 (concluding that relevant insider "sales do not marginally increase the likelihood that defendants made knowingly false or misleading statements out of a desire for personal financial gain" where "Defendants' trading practices remained consistent year-over-year"); *see In re Burlington Coat Factory Sec. Lit.,* 114 F.3d 1410, 1423 (3d Cir. 1997) (same).

Second, Lannett's SEC filings show that the amount of Lannett stock Mr. Bedrosian retained after the end of the class period dwarfs the number of shares he sold during it. *See* Declaration of Matthew D. Lee at 1 (citing SEC Form-4 showing that as of November 9, 2016, Mr. Bedrosian retained some 687,909 shares of Lannett stock, compared to the 80,000 shares he is alleged to have sold during the class period).[4] *See Avaya*, 564 F.3d at 279 (concluding that "defendants' stock transactions do not significantly enhance the inference of scienter" where the defendants "each retained a large percentage of his common stock holdings in Avaya.").

Third, nearly all of the insider sales alleged in Plaintiffs' Amended Complaint occurred at prices well below the alleged class period high of $71.15 per share. AC at ¶¶ 222, 243. Rather, those sales were not timed to market highs at all. *See, e.g., Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) ("The complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud. The complaint does not allege that defendants timed their sales to profit from any particular disclosures, and defendants' sales generally occurred at prices that were not especially high for the class period.") (citation omitted). Fourth, Mr. Bedrosian purchased shares during the class period. AC at ¶ 222, 223. Thus, the timing of Mr. Bedrosian's alleged sales is anything but "highly suspicious."

---

[4] "SEC filings attached [to a motion to dismiss] are matters of public record of which the court can take judicial notice." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998)). *See also Oran*, 226 F.3d at 289 (taking judicial notice of SEC filings).

In short, nothing about Mr. Bedrosian's sales of Lannett stock—if even viewed without pre- or post-class-period context, as Plaintiffs have chosen to present them here—suggests that those trades were unusual in any respect.  Therefore, Plaintiffs' attempt to cast those trades as proof of scienter is baseless and utterly unavailing.

### 3.   The Scienter Allegations Attributed to a "Confidential Witness" Are Unavailing

Plaintiffs attempt to burnish their scienter allegations by asserting that a confidential witness "stated that it was Bedrosian . . . who set the prices for the drugs" and that "nothing was done at Lannett without Bedrosian's blessing."  AC at ¶ 220.  Plaintiffs also point to a confidential witness for the assertion that "Kevin Smith, who set the prices for Lannett's drugs along with Bedrosian, frequently attended heathcare conferences and other industry events, which were also attended by executives from other generic drug companies, such as Par, Impax, Mylan, Sun, and West-Ward."  *Id.* at ¶ 135.  These implausible and vague allegations likewise fail to show scienter.

In an action subject to Rule 9(b) and the PSLRA, a court weighing allegations attributed to a confidential source will "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia'" to determine whether they are sufficiently particularized.  *Avaya*, 564 F.3d at 261 (citing *Chubb*, 394 F.3d at 147).  "If anonymous source allegations are found wanting with respect to these criteria, then [the court] must discount them steeply."  *Id.*

The allegations that Plaintiffs attribute to a confidential witness are wanting with respect to these criteria.  First, Plaintiffs' assertion that "nothing was done at Lannett without Mr. Bedrosian's blessing" is meaninglessly vague and plainly implausible on its face.  Lannett is a

14

publicly traded company that has recorded net sales of more than $100 million within a six-month period (AC at ¶ 159), with a market capitalization large enough to support the trading of "[m]illions of Lannett shares" during the class period.  AC at ¶ 226.  Accordingly, the notion that "nothing" can happen at Lannett absent Mr. Bedrosian's permission is implausible and therefore should not be credited by the Court.  *See Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).

