**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 2:16-cv-05932-WB |
| Plaintiff(s), | **CLASS ACTION** |
| v. | |
| LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**SECOND AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

NATURE OF THE ACTION ................................................................................................ 2

JURISDICTION AND VENUE ......................................................................................... 7

THE PARTIES.................................................................................................................... 7

BACKGROUND AND NATURE OF THE FRAUD AT LANNETT ....................................... 10

    A. Lannett Was In Desperate Need Of Capital To Begin And Maintain the Individual Defendants' Growth By Acquisition Strategy...................................................... 10

    B. Lannett's Class Period Acquisition Binge........................................................... 12

    C. The Generic Drug Market.................................................................................... 14

    D. Lannett Colluded With Competitors to Allocate Market Share in the Generic Drug Market 17

    E. Lannett Colluded With Competitors To Fix the Price Of Generic Drugs ........................... 19

    F. Lannett And Its Co-Conspirators Are Under Multiple Governmental Investigations For Anticompetitive Price-Fixing ............................................................................. 44

    G. Lannett's Survival as a Company Depended on Their Anticompetitive Conduct ............... 49

    H. The Individual Defendants Controlled the Price Hikes....................................... 54

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.......................................................................... 57

LANNETT'S CLASS PERIOD SEC FILINGS WERE MATERIALLY MISSTATED AND VIOLATED GAAP ...................................................................................................... 123

SUMMARY OF SCIENTER ALLEGATIONS....................................................................... 126

LOSS CAUSATION......................................................................................................... 132

PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE).................... 137

INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ............................................ 139

i

CLASS ACTION ALLEGATIONS ........................................................................ 140

CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ........................................... 141

FIRST CLAIM FOR RELIEF ................................................................................ 141

SECOND CLAIM FOR RELIEF ............................................................................ 145

THIRD CLAIM FOR RELIEF .............................................................................. 146

PRAYER FOR RELIEF ...................................................................................... 147

DEMAND FOR JURY TRIAL .............................................................................. 148

Lead Plaintiff the University of Puerto Rico Retirement System ("Lead Plaintiff" or the "UPR") and plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the common stock of Lannett Company, Inc. ("Lannett" or the "Company") between May 9, 2013 and October 31, 2017, inclusive (the "Class Period"), and who were damaged as a result of Defendants' wrongdoing as alleged herein (the "Class"). The securities claims asserted herein are alleged against Lannett, Lannett's Chief Executive Officer, Arthur P. Bedrosian ("Bedrosian"), and Lannett's Chief Financial Officer Martin P. Galvan ("Galvan") (collectively, "Defendants"). As explained in detail below, Plaintiffs seek to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon counsel's investigation, which included review and analysis of, *inter alia*: (i) regulatory filings made by Lannett with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Lannett; (iv) interviews with former Lannett employees; (v) news articles; (vi) state regulatory complaints filed against the Company; (vii) other publicly available information concerning the Defendants, including pending and closed litigation matters involving Lannett; and (viii) consultation with experts, including a forensic accounting expert. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or

control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Lannett's common stock between May 9, 2013, and October 31, 2017, both dates inclusive (the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Lannett and certain of its top officers. Defendants made materially false and misleading statements and omissions to investors which concealed that Lannett colluded with its industry peers to fix the prices of Generic Drugs (defined below). Defendants also made materially false and misleading statements and omissions to investors about the impact of competition and price erosion on its sales of certain key Generic Drugs.

2. Lannett primarily derives its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires ("Generic Drugs").

3. From at least the beginning of the Class Period, Lannett, at the direction of its Chief Executive Officer ("CEO"), Defendant Arthur Bedrosian, and its Chief Financial Officer ("CFO"), Defendant Martin Galvan, engaged in acquisitions that caused the Company's debt to increase substantially to unprecedented levels.

4. To finance the acquisition binge started by the Individual Defendants (defined below), Lannett colluded with its industry peers to fix the prices of at least four of its Generic Drugs, Digoxin, Ursodiol, Levothyroxine, and Acetazolimide (the "Price Fixed Drugs"). This collusion allowed Lannett to reap substantially higher profits and more easily secure the financing necessary to make these huge acquisitions. For example, from 2009 through 2012,

Lannett averaged $118.5 million in net sales, during the Class Period, Lannett averaged net sales of $407 million.

5.     The structure of the market for the Price Fixed Drugs made them highly vulnerable for collusive activity because: (i) the market was dominated by a small group of generic drug companies; (ii) the demand for the Price Fixed Drugs was highly inelastic; (iii) only a small group of companies controlled a substantial share of the market for the drugs; (iv) the only distinguishing factor for purchasers was price; (v) the drugs did not have viable, lower-priced substitutes; (vi) there was a high barrier to entry for these drugs; and (vii) information sharing and price discovery were common among industry peers. All of these factors facilitated Lannett's collusion and made it substantially easier for the members of this price-fixing cartel to monitor each other and coordinate their price increases.

6.     The evidence that Lannett engaged in this anticompetitive collusion to fix the prices of the Price Fixed Drugs is substantial. Indeed, Lannett's blatant collusion caused the prices of its drugs to skyrocket in lock-step with its competitors.

7.      In addition to Lannett's prices for the drugs increasing in lock-step with its competitors, Arthur Bedrosian explicitly signaled price increases on conference calls with analysts.

8.     Other potential reasons for these prices increases are unrealistic. At no point in the Class Period was there a supply shortage, production problem, or sharp increase in demand for these drugs and no competitors left the market.  The most reasonable explanation for these sudden, synchronized price increases is collusion.

9.     Lannett and its executives routinely misled investors about the competition Lannett faced, the viability of its reported sales figures, and the sources of its revenues. For

example, Defendants repeatedly informed investors that the market for Generic Drugs was highly competitive. In reality however, the market for Generic Drugs that Lannett participated in was collusive and lacked any competition. Based on Defendants' materially false and misleading statements and omissions, investors reasonably assumed that Lannett's sales figures relating to its Generic Drugs were an accurate representation of the success of Lannett's products in a competitive market. Actually, those sales figures were materially inflated as a result of Lannett's anticompetitive conduct and did not reflect the sales Lannett would have been able to achieve absent its price-fixing scheme. Reasonable investors would have wanted to know the true competitive environment for Lannett's sales and the risks involved if the price-fixing scheme were exposed. Defendants denied that this risk existed and told investors that Lannett had done nothing wrong, repeatedly offering materially false and misleading explanations for its pricing practices. Defendants did not disclose that the Company's drug pricing relied on unsustainable and illegal misconduct. Moreover, Defendants also failed to disclose that the Company lacked effective disclosure controls regarding its drug pricing methodologies and that Defendants, by engaging in this anticompetitive scheme, were in violation of the Company's own internal code of conduct and ethics.

10. The extent of Lannett's fraud was revealed slowly throughout the Class Period, through a series of partial disclosures, the revelation of the truth harming investors at every turn. The partial disclosures began on July 16, 2014, when Lannett announced that it had received an inquiry from the Connecticut Attorney General regarding its pricing of Digoxin. On this news the price of Lannett shares fell $10.13 per share over two trading days to close at $36.96 per share on July 17, 2014.

11. On December 8, 2014, during after-market hours, the Company filed a Form 8-K

with the SEC revealing that "the Company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." On this news shares of Lannett fell $6.08 per share to close at $41.92 per share.

12.    From the time Defendants' price fixing scheme was first alleged, Defendants continued to make materially false and misleading statements and omissions in order to artificially re-inflate the price of Lannett stock. For example, Bedrosian addressed the inquiry from the Connecticut Attorney General on his August 27, 2014 earnings call with analysts and investors. On that call, Bedrosian maintained that "price increases are opportunistic things … we know we've done nothing wrong, so we're going to continue to operate our business regardless of any investigation." Defendant Bedrosian continued to disparage the grand jury subpoena and the allegations of Lannett's collusive conduct at the Oppenheimer Healthcare Conference on December 8, 2014 when he told an audience member "[T]he Connecticut Attorney General decided to investigate the price increases, assuming [...] that we meet in hotel rooms with competitors and do things like that, which is nonsensical[.]"

13.    As a result of Bedrosian's materially false and misleading denials and Lannett's continuing collusive misconduct, the Company's stock price soared to a Class Period high of $71.15 per share on April 10, 2015. Thereafter, although Lannett's scheme to collude regarding the Price Fixed Drugs continued to artificially inflate the Company's earnings, and its stock price, other factors such as overall reduced demand for certain products, including some of the Price Fixed Drugs, lack of product diversity, the loss of a large customer from one of its acquired companies and high debt, resulted in the decline of Lannett's stock price from its Class Period high.

14.     On November 3, 2016, *Bloomberg* published an article titled "U.S. Charges in Generic Drug Probe to be filed by Year-End", revealing that in connection with the Department of Justice's (the "DOJ") investigation of a dozen companies, including Lannett, federal prosecutors might file criminal charges by the end of 2016 for suspected price collusion. On this news shares of Lannett common stock fell $6.25 per share to close at $17.25 per share.

15.     Finally, on October 31, 2017, a complaint filed by the Attorney General for the State of Connecticut, as well as by the attorneys general of 44 other states and the District of Columbia (the "State AG Proposed Complaint"), became public alleging a far-reaching price-fixing conspiracy by numerous makers of generic drugs. Specifically the Connecticut Attorney General's October 31, 2017 Complaint greatly expanding the scope of the lawsuit initiated in 2016 to go from six drug makers to 20, including Lannett, and to involve the price fixing of now 15 drugs, an addition of 13 which included doxycycline monohydrate which was made by Lannett. The CT AG Complaint alleges that the drugmakers and executives divided customers for their drugs among themselves, agreeing that each company would have a certain percentage of the market, and that the companies agreed on price increases for generic drugs in advance. The Connecticut Attorney General said in connection to the Amended Complaint that "***It is our belief that price-fixing is systematic, it is pervasive, and that a culture of collusion exists in the industry***" and that the facts supporting the allegations of price-fixing and collusion by these generic drugmakers were "***shocking***" and "***mind-blowing***."[1]

16.     On this news, Lannett's share price plunged approximately 14%, falling from an opening price of $23.15 per share on October 31, 2017 to a closing price of $19.90 per share that day, a drop of $3.25 on extremely high trading volume.

---

[1] All emphasis is added unless otherwise noted.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction of the subject matter of this Action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.   In addition, Lannett's principal executive offices are located within this Judicial District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities market.

## THE PARTIES

### A.  Plaintiffs

21.     The University of Puerto Rico Retirement System ("Lead Plaintiff" or "UPR") manages the pension benefits for employees of the University of Puerto Rico, with approximately $1.4 billion in assets under management.  As set forth in its filed Certification (ECF No. 5-2), UPR acquired Lannett common stock at artificially inflated prices during the Class Period and suffered damages as a result of the conduct complained of herein.  On March 20, 2017, the Court appointed UPR as Lead Plaintiff for this litigation.

22.     Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, as set forth in

the certification previously filed with this Court, purchased Lannett common stock at artificially inflated prices during the Class Period and was damaged by the federal securities law violations as alleged herein. Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds and UPR are referred to collectively as "Plaintiffs."

**B.  Defendants**

23.     Defendant Lannett Company, Inc. ("Lannett" or the "Company") is a pharmaceutical corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 9000 State Road, Philadelphia, Pennsylvania. Founded in 1942, Lannett develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas.  Lannett also produces, through its subsidiary Cody Laboratories, Inc., active pharmaceutical ingredients. Lannett primarily derives the majority of its revenue from the sale of Generic Drugs. During the Class Period, Lannett common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "LCI."

24.     Defendant Arthur P. Bedrosian ("Bedrosian") has been the CEO of Lannett since January 2006 and served as the Company's President from May 2002 to December  2014. Prior to becoming President, Bedrosian served as the Vice President of Business Development at Lannett from January 2002 to April 2002, and as a Director from February 2000 to January 2002. Bedrosian was involved in all aspects of the Company and played a substantial role in the pricing of Lannett's Generic Drugs, specifically setting forth and implementing a strategy such that Lannett could affect the prices of generic drugs and begin challenging branded drug patents. Throughout the Class Period, Defendant Bedrosian made materially false and misleading statements and omissions in Lannett's public filings with the SEC, publicly disseminated press

releases, conference calls with investors and analysts, as well as signing the Company's annually-filed Forms 10-K and quarterly-filed Forms 10-Q, including the Company's Sarbanes-Oxley certifications. Bedrosian announced his resignation as Lannett's CEO in September 2017.

25.     Defendant Martin P. Galvan ("Galvan") has been the CFO and Vice President of Finance and Treasurer at Lannett since August 2011. Throughout the Class Period, Defendant Galvan made materially false and misleading statements and omissions in Lannett's public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually-filed Forms 10-K and quarterly-filed Forms 10-Q, including the Company's Sarbanes-Oxley certifications. Defendants' Bedrosian and Galvan are collectively referred to as the "Individual Defendants." Defendant Lannett and the Individual Defendants are referred to as "Defendants."

26.     Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (v) was directly or indirectly involved in the oversight or implementation of the Company's disclosure controls; (vi) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (vii) approved or ratified these false and misleading statements in violation of the federal securities laws.

27.     Lannett is liable for the acts of the Individual Defendants and their employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

28.     The scienter of the Individual Defendants and other employees and the agents of Lannett are similarly imputed to Lannett under *respondeat superior* and agency principles.

## BACKGROUND AND NATURE OF THE FRAUD AT LANNETT

### A.  Lannett Was In Desperate Need Of Capital To Begin And Maintain The Individual Defendants' Growth By Acquisition Strategy

29.     Bedrosian joined Lannett in 2000 as a Director and served in that capacity until January 2002. He then became the Vice President of Business Development before serving as the Lannett's President and later CEO. Bedrosian is involved in all aspects of the Company and plays a substantial role in the pricing of Lannett's Generic Drugs. In 2005 Bedrosian created the "gloom and doom" PowerPoint, as named by Bedrosian, in which it was argued that Lannett, on its present track, had no future in the generic drug industry if it did not find an area of medicine to specialize in and start challenging branded drug patents.

30.     Prior to the Class Period, Lannett was in trouble. Lannett's net sales had begun to stagnate. Specifically, Lannett's net sales ranged from $42 million to $125 million from 2005 through 2012. From 2003 through 2006 Lannett's net sales would rise and fall by approximately $20 million each year and would never break $65 million.

31.     Lannett's fortunes would quickly change once Defendants started to collude with other generic drug manufacturers. Indeed, during the Class Period, Lannett's net sales consistently increased, exploding from $151 million in 2013 to $637 million in 2017.

32.     Challenging branded drug patents is an incredibly resource and capital intensive process. Under the Hatch-Waxman Act, a company can seek approval from the Food and Drug Administration ("FDA") to market a generic version of a branded drug prior to the expiration of the patent that covers the branded drug. A generic drug company such as Lannett seeking to follow this process would need to submit an Abbreviated New Drug Application ("ANDA") with

10

the FDA and certify in the ANDA that the patent for the branded drug is invalid. Lannett (or another generic company) would then need to notify the holder of the patent (*i.e.* the branded drug maker) that an ANDA was submitted for their drug prior to the patent's expiration. The branded drug maker could then file an infringement suit against Lannett (or other generic company), and the introduction of the generic drug would then be postponed for 30 months, unless, before that time, the patent expires or is judged to be invalid or not infringed.[2]

33. Early in the Class Period it seemed that Bedrosian's "gloom and doom" PowerPoint was prophetic. By 2013, Lannett, and its CEO, were under a tremendous amount of pressure to provide consistent growth to its investors. In November 2013, Lannett was viewed by analysts as a "below average" company that was likely to "underperform the market."[3] This type of assessment further pushed Bedrosian to start challenging branded drug patents and launch his growth by acquisition strategy.

34. To attempt to prevent Lannett from underperforming, Bedrosian created a three-part strategy. First, Lannett was going to engage in a growth by acquisition strategy to build a pharmaceutical empire and increase its product offering by absorbing the acquired companies' product lines. Next, Lannett, would use its increased size and resources to challenge existing drug patents. Finally, Lannett, would develop a vertically-integrated controlled substances division. The controlled substances division would allegedly increase Lannett's profitability by allowing it to tap into the multi-billion dollar pain control and opioid industry with patent protections for Lannett's vertically integrated products.

---

[2] *Paragraph IV Drug Patent Challenge Notifications*, U.S. FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/AbbreviatedNewDrugApplicationANDAGenerics/ucm147166.htm (last visited May 19, 2017).

[3] SADIF Investment Analytics SA, *Will Lannett, Company Inc. Burn Out Over the Long Term*, SADIF, November 18, 2013.

35.     Setting this strategy in motion required Lannett to make acquisitions, for which Lannett needed to borrow funds.  Consequently, Bedrosian's strategy resulted in Lannett taking on a large amount of debt, as demonstrated by the chart below. To both entice lenders to loan Lannett this amount of debt, which was unprecedented for it, and to avoid breaching the debt covenants in the associated financing agreements, Lannett needed to ensure that it had significantly higher sales, and revenue numbers. Lannett was able to raise both its total sales and revenues by entering into a cartel to control the prices of the Price Fixed Drugs.  The below chart shows how Lannett's "total long-term debt, less current portion, net" grew from between $839,000 to $6,125,000 from March 1, 2013 to September 1, 2015, and then increased to $1,014,877,000 by December 1, 2015.



### B.  Lannett's Class Period Acquisition Binge

36.     During the Class Period, Lannett spent over $1 billion in cash, stock, and warrants to engage in acquisitions of products or other companies. Defendants spent more money on

acquisitions during the Class Period than at any other point in the Company's 75 year history.

