- For Publication -

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN UTESCH,<br>        **Plaintiff,**<br><br>v.<br><br>LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN AND MARTIN P. GALVAN,<br>        **Defendants.** | CIVIL ACTION<br><br><br><br>NO. 16-5932 |

## **OPINION**

This is a putative securities class action centered on alleged misstatements and omissions made by Lannett Company, Inc., a pharmaceutical company, and its Chief Executive Officer Arthur P. Bedrosian and Chief Financial Officer Martin P. Galvan. Lead Plaintiff, the University of Puerto Rico Retirement System, avers that Defendants misrepresented the nature of price competition for certain generic drugs that Lannett produced. Defendants allegedly colluded with other manufacturers to price-fix certain generic drugs, all while simultaneously touting Lannett's legal compliance to investors.

Plaintiff asserts securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against all Defendants, as well as individual claims under Section 20(a) against Bedrosian and Galvan. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a). All of its securities fraud claims turn on an underlying allegation that Defendants violated antitrust laws. Defendants move to dismiss all of the claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Plaintiff has failed to adequately plead scienter in support of its claims. For the reasons that follow, Defendants' motion is granted.

## I. FACTUAL ALLEGATIONS

Lannett is a pharmaceutical corporation that manufactures drugs. Plaintiff alleges that Lannett colluded with other manufacturers to fix the price of several generic drugs, including Doxycycline Monohydrate ("Doxy Mono"), Digoxin, Levothyroxine Sodium ("Levothyroxine"), Acetazolamide, and Ursodiol (collectively, "Generic Drugs"). Lannett derives the majority of its revenue from the sale of the Generic Drugs. Plaintiff seeks to recover on behalf of the class for alleged damages it suffered as a result of Defendants' misstatements and omissions from May 9, 2013 to October 31, 2017 (the "Class Period").

### a. Lannett's Alleged Participation in Generic Drug Cartel

Before the relevant time period of this dispute, Lannett allegedly suffered financial troubles. From 2003 to 2006, its net sales never exceeded $65 million, but rose and fell by about $20 million each year. Consequently, Bedrosian developed a growth strategy in which Lannett would acquire companies and absorb their product lines. Plaintiff alleges that to finance its acquisition strategy, Lannett colluded with other generic drug manufacturers. According to Plaintiff, this collusion led to wildly successful results. In 2017, for instance, Lannett's net sales skyrocketed to $637 million.

Plaintiff avers that Lannett entered into a cartel with other manufacturers "performing two unique but related types of anticompetitive acts." The first, according to Plaintiff, is "market allocation, which allow[s] generic drug manufacturers to control and divide customer accounts amongst themselves." The second is alleged price-fixing that inflated the prices of generic drugs.

Plaintiff derives many of its allegations of anticompetitive behavior from a complaint filed by various State Attorneys General. The complaint, in turn, alleges a "common

understanding" among generic drug manufacturers that they would each have a market share for a particular drug. This scheme partially relied on phone calls and text messages among the manufacturers discussing pricing strategy. Lannett and its various co-conspirators allegedly colluded to price-fix the Generic Drugs as follows.

### i. *Doxy Mono*

Doxy Mono is an oral medicine used to treat bacterial infections and to prevent malaria. Heritage Pharmaceuticals, a purported co-conspirator of Lannett's, learned from a customer that the demand for Doxy Mono was going to increase. Heritage then "decided to reach out to [Lannett] for the purpose of coordinating their price hikes." In turn, Lannett, Heritage, Mylan, and Par Pharmaceuticals – all competitors in the Doxy Mono market – colluded to fix the price of Doxy Mono. They did so by inter-firm communications, as well as discussions by employees at industry conferences and trade shows. On April 22, 2014, the president of Heritage identified various drugs that would be subject to a price increase and arranged for a phone call among its sales team. During the phone call, the president instructed the sales team to reach out to contacts at each competitor for these various drugs and agree on a price increase. After the phone call, a member of the Heritage sales team called a Lannett employee, and the two agreed to raise the price of Doxy Mono.