Second, the assertions that Plaintiffs attribute to "CW1" are utterly lacking in detail and should be disregarded by the Court for that reason alone.  For instance, Plaintiffs claim that Smith "frequently attended heathcare conferences and other industry events, which were also attended by executives from other generic drug companies, such as Par, Impax, Mylan, Sun, and West-Ward."  AC at ¶ 135.  But this allegation is devoid of any specifics that might lend it even an ounce of analytical significance.  The allegation is silent as to the dates of the alleged "conferences and other industry events," the number of those events, the locations of those events, the names of the individuals who purportedly attended those events on behalf of other pharmaceutical companies, and how "CW1" learned of the events.  Accordingly, those confidentially-sourced assertions are insufficiently specific to be credited by the Court under Rule 9(b) and the PSLRA.  *Avaya*, 564 F.3d at 261 (citing *Chubb*, 394 F.3d at 147); *see also In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 291, 359 (D.N.J. 2007) (concluding that "[t]hese statement[s] cannot amount to a piece of evidence sufficient to meet the pleading burden on its own, since the statements lack any dates on which the relevant information was acquired, [and] there are no facts detailing how UW–1 obtained access to the information.") (citation omitted).

In fact, Plaintiffs' citations to their confidential witness are far more notable for what they do *not* allege.  Plaintiffs do not allege, for instance, that "CW1" was a party to or otherwise

learned of even one communication or agreement between Lannett and any of its competitors to fix the prices of even one of the drugs at issue here.  That a confidential witness who purports to have worked as the "Director of National Accounts for Lannett" for more than a year (AC at ¶ 134) cannot claim to have knowledge of even one such communication or agreement speaks to the fundamental emptiness of Plaintiffs' price-fixing allegations.

Because Plaintiffs have failed to plead with particularity that Lannett acted with the requisite scienter, Plaintiffs' Counts based on violations of Section 10(b) of the Exchange Act are fatally defective and should be dismissed.

### B.     Plaintiffs Have Failed to Plead Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Here, Plaintiffs attempt to connect their alleged losses (1) with Lannett's July 16, 2014 announcement that it had received interrogatories and a subpoena from the Connecticut Attorney General, (2) with Lannett's November 6, 2014 filing of a Form 10-Q stating that a grand jury subpoena had been served on a Company employee, (3) with Lannett's December 8, 2014 filing of a Form 8-K disclosing that it had been served with a grand jury subpoena, and (4) with the publication of the November 3, 2016 Bloomberg article.  AC at ¶¶ 234-240.  None of these allegations even comes close to adequately pleading loss causation.

First, the announcement of possible charges or of a company's receipt of a subpoena does not, as a matter of law, permit the conclusion that wrongdoing actually occurred, and any resultant stock drop is legally caused by speculation rather than misrepresentation.  *See, e.g.,* *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014) ("Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This

type of speculation cannot form the basis of a viable loss causation theory."); *Meyer v. Greene*, 710 F.3d 1189, 1192-93 (11th Cir. 2013) ("the commencement of an SEC investigation in insufficient to constitute a corrective disclosure"); *Sapssov v. Health Mgmt. Assoc., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) ("Revelation of the…investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure"); *see also Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-cv-00993, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) ("An SEC investigation does not reveal to the market that a company's previous statements were false or fraudulent") (citing *Meyer v. Greene*) (internal quotation marks omitted).  Here, although various government agencies have criminally charged *another* company's executives and have commenced civil litigation against *other* pharmaceutical manufacturers in connection with alleged price-fixing (AC at ¶ 117), no such action has been taken against Lannett.  Rather, Plaintiffs' loss causation allegations show nothing beyond Lannett's receipt of various subpoenas and discovery requests, which cannot, as a matter of law, establish loss causation.[5]

Second, when a stock's price rebounds shortly after a corrective disclosure, a plaintiff