37.     Two of the three acquisitions were fueled by exchanging large amounts of Lannett common stock. One of the transactions required Lannett to enter into the largest credit facility in the Company's history. To effectuate these transactions Defendants needed to keep the price of Lannett's stock high and ensure constant revenue from their product lines.  The following allegations provide a summary of these acquisitions.

**1.     Jerome Stevens Pharmaceuticals Transaction**

38.     The first key acquisition by Lannett during the Class Period was between Lannett and Jerome Stevens Pharmaceuticals ("JSP"). Prior to the Class Period, in 2004, Lannett and JSP originally entered into a contract where Lannett agreed to distribute three of JSP's products, Butalbital (with Aspirin, Caffeine and Codeine Phosphate Capsules), Digoxin Tablets, and Levothyroxine Tablets. In exchange for the exclusive right to distribute these drugs, Lannett granted JSP 4,000,000 shares of Lannett common stock. This exclusive contract was due to expire in March 2014.

39.     On August 19, 2013, Defendants announced that they had extended Lannett's contract with JSP, which now provided that Lannett would be the exclusive distributor in the United States for Butalibital (with Aspirin, Caffeine, Codeine Phosphate Capsules), Digoxin Tablets, and Levothyroxine Tablets until March 2024. In exchange for the contract extension Defendants gave JSP 1,500,000 shares of restricted common stock in Lannett.

40.     For Defendants, it was crucial that Lannett effectuate this extension to its distribution agreement with JSP.  Indeed, the three drugs that Lannett exclusively distributed for JSP accounted for a substantial amount of Lannett's gross profit.  For example, in 2013, just two of JSP's drugs, Levyothyroxine and Digoxin, accounted for 46% of Lannett's sales.

### 2. The Silarx Acquisition

41.     On May 18, 2015, Lannett entered into a definitive agreement to acquire Silarx Pharmaceuticals ("Silarx") for $42 million in an all-cash deal. The acquisition closed on June 2, 2015.

42.     Silarx was a manufacturer and marketer of liquid generic pharmaceutical products. Lannett received an FDA approved manufacturing facility to increase utilization, a generic drug pipeline that included four Abbreviated New Drug Applications. This allowed Lannett to expand its product offerings and production capacity at the same time.

### 3. Kremers Urban Pharmaceutical Acquisition

43.     On November 27, 2015, Lannett completed its acquisition of Kremers Urban Pharmaceuticals ("Kremers") for $1.23 billion. Kremers was a specialty generic drug manufacturer and developed generic versions of pharmaceutical products. The deal required Lannett to pay Kremer's parent, UCB, $1.03 billion in cash, and $200 million senior unsecured notes issued to UCB by Lannett. UCB also received warrants to purchase shares of Lannett common stock. As a result of the acquisition, Lannett was able to sell an additional 18 drugs and diversify its business mix away from some of its key products.

### C. The Generic Drug Market

44.     Generic Drugs are exact copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.[4] Generic Drugs must contain the same active ingredient(s) in the same dosage form and in the same strength, and must be bioequivalent to the reference listed drug.

---

[4]     Generic Drugs, FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/Drugs/resourcesforyou/consumers/buyingusingmedicinesafely/understandinggenericdrugs/default.htm (last visited December 12, 2017).

45.     Generic Drugs play a critical role in the nation's healthcare system and are intended to save consumers and the healthcare system billions of dollars annually. In order to promote the development of more Generic Drugs, Congress passed the Hatch-Waxman Act which eliminated the requirement that generic drug companies file a New Drug Application ("NDA") to achieve FDA approval.  Instead, companies can file an ANDA and rely on the data provided by the original NDA holder.

46.     As a further incentive to spur generic companies to provide alternatives to branded drugs, the first generic drug manufacturer to file a substantially complete and certified ANDA is allowed to market its generic drug free from competing generic manufacturers for a set period of time. Typically, this first generic manufacturer will enter the market at a price lower than the branded drug manufacturer and capture a large market share.

47.     Generic drug manufacturers that are first in the market enjoy substantial profits as a result of the lack of generic competition and can usually price their drug up to 75% of the price of the branded drug and still encourage customers to switch from the branded drug to the generic. However, once the exclusivity period ends and a second generic drug manufacturer enters the market, the generic price of the drug is typically dropped to nearly half of the brand name price. As more generic manufacturers begin selling the generic drug, the prices of the drug usually plummet to approximately 20% of the price of the branded drug or lower.

48.     Over the past several years the price dynamic has changed for Generic Drugs. Prices of dozens of Generic Drugs have spiraled to new heights for no apparent reason. Generic drug manufactures, like Lannett, publicly argue that the price increases are a result of, *inter alia,* industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug lines. Regulators, though, have alleged that the true reason for these price increases is

rampant collusion in the generic drug industry.

49. In *Connecticut v. Aurobindo Pharma USA, Inc.*, No: 3:16-cv-02056, (Dkt No. 168), (D. Conn. Mar. 1, 2017), an action filed by the attorneys general of 40 states following a substantial investigation into generic drug price increases, it is alleged that generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors. The companies allegedly exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events to develop relationships and sow the seeds for their illegal agreements. *Id*. at ¶11. The anticompetitive agreements, according to the attorneys general complaint, are further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties and numerous and frequent telephone calls, emails and text messages. *Id*. at ¶¶11, 48-66.

50. The number of trade associations help to structure the generic drug market in a way that has allowed Lannett to interact and communicate with other generic drug companies directly and in person on a frequent basis. The investigative subpoena issued to Lannett in connection with the generic drug investigation focuses on communications or correspondence with competitors regarding the sale of generic prescription medications.

51. As these regular trade meetings were ongoing, the prices for over a thousand generic pharmaceutical drugs skyrocketed during the Class Period. One report noted, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014." During this time, Lannett met and interacted frequently with its competitors at trade shows and conferences hosted by the Generic Pharmaceutical Association, the National Association of Chain Drug Stores, Healthcare Distribution alliance, and Efficient

Collaborative Retail Marketing. At these shows and conferences, representatives from generic drug manufacturers, including Lannett and its competitors, interacted with each other and discussed their respective businesses and customers, and were provided with ample opportunity to discuss, devise, and implement anticompetitive schemes.

### D. Lannett Colluded With Competitors To Allocate Market Share In The Generic Drug Market

52.     Lannett operated as a member of a cartel with other generic drug manufacturers performing two unique but related types of anticompetitive acts. The first anticompetitive act was market allocation, which allowed generic drug manufacturers to control and divide customer accounts amongst themselves. The second anticompetitive act was price fixing, which allowed generic drug manufacturers to artificially raise the prices of generic drugs. Though distinct in conduct, both acts though had the same guiding principle: to maintain artificially inflated pricing within and across the Company's product portfolios and increase prices for drugs without triggering a "fight to the bottom" amongst Lannett's competitors. Defendants' market allocation activity facilitated Defendants' price-fixing misconduct.

53.     To maintain price increases on certain generic drugs, manufacturers enacted an industry-wide agreement to "play nice in the sandbox." The foundation of this agreement is the belief, among manufacturers, that each manufacturer is entitled a certain market share. The mechanics of this agreement were revealed in the State Attorney Generals' proposed consolidated amended complaint filed on October 31, 2017 ("State AG Proposed Complaint").

54.     The State AG Proposed Complaint reveals the inner workings of the Defendants' anti-competitive conduct and their role within the price-fixing cartel, including Lanett's active participation in the anti-competitive scheme. Specifically the State AG Proposed Complaint alleges:

A.  There was a common understanding among the Defendants and other Generic Drug Manufacturers regarding each manufacturers' market share for a specific drug. State AG Proposed Complaint ¶91. This common understanding evolved over the course of several years, but there were general rules that have been place since at least 2006. *Id*. at ¶91

B.  The overarching agreement of Generic Drug Manufacturers was widespread across the entire generic drug industry and, in terms of parties involved, was broader than the Defendants named in the State AG Proposed Complaint. *Id.* at ¶92

C.  When necessary, this anti-competitive scheme was reinforced through phone calls and text messages between the Defendants and other members of the Cartel to discuss each manufacturers' fair share and the desire to maintain or raise prices with respect to specific drugs. *Id*. at ¶92. For example, from July 1, 2013 through July 30 2014 senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Heritage spoke to the Defendants' representatives at least 113 times via telephone call or text message. *Id*. at ¶94.

D.  There was a shared understanding between Defendants and their co-conspirators that competitors in a particular market would reach out to each other with the expectation that they would be able to reach an agreement regarding market share. *Id.* at ¶97.

E.  When the Defendants or another Generic Drug Manufacturer needed to obtain one or more customers to reach its fair share within the market for a generic drug, a competitor would walk away from a customer by informing that customer of a

significant price increase. The Generic Drug Manufacturer looking to increase its fair share would then submit a supra-competitive bid at an amount slightly less than the original competitor to win that customer's business. *Id*. at ¶99.

F.  This understanding between Defendants' and the other members of the Cartel dictated that each member of the cartel would not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take the business. Punishing a competitor for raising prices was against the rules. *Id.* at ¶106.

G.  The Generic Drug Manufacturers routinely shared information with each other about bids and pricing strategy, the terms of their contracts with customers, pricing terms, price protection, and rebates. *Id*. at ¶108-09

55.     This larger conspiracy to allocate market share facilitated Defendants' anti-competitive efforts to fix the prices of generic drugs, as detailed below.

**E.  Lannett Colluded With Competitors To Fix the Price Of Generic Drugs**

**1.  Lannett Colluded to Fix the Price of Doxycycline Monohydrate**

56.     Doxycycline Monohydrate ("Doxy Mono") is known by the brand names of "Acticlate" and "Monodox" and is an oral medicine that is used to treat bacterial infections and is a preventative medication designed to protect against malaria.

57.     At the beginning of the Class Period, one of Defendants' co-conspirators, Heritage Pharmaceuticals, learned from a customer that the demand for Doxy Mono was going to increase significantly. The demand increase was the result of a large price increase that had occurred with a different form of doxycycline as well as supply problems that certain manufacturers were experiencing. Heritage began testing the waters for a price increase and

decided to reach out to Defendants for the purpose of coordinating their price hikes.

58.     The State AG Proposed Complaint details a course of conduct where Defendants' along with Heritage, Mylan, and Par Pharmaceuticals, their three main competitors in the Doxy Mono market, colluded to fix the prices of Doxy Mono, employing age-old antitrust stratagems that were designed to conceal the nature of their anticompetitive conduct. The below allegations are drawn from the State AG's Proposed Amended Complaint:

A.  Prior to the Class Period in February 2013, Heritage was told by a customer that there would be a spike in demand for Doxy Mono. This prompted Heritage to increase the price it charged for Doxy Mono.

B.  By no later than March 13, 2013, Lannett was aware of Heritage's intent to increase Doxy Mono prices.

C.  On March 25, 2013, employees within Lannett communicated with each other regarding price increases for Doxy Mono

D.  On June 12, 2013, Lannett increased its prices for Doxy Mono. Approximately one month later in July 2013, employees at Lannett were asked by at least one customer whether Lannett could provide a lower price for Doxy Mono.

E.  From at least June 11, 2013, onward the four "competitors" that produced and sold Doxy Mono were in frequent communication. At least one employee at Lannett was in frequent communication with an employee at Par Pharmaceuticals.

F.  A Heritage employee, at the direction of senior Heritage management, reached out to an employee at Lannett to obtain specific information regarding Lannett's price increase for Doxy Mono.

G.  Employees at Lannett, Heritage, Par, and Mylan used industry conferences, trade

shows, and a variety of communication methods to coordinate price hikes for Doxy Mono.

H. As of March 2014, Heritage had decided to raise its prices for Doxy Mono with respect to at least one customer.

I. On April 22, 2014, Jason Malek, a president at Heritage Pharmaceuticals, identified eighteen (18) drugs that Heritage would target for price increases. In advance of the call, Malek had circulated a spreadsheet which listed each drug, the competitors selling those drugs, and each competitor's market shares. Malek instructed members of the sales team to immediately reach out to their contacts at each competitor for the drugs on the list, and attempt to reach agreement on the price increases.

J. Following the call a member of the heritage sales team reached out to a Lannett employee for a twenty-nine (29) minute phone call *during which they agreed to raise prices of Doxy Mono.*

59. The allegations in the State AG Proposed Complaint not only provide insight into the anti-competitive conduct of Lannett with regards to Doxy Mono, they also demonstrate the tactics employed by Defendants to perpetuate their scheme.

## 2. Lannett Colluded to Fix the Price of Digoxin

60. Digoxin is used to treat heart failure and chronic atrial fibrillation. The drug is used primarily by elderly patients for the treatment of rapid rhythm disturbance. The World Health Organization has classified Digoxin as an essential medicine. No effective substitute exists for many patients with heart disease, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume. Millions of people in the U.S. rely on the

pill every day. During 2013, the overall market for Digoxin was $198 million. Sales by Impax Pharmaceuticals ("Impax")[5] and Lannett represented a substantial portion of the generic market.

61.     Figure 1 breaks down the total market for Digoxin by percentage of total sales. Figure 1 clearly illustrates that the total sales of generic Digoxin were concentrated among Lannett, and Impax during the Class Period with Par Pharmaceutical ("Par") beginning to enter the market later in the Class Period. Figure 1.1 further breaks down the generic Digoxin market share for the years of 2013 and 2014.

**Figure 1**[6]



Digoxin Tablets: Total WAC Sales %

Source: Symphony Health Solutions

---

[5] Global Pharma and Impax Pharmaceuticals are the same company. Global Pharma was the publicly traded company that Impax merged with prior to the Class Period. *See* Investor FAQ, Impax Laboratories (http://investors.impaxlabs.com/Investor-Relations/Investor-FAQ/default.aspx). References to Impax  refer to Global Pharma and references to Global Pharma refer to Impax.

[6] The Wholesale Acquisition Cost ("WAC") is the manufacturers reported list price of the drug when sold to the wholesaler. WAC does not represent actual transaction prices as it does not include prompt pay, rebates or other discounts in price, but it does form the baseline price at which wholesalers purchase drugs.

**Figure 1.1**



62.    From October 28, 2013, to October 30, 2013, Impax, Lannett and Par attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland. GPhA is a trade association for generic drug manufacturers and distributors.

63.    Immediately following the October 2013 GPhA conference, Lannett and Impax sent Digoxin prices skyrocketing over 700% in lock-step in November 2013. This increase marked the first significant price increase for this essential drug in more than four years. Figure 2 below illustrates this price hike.

**Figure 2**



Source: Symphony Health Solutions

64. High market concentration enabled Impax and Lannett to immediately benefit from the price hikes, as together they controlled approximately 96 percent of the market for Digoxin and therefore their purchasers had no alternatives. This collusion was so profitable that in 2014, market sales of Digoxin increased almost three-fold to $577 million from $198 million in 2013 as a result of this price fixing. Lannett, along with its co-conspirators, maintained this price increase through 2015 when the total sales of Digoxin was $505 million. The sales increase was solely attributable to the November 2013 price hike as the quantity of Digoxin Tablets sold remained relatively stable.

65. The Digoxin price increase was the result of collusive price-fixing. This type of massive price hike had never occurred before for this drug. Moreover, these abnormal price moves by Lannett and Impax were correlated with an unusual degree of uniformity, registering at 99% correlation.[7] At the time of the coordinated price hike, Digoxin had no supply or production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent. Thus, none of the typical reasons for a price increase existed at the time Lannett and Impax increased the price of Digoxin substantially. In fact, when Par became a new entrant to the Digoxin market less than six weeks after Lannett and Impax's coordinated price hike, Par set its Digoxin price at the same level fixed by the two seasoned companies, despite Par's need to build market share from scratch, a highly unusual move for a new entrant into a market.

66. Even with an additional generic drug maker entering the market for Digoxin, Defendant Bedrosian was not worried. His reason for remaining calm was because the competitor was a member of the price-fixing agreement and, as Bedrosian recognized during Lannett's February 6, 2014 earnings call, Par was not going to upset the pricing:

> **February 6, 2014:**
>
> <u>Oppenheimer & Co. Analyst [Rohit Vanjani]:</u> Hi guys congrats on the quarter, again. On digoxin ***you said that Par is a rational competitor.*** Are you seeing anything on the pricing front from them, in terms of discounting?

---

[7] A correlation is a numerical representation of the degree of relationship between two variables. *See* (https://www.socialresearchmethods.net/kb/statcorr.php). In cartels, or collusive markets, there is often a higher correlation between competitors' prices than in competitive markets. *See Hide and seek: the effective use of cartel screens*, Oxera, http://www.oxera.com/getmedia/210bc5bc-0cc9-40ea-8bc9-6c8b2406b485/Cartel-screens.pdf.aspx?ext=.pdf (last visited May 17, 2017).

> <u>Lannett Co, Inc. [Bedrosian]</u>: Well with discounting to our price,
> no. We've seen their prices discounted to the brand of course, but
> **_we're not troubled by their pricing_** in the marketplace.

67.     Typically when a competitor has a massive price increase the rational response would be for the other competitors to keep prices lower than the competitor that raised prices and capture their market share. If Lannett and its co-conspirators did not engage in collusion, they would have lowered their prices as the price increase is against their self-interest.