### ii. *Digoxin*

Digoxin treats heart conditions. Plaintiff alleges that Lannett and another seller of Digoxin, Impax Pharmaceuticals, "represented a substantial portion of the generic market" of the drug. For instance, in 2013, Lannett and Impax had roughly 96% of all Digoxin sales. From October 28, 2013 to October 30, 2013, Impax, Lannett, and Par attended a conference for generic drug manufacturers and distributors. After the conference in November 2013, both Lannett and

3

Impax increased Digoxin prices by over 700%. The increase in price was, according to Plaintiff, the "first significant price increase . . . in more than four years." As a result of Lannett's alleged collusive behavior with Impax, "market sales of Digoxin in 2014 increased almost threefold to $577 million from $198 million in 2013." Plaintiff claims that the increased revenue can only be attributed to the coordinated price increase by Lannett and its co-conspirator.

### iii. Levothyroxine

Levothyroxine treats hypothyroidism and other thyroid-related conditions. Plaintiff avers that, during the Class Period, the market for Levothyroxine "was highly concentrated among four manufacturers": AbbVie US LLC, Mylan N.V., Lannett, and Sandoz. During the Class Period, Lannett controlled about 16% of the market for Levothyroxine. As a result of this "highly concentrated" market, the average price for Levothyroxine increased about 100% from August 2013 to August 2014. Plaintiff alleges that the four manufacturers colluded based on the lock-step manner in which they raised their prices.

### iv. Acetazolamide

Acetazolamide treats glaucoma, epilepsy, altitude sickness, paralysis, and heart failure. According to Plaintiff, the only two producers during the Class Period of Acetazolamide tablets were Lannett and Taro Pharmaceuticals. Although Lannett initially dropped its price to take more market share away from Taro, during the Class Period Lannett and Taro increased the price of Acetazolamide by about 500%. Lannett and Taro made this price increase following a healthcare conference. As Plaintiff contends, the price increase "could only reasonably be explained as the result of collusive behavior."

*v. Ursodiol*

Ursodiol treats gallbladder stone dissolution. The Ursodiol capsule market, according to Plaintiff, "is dominated by Lannett, Actavis Generics, and Epic Pharma," though the tablet itself is manufactured by different companies. After two generic pharmaceutical manufacturers meetings attended by Lannett, Actavis, and Epic, the price of Ursodiol increased from $2 a unit to $5 - $6 per unit. As Plaintiff claims, "[t]hese dramatic and uniform price hikes in Ursodiol have no reasonable explanation absent collusion."

**b. Government Investigations**

Due to the increased prices, Lannett and its alleged co-conspirators "became the focus of regulatory scrutiny in connection with these drug manufacturers' pricing of generic drugs." In particular, Lannett was investigated by the Connecticut Attorney General, Congressional Committees, and the Department of Justice (DOJ).

In November 2016, media outlets initially reported that DOJ prosecutors contemplated filing criminal charges against Lannett and other generic pharmaceutical companies for collusion. By December 2016, various State Attorneys General filed suit against six generic drug manufacturers for anticompetitive price inflation. At the same time, the DOJ unsealed criminal charges against the CEO and President of Heritage. By January 2017, Heritage's CEO and Vice President of Commercial Operations pled guilty to price-fixing charges, though Plaintiff does not identify what entity Heritage colluded with. Plaintiff, however, does not allege that the DOJ has initiated any proceedings against Lannett besides sending one of its corporate officers a subpoena related to antitrust investigations.

### c. The Misstatements and Omissions at Issue

Plaintiff has identified two general types of misstatements promulgated to investors: (i) assertions that drug pricing was competitive and (ii) statements that Lannett had effective internal controls over its financial reporting. For instance, in a securities filing in March 2013, Lannett stated, "Generic pharmaceutical manufacturers and distributors are constantly faced with pricing pressures in the marketplace. . . ." On this form, Bedrosian and Galvan personally certified that they "evaluated the effectiveness of Lannett's internal controls and disclosed any deficiencies or material weaknesses in them." According to Plaintiff, this certification was misleading because it maintained a veneer of robust price competition for the Generic Drugs when, in fact, Lannett was price-fixing many of its products.