---

[5]  Certain courts have qualified or, in some cases, rejected the *Loos* rule.  *E.g., Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016) ("[T]he announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective disclosure by the defendant.") (citations and internal quotation marks omitted). *See also Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620–21 (S.D.N.Y. 2015) ("*Loos* is plainly not controlling within the Second Circuit, and this Court and other courts within this District have concluded that the disclosure of an investigation 'into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice'").  However, even the permissive rule articulated in *Lloyd*, which requires "a subsequent corrective disclosure by the defendant" in addition to the announcement of an investigation, 811 F.3d at 1210, would not be satisfied here.  Moreover, the *Lloyd* and *Orthofix* line of cases represent the minority view.  *See, e.g., Meyer*, 710 F.3d 1189; *Caplin v. Trans1, Inc.*, 973 F. Supp. 2d 596, 609 (E.D.N.C. 2013); *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461 at *12-13 (W.D. Ky. Feb. 10, 2012); *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1219-1221 (E.D. Wash. 2005).

cannot point to that alleged corrective disclosure as proof of loss causation.  *See, e.g., In re Immucor, Inc. Sec. Litig.*, No. 09-cv-2351, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011) (dismissing action for securities fraud where stock rebounded to pre-disclosure price shortly after each relevant disclosure).  Here, Plaintiffs allege that Lannett's stock price hit its class period high of $71.15 in April 2015, *after* the first three of the four alleged revelations underpinning Plaintiffs' loss causation theory.  AC at ¶ 243.  The recovery of Lannett's stock price after these alleged disclosures undermines Plaintiffs' loss causation allegations.

Because Plaintiffs have failed to plead the requisite loss causation, their Counts based on alleged violations of Section 10(b) of the Exchange Act are fatally deficient and should be dismissed.

### C.       Plaintiffs Have Failed to Plead a Material Misrepresentation or Omission

At the outset, Lannett believes that this Court needs not reach the question of whether Plaintiffs have adequately pleaded a material misrepresentation or omission related to the alleged price-fixing scheme.  Plaintiffs' failure to plead scienter or loss causation, as set forth more fully in Sections II.A and II.B, *supra*, provides the Court independent bases to dismiss this case outright, regardless of Plaintiffs' failure to adequately plead a material misrepresentation or omission.  Plaintiffs, however, have also failed to plead a material misrepresentation or omission.

The thrust of the Amended Complaint is that Lannett and its competitors engaged in and concealed an illegal scheme to fix the prices of certain generic drugs.  In support of their claims, Plaintiffs block-quote text from a number of Lannett's SEC filings regarding competition and disclosure controls and allege that these statements were false or misleading because they did not disclose that Lannett had engaged in illegal price-fixing, or the effect of this purported price-fixing on Lannett's financial results.  *See, e.g.*, AC at ¶¶ 159-166.  Accordingly, to plead falsity here, Plaintiffs must allege particularized facts sufficient to show that Defendants engaged in

illegal price-fixing, and then concealed that conduct. *See Twombly*, 550 U.S. at 555. "In cases alleging securities fraud based on the failure to disclose the existence of an underlying illegal scheme," as here, the failure to allege such illegality "with particularity" is fatal. *In re Mirant Corp. Sec. Litig.*, No. 02-cv-1467, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009); *In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006).

### 1.    Plaintiffs Have Failed to Plead an Actionable Omission

Plaintiffs have not adequately pleaded even one actionable omission. It is axiomatic that silence does not constitute an actionable "omission" absent a duty to disclose. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014). More importantly, there is no generalized duty to disclose uncharged and unadjudicated wrongdoing. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.") (internal quotation marks omitted) (footnote omitted).

Here, there has been no adjudication that Lannett has engaged in price-fixing. Nor has any governmental agency brought criminal charges against Lannett related to the alleged price-fixing conspiracy. Accordingly, Lannett is "not require[d] [] to accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), and had no duty to disclose the alleged uncharged and unadjudicated conspiracy described in the Amended Complaint.