68.     Generic Drugs, like Digoxin, are a commodity, with any generic drug substitutable for another, and differentiated competitively with each other primarily based on price. In a market without collusion, if Hypothetical Competitor A ("HCA") raised its prices significantly above those of Hypothetical Competitor B ("HCB") then HCA would lose market share. The market for generic Digoxin was mature; competitors could almost only gain market share by competing on price. Yet, Lannett and Impax increased the price of Digoxin substantially, never undercutting each other, and both maintained the majority of their market share as evident in Figure 1.

69.     The Digoxin market is highly vulnerable to anticompetitive conduct due to a combination of factors. Generally, factors that make a market vulnerable to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) a standardized product with a high degree of interchangeability between the goods of cartel participants; (5) absence of a competitive fringe of sellers; and (6) inter-competitor contacts and communications. All of these factors are present in the market for Digoxin, as they were in November 2013.

70.     <u>Market Concentration</u>. A high degree of concentration facilitates the operation of a cartel, because it makes it easier to coordinate behavior among co-conspirators. Lannett's and

its competitors dominance in the Digoxin market is illustrated by examining the Herfindahl-Hirschman Index ("HHI") for Digoxin. HHI is a standard measure of the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry. A HHI score of 0 indicates perfect competition whereas a score of 10,000 indicates a monopoly. The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is in excess of 2,500 to be "highly concentrated." The HHI for Digoxin ranged from 3,975 to 7091 throughout the Class Period, which shows a highly concentrated market approaching monopoly levels.

71.    Barriers to Entry. Abnormally high prices in a market will normally attract additional competitors that want to take advantage of the high profitability. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, and regulatory and intellectual property barriers to entry.

72.    Demand Elasticity. The elasticity of demand is the relationship between a change in quantity demanded for a product or service and a change in price for the same product. More simply, it is a measure of the responsiveness of a change in price on the quantity demanded. Demand is considered inelastic if an increase in price yields only a small decrease in the quantity sold. Digoxin is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (or others) offers it. Thus, demand for Digoxin is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

73.    High Degree of Interchangeability. Digoxin is a commodity-like product. A

commodity-like product is a product that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Digoxin made by Lannett and its competitors was chemically identical.

74.    <u>Absence of Competitive Sellers</u>. Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy significantly more difficult. There is (and was) no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Digoxin market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

75.    <u>Contacts and Communication Opportunities</u>. Collusion requires a level of trust among the conspirators. Collaboration fostered through industry associations facilitates relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Lannett and its competitors are members of, or participants in, the GPhA which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry.[8] Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

---

[8]    *See* http://www.gphaonline.org/about/membership (last accessed May. 23, 2017).*See also* http://www.gphaonline.org/events/2013-cmc-workshop-past-attendees (last accessed May 23, 2017)

**3. Lannett Colluded To Fix The Price Of Levothyroxine Sodium Tablets**

76.     Levothyroxine Sodium ("Levothyroxine") replaces a hormone (thyroxine) the body would normally produce in the thyroid gland. Levothyroxine is the preferred treatment for hypothyroidism, which afflicts approximately 10 million Americans. Treatment consists of daily consumption of the oral tablet form of Levothyroxine. It is also used to treat goiters, nodular thyroid disease, thyroid cancer and myxedema coma. Levothyroxine is on the World Health Organization's core list of essential medicines. These are medicines that are necessary to meet the minimum needs for a basic health-care system.

77.     The market for Levothyroxine was highly concentrated among four manufacturers. Abbvie US LLC, which sold a branded version, controlled approximately 37-51% of the market during the Class Period. Mylan N.V. ("Mylan"), a generic manufacturer, controlled approximately 33% of the market for Levothyroxine. Lannett controlled approximately 16% of the market for Levothyroxine.[9] Figure 3 clearly illustrates the severely concentrated nature of this market.

**Figure 3**



Levothyroxine Sodium Tablets: Total Sales %

Figure 3 also shows how the market share of the three generic drug producers equalized once they began fixing the price of Levothyroxine. From 2014 through the remainder of the Class Period, Lannett had between 14% and 17% of the market for Levothyroxine while Sandoz had between 13% and 15% and Mylan had approximately 32%.

78.     The highly concentrated nature of this market made it substantially easier for Defendants to manipulate the price of Levothyroxine. As Figure 4 demonstrates, the WAC of Levothyroxine significantly increased approximately 100% from about August 2013 to August 2014.

**Figure 4**



79.     Lannett's collusion regarding Levothyroxine is even more apparent when the price increases of each competitor is viewed together. Figure 5 breaks down the price increase by competitor and the lock-step manner in which they raised their prices. It also clearly shows that

Lannett's its competitors'price hikes all happened shortly after GPhA meetings or conferences where they had the opportunity to collude with one another and develop a strategy for their price hikes.

**Figure 5**



Source: Symphony Health Solutions, Fideres' Calculations

80.     These substantial price increases could only be reasonably explained as the result of collusion. If the market for generic Levothyroxine was rational, then as the Defendants raised Lannett's price, competitors would have stepped in to offer Levothyroxine at a lower price and capture market share from its competitors.

81.     The Levothyroxine price increase was the result of collusive price-fixing. This type of massive price hike for Levothyroxine had never occurred before. Moreover, these abnormal price moves by Lannett, Mylan and Sandoz were correlated with an unusual degree of uniformity. Lannett's degree of uniformity *registered at 99.9% correlation*.

82.     At the time of the coordinated price hike, Levothyroxine had no supply or production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patents. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Levothyroxine substantially.

83.     Further there was also an incredibly low variance between the Levothyroxine prices for Lannett, and its competitors. The variance between firm prices tends to be lower among cartel members. At the beginning of the Class Period, Lannett's prices had an average variance of 1.33% (compared to Mylan and Sandoz).[10] By the end of the Class Period, Lannett's price variance compared to Mylan and Sandoz was **only 0.02%**. This is a decrease in variance of approximately **98.49%**.

84.     While there was a shortage reported for Levothyroxine during the Class Period that shortage was not reported by Lannett. Instead, the shortage was reported by Pfizer Inc. ("Pfizer"). Pfizer is not a major market player in the Levothyroxine market and all other

---

[10] One effective screening mechanism for price-fixing is testing whether pricing in a market is stable (*i.e.* whether there is a low and consistent price variance). *See* Haider & Hunter, *Screening and Testing for Collusive Conduct in the Absence of a Smoking Gun,* NERA Economic Consulting, http://www.nera.com/content/dam/nera/publications/2010/NL_AT_Insights_1010.pdf (last visited May 17, 2017). Collusion tends to diminish price movements because competing firms are coordinating their prices and less likely to react to changes in their costs of production to avoid upsetting their co-conspirators. *See Id.*

manufacturers did not report a shortage.  Thus, this reported shortage by a minor Levothyroxine supplier should not have had a material effect on prices.

85.     The Levothyroxine market is highly vulnerable to anticompetitive conduct due to a combination of factors that make a market vulnerable to collusion. As shown below, all of these factors are present in the market for Levothyroxine.

86.     Market Concentration. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Lannett, and its competitors dominance in the Levothyroxine market is illustrated by examining the HHI for Levothyroxine. The HHI for Levothyroxine ranged from 4,777 to 5,709 throughout the Class Period which shows a highly concentrated market.

87.     Barriers to Entry. Abnormally high prices in a market will normally attract additional competitors that want to take advantage of the high profitability. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market, such as for Levothyroxine, there are significant capital requirements, high manufacturing costs, and regulatory, and intellectual property barriers to entry.

88.     Demand Elasticity. Levothyroxine is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (or others) offers it. Thus, demand for Levothyroxine is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

89.     High Degree of Interchangeability. Levothyroxine is a commodity-like product. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor

these prices effectively. The Levothyroxine made by Lannett and its competitors was chemically identical.

90.     <u>Absence of Competitive Sellers</u>. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Levothyroxine market. Lannett and its competitors have an oligopolistic power over the market which facilitates their ability to raise prices without losing market share to non-conspirators.

91.     <u>Contacts and Communication Opportunities</u>. Lannett and its competitors for Levothyroxine are members of or participants in the GPhA, which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals and suppliers of other goods and services to the generic industry. Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

### 4.   Lannett Colluded To Fix The Price Of Acetazolamide

92.     Acetazolamide is a medication used to treat glaucoma, epilepsy, altitude sickness, paralysis and heart failure. The World Health Organization has classified Acetazolamide as an essential medicine.

93.     The market for the Acetazolamide is divided into a market for tablets and a market for sustained release capsules.[11] The market for Acetazolamide tablets was worth approximately $276.9 million during the Class Period where the market for the sustained release capsules was worth approximately $201.6 million.

94.     The market for generic Acetazolamide is highly concentrated. For the majority of

---

[11]  Throughout this complaint, unless otherwise noted, Acetazolamide only refers to the tablet form of Acetazolamide.

the Class Period, the only two producers of Acetazolamide were Lannett and Taro Pharmaceuticals ("Taro"). Figure 6 below illustrates the highly concentrated nature of this market as close to 100% of the total sales were distributed between Lannett and Taro.

**Figure 6**



Source: Symphony Health Solutions, Fideres Calculations

Prior to the Class Period, Lannett had roughly 20% of the market share for Acetazolamide. However, as evidenced by the above Figure 6, from January 2009 through July 2011 Lannett's market share significantly increased, almost doubling within two years. Figure 7 shows the reason for this rapid increase in market share. Lannett **had dropped its price to grab market share** away from Taro. In fact, Lannett's prices moved in the complete opposite direction of Taro's price prior to the Class Period with a –99% correlation.[12] Once the Class Period started

---

[12] The main result of a correlation is called a correlation coefficient and it ranges from -100% to 100% (some studies use -1.0 to +1.0). If the correlation coefficient is closer to 0 then there is no relationship between the variables. If the correlation coefficient is positive then, for example, as one variable gets larger the other gets larger. If, however, the correlation coefficient is negative then, for example, as one variable gets larger the other gets smaller.

Lannett's and Taro's prices for Acetazolamide had a 98% correlation.

**Figure 7**



95.     The high market concentration of Acetazolamide enabled Lannett and Taro to immediately benefit from their lock-step price increases. As evidenced by Figure 8, the price of Acetazolamide jumps nearly 500% at the start of the Class Period and immediately following the October 2013 GPhA meeting.

**Figure 8**



Acetazolamide Tablets: Average Price

Source: Symphony Health Solutions, Fideres Calculations

96.     The Acetazolamide price increases could only reasonably be explained as the result of collusive behavior. If this market behaved rationally or the competitors behaved rationally, once Lannett raised its prices, Taro would have undercut Lannett and attempted to capture Lannett's market share. This did not happen. Instead, Taro and Lannett colluded to raise their prices simultaneously so that their customers did not have any other options.

97.     The Acetazolamide price increases were the result of collusive price-fixing. This type of massive price hike had never occurred before. In fact these abnormal price moves by

Lannett and Taro were correlated with an unusual degree of uniformity, registering at 98% correlation. At the time of the coordinated price hike, Acetazolamide had no supply or production issues to justify the price increase. There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Acetazolamide substantially.

98. The Acetazolamide market is highly vulnerable to anticompetitive conduct due to a combination of factors that make a market vulnerable to collusion. As shown below, all of these factors are present in the market for Acetazolamide.

99. <u>Market Concentration</u>. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Lannett and its competitors dominance in the Acetazolamide market is illustrated by examining the HHI for Acetazolamide. The HHI for Acetazolamide ranged from 7,014 to 7,019 during the Class Period which shows a highly concentrated market.

100. <u>Barriers to Entry</u>. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, regulatory, and intellectual property barriers to entry.

101. <u>Demand Elasticity</u>. Acetazolamide is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett or others offers it. Thus, demand for Acetazolamide is inelastic and is an ideal price-fixing product

because price increases result in more revenue with negligible losses in sales volume.

102.  <u>High Degree of Interchangeability</u>. Acetazolamide is a commodity-like product. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Acetazolamide made by Lannett and its competitors was chemically identical.

103.  <u>Absence of Competitive Sellers</u>. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett or its competitors in the Acetazolamide market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

104.  <u>Contacts and Communication Opportunities</u>. Lannett and its competitors are members of or participants in the GPhA, which is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry. Therefore, representatives from Lannett had the opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

### 5.  Lannett Colluded to Fix the Price of Ursodiol

105.  Generic Ursodiol, or Ursodeoxycholic Acid, in capsule form ("Ursodiol")[13] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution. Urosdiol is a widely prescribed drug in the United States, particularly for older Americans.  Ursodiol has been available on the

---

[13] Ursodiol only refers to the Ursodiol Capsule market. If references are made to the Ursodiol Tablet market that will be specifically noted.

generic market since 2000. Annual sales of Ursodiol in capsule form for 2015 were $433 million.

106.     The market for Ursodiol is divided between capsule and tablet forms. The Ursodiol Capsule market is dominated by Lannett, Actavis Generics ("Actavis") and Epic Pharma ("Epic"). The tablet though is manufactured by a different group of companies. The total market for Ursodeoxycholic Acid is divided between tablets and capsules.

107.     Lannett, with Actavis and Epic, dominated the Urosdiol market. Lannett's Ursodiol sales in 2014 were $86.8 million, Actavis's sales of Ursodiol exceeded $155.2 million, and Epic's Ursodiol sales exceeded $60.7 million. As Figure 9 shows, these three companies controlled substantially all of the Ursodiol Capsule market.

**Figure 9**



108.    Prior to the Class Period, the price of Ursodiol had remained somewhat stable at approximately $2 per capsule. Following two generic pharmaceutical manufacturers meetings attended by Actavis, Lannett and Epic, in February and June of 2014, the price of Ursodiol shot up over 200% from $2 a unit to $5-$6 per unit. Figure 10 displays the WAC, which Lannett raised over 200% from the end of April to the end of June 2014.

**Figure 10**



109.    In sharp contrast to the pricing of Ursodiol, the Ursodiol Tablets prices remained largely unchanged throughout the Class Period. The key difference between Ursodiol and the Ursodiol Tablets is the manufacturers, as illustrated in Figure 11.

**Figure 11**



Ursodiol Price per Unit

110.    These dramatic and uniform price hikes in Ursodiol have no reasonable explanation absent collusion. There were no supply shortages of urdeoxycholic acid prior to, after or during mid-2014. The FDA reported no ursodeoxycholic acid shortages, there were no new patents or formulations, no labelling changes, and once in production, ursodeoxycholic acid is not difficult to make. Lannett never provided a meaningful explanation for the coordinated price rise. There were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway. Thus, none of the typical reasons for a price increase existed at the time these companies increased the price of Ursodiol substantially.

111. The Ursodiol market is highly vulnerable to anticompetitive conduct due to a combination of factors that are present in the market for Ursodiol.

112. Market Concentration. Lannett's and its competitors' dominance in the Ursodiol market is illustrated by comparing the HHI for Ursodiol. The HHI for Ursodiol ranged from 5,077 to 7,507 during the Class Period which shows a highly concentrated market.

113. Barriers to Entry. The presence of significant barriers to entry makes it more difficult for new competitors to enter the market and facilitates the operation of a cartel. In the generic drug market there are significant capital requirements, high manufacturing costs, regulatory, and intellectual property barriers to entry.

114. Demand Elasticity. Ursodiol is a crucial drug for the people who require it and patients consider it a necessity that must be purchased at whatever price Lannett (and others) offers it. Thus, demand for Ursodiol is inelastic and is an ideal price-fixing product because price increases result in more revenue with negligible losses in sales volume.

115. High Degree of Interchangeability. Ursodiol is a commodity-like product. When products offered by different suppliers are viewed as interchangeable by purchasers it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively. The Ursodiol made by Lannett and its competitors was chemically identical.

116. Absence of Competitive Sellers. There is no realistic threat that a fringe of competitive sellers will take market share from Lannett, or its competitors, in the Ursodiol market. Lannett, and its competitors, have an oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.

117. Contacts and Communication Opportunities. Lannett and its competitors are members of or participants in the GPhA. Therefore, representatives from Lannett had the

opportunity to meet with competitors and conspire with them at these trade organization functions, conferences, customer events, dinners and meetings.

### F. Lannett And Its Co-Conspirators Are Under Multiple Governmental Investigations For Anticompetitive Price-Fixing

118.     As a result of Defendants' drug pricing misconduct, throughout the Class Period, Lannett, as well as a number of its co-conspirators, became the focus of regulatory scrutiny in connection with these drug manufacturers' pricing of generic drugs. Specifically, during the Class Period, Lannett was investigated by the Connecticut Attorney General, Congressional Committees, and the Department of Justice (the "DOJ").

119.     On July 16, 2014, Lannett disclosed that it had received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into the pricing of Digoxin.

120.     Shortly after, October 2, 2014 Senator Bernard Sanders and Representative Elijah E. Cummings sent Defendant Bedrosian a letter regarding their investigation into "the recent staggering price increases for Generic Drugs used to treat everything from common medical conditions to life-threatening illnesses." In connection with this investigation, Senator Sanders and Representative Cummings requested:

Documents and information for the time period covering January 1, 2012, to the present regarding:

(1) total gross revenues from the company's sales of these drugs;

(2) the dates, quantities, purchasers, and prices paid for all sales of these drugs;

(3) total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4) sales contracts or purchase agreements for active pharmaceutical

ingredients for these drugs, including any agreements relating to exclusivity, if applicable;

(5) a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of these drugs;

(6) any cost estimates, profit projects, or other analyses relating to the company's current and futures sales of these drugs;

(7) prices of these drugs in all foreign countries or markets, including price information or the countries paying the highest and lowest prices; and

(8) the identity of company official(s) responsible for setting the prices of these drugs over the above time period.

121. This is November 6, 2014, Lannett disclosed in a Form 10-Q filed with the SEC that the "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."