Plaintiff's theory of loss is that it purchased Lannett common stock at ballooned prices and suffered economic losses when the truth of Lannett's alleged antitrust conspiracy was revealed. Lannett's stock prices allegedly dropped when, *inter alia*, a Bloomberg article reported that federal prosecutors contemplated filing criminal charges against Lannett (and other pharmaceutical companies) for antitrust violations.

## II. LEGAL STANDARD

When ruling on a motion to dismiss under Rule 12(b)(6), a court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007). However, legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements" are disregarded. *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (internal quotation marks omitted).

In cases alleging securities fraud, a plaintiff must "satisfy the heightened pleading rules codified in" the Private Securities Litigation Reform Act (PSLRA). *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Accordingly, the PSLRA contains "[e]xacting pleading requirements." *Id.* As will be explained below, the PSLRA's provision governing scienter pleading applies with special force.

### III. DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 prohibits any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe. . . ." 15 U.S.C. § 78j(b). Stating a claim for relief under Rule 10b-5, in turn, requires pleading that the "defendant acted with scienter." *Williams v. Globus Med. Inc.*, 869 F.3d 235, 240 (3d Cir. 2017) (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004)). "Scienter" refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (2007)). At issue here is whether Plaintiff has adequately pleaded scienter.

#### a. Scienter Pleading under *Tellabs*

"The PSLRA's requirement for pleading scienter . . . marks a sharp break" with traditional fraud pleading under Rule 9(b) of the Federal Rules of Civil Procedure. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2017). A plaintiff cannot plead the scienter element generally. *Id.* Indeed, Plaintiff here must "state with particularity

7

facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 321. In *Tellabs*, the Supreme Court held that, to determine whether the allegations give rise to a "strong inference" of scienter, "the court must take into account plausible opposing inferences." *Id*. at 323. Under this "inherently comparative" inquiry, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. Scienter pleading does not turn on "the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269; *id.* at 272 ("Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance."). "The inference that the defendant acted with scienter need not be irrefutable." *Tellabs*, 551 U.S. at 324.

Plaintiff argues that the following seven allegations, taken collectively, give a cogent and compelling account of scienter:

- "[T]here was a choreographed relationship between generic drug industry events and lock-step, industry-wide increases to the price of generic drugs";

- Absent collusion, any price increases by Lannett were contrary to its interest because other drug manufacturers would have lowered their prices to capture more market share;

- Lannett was named as a defendant in a State AG Complaint and received a grand jury subpoena related to a federal investigation of potential antitrust violations;

- Bedrosian was responsible for setting drug prices;

- Drug pricing was a core operation of Lannett's business;

- The generic drugs industry is highly regulated and Defendants represented that they complied with these regulations; and

8

- Defendants had a motive to commit fraud so they could maintain high stock prices to fund their growth strategy.[1]

Here, all of Plaintiff's securities fraud claims depends on the predicate allegation that Lannett participated in an anticompetitive scheme to price-fix the Generic Drugs. Therefore, Plaintiff must "state with particularity facts giving rise to a strong inference" that Defendants either knew or recklessly disregarded the risk that Lannett price-fixed the Generic Drugs. 15 U.S.C. § 78u-4(b)(2)(A); *Avaya*, 564 F.3d at 267. On this score, the Complaint fails.

Read holistically, the scienter allegations do not give rise to a strong inference that Defendants acted with fraudulent intent – that is, knew or recklessly disregarded that Lannett was committing antitrust violations – in representing that the market for Generic Drugs was price competitive or that Lannett had effective internal controls over its financial reporting. *See id.* As currently styled, Plaintiff's theory of securities fraud liability is premised on misstatements that Galvan or Bedrosian made in either SEC filings or conference calls with investors and analysts. Because Plaintiff's scienter allegations are deficient as to both individuals, the scienter pleading is accordingly deficient for Lannett as well.[2] The Court now turns to Plaintiff's scienter allegations more specifically.

---

[1] Although Plaintiff identified thirteen types of scienter allegation in its Complaint, it later distilled them to seven main allegations in its opposition briefing.