### 2.    Plaintiffs Have Failed to Allege That Defendants Made Any Misleading Statements Regarding Lannett's Earnings

In the Amended Complaint, Plaintiffs repetitively and summarily assert that certain of Lannett's SEC filings were inaccurate because the "revenue and income[ figures reported therein]. . . were inflated as a result of illegal price-fixing and artificially-inflated generic drug

19

prices . . . ."  AC at ¶¶ 145(i), 152(d), 161(d), 163(c), 166(d), 168(b), 171(i), 173(d), 176(d), 178(e), 181(d), 183(e), 186(d), 188(e), 191(j), 194(f), 197(c), 200(c), 203(j), 206(c).  Similarly, Plaintiffs assert that "Lannett's reported revenues were impacted by its involvement in a cartel to raise the prices of the Price Fixed Drugs" and that the Company's net income "heavily relied" on "[c]olluding to increase the prices of these drugs."  *Id.* at ¶ 211.  Each of these conclusory, underspecified assertions amounts to nothing more than an allegation that because Lannett purportedly participated in an illegal price-fixing scheme, the earnings data reported in its corresponding SEC filings must, *ipso facto*, be misleading.

These assertions, like the baseless price-fixing allegations on which they rely, are far too conclusory to satisfy the applicable particularity requirements.  *See, e.g.*, *Williams*, 2017 WL 3611996, at *3 (where a falsity allegation "is made on information and belief, [the complaint must plead] all facts supporting that belief with particularity.") (citations omitted).  Moreover, because Plaintiffs have utterly failed to plead that any of the earnings data included in any of Lannett's SEC filings inaccurately stated the sums the Company actually took in, those allegations fail to state a cognizable claim under Rule 10(b).  This Circuit and other courts have held that the accurate recitation of earnings simply is not cognizable as a Rule 10(b) violation. *See Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("'Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).'") (quoting *In re Advanta*, 180 F.3d at 538); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) ("Courts in this district have held that the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability.") (citations and internal quotation marks omitted), *appeal*

*dismissed sub nom. In re Sanofi Sec.* (July 25, 2016).[6]

### 3.    Plaintiffs Have Alleged No Evidence of Illegal Price-Fixing

In order to plead a price-fixing scheme adequately, a complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement or circumstantial evidence." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (citation omitted). In either event, the "crucial question" is whether the alleged conduct stems from an independent decision or an agreement. Parallel business behavior, while admissible, "falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Twombly,* 550 U.S. at 553 (citation and internal quotation marks omitted). Phrased differently, "[u]nilateral action, regardless of the motivation is not a violation of Section 1." *Milberg Factors, Inc.,* 662 F.3d at 221 (citation omitted).

Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* at 226 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010)). Plaintiffs have failed to allege any direct evidence of conspiracy. Their 162-page Amended Complaint is devoid of a single alleged phone call, email, or other communication in which any Lannett employee conspired with other companies' employees to set drug prices, which are the types of direct evidence recognized by courts. *See InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 162-63 (3d Cir. 2003) (citations omitted) (providing examples of direct evidence of price-fixing, such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged

---

[6]  "Moreover, statements concerning the Company's . . . 'strong performance,' . . . constitute nothing more than mere 'puffery,' insufficient to sustain a Rule 10b-5 claim." *Galati*, 220 F.App'x at 102 (citation omitted).

conspirators"). The absence of direct evidence of illegal price-fixing is particularly obvious here, where Plaintiffs allege only that two executives of Heritage, *another* manufacturer of generic drugs, have pleaded guilty to price-fixing. AC at ¶ 117.

Rather, Plaintiffs' price-fixing theory rests entirely on circumstantial evidence and weak evidence at that: alleged market "vulnerab[ility] to anticompetitive conduct," trade meetings, governmental investigations, and price movements. These allegations fall far short of showing a price-fixing conspiracy, where actionable Section 10(b) claims routinely rest on a public admission of guilt. *See, e.g., In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (denying holding company's motion to dismiss Section 10(b) claim premised on failure to disclose price-fixing where co-conspirator entered into DOJ's leniency program); *In re Micron Techs., Inc. Sec. Litig.*, No. 06-cv-085, 2007 WL 576468, at *3 (D. Idaho Feb. 21, 2007) (same).

In the absence of direct evidence that Lannett participated in an illegal conspiracy to increase the prices of its generic drugs, Plaintiffs must present "evidence that reasonably tends to prove that [Lannett and its alleged co-conspirators] had a conscious commitment to a common scheme" to fix prices. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted). Such circumstantial evidence must be placed in "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly,* 550 U.S. at 557. Here, however, Plaintiffs' allegations fail to plead with specificity anything that even *remotely* approaches a preceding agreement.