122. On November 7, 2014, one of Lannett's competitors in the Digoxin market, Impax, announced that one of its sales representatives had received a grand jury subpoena from the DOJ's Antitrust Division concerning the sale of Generic Drugs.

123. On December 5, 2014, the DOJ's Antitrust Division issued a grand jury subpoena to Par and requested documents relating to Digoxin

124. On November 3, 2016, media outlets reported that DOJ prosecutors might file criminal charges by the end of 2016 against Lannett and several other generic pharmaceutical companies for unlawfully colluding to fix generic drug prices. *Bloomberg* specifically named Lannett as one of the manufacturers implicated through Digoxin. In the article titled "U.S. Charges in Generic-Drug Probe to be Filed by Year-End," *Bloomberg* reported, in relevant part:

U.S. prosecutors are bearing down on generic pharmaceutical

companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceuticals Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, ***Lannett Co.***, Impax Laboratories, Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

125.    On this news, Lannett's share price fell $6.25 per share, or approximately 27% from its previous closing price to close at $17.25 per share on November 3, 2016.

126.    On December 14, 2016, the State of Connecticut and nineteen other states filed an original complaint ("AG Complaint") – subsequently amended on March 1, 2017 to include 20 additional states – against six generic drug manufacturers for illegal schemes involving market share allocation and anticompetitive price inflation. At the same time, the DOJ unsealed criminal charges against the CEO and President of Heritage Pharmaceuticals, Inc. ("Heritage"). On January 9, 2017, and January 10, 2017, respectively, Heritage's CEO Jeffrey Glazer, and its Vice President of Commercial Operations, Jason Malek, pleaded guilty to price-fixing charges.

127.    Governmental investigations are ongoing. According to the AG Complaint, "[i]n July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. The information developed through that

investigation, which is ongoing, uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." The AG Complaint filed was only an "initial civil action" to be followed by additional filings as the states "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors [that] will be acted upon at the appropriate time."

128.    In an interview with a reporter for the *New York Times* published on December 15, 2016, Connecticut's Attorney General George Jepsen stated that there were more lawsuits to come:

> "We believe that this is just the tip of the iceberg . . . . I stress that our investigation is continuing and it goes way beyond the two drugs in this lawsuit, ***and it involves many more companies*** than are in this lawsuit."

129.    The DOJ has also stated that its investigations are ongoing. In a motion to stay discovery in a civil antitrust case concerning the drug propranolol, filed on February 24, 2017, the DOJ emphasized the broad-ranging nature of its ongoing investigation, the "numerous corporations and individuals" implicated, and the "plethora of evidence" amassed against these corporations and individuals:

> The Complaints refer to the United States' criminal investigation into the generic pharmaceutical industry as part of the factual basis for their antitrust claims...
>
> The United States unsealed the first criminal information in that investigation on December 14, 2016... the two executives – Jeffrey Glazer and Jason Malek – pled guilty to these charges on January 9, 2017, and both are cooperating with the United States' ongoing criminal investigation.
>
> Although, to date, the United States has filed charges against only Glazer and Malek, as described in this Memorandum and detailed

more fully in the Grundvig declaration, the criminal investigation into the generic pharmaceutical industry is ongoing and broad-ranging, and it has already implicated numerous corporations and individuals. Additional corporations and individuals may be implicated as the investigation continues to develop

\* \* \*

Thus, absent a stay, discovery in these cases should sweep up evidence related to other drugs that the United States is currently investigating.

\* \* \*

Broad civil discovery in these cases would threaten the United States' ongoing investigation because subjects of the investigation will gain access to a plethora of evidence that they could not otherwise obtain.

\* \* \*

[T]he United States is conducting sensitive negotiations with potential criminal defendants and has a considerable interest in limiting sworn testimony given by its cooperators. (*See* Grundvig Decl., ¶13.)[14]

130.    The DOJ has intervened in numerous other civil actions involving different drugs and generic manufacturers. In particular, on January 5, 2017, the Antitrust Division's Washington Criminal I Section submitted an Uncontested Motion of the United States to Intervene in the *In re Generic Digoxin and Doxycycline Antitrust Litigation*, in which Lannett, Jeffrey Glazer, Jason Malek, Heritage, Impax, Par, West-Ward, Sun Pharmaceutical Industries Ltd. ("Sun"), Actavis, Mayne Pharma Group Ltd., and Mylan are named as defendants. In its motion, the DOJ asserted that "this litigation shares common questions of law and fact with an ongoing federal criminal investigation. Continued litigation of this consolidated action is likely to result in the disclosure of information that will harm the ongoing criminal antitrust investigation." On January 6, 2017, United States District Judge Cynthia Rufe granted the DOJ's

---

[14] Memorandum of Law in Support of the United States' Motion for Reconsideration of Its Motion for a  Limited Stay of Certain Discovery, *Castillo v. Actavis Elizabeth, LLC, et al.*, No. 1:16-cv-009901 (S.D.N.Y. Feb. 24, 2017), Dkt No. 62. The Grundvig Declaration, which was filed with the Memorandum of Law, was filed under seal.

uncontested motion to intervene.

131.     On May 3, 2017, Perrigo Company plc ("Perrigo") disclosed that federal authorities had raided their office as part of a probe into potential price-fixing. Perrigo was not previously named in either the Connecticut Attorney General original or amended complaint nor had any Perrigo executives entered into plea agreements with the DOJ.

132.     On October 31, 2017 the States Attorneys General filed their proposed amended complaint in their action against generic pharmaceutical companies for their collusion. The new complaint alleged price fixing against 18 companise over 15 drugs. The original complaint had only alleged misconduct by six companies over two drugs.  The Connecticut Attorney General George Jepsen, noted that "it is our belief that *price-fixing [in the generic drug industry] is systematic, it is pervasive, and that a culture of collusion exists in the industry.*"

### G. Lannett's Survival as a Company Depended on Their Anticompetitive Conduct

133.     In connection with the Company's acquisition of Kremers, Lannett acquired a substantial amount of debt.  In fact, Lannett acquired more debt in connection with its purchase of Kremers than at any other time during the Class Period. *See ¶43 Infra*.

134.     Lannett's Amended Senior Secured credit facility with Deerfield Partners L.P., contains a financial performance covenant that is triggered when the aggregate principal amount of the outstanding Revolving Credit Facility and outstanding letters of credit as of the last day of the most recent fiscal quarter is greater than 30% of the aggregate commitments under the Revolving Credit Facility.

135.     On January 18, 2017, an article on Lannett appeared on *SeekingAlpha*[15] which

---

[15] SeekingAlpha is a crowd-sourced content service for financial markets. Article and research covers a broad range of stocks, asset classes, ETFS and investment strategies.

stated, among other things, that, if even modest price cuts were imposed on Lannett's main drugs, the Company would violate those debt covenants. The article explained that Lannett was heavily leveraged and extremely dependent on the windfall profits from a small group of drugs to generate enough revenue to service its debt. Indeed, the article stated that the debt load was based on an assumption of unrestrained drug price increases. The article further stated that new court filings conclusively showed Lannett "conspired to fix drug pricing."

136. The extent of Lannett's reliance on a small group of drugs is demonstrated in Figures 12-15. These figures display the product mix as a percentage of Lannett's total sales, as listed in various Lanett Form 10-Ks filed with the SEC. These charts demonstrate that the Price Fixed Drugs made up a substantial portion of Lannett's total product mix from 2013 to 2016.

**Figure 12**

**Figure 13**



**Figure 14**



**LANNETT'S PRODUCT MIX 2015**

**Figure 15**



**LANNETT'S PRODUCT MIX 2016**

52

Lannett provided a chart in its Form 10-K which showed the medical indication of the drugs and the name of Lannett's affiliated product.[16] This chart has been reproduced from Lannett's 2016 Form 10-K as Figure 16 below.

**Figure 16**

| Name of Product(1) | Medical Indication |
|---|---|
| 1 Acetazolamide Tablets | Glaucoma |
| 2 Butalbital, Acetaminophen and Caffeine Tablets | Migraine |
| 3 Butalbital, Aspirin and Caffeine Capsules | Migraine |
| 4 C-Topical ® Solution | Anesthetic |
| 5 Digoxin Tablets* | Congestive Heart Failure |
| 6 Glycolax Rx | Gastrointestinal |
| 7 Isosorbide Mononitrate CR | Cardiovascular |
| 8 Levothyroxine Sodium Tablets* | Thyroid Deficiency |
| 9 Methylphenidate HCL CD | Central Nervous System |
| 10 Methylphenidate ER | Central Nervous System |
| 11 Nifedipine CR | Cardiovascular |
| 12 Omeprazole DR | Gastrointestinal |
| 13 Oxbutynin ER | Urinary |
| 14 Pantoprazole DR | Gastrointestinal |
| 15 Pilocarpine HCl Tablets | Dryness of the Mouth |
| 16 Triamterene w/Hydrochlorothiazide Capsules | Hypertension |
| 17 Ursodiol Capsules | Gallstone |

137.    As Figures 12-15 illustrate, Lannett was highly dependent on a very small group of drugs to generate a disproportionate amount of its annual sales. In fact, the Price Fixed Drugs made up approximately *56% to 72% of Lannett's total annual sales from 2013 to 2016*. Thus, a substantial amount of Lannett's sales were dependent on maintaining high prices among the Price Fixed Drugs.

138.    Lannett's reliance on the Price Fixed Drugs to generate a substantial amount of its profit was noted by *Forbes*. On October 6, 2016, *Forbes* published an article titled "Another Drug Company That Raises Prices Like Crazy." In that article, Lannett's pricing strategy was

---

[16] The chart also includes the equivalent brand name of the drug but that row has been intentionally left out.

noted:

> Lannett's aggressive pricing strategy first centered largely around three popular drugs covered by Medicare—digoxin, ursodiol, and levothyroxine. At one of four offered dosages*, the average manufacturer price for Lannett's digoxin, a lifesaving treatment used for congestive heart failure, rose by 857%* to 50 cents per pill from April 2013 to April 2015, according to Lannett's AMP pricing list. By September 2014, Lannett had received a subpoena from Connecticut's attorney general about the company's pricing practices for digoxin. The company maintains that it acted in compliance with all applicable laws and is cooperating with the investigation. *Starting around April 2013, Lannett increased the price of levothyroxine, a widely used thyroid medicine, by 158%* in two years to 14 cents per pill. Between December 2013 and October 2014*, Lannett boosted the price of a generic drug for gallstones, ursodiol, by 700% to $286 per prescription,* IMS Health data shows. Ursodiol recently cost $2.29 per pill.
>
> Product price increases contributed $157.3 million of revenue in Lannett's fiscal 2015, an SEC filing says*. Levothyroxine and ursodiol accounted for half of Lannett's revenue in its fiscal 2015, according to research from Deutsche Bank.*

139.    The Levothyroxine price increase alone added approximately $78 million to Lannett's revenue and its Earnings Before Interest, Tax, Depreciation and Amoritization ("EBITDA") during the Class Period.

140.    Thus, Lannett's need to service its huge debt by generating revenue motivated Defendants to enter into collusive drug pricing arrangements in violation of United States antitrust laws.

## H.  The Individual Defendants Controlled The Company's Price Hikes

141.    Many of the generic pharmaceutical industry price-fixing schemes were "conceived and directed by executives at the highest level," as stated in the State AG Proposed Complaint. The Company's senior executives admitted that exploitation of pricing was a Company focus and core strategy for Lannett.

142.     Defendant Bedrosian admitted at the Morgan Stanley Healthcare Conference on September 8, 2014 that "I will sit here in front of all you and ***tell you that two people in Lannett made the decision on the price increase of digoxin***. My sales Vice President Kevin Smith was the one who came to me when Kogas bought the brand. He suggested we raise the price on the generic. [...] ***I said there's a good likelihood that they will not try to grab market share, but follow us and raise the price. So we raised our price[.]***"

143.     The above statement demonstrates that the only two people at Lannett who controlled pricing were CEO Bedrosian and his Vice President of Sales Kevin Smith. Thus, Bedrosian oversaw and authorized each and every price increase as he participated in the generic drug cartel.

144.     In addition, the former Director of National Accounts for Lannett from October 2014 to December 2015 ("CW1"), who reported directly to Kevin Smith ("Smith"), stated that drug prices, including price increases, were determined by Smith and Bedrosian. CW1 further stated that Smith reported directly to Bedrosian and that "***nothing is done without [Bedrosian's] knowledge***. It's not ask for forgiveness rather than approval. You need approval to do anything."

145.     CW1 also stated that Kevin Smith, who set the prices for Lannett's drugs along with Bedrosian, frequently attended healthcare conferences and other industry events, which were also attended by executives from other generic drug companies, such as Par, Impax, Mylan, Sun, and West-Ward.

146.     Bedrosian and other generic drug company CEOs would signal price increases to each other. These actions ensured that each member of the cartel could raise their prices accordingly and the cartel could command a substantial premium for their drugs.

147.     In Lannett's September 10, 2013 earnings call, Bedrosian was asked for his

reaction to Mylan increasing the price of Levothyroxine significantly. Bedrosian replied, "***You mean after I sent them the thank you note***?" He continued: "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful. Because Lannett tends to be active in raising prices … So I'm grateful to see price increases." During the same call, Bedrosian also provided his view on whether there would be new competitors in the generic Levothyroxine market. Bedrosian stated that there were two possible competitors but "hopefully, both companies turn out to be responsible companies and don't go into the marketplace.   We're seeing more responsibility on the part of all of our competitors, I believe, because all of us are facing the same costs... So I would expect that all the companies are not going to behave like they have in the past. ***And I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that.***"

148.   Defendant Bedrosian used the same September 10, 2013, conference call to provide signals to competitors to raise their prices and to guarantee that Lannett would act "responsibly" and do the same. Bedrosian stated: "I am finding a climate out there has changed dramatically and ***I see more price increases coming from our competing competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit. If they don't that's their issue. But our plan is to raise prices on any product that we think we can or haven't raised a price.***"

149.   On November 3, 2014, Bedrosian, during an earnings conference call, described Mylan as "***one of those rational competitors so we're not really expecting anything crazy from them***." The price increases were compared to a "***rocket ship [that] is leveling off now that its***

*broken through the atmosphere*." Mylan was described as "not [an] irrational player[], I don't see them just going out and trying to grab market share."

<u>**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**</u>

150.     As summarized below, throughout the Class Period, Defendants materially false and misleading statements concerning, among other things: (i) how competition was the primary driver of Defendants' generic drugs, (ii) drug pricing; (iii) the Company's financial artificially inflated revenue and other financial metrics; (iv) the Company's internal controls over financial reporting and disclosure controls, including Sarbanes-Oxley certifications signed by the Individual Defendants; and (v) the company's internal code of ethics and conduct.

A.     **Third Quarter 2013 Form 10-Q**[17]

151.     The Class Period begins on May 9, 2013. On this date the Company filed with the SEC a Form 10-Q for the quarter ending March 31, 2013 (the Third Quarter 2013 10-Q) (Lannet's fiscal year ended on June 30 of each year of the Class Period), signed by the Individual Defendants. In the First Quarter 2013 10-Q, the Company reported a gross profit of $15.1 million, earnings per common share of $0.14, on $39.022 million of revenue compared to net income of $3.963 million.

152.     In the Third Quarter 2013 10-Q, Lannett also stated: "***While the Company is continuously striving to keep product costs low***, there can be no guarantee that profit margins will stay consistent in future periods. ***Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods***.  Changes in the future sales product mix may also occur."

153.     Similarly, in the Third Quarter 2013 10-Q, Lannett also stated that: "Generic

---

[17]  Lannett's first quarter ends on September 30th, the second quarter ends on December 30th, the third quarter ends on March 30th, and the fiscal year ends on June 30th.

pharmaceutical manufacturers and distributors *are constantly faced with pricing pressures in the marketplace as competitors attempt to lure business from distributors, wholesalers and chain retailers by offering lower prices than the incumbent supplier*."

154.    Defendants also maintained that their representations in the Third Quarter 2013 10-Q had been "prepared in accordance with U.S. generally accepted accounting principles" and were accurate and could be relied up, with the Company stating that:

> As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

> Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

155.    Further, in the Company's Third Quarter 2013 10-Q, the Individual Defendants each personally certified that they had evaluated the effectiveness of Lannett's internal controls and disclosed any deficiencies or material weaknesses in them.  Specifically, the Individual Defendants made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition, results of operations, changes in shareholders' equity, and cash flows of the Company as of and for the periods presented in this report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting;

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors:

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control

over financial reporting.

156.    In the Third Quarter 2013 10-Q, the Individual Defendants also each personally certified that they had evaluated the effectiveness of Lannett's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

157.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded with its competitors to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i.   The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal, anti-competitive conduct;

    ii.   The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

    iii.   Lannett's inflation of sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities along with the attendant negative financial and

reputation harm; and

    iv.   Lannett's revenues and income as stated above were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs.

## B. **August 21, 2013 Cannacord Genuity Growth Conference**

158.    On August 15, 2013, Defendants took part in in the Cannacord Genuity Growth Conference, during which Defendant Bedrosian made materially false and misleading statements about the Company's purported competition with other generic drug makers. In response to an audience members' question, Defendant Bedrosian stated: "***we compete with every one of the major players*** – Teva or Waterson … Mylan, Sandoz, ***every single one of them we have products that compete with***. For example, ***my biggest selling product, the levothyroxine sodium product, I and Mylan have the two biggest market shares in the country. Sandoz is a third to us***."