[2] The Third Circuit has not yet decided whether scienter allegations against a corporation require scienter allegations against individual corporate officers. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) ("We, however, neither have accepted nor rejected the doctrine of corporate scienter in securities fraud actions, and we do not do so now. . . ."); *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676-77 (3d Cir. 2011). As one court has noted, "[t]here is a circuit split on this issue." *MTB Investment Partners, LP v. Siemens Hearing Instruments, Inc.*, 2013 WL 12149253, at *5 (D.N.J. 2013).

For instance, the Seventh Circuit has concluded that "[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who connected and disseminated the fraud." *Makor Issues & Rights, Ltd. v. Tellabs Inc. ("Tellabs II")*, 513 F.3d 702, 710 (7th Cir. 2008). The Seventh Circuit added: "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.*

*i. Antitrust Allegations*

As an initial matter, the Complaint doesn't speak of any "direct evidence of an agreement," such as a "document or conversation explicitly manifesting the existence of the agreement in question," by Bedrosian or Galvan to price-fix the Generic Drugs. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 & 324 n.23 (3d Cir. 2010) (internal quotation marks omitted). Although the Complaint generally avers that several anticompetitive agreements were "coordinated at regular 'industry dinners,' 'girls nights out,' lunches, parties and numerous and frequent telephone calls, emails and text messages," it makes no allegation that Bedrosian or Galvan was a part of these outings or knew about them.[3] For instance, as to Doxy Mono, Plaintiff pleads that an unidentified employee within Heritage's sales team "reached out to a Lannett employee for a twenty-nine (29) minute phone call during which they agreed to raise prices of Doxy Mono." Plaintiff does not plead that Bedrosian or Galvan directed a Lannett

---

The Third Circuit has also referred to a Sixth Circuit case that recognized the ability to plead corporate scienter without reference to particular individuals. *Rahman*, 736 F.3d at 246 (discussing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)); *Roseville*, 442 F. App'x at 676 (same). As the *Roseville* court explained, the scienter inference against a corporation was warranted in *Bridgestone* because the purported wrongdoing was "extraordinary." *Id.* Specifically, Bridgestone and its subsidiary "had information that their tires were rupturing and causing, among other things, a significant number of rollover accidents." *Id.* Bridgestone and the subsidiary then "engaged in a variety of tactics, such as a large-scale secret settlement with State Farm Insurance Co., to keep the scope of the problem from safety regulators in the United States and several other countries, as well as from investors." *Id.*

The *Roseville* court has suggested that the Sixth and Seventh Circuit's approach to corporate scienter is tenable. *Id.* at 676-77. However, the *Roseville* court concluded that dismissal under Rule 12(b)(6) was appropriate because the plaintiff's allegations were a "far cry" from the facts in *Bridgestone* and the hypothetical in *Tellabs II*. *Id.* at 676. Notably, the *Roseville* plaintiff's securities fraud claims, as with Plaintiff's, were based on misrepresentations about the company's price-fixing activity. *See id.* at 673-74. The *Roseville* court held that such allegations do not amount to "extraordinary" wrongdoing by a corporation that would merit a strong inference of corporate scienter in the absence of scienter allegations against specific corporate officers. *Id.* at 676. So too here.

[3] Insofar as Plaintiff argues that pricing was a "core operation" of Lannett's and that its CEO and CFO therefore must have known about all factual circumstances attending the Generic Drugs' pricing, that is addressed later in Section III.a.iv.