Plaintiffs' claims of price-fixing rely principally on vague allegations regarding price increases for the identified drugs. *See, e.g.*, AC at ¶ 53 (alleging that "Lannett and Impax sent digoxin prices skyrocketing over 700% in lock-step in November 2013."). The pricing

allegations, however, lack any specific details—*e.g.*, whose price moved first, how much time elapsed before the other firm increased its price, what happened next, etc.—that are critical to whatever inferences Plaintiffs ask the Court to draw.  On this basis alone, Plaintiffs' underspecified allegations fail to plead price-fixing.  *Twombly*, 550 U.S. at 565-66 & n.10.

More broadly, allegations of parallel pricing, without more, simply do not permit an inference of illegal price-fixing.  Parallel conduct is often "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 554 (citation omitted).  "There is nothing irrational or self-defeating about...parallel pricing in an oligopolistic market in which enlightened economic actors may independently and unilaterally choose to adopt and maintain supra-competitive pricing in order to increase industry profits . . . ." *Superior Offshore Int'l Inc. v. Bristow Group, Inc.*, 738 F. Supp. 2d 505, 514-15 (D. Del. 2010), *subsequent dismissal,* 2011 WL 2516522 (D. Del. Jun. 23, 2011), *aff'd* 490 F.App'x 492 (3d Cir. 2012).  And "[c]onscious parallelism, however, will not be inferred merely because the evidence tends to show that a defendant may have followed a competitor's price increase." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 128 (3d Cir. 1999).

Nor do Plaintiffs' allegations that Lannett employees had "opportunit[ies]" to conspire at industry conferences add anything to their claim of price-fixing.  AC at ¶¶ 49, 52, 65, 82, 95, 108.  "[P]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1235 (3d Cir. 1993) (citation and internal quotation marks omitted); *In re Blood Reagents Antitrust Litig.*, 2017 WL 3048660, *22 (E.D. Pa. 2017) ("Proof of opportunity to conspire is relevant, but is not enough to sustain an antitrust plaintiff's burden") (citation and internal quotation marks omitted); *Just New Homes, Inc. v. Beazer Homes*, 293 F.App'x 931, 934

(3d Cir. 2008) ("membership in a trade association, without more, does not violate the antitrust laws.") (citation omitted).  *See also In re Chocolate Confectionary Antitrust Litig.,* 801 F.3d 383, 409 (3d Cir. 2015) ("Plaintiffs' evidence is essentially that the executives . . . were in the same place at the same time, which is insufficient to support a reasonable inference of concerted activity") (citation omitted); *Alvord-Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1014 (3d Cir. 1994) ("Plaintiffs . . . seek to infer an agreement from those communications despite a lack of independent evidence tending to show an agreement and in the face of uncontradicted testimony that only informational exchanges took place.  Without more, they cannot do so.").  Moreover, Plaintiffs failed to allege even a single specific interaction or communication between Lannett employees and employees of other drug companies at any of those conferences, let alone any concerning price-fixing.

Plaintiffs also attempt to support their price-fixing claim by pointing to the pendency of governmental inquiries related to generic drug prices, none of which has resulted in any adjudication of wrongdoing, or even the filing of any criminal charges, against Lannett.  *See* AC at ¶¶ 109-122.  Courts assign no weight to allegations that a defendant is being investigated, as "the mere occurrence of [an] investigation is equally consistent with Defendants' innocence." *Superior Offshore*, 738 F. Supp. 2d at 517.   Here, Plaintiffs allege only that Lannett has received information requests—specifically, a letter from Congress, interrogatories and a subpoena from the Connecticut Attorney General, and grand jury subpoenas.  AC at ¶¶ 234, 111, 237, 239.  The mere existence of these inquiries cannot legally support a securities fraud claim premised on alleged price-fixing. *City of Pontiac,* 752 F.3d at 184.