159.    Defendant Bedrosian's statements were materially false and misleading because the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal, anti-competitive conduct, and in fact was collusive and lacked true competition.

## C. **September 10, 2013 Conference Call**

160.    On September 10, 2013, Lannett held a conference call with investors and analysts to discuss the Company's Fourth Quarter 2013 financial results.  During this conference call, Defendant Bedrosian made materially false and misleading statements and omissions about the Company's purported competition with other generic drug makers. In response to a ROTH Capital Partners' question concerning competition over levothyroxine, Defendant Bedrosian

stated: "while I'm an optimist generally speaking, when it comes to competition I always expect the worst. We certainly know that there are at least two possible competitors in the wings. None of them have talked about anything at this point … hopefully both companies turn out to be responsible companies and don't go into the marketplace. ***We're seeing more responsibility on the part of all of our competitors***."

161.    Defendant Bedrosian's statements were materially false and misleading because the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal, anti-competitive conduct, and in fact was collusive and lacked true competition.

### D.  Fiscal Year 2013 Form 10-K

162.    On September 12, 2013, Lannett filed with the SEC its Form 10-K for the year ended June 30, 2013 ("2013 10-K"), which was signed by the Individual Defendants. In the 2013 10-K, Defendants made materially false and misleading statements and omissions about the purported competitiveness of the generic drug industry and Lannett's relationship to other generic drug manufacturers, as well as the pricing of generic drugs as a result of that purported competition. For example, in the 2013 10-K, the Company stated in connection with certain "Key Products" that:

> Levothyroxine Sodium tablets are produced and marketed with 12 varying potencies.  In addition to generic Levothyroxine Sodium tablets, we also market and distribute Unithroid® tablets, a brand version of Levothyroxine Sodium tablets, which is produced and marketed with 11 varying potencies … ***In our distribution of these products, we compete with two brand Levothroxine Sodium products—Abbott Laboratories' Synthroid® and Monarch Pharmaceutical's Levoxyl®— as well as generic products from Mylan and Sandoz***.

> Digoxin tablets are produced and marketed with two different

potencies … **In our distribution of these products, we compete with two similar generic products from Impax and West-Ward and the brand Lanoxin from Covis**.

*     *     *

Competition from new and other market participants for the manufacture and distribution of certain products would likely affect our market share with respect to such products as well as force us to reduce our selling price for such products due to their increased availability. As a result, we believe that **our success depends on our ability to properly assess the competitive market of new products, including market share, the number of competitors and the generic unit price erosion.**

163. Similarly, the Company stated in connection with the purported competitive nature of the generic drug industry that "**The generic pharmaceutical industry is highly competitive**," that Lannett "**faced strong competition in [its] generic product business**" and that:

> **The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price**. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders.

164. In the Lannett's 2013 10-K, the Company also materially misstated its revenue and profits. Specifically, the Company stated that:

> For the fiscal year ended June 30, 2013, net sales increased to $151.1 million from $123.0 million for the fiscal year ended June 30, 2012. **Gross profit rose to $57.4 million from $38.9 million**. As a percentage of net sales, gross margin was 38% compared with 32% for the prior year. R&D expenses were $16.3 million compared with $11.8 million for fiscal 2012. SG&A expenses were $22.4 million compared with $20.2 million for the prior year. Operating income was $18.8 million compared to $6.9 million for fiscal 2012. Net income attributable to Lannett Company, Inc. was $13.3 million, or $0.46 per diluted share, compared to $3.9 million, or $0.14 per diluted share for the prior year. A more detailed

discussion of the Company's financial results can be found below.

165. In Lannett's 2013 10-K, Defendants also materially represented the Company's compliance with applicable laws, despite the fact that the Company, throughout the Class Period was engaging in conduct in violation of anti-trust laws. Specifically, Lannett stated "We monitor our compliance and we believe *we are in substantial compliance with all regulatory bodies*." Likewise, Lannett stated that "*we have developed and instituted a corporate compliance program based on what we believe are the current best practices* and we continue to update the program in response to newly implemented or changing regulatory requirements."

166. Defendants also maintained that their representations in the 2013 10-K had been prepared "in accordance with accounting principles generally accepted in the United States" and that based upon the evaluation of the Individual Defendants the Company's disclosure controls were effective and the Company's financial statements could be relied upon and that all "information required to be disclosed by the Company" was included in the filing.

167. Throughout the Class Period, Lannett's Forms 10-K, (including the 2013 10-K) represented that the Company "has adopted the Code of Professional Conduct (the 'code of ethics'), *a code of ethics that applies to the Company's Chief Executive Officer and Chief Financial Officer,* as well as all other company personnel." The operative and applicable version of the referenced Code of Ethics, approved by Lannett's Board of Directors as of June 14, 2013, states: "*Employees, officers and directors shall maintain the confidentiality of information entrusted to them by the Company and its customers*, except when disclosure is authorized or legally mandated. *Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed*. In addition, all employees, officers and directors have a fiduciary obligation to the Company whenever they are

in possession of material, nonpublic information." The Code of Ethics also mandated that employees conduct themselves in "***compliance with laws***" and "***required [employees] to report violations of laws, rules, regulations or the Code to appropriate personnel***."

168.    The statements referenced in ¶167 above were materially false and misleading and/or omitted material facts because Lannett, its representatives, and the Individual Defendants did not comply with the Company's stated Code of Ethics, given Defendants' sharing of confidential pricing information helpful to competitors and the anti-competitive and collusive conduct alleged herein and failed to disclose that: (i) Lannett and the Individual Defendant and several of the Company's pharmaceutical industry peers colluded to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct in violation of federal law; and (iii) consequently, Lannett's revenues during the Class Period were in part the result of anti-competitive conduct. Having elected to speak publicly about the Company's adoption of the Code of Ethics which expressly prohibited the sharing of confidential proprietary information and mandated the reporting of violations of the law, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding violations of that Code of Ethics, including the anti-competitive conduct alleged herein. As a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

169.    Further, in the Company's 2013 10-K the Individual Defendants each personally certified that they had evaluated the effectiveness of Lannett's internal controls, disclosed any deficiencies or material weaknesses in them, and, in connection with their SOX certifications, stated that  the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

170.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i.   The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for some or all of the Price Fixed Drugs was the product of illegal price fixing;

    ii.   The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for Price Fixed Drugs was collusive and lacked true competition;

    iii.   The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

    iv.   The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

    v.   The statement referred to above about Lannett competing with Impax was materially false and misleading because the defendants were colluding

with Impax to fix the price of generic Digoxin;

vi.   The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

vii.  The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

viii. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

ix.   Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

x.    Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**E. November 7, 2013 Conference Call**

171.   On November 7, 2013, the Company held a conference call with investors and analysts to discuss Lannett's financial results for the period ended September 30, 2013. During

this conference call, Defendant Bedrosian made materially false and misleading statements and omissions concercning the purported competition which Lannett faced in the generic drug industry and how that competition affected pricing. Specifically, in response to a Bank of America Merrill Lynch analyst's question concerning Lannett's ability to maintain gross margins, Defendant Bedrosian stated: "It's hard to say but I would believe they are sustainable as we're not expecting any changes that we anticipate this point. But we're in a commodity business, *so it's always hard to determine when you're going to get additional competition or when prices will erode as they generally do*."

172.     Defendant Bedrosian's statement was materially false and misleading because Defendants failed to disclose that pricing for some or all of the Price Fixed Drugs was the product of illegal price fixing, that the market for Price Fixed Drugs was collusive and lacked true competition; that the prices for the Price Fixed Drugs were inflated by illegal price fixing.

### F.  November 8, 2013 Form 10-Q

173.     On November 8, 2013, Lannett filed with the SEC its Form 10-Q for the period ended September 30, 2013, signed by the Individual Defendants.  In this Form 10-Q, Defendants made materially false and misleading statements and omissions about the so-called competitive market for generic drugs and how that competition affected prices. Specifically, Defendants stated: "*While the Company is continuously striving to keep product costs low*, there can be no guarantee that gross profit percentages will stay consistent in future periods. *Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods*." Similarly, Defendants stated, "Pricing changes are discretionary decisions made by management to reflect competitive market conditions."

174.     Defendants also maintained that their representations in the First Quarter 2014 10-

Q had been "prepared in accordance with U.S. generally accepted accounting principles" and were accurate and could be relied upon.

175.     Further, in the Company's November 2013 10-Q, the Individual Defendants each personally certified that they had evaluated the effectiveness of Lannett's internal controls and disclosed any deficiencies or material weaknesses in them.

176.     Likewise, in the November 2013 10-Q, the Individual Defendants also each personally certified that they had evaluated the effectiveness of Lannett's internal controls, disclosed any deficiencies or material weaknesses in them, and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

      i.  The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increased sales in a variety of products was materially false and misleading because they do not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

      ii.  Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

      iii.  Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### G.  December 10, 2013 Conference Call

177.     On December 10, 2013, Defendants took part in a conference call at the

Oppenheimer Healthcare Conference. During this conference call, Defendants made materially false and misleading statements and omissions about the purported competitive marketplace for generic drugs and how that competition affected the pricing of those drugs. For example, during this December 10, 2013 conference call, Defendant Bedrosian stated, "We have had opportunities to raise prices in the marketplace, fortunately, because in our world, usually generic drugs just drop in price. But we have a very aggressive stance; we try raising prices, we see if it sticks. *We don't have a lot of competition in each one of our areas for each one of our products*."

178.     Defendant Bedrosian's statement was materially false and misleading because because Defendants failed to disclose that pricing for some or all of the Price Fixed Drugs was the product of illegal price fixing, that the market for Price Fixed Drugs was collusive and lacked true competition; that the prices for the Price Fixed Drugs were inflated by illegal price fixing.

### H.  December 19, 2013 Form 8-K

179.     On December 19, 2013, the Company filed with the SEC a Form 8-K detailing its entry into a material definitive agreement with Citibank, by which Citibank would procide a revolving loan of up to $50 million to Lannett. As an exhibit to that 8-K, Lannett made materially false and misleading statements and omissions concerning its purported compliance with laws. Specifically, Lannett stated:

> *Each Loan Party and each of its Domestic Subsidiaries is in compliance with all Laws* (including, without limitation, all food and drug and health care and medical related Laws) applicable to it or its properties, except where the failure to be in compliance, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

180.     By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading.  Lannett's  misled investors by presenting a materially false and

misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In addition, the above statements and omissions were materially false and misleading because Lannett, at the time this agreement was signed, was in violation of the United States Antitrust Laws.

## I. February 6, 2014 Form 8-K

181. On February 6, 2014 the Company filed an 8-K announcing "Lannett Reports Record Financial for Fiscal 2014 Second Quarter."("2Q2014 8-K") This filing contained more detailed financial information about the Company for the Second Quarter and guidance for the remainder of the 2014 fiscal year. In this filing the Company stated:

> For the fiscal 2014 second quarter, *net sales rose 84% to $67.3 million from $36.6 million in last year's second quarter. Gross profit more than tripled to $41.0 million, or 61% of net sales, from $13.4 million, or 37% of net sales, for the fiscal 2013 second quarter.*
>
> "For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history," said Arthur Bedrosian, president and chief executive officer of Lannett. "*Our excellent financial performance was driven by price increases, strong sales of existing products and favorable product mix.* "
>
> *For the first six months of fiscal 2014, net sales rose 57% to $113.2 million from $71.9 million for the first six months of fiscal 2013. Cost of sales for the first six months of fiscal 2014 included a non-recurring, pre-tax charge of $20.1 million related to the previously announced contract extension with JSP, Inc. (JSP) to continue as the exclusive distributor in the United States of three JSP products.*

182. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business,

financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

      i.   The statements referred to above about the Company's improved performance being driven by strong sales of existing products was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

     ii.   The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs; and

    iii.   The statements referred to above regarding the Company's improved performance begin driven by a favorable product mix were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs.

### J.  Second Quarter 2014 Form 10-Q

183.    On February 7, 2014, the Company filed a 10-Q with the SEC for the second quarter of 2014 ("2Q2014 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the second quarter of Fiscal 2014, *net sales increased to $67.3 million representing 84% growth over the prior year period. Gross profit increased $27.6 million to $41.0 million, compared*

*to the prior year period.*

*For the first six months of Fiscal 2014, net sales increased to $113.2 million representing 57% growth over the prior year period.*

\* \* \*

*Net sales increased 84% to $67.3 million for the three months ended December 31, 2013.*

\* \* \*

Product price increases contributed $25.5 million to the overall increase in net sales, while increased volumes added $5.3 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. *Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.*

\* \* \*

*Thyroid Deficiency. Net sales of drugs used for the treatment of thyroid deficiency increased by $11.8 million, primarily as a result of price increases on key products.*

*Cardiovascular. Net sales of drugs used for cardiovascular treatment increased by $9.7 million, primarily as a result of price increases on products used to treat congestive heart failure.* The increase in net sales was partially offset by a decrease in net sales on products used to treat hypertension due to pricing pressures.

*Antibiotic. Net sales of antibiotics increased by $3.3 million. The increase in net sales was primarily attributable to increased volumes across various products.*

\* \* \*

*Net sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for gout, thyroid deficiency and cardiovascular, as discussed above. Retail chain net sales increased primarily as a result of increased sales of drugs for the treatment of thyroid deficiency and cardiovascular, as discussed above.*

\* \* \*

*Cost of Sales. Cost of sales for the second quarter of Fiscal 2014 increased $3.1 million to $26.3 million. The increase primarily reflected the impact of the increase in sales volumes, offset by changes in the mix of products sold.* Amortization expense included in cost of sales totaled $467 thousand for the second quarter of Fiscal 2014 and $470 thousand for the second quarter of Fiscal 2013.

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. ***Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.*** Changes in future product sales mix may also occur.

\*  \*  \*

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.***

184.  The 2Q2014 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

185.  By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business,

financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i.  The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

    ii.  The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

    iii.  The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because it does not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

    iv.  Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

    v.  Lannett failed to make required disclosures regarding the impact of the

artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**K.  May 7, 2014, Form 8-K**

186.    On May 7, 2014, the Company filed a Form 8-K with the SEC preliminarily announcing its financial results for the third quarter of 2014 ("3Q2014 8-K"). In that filing the company stated:

> For the fiscal 2014 third quarter, net sales doubled to $80.0 million from $39.0 million in last year's third quarter. ***Gross profit more than tripled to $56.1 million, or 70% of net sales, from $15.2 million, or 39% of net sales, for the fiscal 2013 third quarter.*** Research and development (R&D) expenses increased to $10.6 million from $5.2 million for the fiscal 2013 third quarter. ***Selling, general and administrative (SG&A) expenses were $9.6 million, compared with $5.2 million in the same quarter of the prior year.*** Operating income rose substantially to $36.0 million from $4.7 million for the third quarter of fiscal 2013.  Net income attributable to Lannett Company grew nearly six-fold to $23.0 million, or $0.63 per diluted share, from $3.9 million, or $0.14 per diluted share.
>
> "The fiscal 2014 third quarter represents the sixth consecutive quarter of record net sales, as well as the ninth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, president and chief executive officer of Lannett. ***"Our excellent financial performance was largely driven by price increases across multiple product categories and strong sales of existing products. We are pleased to have recently received approval for Diazepam Oral Solution (Concentrate) and expect our 19 product applications pending at FDA combined with an additional five ANDAs planned for submission by June 30, 2014 to position us well for continued long-term growth."***
>
> For the first nine months of fiscal 2014, ***net sales rose 74% to $193.2 million from $110.9 million for the first nine months of fiscal 2013.***  Cost of sales for the first nine months of fiscal 2014 included a non-recurring, pre-tax charge of $20.1 million related to the previously announced contract extension with JSP, Inc. (JSP) to continue as the exclusive distributor in the United States of three JSP products.  ***Accordingly, gross profit was $98.5 million, or***

*51% of net sales.*

187. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

       i. The statements referred to above about the Company's improved performance being driven by strong sales of existing products was materially false and misleading because it failed to disclose that the company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

      ii. The statements referred to above about the Company's improved performance was driven by price increases was materially false and misleading because it fails to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

     iii. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

     iv. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported

revenue in violation of SEC disclosure rules.

**L.  Third Quarter 2014 Form 10-Q**

188.    On May 9, 2014, the Company filed its Form 10-Q with the SEC for the third quarter of 2014 ("3Q2014 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> ***Net sales increased 105% to $80.0 million for the three months ended March 31, 2014****.*
> \* \* \*
> Product price increases contributed $42.5 million to the overall increase in net sales.  A decrease in volumes slightly offset the overall increase in net sales by $1.6 million.  ***The Company experienced favorable trends in product pricing on several key products during the period, as discussed below.  Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue***.
> \* \* \*
> ***Product price increases contributed $73.3 million to the overall increase in net sales, while increased volumes added $9.0 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.***
> \* \* \*
> ***Evaluation of Disclosure Controls and Procedures***
>
> As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").  Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated

and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

189. The 3Q2014 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

190. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

    ii. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency

medication was, in whole or in part, a result of Lannett colluding with

conspirators to fix the price of the Price Fixed Drugs;

iii. The statements referred to above regarding the sales increases to

wholesalers/distributors increasing primarily as a result of increases sales

in a variety of products is materially false and misleading because it does

not attribute the increased sales, in whole or in part, to the Company's

entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

iv. Lannett's revenue and income, as stated above, were inflated in part as a

result of illegal price-fixing and artificially inflated generic drug prices for

the Price Fixed Drugs; and

v. Lannett failed to make required disclosures regarding the impact of the

artificial price increases (tied to illegal price-fixing activity) on its reported

revenue in violation of SEC disclosure rules.