10

employee to extend an offer to price-fix Doxy Mono – or how either of them would be privy to this oral agreement related to Doxy Mono prices.[4]

And for all of the other Generic Drugs, Plaintiff does not identify an explicit agreement to price-fix, or Bedrosian and Galvan's awareness of price-fixing done by winks and nods. Rather, Plaintiff alleges that the price hikes for Digoxin, Levothyroxine, Acetazolamide, and Ursodiol, can only be explained by anticompetitive agreements – all without tethering such agreement, implied or explicit, to Bedrosian or Galvan personally. Nor does Plaintiff allege that Bedrosian or Galvan attended the healthcare conferences or trade shows that purportedly resulted in price hikes for the Generic Drugs, or knew about any closed-door deals that occurred at these meetings. Insofar as Plaintiff alleges that it would have been contrary to Lannett's interest to raise prices because it would have lost market share to other competitors, this is relevant to Lannett's possible antitrust violation. *See id.* at 322 (holding that "evidence that the defendant acted contrary to its interests" is a plus factor to consider in determining whether an anticompetitive agreement exists). But it says little about what Bedrosian or Galvan knew. In short, none of the antitrust allegations implicate Bedrosian or Galvan's knowledge or disregard of antitrust problems.

Moreover, the governmental inquiries into Lannett's purported antitrust violations are unpersuasive in raising the inference that Bedrosian or Galvan knew about the potential price-fixing. *See In re Gentiva Sec. Lit.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("The Court agrees that while the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis."). The Complaint alleges that the Senior Vice President of Sales and Marketing at

---

[4] Instead, Plaintiff's contention is that a "Heritage employee, at the direction of senior Heritage management, reached out to an employee at Lannett to obtain specific information regarding Lannett's price increase for Doxy Mono."

11

Lannett – not Bedrosian or Galvan – received a grand jury subpoena related to a federal investigation of antitrust violations. And the AG Complaint, filed by various State Attorneys General, asserts that "price-fixing . . . is pervasive" and that "a culture of collusion exists in the [pharmaceutical] industry." This conclusory generalization falls short of satisfying the particularity requirement for scienter pleading. 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 321. Even the letter sent to Bedrosian from Congress, as cited in the Complaint, pertains to price increases for various drugs without reference to price-fixing or the Generic Drugs at issue.

> ii. *Confidential Witness Allegation*

The only allegation unique to Bedrosian which would suggest scienter comes from one confidential witness. As former Director of National Accounts for Lannett from October 2014 to December 2015, the confidential witness reported to Lannett's Vice President, Kevin Smith. The confidential witness claims that Bedrosian and Smith determined drug prices. And according to him, "nothing is done without [Bedrosian's] knowledge. It's not ask for forgiveness rather than approval. You need approval to do anything." The witness adds that Smith "frequently attended healthcare conferences and other industry events, which were also attended by executives from other generic drug companies, such as Par, Impax, Mylan, Sun, and West-Ward." Plaintiff therefore argues that Bedrosian must have known about Lannett's alleged price-fixing.

While statements from confidential witnesses may be considered in evaluating scienter, they must be discounted "steeply" if they are not sufficiently particularized; a court evaluates the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263. If, as here, the plaintiff lacks "documentary evidence such as internal memoranda" in support of its

12

Complaint, "reliance on confidential sources to supply the requisite particularity for their fraud claims . . . assumes a heightened importance." *Id*. at 261 (quoting *Chubb*, 394 F.3d at 146).

The confidential witness allegations are wanting under these criteria and are thus given little weight. The assertion that Bedrosian's approval was required "to do anything" sounds in exaggeration and stretches the bounds of credulity. By Plaintiff's own allegations, Lannett makes hundreds of millions of dollars in net sales and trades on the New York Stock Exchange. To require Bedrosian's blessing on all transactions in a large company would be implausible. The confidential witness also does not explain the source of his knowledge. *See id*.; *Chubb*, 394 F.3d at 146 (confidential witness should be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). How did he, as Smith's subordinate, know that Bedrosian had to rubber stamp all matters? And how did he know that Bedrosian needed to bless all transactions during the class period from May 9, 2013 to October 31, 2017, when he only worked at Lannett from October 2014 to December 2015? Further compounding the vagueness of these assertions, the confidential witness provides no details about where and when Smith attended these healthcare conferences to allegedly price-fix with other pharmaceutical executives. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) (discounting statements by confidential witness because, *inter alia*, the confidential witness failed to provide dates for closed-door meetings).