Similarly, the only criminal charges identified in the Amended Complaint were filed against a drug maker *other* than Lannett.  AC at ¶¶ 117, 118.  Plainly, criminal charges against

companies other than Lannett do not constitute particularized allegations of wrongdoing by Lannett. Nor do the statements that Plaintiffs attribute to Mr. Bedrosian suggest that any of the Defendants participated in illegal price-fixing.  For instance, the Amended Complaint quotes Mr. Bedrosian as stating during a 2013 conference call that Lannett "ha[s] more price increases planned for this year within our budget.  And hopefully our competitors follow suit.  If they don't that's their issue."  *Id.* at ¶ 138.  Nothing about such statements suggests that Lannett was involved in a secret and illegal price-fixing conspiracy.  As several courts have observed, such behavior does "not support an inference of an agreement to fix prices."  *Superior Offshore Int'l., Inc. v. Bristow Grp., Inc.*, 490 F.App'x 492, 498 (3d Cir. 2012) ("[V]ague statements such as an admonition to 'play by the rules' do not constitute direct evidence of a conspiracy.") (citations omitted).

Because Plaintiffs have failed to plead a material misstatement or omission with the requisite particularity, Counts I and II in the Amended Complaint are fatally deficient and should be dismissed. [7]

## III.    PLAINTIFFS' SECTION 10(B) PRICE-EROSION ALLEGATIONS FAIL TO STATE A CLAIM

Plaintiffs' Amended Complaint includes a conclusory assertion that Defendants "made false statements and omissions to investors about the impact of competition and price erosion on its sales of certain key Generic Drugs."  AC at ¶ 1.  The allegations made in support of this theory of liability appear to consist of nothing more a summary assertion, which Plaintiffs repeat

---

[7] If the Court concludes that this case should not be dismissed on either scienter or loss causation grounds as detailed above, and determines to reach the merits of Plaintiffs' price-fixing allegations, Lannett respectfully suggests that this Court coordinate with the Court hearing the MDL litigation to avoid the risk of inconsistent rulings that compelled the JPML to centralize all generic drug price-fixing cases in this District.

after block-quoting text from certain of Defendants' SEC filings, that the quoted statements were false and misleading because Defendants failed to declare their "involvement in a cartel to fix the price of Price Fixed Drugs."  AC at ¶¶ 145, 154, 171, 191, 203.

As a threshold matter, Plaintiffs' allegations that Defendants failed to warn investors about the inimical effects of increasing competition in the markets for its generic drugs cannot be squared with Plaintiffs' concomitant allegations that Defendants fraudulently overstated the amount of competition in those markets.  Plaintiffs first fault Lannett for "repeatedly inform[ing] investors that the market for Generic Drugs was highly competitive."  AC at ¶ 8.  Later in the Amended Complaint, however, Plaintiffs quote Mr. Bedrosian as saying that "prices will erode as they generally do."  *Id.* at ¶ 153.  Plaintiffs cannot have it both ways.  In any event, Plaintiffs' allegations in support of this tag-along claim do not plead securities fraud; rather, they show only that Lannett's warnings about the generic marketplace's highly competitive nature were correct.  Such statements are not actionable under the securities laws.

### A.    Plaintiffs Have Failed to Plead a Material Misrepresentation or Omission

As a preliminary matter, and as set forth more fully above, Plaintiffs have failed to plead that Defendants made any material misrepresentations or omissions related to Defendants' alleged involvement in an illegal price-fixing scheme.  *See* Section II(C), *supra*.  On that basis alone, dismissal is warranted.

Additionally, Plaintiffs allege in their very own Amended Complaint that Defendants effectively informed investors that "prices will erode as they generally do," and that the generic pharmaceutical industry is "highly competitive."  AC at ¶¶ 143, 153, 169, 189.  Plainly, in light of these disclosures, Plaintiffs simply cannot plead that Defendants failed to warn them regarding the competitive nature of the relevant markets and of the prospect of price erosion.  Accordingly, Plaintiffs have failed to plead a material misrepresentation or omission in

26

connection with their price-erosion claim.