**M. August 27, 2014, Form 8-K**

191.    On August 27, 2014, the Company filed a Form 8-K with the SEC preliminarily

announcing their financial results for the fourth quarter of 2014. In that filing the company

stated:

> "The fiscal 2014 fourth quarter represents the seventh consecutive
> quarter of record net sales, as well as the tenth consecutive quarter
> in which net sales and adjusted EPS exceeded the comparable
> prior-year period," said Arthur Bedrosian, president and chief
> executive officer of Lannett. ***"Our excellent financial results are
> due, in large part, to our loyal and supportive customers, as well
> as our dedicated employees, who are committed to making
> Lannett a formidable force in the generic drug industry.***

192.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were

materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

     i. The statements referred to above about the Company's improved performance being driven by customers and employees was materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

     ii. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

     iii. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**N. Fiscal Year 2014 Form 10-K**

193. On August 29, 2014, Lannett filed a Form 10-K with the SEC for the fiscal year of 2014 ("2014 10-K"), which was signed by the Individual Defendants. In that 10-K the Defendants stated in part:

*    *    *

*Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships*. We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products*. **We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to***

*current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.*

\* \* \*

*Net sales of Levothyroxine Sodium tablets totaled $102.2 million in fiscal year 2014. In our distribution of these products, we compete with two brand Levothyroxine Sodium products— AbbVie's Synthroid® and Pfizer's Levoxyl®— as well as generic products from Mylan and Sandoz.*

*Net sales of this product totaled $54.7 million in fiscal year 2014. In our distribution of these products, we compete with a generic product from Impax and expect to compete against West-Ward, Caraco and the brand Lanoxin from Covis.*

\* \* \*

*Competition*

*The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.*

*We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors.*

\* \* \*

| Product | Primary Competitors |
| --- | --- |
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Actavis and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Alternative products including Lidocaine and Epinephrine |
| Digoxin Tablets | Impax, West-Ward, Caraco, and Covis |
| Doxycycline Hyclate and Monohydrate Tablets | Par, Mylan, Sandoz and Ranbaxy |
| Hydromorphone HCl Tablets | Mallinckrodt, Roxane and Purdue |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Morphine Sulfate Oral Solution | Caraco, Paddock, Roxane, Mallinckrodt and Vista |
| Primidone Tablets | Actavis, Qualitest and Amneal |
| Rifampin Capsules | Lupin, Sandoz and Versapharm |
| Triamterene w/Hydrochlorothiazide Capsules | Sandoz and Mylan |
| Ursodiol Capsules | Epic, Mylan and Actavis |

*      *      *

**The generic pharmaceutical industry is highly competitive.**

*We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. *As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.*

*      *      *

For Fiscal 2014, *net sales increased to $273.8 million representing 81% growth over the prior year period. Gross profit increased $97.0 million to $154.4 million,* compared to the prior year period, and included the $20.1 million charge related to the JSP contract renewal

*      *      *

Net sales increased 81% to $273.8 million for the fiscal year ended June 30, 2014.

*      *      *

Product price increases contributed $115.1 million to the overall increase in net sales, while increased volumes added $7.6 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, *the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.*

*      *      *

83

*Net sales to wholesaler/distributor increased primarily as a result of increased sales in a variety of products for gout, thyroid deficiency and cardiovascular, as discussed above.  Retail chain net sales increased primarily as a result of increased sales of drugs for the treatment of thyroid deficiency and cardiovascular, as discussed above.*

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods.  *Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.  Changes in future product sales mix may also occur.*

\*        \*        \*

*Thyroid Deficiency.*  Sales of drugs used for the treatment of thyroid deficiency increased by $7.1 million, *primarily as a result of both volume and price increases on key products within this medical indication.*

*Cardiovascular.*  Sales of drugs for cardiovascular treatment *increased by $7.7 million primarily due to increased volumes related to a product used for the treatment of hypertension which commenced shipping at the end of December 2011.*

*Antibiotic.*  Sales of drugs in the antibiotic medical indication *increased by $2.4 million primarily as a result of increased volumes on selected key products within the medical indication.*

\*        \*        \*

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2014.  *Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective* to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported as specified in Securities and Exchange Commission rules and forms.  There were no changes in these controls or procedures identified in connection

with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include, among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

194.    The 2014 10-K contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

195.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular, Defendants knew or recklessly disregarded that:

    i.    The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal price-fixing;

ii.   The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

iii.  The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

iv.   The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

v.    The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin was materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

vi.   The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

vii.  The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose

86

the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

viii. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

ix. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

x. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### O. November 4, 2014, 8-K

196. On November 4, 2014, the Company filed an 8-K announcing "Lannett Reports Net Sales of $93 Million, EPS of $0.94 for Fiscal 2015 First Quarter." This filing contained more detailed financial information about the Company for the First Quarter of 2015. In this filing the Company stated:

> For the fiscal 2015 first quarter, **net sales doubled to $93.4 million from $45.8 million in last year's first quarter. Gross profit was $71.6 million, or 77% of net sales.**
>
> "The fiscal 2015 first quarter represents the eighth consecutive quarter of record net sales, as well as the eleventh consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, president and chief executive officer of Lannett. ***"Strong sales across a number of product categories, including cardiovascular, gallstone, glaucoma, migraine and thyroid deficiency, drove our excellent financial results.*** The quarter also benefited from increased sales of our C-Topical® and recently launched Oxycodone HCl Oral Solution products."

197.     By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i.     The statements referred to above about the Company's improved performance being driven by strong sales was materially false and misleading because it failed to disclose that the company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

    ii.     The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

    iii.     Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

    iv.     Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

    v.     Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation

of SEC disclosure rules.

### P. First Quarter 2015 Form 10-Q

198.    On November 6, 2014, the Company filed a Form 10-Q with the SEC for the second quarter of 2015 ("1Q2015 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> Net sales increased 104% to $93.4 million for the three months ended September 30, 2014.
>
>     *   *   *
>
> ***Product price increases contributed $52.4 million to the overall increase in net sales, partially offset by decreased volumes of $4.8 million.*** The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.
>
>     *   *   *
>
> ***Cardiovascular.*** Net sales of drugs used for cardiovascular treatment increased by $14.4 million, ***primarily as a result of price increases on products used to treat various cardiac conditions.*** The increase in net sales was partially offset by volume decreases on several products within the indication.
>
> ***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency ***increased by $13.3 million, primarily as a result of price increases on key products, partially offset by decreased volumes. Above average customer purchases in the fourth quarter of Fiscal Year 2014, in anticipation of a price increase effective in the first quarter of Fiscal Year 2015, led to lower volumes in the first quarter of Fiscal Year 2015***. The Company expects volumes to normalize in the remaining quarters of Fiscal Year 2015.
>
>     *   *   *
>
> ***Gross Profit.*** Gross profit percentages for the first quarter of Fiscal Year 2015 and 2014 were 77% and 3%, respectively. The charge related to the JSP contract renewal negatively impacted gross margin percentage by 44% points in the first quarter of Fiscal

Year 2014. ***The remaining increase in gross profit percentage was due to product price increases.***

***The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.*** Changes in future product sales mix may also occur.

*      *      *

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

199.    The 2Q2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2014 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

200.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business,

90

financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

ii. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

iii. The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products was materially false and misleading because they did not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

iv. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

v. Lannett failed to make required disclosures regarding the impact of the

artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

### Q. February 6, 2015, Form 8-K

201. On February 6, 2015, the Company filed a Form 8-K announcing Lannett's preliminary results for the Second Quarter of 2015. In this filing the Company stated:

> "**Strong sales and gross margin across a number of product categories drove our record financial results**," said Arthur Bedrosian, chief executive officer of Lannett. "The fiscal 2015 second quarter represents the ninth consecutive quarter of record net sales, as well as the twelfth consecutive quarter in which net sales and adjusted EPS exceeded the comparable prior-year period. Looking ahead, we expect our momentum in the first half of the year to continue into the second half."
>
> **For the first six months of fiscal 2015, net sales rose 84% to $208.2 million from $113.2 million in the comparable prior-year period.** Gross profit was $158.8 million, or 76% of net sales. This compares with gross profit for the first six months of fiscal 2014 of $42.3 million, or 37% of net sales, which included a non-recurring pre-tax charge of $20.1 million related to the contract extension with JSP, Inc. (JSP). Excluding the JSP contract renewal charge, gross profit was $62.4 million, or 55% of net sales.

202. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

> i. The statements referred to above about the Company's improved performance being driven by strong sales was materially false and misleading because it failed to disclose that the Company was engaged in

a cartel to control the pricing of the Price Fixed Drugs;

ii. The statements referred to above about the Company's improved performance was driven by gross margins was materially false and misleading because it fails to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iii. The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iv. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

v. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

vi. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**R. Second Quarter 2015 Form 10-Q**

203.    On February 6, 2015, the Company filed its Form 10-Q with the SEC for the second quarter of 2015 ("2Q2015 10-Q"), which was signed by the Individual Defendants. In

this filing the Company stated that:

For the second quarter of Fiscal Year 2015, **net sales increased to $114.8 million, representing 71% growth over the second quarter of Fiscal Year 2014.** Gross profit increased to $87.2 million compared to $41.0 million in the prior-year period and gross profit percentage increased to 76% compared to 61% in the prior-year period. R&D expenses increased 35% to $7.8 million compared to the second quarter of Fiscal Year 2014 while SG&A expenses increased 30% to $12.8 million from $9.9 million. Operating income for the second quarter of Fiscal Year 2015 was $66.5 million compared to $25.4 million in the second quarter of Fiscal Year 2014. Net income for the second quarter of Fiscal Year 2015 was $44.8 million, or $1.21 per diluted share compared to $16.6 million or $0.46 per diluted share in the second quarter of Fiscal Year 2014.

\*      \*      \*

Net sales increased 71% to $114.8 million for the three months ended December 31, 2014.

\*      \*      \*

**Product price increases contributed $50.9 million to the overall increase in net sales, partially offset by decreased volumes of $3.4 million.** The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.

\*      \*      \*

**Thyroid Deficiency. Net sales of drugs used for the treatment of thyroid deficiency increased by $18.3 million, primarily as a result of price increases on key products**. Increased volumes also added to the increase in net sales.

**Gallstone. Net sales of drugs used for gallstones increased by $15.6 million.** The increase in net sales was primarily attributable to price increases, partially offset by decreased volumes.

**Migraine. Net sales of drugs used to treat migraines increased by $4.6 million.** The increase in net sales was primarily attributable to price increases on key products.

\*      \*      \*

94

*Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency, gallstones and cardiovascular, as discussed above.* […]

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. *Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.*

\* \* \*

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

204.     The 2Q2015 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2Q2015 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

205.     By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled

investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

    ii. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increased price but do not disclose that the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

    iii. The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products was materially false and misleading because they did not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

    iv. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

v. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

## S. May 7, 2015, Form 8-K

206. On May 7, 2015, the Company filed a Form 8-K announcing their results for the Third Quarter of 2015. In this filing the Company stated:

> "We have now reported thirteen consecutive quarters in which net sales and adjusted EPS exceeded the comparable prior-year period," said Arthur Bedrosian, chief executive officer of Lannett. *"Our third quarter performance reflects higher sales and gross margin across a number of product categories, partially offset by lower sales of our cardiovascular products, which as expected faced new entrants in the market. With our strong third quarter and outlook for a solid fourth quarter, we have raised our fiscal 2015 full-year guidance*."

207. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's improved performance being driven by higher sales were materially false and misleading because it failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

ii. The statements referred to above about the Company's performance being

driven by higher gross margins were materially false and misleading because they failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iii.  The statements referred to above regarding the Company's improved performance being driven by a favorable product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iv.  Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

v.  Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

vi.  Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**T.  Third Quarter 2015 Form 10-Q**

208.  On May 8, 2015, the Company filed a 10-Q with the SEC for the third quarter of 2015 ("3Q2015 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

*For the third quarter of Fiscal Year 2015, net sales increased to $99.4 million, representing 24% growth over the third quarter of Fiscal Year 2014.*

*   *   *

**Results of Operations - Three months ended March 31, 2015 compared with the three months ended March 31, 2014**

*Net sales increased 24% to $99.4 million for the three months* ended March 31, 2015. [...]

*Product price increases contributed $29.5 million to the overall increase in net sales, partially offset by decreased volumes of $10.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.* [...]

While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. *Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.*

*   *   *.

**Results of Operations - Nine months ended March 31, 2015 compared with the nine months ended March 31, 2014**

*Net sales increased 59% to $307.6 million for the nine months ended March 31, 2015. [...]*
*Product price increases contributed $133.5 million to the overall increase in net sales, partially offset by decreased volumes of $19.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these* favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue. [...]

209.    The 3Q2015 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2015 10-Q was accurate and disclosed any material changes to the company's disclosure controls over

financial reporting

210. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

ii. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they only attribute the increase to increases in price, but fail to disclose the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

iii. The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because it does not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

> iv.  Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and
>
> v.  Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**U.  August 26, 2015, Form 8-K**

211.  On August 26, 2015, the Company filed a Form 8-K.  In this filing the Company stated:

> ***"Our fourth quarter performance was in line with expectations and reflects higher sales and gross margin across a number of product categories,"*** said Arthur Bedrosian, chief executive officer of Lannett.  "We have now reported fourteen consecutive quarters in which net sales and adjusted EPS exceeded the comparable prior-year period.
>
> "Also during the fourth quarter, we completed the Silarx acquisition, which expands and diversifies our product pipeline, adds greater capacity to manufacture liquid pharmaceuticals and increases our current research and development capabilities.  I am pleased to report that we expect the acquisition to be immediately accretive to our fiscal 2016 financial results and the integration of Silarx's operations is proceeding smoothly and is nearly complete."
>
> For the fiscal 2015 full year, ***net sales rose 49% to $406.8 million from $273.8 million in the prior year.***  Gross profit was $306.4 million, or 75% of net sales.

212.  By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and

actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular, Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's improved performance reflected higher sales were materially false and misleading because they failed to disclose that the Company was engaged in a cartel to control the pricing of the Price Fixed Drugs;

ii. The statements referred to above about the Company's improved performance was driven by higher gross margins was materially false and misleading because they failed to disclose that the price increases and improved performance were actually a result of the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iii. The statements referred to above regarding the Company's improved performance being driven by a number of product categories were materially false and misleading because they failed to disclose the Company's participation in a cartel to fix the price of the Price Fixed Drugs;

iv. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

v. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

vi. Lannett failed to make required disclosures regarding the impact of

artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

## V.  2015 Form 10-K

213.    On August 27, 2015, Lannett filed a Form 10-K with the SEC for the fiscal year of 2015 ("2015 10-K"), signed by the Individual Defendants. In that 2015 10-K the Defendants stated in part:

> *Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships.*
>
> **We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products.  We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.**
>
> *       *       *
>
> *Levothyroxine Sodium Tablets*
>
> Levothyroxine Sodium tablets are produced and marketed with 12 varying potencies.  Levothyroxine Sodium tablets are manufactured by JSP and we distribute it under the JSP Distribution Agreement.  Levothyroxine Sodium tablets remain one of the most prescribed drugs in the U.S. and are used by patients of various ages and demographic backgrounds for the treatment of thyroid deficiency.  Net sales of Levothyroxine Sodium tablets totaled $153.5 million in fiscal year 2015.  In our distribution of these products, **we compete with two brand Levothyroxine Sodium products—AbbVie's Synthroid® and Pfizer's Levoxyl®— as well as generic products from Mylan and Sandoz.**
>
> *Digoxin Tablets*
>
> Digoxin tablets are produced and marketed with two different potencies.  This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement.  Digoxin tablets are used to treat congestive heart failure in patients of various ages and demographics.  Net sales of this product totaled $49.0 million in

fiscal year 2015. In our distribution of these products, **we compete with a generic product from Impax and expect to compete against West-Ward, Caraco, Mylan, Impax and the brand Lanoxin from Covis.**

\*      \*      \*

*Ursodiol Capsules*

Ursodiol Capsules are produced and marketed in 300 mg capsules and are used for the treatment of gallstones. Net sales of Ursodiol Capsules totaled $65.3 million in fiscal year 2015. **We compete with a generic product from Mylan and Epic as well as the brand Actigall from Actavis.**

\*      \*      \*

**Competition**

**The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.**

**We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products**.

\*      \*      \*

| Product | Primary Competitors |
| --- | --- |
| Acetazolomide Tablets | Taro |
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Actavis and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Alternative products including using Lidocaine and Epinephrine combined |
| Digoxin Tablets | Mylan, Impax, West-Ward, Caraco, and Covis |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Ursodiol Capsules | Epic, Mylan and Actavis |

*     *     *

**The generic pharmaceutical industry is highly competitive.**

*We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.*

*     *     *

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2015. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported as specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management to allow timely decisions regarding required disclosures. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have

materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include, among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

214. The 2015 10-K contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting

215. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

   i. The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal price-fixing;

   ii. The statements referred to above about competition in the generic drug

marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

iii. The statements referred to above about Lannett's product pricing and pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

iv. The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

v. The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin were materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

vi. The statements referred to above about Lannett competing in the Ursodiol marketplace were materially false or misleading because Lannett had entered into a cartel to fix the price of generic Ursodiol and other Price Fixed Drugs;

vii. The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk

of variation due to the inability to continue to price-fix;

viii. The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to control the prices of the Price Fixed Drugs in violation of the antitrust laws;

ix. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

x. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

xi. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

### W. First Quarter 2016 Form 10-Q

216. On November 5, 2015, the Company filed its Form 10-Q with the SEC for the first quarter of 2016 ("1Q2016 10-Q"), signed by the Individual Defendants. In this filing the Company stated that:

> ***Thyroid Deficiency.*** Net sales of drugs used for the treatment of thyroid deficiency increased by $7.8 million, ***primarily as a result of increased volumes compared to the prior-year period due to above average customer purchases in the fourth quarter of Fiscal Year 2014 in anticipation of a price increase effective in the first quarter of Fiscal Year 2015, which led to lower than average volumes in the first quarter of Fiscal Year 2015. The increase in volumes was partially offset by pricing pressures.***

*       *       *.