The confidential witness' claim that Bedrosian could set drug prices is similarly unavailing in showing scienter. Alleging that Bedrosian had authority to raise prices is not the equivalent of alleging that Bedrosian illegally price-fixed with peer companies.[5] *See id.* ("Yet the fact that a CEO visited a subsidiary's premises to meet with its president will not establish

---

[5] For this reason, Plaintiff's allegation that Bedrosian personally said, at a healthcare conference, that he increased the price of Digoxin is unpersuasive in demonstrating scienter.

13

that the CEO had knowledge of illegal activities at the subsidiary."). Indeed, Bedrosian's ability to set prices for drugs crucial to the company's survival would be expected of a CEO in "conducting legitimate business." *See id.*

Even if the confidential witness' statements were given weight, they say nothing about Galvan's knowledge or reckless disregard of Lannett's alleged price-fixing. In fact, Plaintiff makes no particularized averments specific to Galvan's scienter in the entire Complaint.

### iii. Motive

Plaintiff's allegation that Bedrosian and Galvan had a motive to commit securities fraud adds nothing to the scienter calculus. *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) ("Blanket assertions of motive and opportunity will not suffice, and catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.") (internal quotation marks omitted). Plaintiff's contention is that both executives had a motive to conceal Lannett's antitrust conspiracy to maintain high stock prices to "fund the Company's growth-by-acquisition strategy." However, a desire to maintain high stock prices and secure Lannett's financial future is a motive that would be "generally possessed by most corporate directors" and does not suffice for purposes of pleading scienter. *See Avaya*, 564 F.3d at 278. Although a court "do[es] not look at motive allegations alone," it bears noting that corporate officers such as Bedrosian and Galvan "always have an incentive to improve the lot of their companies." *Id*. at 279. This is not equated with a motive to commit fraud. *See id*.

### iv. Importance of Generic Drugs Pricing

Plaintiff claims that the pricing of the Generic Drugs constitutes a "core operation" of

14

Lannett and therefore knowledge pertaining to their alleged price-fixing can be attributed to its CEO and CFO – Bedrosian and Galvan. The Third Circuit recognizes a "core operations doctrine" in which knowledge about pricing can be imputed to high-level corporate officers. *Rahman*, 736 F.3d at 246; *see also Avaya*, 564 F.3d at 268 ("Shareholders assert that since competition, pricing policies, and pricing concessions are 'core matters' of central importance to [defendant company] and its principal executives, a 'core operations inference' supports scienter.").

The core operations doctrine does not help Plaintiff. The Generic Drugs purportedly generate a substantial amount of revenue for Lannett, so their pricing would be a "core matter" for Bedrosian and Galvan. *See id.* But on the facts currently alleged, the inference that Bedrosian and Galvan had "knowledge of illegal activities" crosses a bridge too far. *See Rahman*, 736 F.3d at 245. It is one thing to say that, due to the Generic Drugs' importance, Bedrosian and Galvan were aware of the Generic Drugs' price increases. It is another to infer that, due to these price increases, Bedrosian and Galvan must have known the reason for the increases was due to a price-fixing conspiracy with other major pharmaceutical companies.

To the contrary, Bedrosian's alleged oral representations to investors betray Plaintiff's argument that Bedrosian and Galvan acted with scienter:

- On a September 10, 2013 earnings call, "Bedrosian was asked for his reaction to Mylan increasing the price of Levothyroxine significantly." Bedrosian replied, "You mean after I sent them the thank you note? So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

- On the same September 10, 2013 call, when asked whether there would be new market entrants for Levothyroxine, Bedrosian opined that there could be two new competitors but "hopefully, both companies turn out to be responsible companies and don't go into the marketplace" due to high production costs. Bedrosian predicted "more price increases in the generic marketplace or certainly less price erosion in the marketplace" because of fewer competitors.

15

- On a November 7, 2013 conference call, an analyst asked a question "concerning Lannett's ability to maintain gross margins" generally without reference to any particular Generic Drug. Bedrosian said, "It's hard to say but I would believe they are sustainable as we're not expecting any changes that we anticipate this point. But we're in a commodity business, so it's always hard to determine when you're going to get additional competition or when prices will erode as they generally do."