> **B.      Plaintiffs Have Failed to Plead a Strong Inference of Scienter**

Plaintiffs have also failed to plead the requisite strong inference of scienter as to their price-erosion theory.  In fact, Plaintiffs' Amended Complaint is entirely devoid of *any* particularized allegation regarding Defendants' scienter as to their alleged misstatements regarding the risk of price-erosion.  In the absence of particularized facts showing that Defendants acted with the requisite state of mind, Plaintiffs' throw-away price-erosion theory simply cannot meet the exacting standard applicable to a claim for securities fraud.  *See, e.g.*, *Tellabs*, 551 U.S. at 313; 15 U.S.C. § 78u-4(b)(2)(A).  Accordingly, the Court should dismiss Plaintiffs' Section 10(b) claim sounding in price-erosion.

## IV.      PLAINTIFFS' SECTION 20(A) ALLEGATIONS FAIL TO STATE A CLAIM

Section 20(a) of the PSLRA provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78(t).

To establish liability under Section 20(a), "the plaintiff must allege (1) an underlying violation of the securities laws by a person or entity; (2) that the defendant was a 'controlling person,' that is, one who had the power to control or influence the company, and (3) that the defendant was 'in some meaningful sense,' a culpable participant in the fraud."  *Payne v. DeLuca*, 433 F. Supp. 2d 547, 611 (W.D. Pa. 2006); *see also Party City*, 147 F. Supp. 2d at 317.  Because liability under Section 20(a) is predicated on an underlying violation of the PSLRA,

"[c]laims under Section 20(a), therefore, are 'derivative – requiring proof of a separate underlying violation of the Exchange Act." *Party City,* 147 F. Supp. 2d at 317 (quoting *Milestone Scientific*, 103 F. Supp. 3d at 474).  Accordingly, if the underlying claim is insufficiently pled and no control person is liable, any corresponding Section 20(a) claims must likewise be dismissed.  *See, e.g., Payne*, 433 F. Supp. 2d at 611 (dismissing Section 20(a) claims for failure to plead adequate Section 10(b)/Rule 10b-5 claims); *Party City,* 147 F. Supp. 2d at 317 (same).  Accordingly, Plaintiffs' Section 20(a) claim against the Individual Defendants must be dismissed because Plaintiffs' Section 10(b) and Rule 10b-5 claims fail to state a claim.

Assuming, *arguendo*, that Plaintiffs had adequately pled an underlying primary violation of the PSLRA, Plaintiffs' Section 20(a) claim would nonetheless fail because Plaintiffs have not adequately alleged the requisite participation by the alleged control persons in the underlying primary violation.  *See In re Prison Realty Sec. Litig.*, 117 F .Supp. 2d 681, 692 (M.D. Tenn. 2000) (dismissing Section 20(a) claims even though court found complaint sufficiently alleged a primary violation because plaintiffs failed to plead facts about *how* defendants had power to control transaction at issue or *how* defendants actually exercised control over the alleged primary violator); *see also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484-85 (3d Cir. 2013). Notably, Plaintiffs have not alleged that either of the Individual Defendants took any specific action, such as participating in a specified meeting, sending or receiving a single email, text message, or other written or recorded communication with any of their alleged co-conspirators in furtherance of the purported price-fixing scheme.  Indeed, Plaintiffs nary reference Mr. Galvin at all.  Because the Amended Complaint is devoid of any facts or detail sufficient to allege *how* the Individual Defendants actually participated in the underlying fraud—*i.e.*., the purported price-fixing scheme—Plaintiffs' Section 20(a) claim fails.  *In re Prison Realty*, 117 F. Supp. 2d at 692.

28

Accordingly, the Court should dismiss Plaintiffs' Section 20(a) claim.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated:  September 15, 2017

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: /s/ Ian M. Comisky
    Ian M. Comisky (PA 20634)
    Matthew D. Lee (PA 85914)
2000 Market Street, 20th Floor
Philadelphia, PA  19103
Phone: (215) 299-2795, 2765
Fax: (215) 299-2150
icomisky@foxrothschild.com
mlee@foxrothschild.com

*Attorneys for Defendants Lannett Company,*
*Inc., Arthur P. Bedrosian, and Martin P. Galvan*