Net sales to wholesaler/distributor and retail chain increased as a result of increased sales in a variety of products for thyroid deficiency and gallstones, as discussed above. Mail-order pharmacy net sales decreased primarily as a result of decreased sales of cardiovascular drugs, as discussed above.

*       *       *

*Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

217.    The 1Q2016 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2016 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

218.    By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and

actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's improved performance specifically with regards to a growth in net sales were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

ii. The statements referred to above about the Company being unable to predict the level of competition in the marketplace were materially false and misleading because the Company was involved in a cartel to fix the price of the Price Fixed Drugs and control the level of competition in the marketplace;

iii. The statements referred to above regarding the sales of drugs used for the treatment of thyroid deficiency were materially false and misleading because they primarily attribute the increase to increases in price, but failed to disclose the reason for the increase in sales of the thyroid deficiency medication was, in whole or in part, a result of Lannett colluding with conspirators to fix the price of the Price Fixed Drugs;

iv. The statements referred to above regarding the sales increases to wholesalers/distributors increasing primarily as a result of increases sales in a variety of products is materially false and misleading because they did not attribute the increased sales, in whole or in part, to the Company's entry into an illegal conspiracy to fix the price of the Price Fixed Drugs;

v. The statements referred to above regarding Lannett's cost of sales and gross profits were materially false and misleading because they omit information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

vi. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

vii. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

## X. Second Quarter 2016 Form 10-Q

219. On February 9, 2016, the Company filed its Form 10-Q with the SEC for the second quarter of 2016 ("2Q2016 10-Q"), signed by the Individual Defendants. In this filing the Company stated that:

> **Results of Operations - Three months ended December 31, 2015 compared with the three months ended December 31, 2014**
>
> ***Net sales increased 11% to $127.1 million for the three months ended December 31, 2015.***
>
> *       *       *.
>
> ***Evaluation of Disclosure Controls and Procedures***
>
> As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed,

summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report. Our evaluation excluded Kremers Urban Pharmaceuticals, which was acquired on November 25, 2015.

220. The 2Q2016 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2016 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

221. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

   i. The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

   ii. The statements referred to above regarding Lannett's net sales and gross profits were materially false and misleading because they omitted information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

iii.   Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

iv.   Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**Y. Third Quarter 2016 Form 10-Q**

222.   On May 10, 2016, the Company filed its Form 10-Q with the SEC for the third quarter of 2016 ("3Q2016 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> For the third quarter of Fiscal Year 2016, *net sales increased to $163.7 million, which included $69.9 million of net sales from the recently acquired KUPI.* Excluding the impact of KUPI, net sales decreased 6% as compared to the same prior-year period primarily due to pricing pressures and increased competition, partially offset by increased volumes. Total net sales, which included a $23.6 million reduction for a settlement agreement, increased to $140.1 million from $99.4 million in the prior-year period. *Gross profit, including the $23.6 million settlement agreement, decreased to $57.5 million compared to $75.6 million in the prior-year period and gross profit percentage decreased to 41% compared to 76% in the prior-year period.*
>
> *                    *                    *.
>
> *Evaluation of Disclosure Controls and Procedures*
>
> As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the

SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

223. The 3Q2016 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 3Q2016 10-Q was accurate and disclosed any material changes to the Company's disclosure controls over financial reporting.

224. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

    i. The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

    ii. The statements referred to above regarding Lannett's net sales and gross profits were materially false and misleading because they omitted information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

iii. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

iv. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC disclosure rules.

**Z. 2016 Form 10-K**

225. On August 29, 2016, Lannett filed its Form 10-K with the SEC for the fiscal year of 2016 ("2016 10-K"), which was signed by the Individual Defendants. In that 10-K the Defendants stated in part:

> *Continue to Broaden our Product Lines Through Internal Development and Strategic Partnerships.*
>
> **We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.**
>
> **We have four strategies for expanding our product offerings: (1) deploying our experienced R&D staff to develop products in-house; (2) entering into product development agreements or strategic alliances with third-party product developers and formulators; (3) purchasing ANDAs from other generic manufacturers; and (4) marketing drugs under brand-names. We expect that each strategy will facilitate our identification, selection and development of additional pharmaceutical products that we may distribute through our existing network of customers.**
>
> \*          \*          \*
>
> **Key Products**

*Levothyroxine Sodium Tablets*

Levothyroxine Sodium tablets, which are used for the treatment of thyroid deficiency by patients of various ages and demographic backgrounds, is the second most prescribed drug in the United States. The product is manufactured by JSP and distributed by us under the JSP Distribution Agreement and is produced and marketed in 12 potencies. Net sales of Levothyroxine Sodium tablets totaled $162.4 million in fiscal year 2016. Levothyroxine is a narrow therapeutic index drug and very difficult to formulate which results in a less competitive market environment for this molecule. In our distribution of these products*, we compete with two brand Levothyroxine Sodium products, AbbVie's Synthroid and Pfizer's Levoxyl, as well as generic products from Mylan and Sandoz.*

*Digoxin Tablets*

Digoxin tablets, which are used to treat congestive heart failure in patients of various ages and demographics, are produced and marketed with two different potencies. This product is manufactured by JSP and we distribute it under the JSP Distribution Agreement. Net sales of this product totaled $23.9 million in fiscal year 2016. The product is highly potent based on Environment, Health & Safety ("EHS"), regulations and its API availability is limited given there are only two active suppliers, based on the FDA Drug Master File ("DMF") list*. In our distribution of these products, we compete with generic products from Mylan, Impax, West-Ward and until recently Sun, as well as the brand product Lanoxin distributed by Concordia.*

*Acetazolamide Tablets*

Acetazolamide tablets are used for the treatment of glaucoma. The product is a carbonic anhydrase inhibitor that reduces fluid pressure in the eyeball. It also increases the removal of water from the body by the kidneys and may block certain nerve discharges that may contribute to seizures. Net sales of Acetazolamide tablets totaled $25.3 million in fiscal year 2016. Currently*, our primary generic competitor for this drug is Taro Pharmaceutical Industries.*

*     *     *

*Ursodiol Capsules*

Ursodiol Capsules are produced and marketed in 300 mg capsules and are used for the treatment of gallstones. Net sales of Ursodiol capsules totaled $67.3 million in fiscal year 2016. **We compete with a generic product from Epic and Mylan, as well as the brand product Actigall distributed by Actavis.**

*     *     *

## Competition

*The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages* are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position. We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products:

| Product | Primary Competitors |
| --- | --- |
| Acetazolamide Tablets | Taro |
| Butalbital, Acetaminophen and Caffeine Tablets | Mallinckrodt, Mikart, Qualitest, Watson and West-Ward |
| Butalbital with Aspirin and Caffeine, with and without Codeine Phosphate Capsules | Actavis and Breckenridge |
| C-Topical® Solution | Compounding pharmacies and alternative drugs |
| Digoxin Tablets | Mylan, Impax, West-Ward, Sun and Concordia |
| Levothyroxine Sodium Tablets | AbbVie, Pfizer, Mylan and Sandoz |
| Methylphenidate ER Tablets | Janssen, Mallinckrodt and Actavis |
| Omeprazole Capsules | Sandoz, Dr. Reddy's and Zydus |
| Ursodiol Capsules | Epic, Mylan and Actavis |

*     *     *

**The generic pharmaceutical industry is highly competitive.**

*We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.* As patents for

brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. ***Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.*** Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

*    *    *

*Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, for financial reporting as of June 30, 2016. Based on that evaluation, our chief executive officer and chief financial officer concluded that these controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported as specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management to allow timely decisions regarding required disclosures. There were no changes in these controls or procedures identified in connection with the evaluation of such controls or procedures that occurred during our last fiscal quarter, or in other factors that have materially affected, or are reasonably likely to materially affect these controls or procedures.

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Securities and Exchange Commission. These disclosure controls and procedures include,

among other things, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

226. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bedrosian and Galvan, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the company's disclosure controls over financial reporting

227. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

  i. The statements referred to above about pricing in the marketplace for Generic Drugs were materially false and misleading because Defendants failed to inform investors that pricing for the Price Fixed Drugs was the product of illegal collusion and anticompetitive conduct;

  ii. The statements referred to above about competition in the generic drug marketplace, including that the marketplace for Generic Drugs was highly competitive, were materially false and misleading because the market for the Price Fixed Drugs was collusive and lacked true competition;

  iii. The statements referred to above about Lannett's product pricing and

pricing in the generic drug marketplace were materially false and misleading because Defendants failed to disclose that the prices for the Price Fixed Drugs were inflated by illegal price fixing;

iv. The statement referred to above about Lannett competing with Mylan and Sandoz for sales of Levothyroxine was materially false and misleading because the Defendants were colluding with Mylan and Sandoz to fix the price of Levothyroxine;

v. The statement referred to above about Lannett competing with Impax and West-Ward for sales of Digoxin were materially false and misleading because the Defendants were colluding with Impax and West-Ward to fix the price of generic Digoxin;

vi. The statements referred to above about Lannett competing in the Ursodiol marketplace were materially false or misleading because Lannett had entered into a cartel to fix the price of generic Ursodiol and the other Price Fixed Drugs;

vii. The statements referred to above concerning the variation in revenues and operating results were materially false and misleading because Lannett's variations resulted, in part, from the artificial inflation of generic drug prices for the Price Fixed Drugs and carried the additional undisclosed risk of variation due to the inability to continue to price-fix;

viii. The statements referred to above about the effectiveness of Lannett's disclosure controls were materially false and misleading because Lannett failed to disclose the existence of, and its participation in, a cartel to

control the prices of the Price Fixed Drugs in violation of the antitrust laws;

ix. Lannett's inflation of sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed Lannett to the significant risk of prosecution by state and federal antitrust authorities;

x. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially-inflated generic drug prices for the Price Fixed Drugs; and

xi. Lannett failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure rules.

**AA.**     **First Quarter 2017 Form 10-Q**

228.    On November 4, 2016, the Company filed its Form 10-Q with the SEC for the first quarter of 2017 ("1Q2017 10-Q"), which was signed by the Individual Defendants. In this filing the Company stated that:

> **Financial Summary**
>
> For the first quarter of Fiscal Year 2017, net sales increased to $161.6 million, which included $49.9 million of net sales from the recently acquired KUPI. Excluding the impact of KUPI, ***net sales increased 5% as compared to the same prior-year period primarily due to price increases and, to a lesser extent, increased volumes from additional product launches.***
>
> *              *              *
>
> ***Evaluation of Disclosure Controls and Procedures***
>
> As of the end of the period covered by this Form 10-Q, management performed, with the participation of our Chief Executive Officer and Chief Financial Officer, an evaluation of the effectiveness of our disclosure controls and procedures as defined

in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

Based upon the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that Lannett's disclosure controls and procedures were effective as of the end of the period covered by this report.

229. The 1Q2017 10-Q contained signed certifications pursuant to the SOX by Defendants Bedrosian and Galvan, stating that the financial information contained in the 1Q2017 10-Q was accurate and disclosed any material changes to the company's disclosure controls over financial reporting.

230. By virtue of the facts alleged in ¶¶29-149, the statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Lannett's business, financials, operations and compliance policies by, among other things, failing to disclose and actively concealing that Lannett had colluded to fix the price of the Price Fixed Drugs. In particular Defendants knew or recklessly disregarded that:

i. The statements referred to above about the Company's pricing and competition were materially false and misleading because the Company failed to mention that this increase in net sales was caused by their collusive conduct to fix the price of the Price Fixed Drugs;

ii. The statements referred to above regarding Lannett's cost of sales and

gross profits were materially false and misleading because they omit information regarding the existence of the a cartel to fix the price of the Price Fixed Drugs;

iii. Lannett's revenue and income, as stated above, were inflated in part as a result of illegal price-fixing and artificially inflated generic drug prices for the Price Fixed Drugs; and

iv. Lannett failed to make required disclosures regarding the impact of the artificial price increases (tied to illegal price-fixing activity) on its reported revenue in violation of SEC.

## LANNETT'S CLASS PERIOD SEC FILINGS WERE MATERIALLY MISSTATED AND VIOLATED GAAP

231. As alleged herein, throughout the Class Period Defendants were engaged in price fixing activity for the Price Fixed Drugs.

### A. Lannett Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues

232. During the Class Period, Lannett was engaged in illegal price-fixing activity on the Price Fixed Drugs. SEC Management Discussion and Analysis ("MD&A") disclosure rules required Defendants to disclose the impact of the artificial price increases on Lannett's reported revenues.[18]

---

[18] SEC Financial Reporting Release No. 72, *Commission Guidance Regarding Managements Discussion and Analysis of Financial Condition and Results of Operations:*

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent....

> The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial

233. SEC Staff Accounting Bulletin No. 104 ("SAB 104") required additional MD&A disclosures regarding the impact of the Price Fixed Drugs' price increases, including the origin of the price increases (*i.e.*, illegal price-fixing activity), on Lannett's reported revenues during the Class Period. SAB 104 states:

> ***Changes in revenue*** should not be evaluated solely in terms of volume and price changes, but ***should also include an analysis of the reasons and factors contributing to the increase or decrease.***

234. Additionally, SEC Release No. 33-8350 provides the following analogous disclosure guidance requiring an analysis of volume and price changes affecting the Company's revenues:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[19]

235. Lannett's reported revenues were impacted by its involvement in a cartel to raise the prices of the Price Fixed Drugs. During the Class Period the Price Fixed Drugs made up approximately 56% to 72% of Lannett's total annual sales and as such had a substantial effect on

---

condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:

1. To provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

2. To enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

3. To provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

[19] SEC Release Nos. 33-8350; 34-48960; FR-72

Lannett's revenue. Colluding to increase the prices of these drugs, upon which Lannett's net income heavily relied, allowed Lannett to deceive investors into thinking Lannett's financial performance was the result of legal business practices. Moreover, investors were deceived as to the risk that these revenues would continue.

**B. The Misstatements Were Material**

236.     The SEC sets out certain methods to determine materiality. In the SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality* ("SEC 1-M") the SEC states: "the omission... of an item in a financial report is material if, in the light of the surrounding circumstances, the magnitude of the items is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion of the item.

237.     According to SEC 1-M, when assessing materiality there are both quantitative and qualitative factors that must be examined. Here the above-alleged misstatements are both qualitatively and quantitatively material.

238.     The misstatements were quantitatively material to Lannett's financial statements because of the sheer amount of sales, and accordingly revenue, that the Price Fixed Drugs occupied in Lannett's finances.

239.     The misstatements were also qualitatively material as they concealed unlawful transactions. According to SEC 1-M: "Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are:...Whether the misstatement involves concealment of an unlawful transaction." While none of these misstatements are "quantitatively small" the fact that the misstatements all hid unlawful transactions should further support their qualitative materiality.

## SUMMARY OF SCIENTER ALLEGATIONS

240.　Defendants, including Individual Defendants Bedrosian and Galvan, each acted with scienter in that each knew or recklessly disregarded that the public statements regarding Lannett's drug pricing, the competitive nature of the generic drug industry, the accuracy of the Company's financial statements, and the efficacy of Lannett's internal controls over financial reporting were materially false and misleading when made.  The information in this section is a summary of the allegations detailing Defendants' scienter that are set forth more fully above.

241.　***First***, there were no material increases in demand or production costs or reported supply shortages for Lannett's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Lannett's competitors' generic drugs during the Class Period. The more compelling explanation for these price increases is price collusion between Lannett and its competitors, as evidenced by: (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with the Company's competitors; and (iii) the fact that the increases typically occurred within weeks of the industry conferences or events attended by Lannett executives, including those directly responsible for setting prices at the Company.

242.　***Second***, price increases of the magnitude alleged herein would have been contrary to Lannett's economic interest absent an agreement to fix prices. Without the certainty that all of the Lannett's co-conspirators would raise and maintain the prices for their generic drugs, each co-conspirator risked getting undercut by the others, leading to a loss of market share and revenue. This risk was alleviated by the co-conspirators' agreement to raise and maintain their prices.

243.　***Third***, Lannett and the Individual Defendants had a palpable motive to fix prices

126

with Lannett's competitors which derives from the nature of the U.S. generic drug market itself. As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs. This stabilization of prices in turn caused Lannett's profits to level off, giving Lannett and its co-conspirators a common motive to conspire to raise prices.

244.    ***Fourth***, as described above, the historic rise in generic drug prices during the Class Period was well publicized. These price increases led to significant regulatory scrutiny and industry-wide investigation. For example, in July 2014, Lannett disclosed that the Attorney General for Connecticut was investigating the Company in connection with Lannett's pricing of Digoxin. Then, on October 2, 2014, Defendant Bedrosian received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings, putting Defendants on notice of an investigation and requesting pricing data and other information regarding the Company's generics business. Then, in December 2015, Lannett's disclosed that it had received a subpoena from the DOJ's antitrust division. These investigations and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price collusion and a duty to monitor changes in the Company's generic drug pricing. These duties to investigate and monitor fell upon the Individual Defendants as the Company's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls.  Moreover, even without the Connecticut Attorney General's, Congress', and the DOJ's investigations, the Individual Defendants' duties to investigate and monitor were triggered by the Company's Code of Conduct, which prohibited price-fixing and other anti-competitive

conduct as violations of federal law. At a minimum, Lannett's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty to investigate perceived anticompetitive behavior and their duty to monitor changes in the pricing of the Company's core products.