- On a December 10, 2013 conference call at a healthcare conference, Bedrosian stated, "We have had opportunities to raise prices in the marketplace, fortunately, because in our world, usually generic drugs just drop in price. But we have a very aggressive stance; we try raising prices, we see if it sticks. We don't have a lot of competition in each one of our areas for each one of our products."

- On a February 6, 2014 earnings call, an analyst asked whether Par was a "rational competitor" in its sale of Digoxin. Bedrosian replied that Lannett has seen Par's "prices discounted" but was "not troubled by [Par's] pricing in the marketplace."

Based on these statements, Bedrosian was aware that prices of certain Generic Drugs increased in a small market. But his statements related to Lannett's "core operation" in drug pricing do not otherwise point to an inference of scienter – that is, his knowledge that the prices were the result of price-fixing and subsequent attempt to conceal that price-fixing.

*v. Industry Regulation*

Finally, Plaintiff's allegation that Lannett operates in a highly regulated industry is unavailing in showing fraudulent intent. Plaintiff cites no case law where a corporation's participation in a highly regulated industry adds to the inference of fraudulent intent, or explains why this would create such an inference.

*vi. Overall Assessment of Scienter*

Bearing in mind the obligation "not to scrutinize each allegation in isolation but to assess all the allegations holistically," the Court concludes that the scienter pleading is deficient: the Complaint's inference of scienter is not as "cogent" and "compelling" as the opposing inference that may be drawn from the facts currently alleged. *See Tellabs*, 551 U.S. at 324; *see also id.*

16

(holding that the "inference of scienter must be more than merely 'reasonable' or 'permissible'"). The more cogent and compelling account, based on a holistic evaluation of the Complaint, is that:

(1) unspecified Lannett employees may have planned price hikes at certain healthcare conferences or over the phone;

(2) Bedrosian, cognizant of the small number of pharmaceutical companies in the Generic Drugs market, increased the prices of Generic Drugs

(3) Bedrosian decided, independent of those unspecified Lannett employees' potential plans, to increase the price of Generic Drugs;

(3) Consistent with his role as CEO, Bedrosian increased prices of the Generic Drugs for the benefit of Lannett;

(4) Bedrosian and Galvan made representations about price competition and Lannett's internal controls over its financial reporting based on their understanding that the Generic Drugs market, though otherwise legal, was dominated by few competitors; and

(5) Lannett's and other pharmaceutical companies' price increases for important drugs triggered scrutiny from various governmental bodies, though there is no conclusive finding as to its antitrust liability yet.

At the pleading stage, these are the more cogent inferences that may be drawn because Plaintiff devotes the bulk of its allegations to antitrust violations without giving sufficient attention to statements or acts that add to the scienter calculus. The Complaint, in other words, is insufficiently particularized and clear as to Bedrosian and Galvan's state of mind. *See id.* at 326. ("[O]missions and ambiguities count against inferring scienter.").

In sum, while sketching the contours of Lannett's alleged antitrust violations is necessary for the success of Plaintiff's claims, it is not sufficient to satisfy the scienter standard for securities fraud. That requires more: a "strong inference" that Bedrosian, Galvan, and Lannett acted with a culpable state of mind. *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 321. Plaintiff has not met that standard. Thus, its Rule 10b-5 claims against all Defendants shall be

dismissed without prejudice. Plaintiff will be given leave to amend to address the scienter pleading deficiency.[6]

### b. Section 20(a) Claim against Bedrosian and Galvan

Section 20(a) of the Securities Exchange Act authorizes a cause of action against individuals who control a corporation that has violated Section 10(b). 15 U.S.C. § 78t(a). Therefore, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252. Because Plaintiff has failed to adequately plead scienter, its Section 20(a) claim against Bedrosian and Galvan necessarily fails and will be dismissed without prejudice.

An order follows.

                                                     **BY THE COURT:**

                                                   /s/Wendy Beetlestone, J.

**Date: July 31, 2018**                                                    **WENDY BEETLESTONE, J.**

---

[6] At this juncture, the Court will not address Defendants' remaining arguments presented in their motion to dismiss.