245.    **Fifth**, Defendants', including Bedrosian and Galvan's, scienter is supported by the fact that their public statements concerning the "competitive" nature of the generic drug industry directly contradicted by Defendants' collusive and anticompetitive behavior in regards to setting drug prices, as demonstrated by the allegations in the Connecticut Attorney General's complaint.

246.    **Sixth**, Defendants' scienter is also supported by the fact that the pricing of generic drugs was critical to Lannett's survival and the selling of those drugs was the Company's core operation. Lannett, as a generic drug manufacturer, is primarily engaged in the development and sales of Generic Drugs. The illegal conduct alleged in this complaint affected the prices at which Lannett was selling its drugs.

247.    The Price Fixed Drugs, which made up between 56% and 72% of Lannett's total annual sales during the Class Period, were central to the survival, profitability, and marketability of Lannett. In fact, Levothyroxine and Digoxin were so important to Lannett that if it experienced an interruption in the supply of those drugs or the supply was interrupted, then Lannett's operating results would suffer. Lannett used this language in their 2014 10-K during the Class Period:

> *We materially rely on an uninterrupted supply of finished products from JSP for a majority of our sales. If we were to experience an interruption of that supply, our operating results would suffer.*

58% of our fiscal year 2014 net sales are of distributed products, primarily manufactured by JSP. ***Two of these products are Levothyroxine Sodium and Digoxin, which accounted for 37% and 20%, respectively, of our Fiscal 2014 net sales, and 38% and 8%, respectively, of our net sales for Fiscal 2013***. On August 19, 2013, the Company entered into an agreement with JSP to extend its initial contract to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; Levothyroxine Sodium Tablets USP. The amendment to the original agreement extends the initial contract, which was due to expire on March 22, 2014, for five years through March 2019. Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party. If the supply of these products is interrupted in any way by any form of temporary or permanent business interruption to JSP, including but not limited to fire or other naturally-occurring, damaging event to their physical plant and/or equipment, condemnation of their facility, legislative or regulatory cease and desist declaration regarding their operations, FDA action, and any interruption in their source of API for their products, our operating results could be materially adversely affected. We do not have, at this time, a second source for these products.

248. With an incredibly small product mix making up more than half of Lannett's revenue, even small price increases in key products would result in a material return on Lannett's bottom line.

249. ***Seventh***, Defendants' scienter is also supported by the fact that they needed to ensure that their profits from the Price Fixed Drugs remained high so that they could secure funding for their growth-by-acquisition strategy, which resulted in the Company taking on more debt than it had at any other time in its history. Defendants then needed to continue in this illegal, anticompetitive price fixing to pay off the debt that it had incurred and to remain a viable company. The Company also used its common stock, with their prices increased by the price-fixing scheme, and the additional revenue it realized from the increased prices of the Price Fixed

Drugs, to pay for Lannett's acquisitions during the Class Period.

250.    **Eighth**, Defendants' scienter is also supported by of the Individual Defendant's direct involvement in setting drug prices. During the Class Period, the Individual Defendants regularly told analysts, and the investing public, of their personal involvement in the pricing of the Price Fixed Drugs. Indeed, Defendant Bedrosian admitted that he was responsible for the price increases of these products.

251.    In addition, CW1 stated that it was Bedrosian and Kevin Smith who set the prices for the drugs, including the increases in those prices, and further stated that nothing was done at Lannett without Bedrosian's blessing.

252.    **Ninth**, Defendants' scienter is also supported by the fact that the Individual Defendants attended generic drug industry events and took part in numerous phone calls, suspiciously time with the lock-step, industry-wide increases to generic drugs. Accordingly, there is a strong inference that the various participants in the alleged price-fixing schemes were well-acquainted with each other, bolstering the likelihood that these participants entrusted each other to engage in, and jointly conceal, the illicit price-fixing.

253.    **Tenth**, Defendants' scienter is also supported by the fact that the generic drug industry is highly regulated.  Indeed, Defendants admitted in their Forms 10-K for example that the Company was "subject to extensive regulation by the federal government."  This fact alone supports a strong inference that Lannett and the Individual Defendants knew (or were at least reckless in not knowing) that its anticompetitive practices concerning drug prices were in violation of federal law.

254.    **Eleventh**, Defendants' scienter is also supported by the fact that the Individual Defendants represented that, during the Class Period, Lannett's internal controls over financial

reporting were effective and that the Company's financial results accurately represented the true financial condition of the Company when in fact they did not. Indeed, in every Class Period Form 10-K and 10-Q, the Individual Defendants made such representations, with the Individual Defendants signing Lannett's annual and quarterly filings and Sarbanes-Oxley certifications. However, as Plaintiffs allege, quarter after quarter throughout the Class Period, Defendants' financial results were artificially inflated as a result of Defendants' generic drug pricing scheme.

255. **_Twelfth_**, the Individual Defendants' scienter is also supported by the fact that they consistently spoke to investors about the purported competitive nature of the generic industry and the Company's price increases of its drugs in relationship to the generic drug industry. The Individual Defendants held themselves out to be, and indeed were, aware of the sensitive and highly material nature of this information. Therefore, investors reasonably expected them to have knowledge about the truth or falsity of their statements.

256. **_Thirteenth_**, Defendants' scienter is also supported by the fact that, during the Class Period, Defendant Bedrosian resigned as CEO of the Company. Specifically, on September 25, 2017, the Company announced that as "part of a unanimously approved search process," Lannett's Board of Directors had begun the process to search for Bedrosian's replacement as CEO of the Company. At the time, no replacement had yet to be identified. Indeed, when an executive-level officer, such as Bedrosian, leaves a company and no successor is immediately available, such a departure is indicative of an unexpected or forced resignation.

257. Defendants were also highly motivated to sell 4.25 million shares of Lannett common stock that they issued during the Class Period. These shares yielded net proceeds of $71.5 million. The Defendants needed to ensure there was sufficient demand for these shares and through their price fixing, Defendants were able to craft an image of Lannett as a company

whose common stock was highly desirable.

## LOSS CAUSATION

258.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses.  During the Class Period, Plaintiffs and the Class purchased Lannett common stock at artificially inflated prices and were damaged thereby when the price of Lannett common stock declined when the truth was revealed.  The price of Lannett common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

259.    Specifically, Defendants' materially false and misleading statements and omissions misrepresented, *inter alia*, Lannett's competition, as the Company was not competing as to price regarding certain of its drugs, but instead had colluded with other companies to fix the prices of those drugs.  In addition, Defendants' materially false and misleading statements and omissions misrepresented, *inter alia*, that Lannett was complying with all laws when, in fact, it was violating federal antitrust laws by colluding with other companies to determine prices for certain of its drugs. The materially false and misleading statements and omissions also failed to inform the Class of the risk that Lannett's financial results could not be sustained because they were the result of price-fixing.  Defendants' false and misleading representations and omissions caused and maintained the artificial inflation in the price of Lannett's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market. The timing and magnitude of Lannett's common stock price declines, as detailed herein, negate any inference that the losses suffered by Plaintiffs and the Class was caused by changed market

conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct. The market for the Company's common stock promptly digested current information with respect to Lannett from all publicly available sources and reflected such information in the price of the Company's common stock.

260.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the market in a series of partial adverse disclosures and third-party reports in the media. When Defendants' prior misrepresentations and omissions were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of Lannett common stock declined because the price inflation was removed. As a result of their purchases of Lannett common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. The disclosures that corrected the market prices to reduce the artificial inflation caused by Defendants' materially false and misleading statements and omissions are detailed below.

261.     On July 16, 2014, Lannett issued a press release revealing that "it has received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin." The press release stated, in part, as follows:

### Lannett Receives Inquiry from Connecticut Attorney General

Lannett Company, Inc. (NYSE: LCI) today announced that it has received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin. According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a0 fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.

262.     On this news, the price of Lannett common stock plummeted approximately 17%, falling from an opening price of $44.50 on July 16, 2014 to close at $36.96 per share on July 17, 2014, a drop of $7.54 per share on extremely high trading volume.

263.     On November 6, 2014, the Company filed a Form 10-Q for the period ended September 30, 2014, revealing that a grand jury subpoena had been served on the Company's Senior Vice President of Sales and Marketing relating to a federal investigation of the generic pharmaceutical industry.  That Form 10-Q stated, in part, as follows:

Federal Investigation into the Generic Pharmaceutical Industry

On November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.   The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.

264.     On this news, the price of Lannett common stock plunged approximately 6%, falling from an opening price of $53.39 to close at $50.17 per share on November 7, 2014, a drop of $3.22 per share on extremely high trading volume.

265.     On December 8, 2014, after the market closed, Lannett filed a Form 8-K with the SEC, disclosing that it was served with a grand jury subpoena relating to the federal investigation of the generic pharmaceutical industry.  The Form 8-K stated, in part, as follows:

On December 5, 2014, the Company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products.

266. On this news, shares of Lannett plunged approximately 13%, falling from a closing price of $48.00 per share on December 8, 2014 to close at $41.92 per share on December 10, 2014, a drop of $6.08 per share on extremely high trading volume.

267. On November 3, 2016, during the middle of the trading day, *Bloomberg* revealed that criminal charges would likely be filed against Lannett for unlawful price collusion in the generic drug industry. The *Bloomberg* article reported, in part, as follows:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceuticals Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, ***Lannett Co.***, Impax Laboratories, Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
>           \*      \*      \*
>
> Digoxin prices increased nearly sevenfold in late 2013. Lannett raised the list price to $1.185 a pill from 17 cents on Oct. 16, 2013, for a 100 pack of 250 microgram tablets, according to data from First Databank complied by Bloomberg. Six days later, Impax matched Lannett's price, up from 14 cents a pill. At the time, the two companies dominated the market.
>
> Par introduced its own version to the market in January 2014, also at $1.185 a pill. In March 2015, Sun Pharma followed

suit.

268.     On this news, Lannett's share price plunged approximately 26%, falling from an opening price of $23.45 per share on November 3, 2016 to a closing price of $17.25 per share that day, a drop of $6.20 on extremely high trading volume.

269.     Finally, on October 31, 2017, a complaint filed by the Attorney General for the State of Connecticut, as well as by the attorneys general of 44 other states and the District of Columbia, became public alleging a far-reaching price-fixing conspiracy by numerous makers of generic drugs, greatly expanding the scope of the lawsuit initiated in 2016 to go from six drug makers to 20, including Lannett, and to involve the price fixing of of now 15 drugs, an addition of 13, doxycycline monohydrate, made by Lannett. The State AG Proposed Complaint alleges that the drugmakers and executives divided customers for their drugs among themselves, agreeing that each company would have a certain percentage of the market, and that the companies agreed on price increases for generic drugs in advance. The Connecticut Attorney General said in connection to the Amended Complaint that "It is our belief that price-fixing is systematic, it is pervasive, and that a culture of collusion exists in the industry" and that the facts supporting the allegations of price-fixing and collusion by these generic drugmakers were "shocking" and "mind-blowing"

270.     On this news, Lannett's share price plunged approximately 14%, falling from an opening price of $23.15 per share on October 31, 2017 to a closing price of $19.90 per share that day, a drop of $3.25 on extremely high trading volume.

271.     Accordingly, as a result of their purchases of Lannett's publicly traded common stock during the Class Period, Plaintiffs and other members of the Class suffered significant economic loss and damages.

## PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

272. The market for Lannett's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or omissions made by Defendants and alleged herein, Lannett's common stock traded at artificially inflated prices during the Class Period. On April 10, 2015, the Company's stock closed at a Class Period high of $71.15 per share. Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Lannett's common stock and market information relating to Lannett, and have been damaged thereby

273. During the Class Period, the artificial inflation of Lannett's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lannett's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Lannett and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

274. At all relevant times, the market for Lannett's common stock was an efficient market for the following reasons, among others:

a) Lannett stock met the requirements for listing, and was listed, and actively traded on the NYSE, a highly efficient and automated market;[20]

b) As a regulated issuer, Lannett filed periodic public reports with the SEC and/or the NYSE;

c) Lannett regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuit of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Lannett was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

275.    As a result of the foregoing, the market for Lannett's common stock promptly digested current information regarding Lannett from all publicly available sources and reflected such information in Lannett's public stock price. Under these circumstances, all purchasers of Lannett's common stock during the Class Period suffered similar injury through their purchase of Lannett's common stock at artificially inflated prices and a presumption of reliance applies.

276.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants material omissions. Because this

---

[20] During the early portion of the Class Period Lannett was listed on NYSE MKT which is the New York Stock Exchange's Small Cap Equity Market. On December 2, 2013 Lannett announced that it would begin transfer listing its common stock onto the New York Stock Exchange ("NYSE") and it would begin trading on the NYSE from December 13, 2013 onwards.

action involves Defendants' failure to disclose material adverse information identified above, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material undisclosed facts, including the collusion Lannett engaged in with other generic drug companies, and the consequences of possible criminal proceedings against the Company for its ongoing involvement in a cartel to fix the prices of the Price Fixed Drugs, as set forth above, that requirement is satisfied.

## **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

277.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

278.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Lannett who knew that the statement was materially false or misleading when made. Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## CLASS ACTION ALLEGATIONS

279.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Lannett's common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

280.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lannett's common stock were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Lannett shares were traded publicly during the Class Period on the NYSE. As of May 15, 2017 Lannett had 37.19 million shares of common stock outstanding. Record owners and other members of the Class may be identified from the records maintained by Lannett or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

281.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

282.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

283.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     Whether the statements and omissions made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Lannett;

c.     Whether Lannett engaged in collusion to fix prices for the Price Fixed Drugs;

d.     Whether Defendants acted with scienter;  and

e.     To what extent the members of the Class have sustained damages and the proper measure of damages.

284.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

#### Violation of Section 10(b) of
#### The Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

285.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

286.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (ii) cause Plaintiffs and the other members of the Class to purchase Lannett's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

287.    Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lannett's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

288.    Defendants, individually and in concert, directly and indirectly. By the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lannett's financial well-being, operations and prospects, as specified herein.

289.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lannett's value and performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lannett and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

290.    Each of the Individual Defendants' primary liability, and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, products, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times, including communications with governmental and regulatory agencies; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

291.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly

and for the purpose and effect of concealing Lannett's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

292.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lannett's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Lannett's common stock during the Class Period at artificially high prices and were damaged thereby.

293.    At the time of said misrepresentations and/or omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the criminal enterprise that Lannett was involved in, which was not disclosed by Defendants, the Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Lannett common stock, or, if they had acquired such common stock during the Class Period, they would

not have done so at the artificially inflated prices which they paid.

294.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

295.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Against All Defendants

296.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

297.     During the Class Period, Defendants violated SEC Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and the members of the Class with their purchases of Lannett common stock during the Class Period as alleged herein.

298.     During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

299.     Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading. Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated

in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Lannett as specified herein.

300. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Lannett's true financial condition from the investing public and supporting the artificially inflated price of Lannett common stock.

301. Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lannett common stock. Plaintiffs and the Class would not have purchased Lannett common stock at the prices they paid, or at all, had they been aware that the market prices for the common stock had been artificially inflated by the materially false and misleading statements and omissions alleged herein.

## THIRD CLAIM FOR RELIEF

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

302. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

303. The Individual Defendants acted as controlling persons of Lannett within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making

of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

304.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

305.    As set forth above, Lannett and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Lannett's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows

(a)    Declaring this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Finding Defendants violated the law as allege above,

(c)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly or severally, for all damages sustained as a result of

Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(d)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable.

DATED: December 14, 2017                    Respectfully submitted,

By: _____
David M. Promisloff (ID# 200971)
**PROMISLOFF & CIARLANTO, P.C.**
Jeffrey J. Ciarlanto (ID# 205838)
5 Great Valley Parkway, Suite 210
Malvern, Pennsylvania 19355
(215) 259-5156
(215) 600-2642 (fax)
David@prolawpa.com
Ciarlanto@prolawpa.com

*Liaison Counsel for the Class*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Mitchell M.Z. Twersky (*Pro Hac Vice*)
Atara Hirsch (*Pro Hac Vice* forthcoming)
Lawrence Levit (*Pro Hac Vice*)
Todd Kammerman (*Pro Hac Vice*)
Matthew E. Guarnero (*Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050
(212) 279-3655 (fax)
MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
TKammerman@aftlaw.com
MGuarnero@aftlaw.com

*Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*Pro Hac Vice*)
600 Third Avenue
New York, New York 10016
(212) 661-1100
(917) 463-1044 (fax)
JALieberman@pomlaw.com
TAWeinrib@pomlaw.com

*Counsel for Plaintiff Ironworkers
Locals 40, 361 & 417 Union Security
Funds*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on December 14, 2017, a true and correct copy of the foregoing was filed with the Clerk of the Court. Plaintiffs' counsel will serve the Amended Complaint on counsel of record via electronic mail on December 14, 2017. Defendants' counsel includes:

Ian M. Comisky ([Icomisky@foxrothschild.com](mailto:Icomisky@foxrothschild.com))

Matthew D. Lee ([Mlee@foxrothschild.com](mailto:Mlee@foxrothschild.com))

David M. Promisloff