**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff(s), <br><br> v. <br><br> LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN, <br><br> Defendants. | Civil Action No. 2:16-cv-05932-WB <br><br> **CLASS ACTION** <br><br><br> **JURY TRIAL DEMANDED** |

**THIRD AMENDED CONSOLIDATED**
**SECURITIES CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

NATURE OF THE ACTION ................................................................................. 2

JURISDICTION AND VENUE ........................................................................... 7

THE PARTIES..................................................................................................... 8

BACKGROUND AND NATURE OF THE FRAUD AT LANNETT ....................... 10

  A. The Generic Drug Market ........................................................................ 10

  B. Generic Drug Manufacturers Engaged In Anticompetitive Conduct Throughout The Class Period.................................................................................................... 11

  C. Specific Evidence Of Price-Fixing And Anticompetitive Conduct With Respect To Lannett And Lannett's Generic Drug Products ...................................... 19

  D. Lannett's Financial Results Were Dependent On The Increased Prices Of A Few Key Drug Products ....................................................................................... 34

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD............................................. 38

SUMMARY OF SCIENTER ALLEGATIONS ...................................................... 71

LOSS CAUSATION............................................................................................. 79

PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...... 86

INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ............................. 88

CLASS ACTION ALLEGATIONS ...................................................................... 89

CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ........................... 91

FIRST CLAIM FOR RELIEF ............................................................................. 91

SECOND CLAIM FOR RELIEF ......................................................................... 94

THIRD CLAIM FOR RELIEF ............................................................................. 96

PRAYER FOR RELIEF ...................................................................................... 97

DEMAND FOR JURY TRIAL ............................................................................ 97

Lead Plaintiff the University of Puerto Rico Retirement System ("Lead Plaintiff" or "UPR") and plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action against Lannett Company, Inc. ("Lannett" or the "Company"), Lannett's former Chief Executive Officer ("CEO") Arthur P. Bedrosian ("Bedrosian"), and Lannett's Chief Financial Officer ("CFO") Martin P. Galvan ("Galvan") (collectively, "Defendants").  Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief are based upon counsel's investigation, which included review and analysis of, *inter alia*:  (i) regulatory filings made by Lannett with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Lannett; (iv) interviews with former Lannett employees; (v) news articles; (vi) state regulatory complaints filed against Lannett; (vii) other publicly available information concerning Defendants, including pending and closed litigation matters involving Lannett; and (viii) consultation with experts, including a forensic accounting expert.  Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## NATURE OF THE ACTION

1.     This is a securities class action brought on behalf of all persons who purchased or otherwise acquired Lannett's common stock between July 15, 2014 and October 31, 2017, inclusive (the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Lannett and its then-CEO Defendant Bedrosian and CFO Defendant Galvan.  Defendants made materially false and misleading statements and omissions related to the potential impact of regulatory investigations and antitrust enforcement actions stemming from industry-wide price-fixing agreements and other anticompetitive behavior in violation of federal and state law.  Defendants also made materially false and misleading statements and omissions to investors about the impact of competition and price erosion on its sales of certain key generic drug products.

2.     Lannett primarily derives its revenue from the sale of generic drugs, which are the bioequivalent to certain patented brand name drugs once their patent expires.

3.     Throughout the Class Period, Lannett's financial results were enhanced by the effects of an industry-wide scheme to raise and fix the prices of at least five generic drugs sold by Lannett:  Doxycycline Monohydrate (aka "Doxy Mono"), Digoxin, Levothyroxine, Acetazolamide, and Ursodiol (collectively, the "Price Fixed Drugs").  Two of these products, Doxy Mono and Acetazolamide, are the subject of a regulatory action brought on behalf of 47 State Attorneys General, and the Attorneys General of the District of Columbia and the Commonwealth of Puerto Rico.  The remaining drugs, Digoxin, Levothyroxine and Ursodiol, are the subject of antitrust actions that are part of a greater Multidistrict Litigation concerning generic drug price-fixing.

2

4.      Since the beginning of the Class Period, Lannett and its executive officers represented to investors that Lannett's revenues and financial results were the result of an aggressive pricing campaign and competitive market forces.  Even as it began to be revealed during the Class Period that several of Lannett's competitors were implicated in illegal price-fixing and anti-competitive conduct, Defendants assured investors that Lannett's past financial results were the product of competitive market forces; and, that the Company's pricing strategy and future results would not be impacted by regulatory scrutiny of anticompetitive conduct in the industry, or the threat of being implicated in any price-fixing or anticompetitive scheme.  Indeed, even though Lannett and certain of its officers were subpoenaed or referenced in regulatory actions against Lannett's competitors for anticompetitive behavior, Defendants continued to assure investors that Lannett did not engage in illegal anticompetitive behavior and that there was no risk that Lannett would be implicated or impacted by such actions.

5.      On July 8, 2014, *The New York Times* published an article scrutinizing the significant price increases by Lannett (and its main market competitor) with respect to a cardiovascular drug called Digoxin.  The article stated that the two main manufacturers of Digoxin, Lannett and Global Pharmaceuticals ("Global Pharma"), the generics division of Impax Laboratories ("Impax"), began raising the price of Digoxin in "late 2013" even though "[t]here was no drug shortage, according to the Food and Drug Administration, that might explain the increase [nor] new patent or new information . . . What had changed most were the financial rewards of selling an ancient, lifesaving drug and company strategies intended to reap the benefits."  The article noted that Lannett's "reported sales for cardiovascular products – its major drug in that category is Digoxin – rose to $16.9 million from $4.5 million in just a few months."  The article also noted that in response to a request for comment, Lannett replied, "On occasion

3

and for a variety of reasons generic drug makers can and do raise prices." Lannett excused its price increases as the result of unsubstantiated factors, including "problems acquiring raw material, increased costs of complying with the Food and Drug Administration requirements and manufacturers exiting the market."

6.     On July 16, 2014, Lannett announced that it had received a subpoena and interrogatories from the Connecticut Attorney General regarding its pricing of Digoxin, but Defendants assured investors that Lannett would not be implicated in any unlawful conduct. At the same time, Defendants Bedrosian and Galvan were communicating to market analysts that Lannett's management believed that Lannett's Digoxin pricing strategy would hold in the market. For example, an analyst report by Rohit Vanjani at Oppenheimer & Co Inc. ("Oppenheimer"), issued on July 15, 2014, after a meeting with Defendants Bedrosian and Galvan, reported that Lannett said it would not change its pricing strategy with respect to Digoxin and other generic drugs because, "Lannett's view is that the company has a window of opportunity on price increases until 2016, when the generics wave begins to recede. Management is even eyeing additional price increases later this year, although the company would not specify on which franchises. With respect to digoxin specifically, management still believes that it is at the low end of market pricing compared to competitors…"

7.     On an August 27, 2014, earnings call with investors and analysts, Defendant Bedrosian again downplayed the implications and impact of the inquiry from the Connecticut Attorney General, maintaining that Lannett's "price increases are opportunistic things . . .  we know we've done nothing wrong, so we're going to continue to operate our business regardless of any investigation."

8.     On November 6, 2014, the Company announced in its Form 10-Q filed with the SEC that "the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  Then, on December 8, 2014, during after-market hours, the Company filed a Form 8-K with the SEC revealing that "the Company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act" based on anticompetitive behavior.  The investigation spawning these subpoenas was separate from the investigation led by the Connecticut Attorney General.  On this news, shares of Lannett fell $6.08 per share to close at $41.92 per share.

9.     Despite increasing scrutiny of anticompetitive behavior in the generic drug industry, Defendants continued to downplay the risk that Lannett would be implicated or impacted by the investigations.  For instance, during the Oppenheimer Healthcare Conference on December 10, 2014, Defendant Bedrosian referred to the Connecticut Attorney General's investigation into industry price fixing as "nonsensical" and stated that "the Company hasn't done anything wrong, and we're comfortable with the position we have taken with our price increases and how we've made those decisions."

10.     Through these assurances, Defendants misled investors about the risk that Lannett faced from industry-wide scrutiny of price-fixing and other anticompetitive behavior.  Defendants knowingly or recklessly created the false impression among investors that Lannett's price increases and financial results were the product of competitive market forces, as opposed to illegal price-fixing and anticompetitive conduct among Lannett's competitors; and, that and that there was no risk that Lannett would be implicated or impacted any illegal price-fixing scheme or

5

anticompetitive conduct.  As a result, Lannett's stock price reached a Class Period high of $71.15 per share.

11.     On November 3, 2016, *Bloomberg* published an article titled "U.S. Charges in Generic Drug Probe to be filed by Year-End," revealing that in connection with the United States Department of Justice's (the "DOJ") investigation of a dozen companies, including Lannett, federal prosecutors might file criminal charges by the end of 2016 for suspected price collusion. On this news shares of Lannett common stock fell $6.25 per share to close at $17.25 per share.

12.     On October 31, 2017, the Connecticut Attorney General sought to expand an existing antitrust action by filing a proposed amended complaint on behalf of Connecticut and the attorneys general of 44 other states and the District of Columbia and Puerto Rico alleging an illegal price-fixing scheme effected by numerous generic drug manufacturers, including Lannett (the "State AG Complaint").[1]  Initially, on December 14, 2016, the Connecticut Attorney General of Connecticut filed a complaint on behalf of 20 state attorneys general against six Generic Drug manufacturers, alleging price-fixing and anticompetitive conduct with respect to two generic drugs.   After a continued investigation and with the benefit of discovery in the initial action, the Connecticut Attorney General sought leave to file an amended complaint accusing 17 generic drug companies, including Lannett, of price-fixing and anticompetitive conduct with respect to 15 generic drugs, including two drugs sold by Lannett: Doxy Mono and Acetazolamide.  The State AG Complaint alleges that the generic drug manufacturers and their executives wrongfully divided market share and customers, and set price increases for generic drugs.  The Connecticut Attorney

---

[1] The court granted the State Attorney Generals leave to file the State AG Complaint on June 5, 2018, and the complaint was filed on June 18, 2018 (ECF No. 14, *State of Connecticut et al v. Aurobindo Pharma USA, Inc. et al,* E.D. Pa. Case No. 2:17-cv-03768-CMR).  Other than the addition of two more State Attorney Generals, the allegations in the October 31, 2017 and the June 18, 2018 complaints are the same.

General said in connection with the State AG Complaint, "***It is our belief that price-fixing is systematic, it is pervasive, and that a culture of collusion exists in the industry***" and that the facts supporting the allegations of price-fixing and collusion by these generic drug makers were "***shocking***" and "***mind-blowing***."[2]  The State AG Complaint also stated that the "Plaintiff States continue to investigate additional conspiracies, involving these and other generic drugs not identified in [the State AG Complaint], and will likely bring additional actions based on those conspiracies at the appropriate time in the future."

13.     After the State AG Complaint and the details of the expanded scope became public, Lannett's share price fell $3.25, or approximately 14%, from an opening price of $23.15 per share on October 31, 2017, to a closing price of $19.90 per share that day, on extremely high trading volume.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction of the subject matter of this Action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Lannett's principal executive offices are located within this Judicial District.

---

[2] Herein, all emphasis is added unless otherwise noted.

7

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities market.

## THE PARTIES

### A.     Plaintiffs

18.     The University of Puerto Rico Retirement System ("Lead Plaintiff" or "UPR") manages the pension benefits for employees of the University of Puerto Rico, with approximately $1.4 billion in assets under management.  As set forth in its filed Certification (ECF No. 5-2), UPR acquired Lannett common stock at artificially inflated prices during the Class Period and suffered damages as a result of the conduct complained of herein.  On March 20, 2017, the Court appointed UPR as Lead Plaintiff for this litigation.

19.     Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds, as set forth in the certification previously filed with this Court, purchased Lannett common stock at artificially inflated prices during the Class Period and was damaged by the federal securities law violations as alleged herein.  Herein, Plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds and Lead Plaintiff UPR are referred to collectively as "Plaintiffs."

### B.     Defendants

20.     Defendant Lannett Company, Inc. ("Lannett" or the "Company") is a pharmaceutical corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 9000 State Road, Philadelphia, Pennsylvania.  Founded in 1942, Lannett develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address

8

a wide range of therapeutic areas.  Lannett also produces, through its subsidiary Cody Laboratories, Inc., active pharmaceutical ingredients.  Lannett derives the majority of its revenue from the sale of generic drugs.  During the Class Period, Lannett common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "LCI."

21.     Defendant Arthur P. Bedrosian ("Bedrosian") served as the President of Lannett from May 2002 through December 2014, and as the Company's CEO from January 2006 until January 2, 2018.  Prior to becoming President, Bedrosian served as the Vice President of Business Development at Lannett from January 2002 to April 2002.  As the President and CEO of Lannett, Bedrosian was involved in all aspects of the Company and played a substantial role in the pricing of Lannett's generic drugs, specifically setting forth and implementing a strategy such that Lannett could affect the prices of generic drugs and begin challenging branded drug patents.  Throughout the Class Period, Defendant Bedrosian made materially misleading statements and omissions in Lannett's public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually-filed Forms 10-K and quarterly-filed Forms 10-Q.

22.     Defendant Martin P. Galvan ("Galvan") has been the CFO and Vice President of Finance and Treasurer at Lannett since August 2011.  Throughout the Class Period, Defendant Galvan made materially misleading statements and omissions in Lannett's public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually-filed Forms 10-K and quarterly-filed Forms 10-Q.  Defendants' Bedrosian and Galvan are referred to as the "Individual Defendants."  Defendant Lannett and the Individual Defendants are referred to collectively as "Defendants."

23.     Each of the Individual Defendants:  (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (v) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (vii) approved or ratified these misleading statements in violation of the federal securities laws.

## BACKGROUND AND NATURE OF THE FRAUD AT LANNETT

### A.     The Generic Drug Market

24.     Generic drugs, as required by regulation of the Food and Drug Administration ("FDA"), are exact copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.

25.     To promote the development of more generic drugs, Congress passed the Hatch-Waxman Act which eliminated the requirement that generic drug companies file a New Drug Application ("NDA") to achieve FDA approval.  Instead, companies can file an ANDA and rely on the data provided by the original NDA holder.

26.     As a further incentive to spur generic companies to provide alternatives to branded drugs, the first generic drug manufacturer to file a substantially complete and certified ANDA is afforded the right to market its generic drug free from competing generic manufacturers for a period of time.  Typically, the first generic drug manufacturer will enter the market below the price

of the branded drug, creating downward pressure on the price of the branded drug as the generic drug manufacturer and branded drug manufacturer compete for market share.

27.    Historically, once the exclusivity period ends for first generic drug manufacturer, the introduction of additional generic drug manufactures leads to a precipitous drop in drug prices.

28.    Since 2013, however, the pricing trends of generic drugs introduced to the market has changed, such that there is no longer a precipitous drop in pricing as competition is introduced to the market.  As alleged in the State AG Complaint, this changed trend was the result of anticompetitive behavior, including price-fixing and collusion.  Lannett (and other generic drug manufacturers implicated in the State AG Complaint) proclaim, however, that the changed price trends and lack of pricing pressure is the result of competitive market forces, such as industry consolidation, FDA-mandated plant closures, and the elimination of unprofitable generic drug lines.

**B.    Generic Drug Manufacturers Engaged In Anticompetitive Conduct Throughout The Class Period**

29.    On December 14, 2016, the Connecticut Attorney General, on behalf of the attorneys general of 20 states, filed an action, *Connecticut v. Aurobindo Pharma USA, Inc. et al.,* No. 3:16-cv-2046 (D. Conn.),[3] accusing six generic drug companies of price-fixing and anticompetitive conduct.  Specifically, the action alleged that increased prices for certain generic drugs, particularly since 2013, were the result of illegal collusion between the generic drug companies, through senior leadership and marketing and sales executives.  Although the initial complaint named only six defendant companies with respect to two drugs, the complaint suggested

---

[3] The Panel on Multidistrict Litigation transferred the case to the Eastern District of Pennsylvania on August 23, 2017, as *State of Connecticut et al v. Aurobindo Pharma USA, Inc. et al,* E.D. Pa. Case No. 2:17-cv-03768-CMR, which is centralized for pretrial proceedings as part of *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, E.D. Pa. Case No. 16-md-2724-CMR, MDL No. 2724.

that the scope of the action would likely be expanded, stating "Although the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time, this Complaint focuses on illegal and competitive conduct with regard to two of those drugs: Doxy DR and Glyburide."  Lannett was not named as a defendant in this initial complaint.

30.     As alleged in the initial complaint filed on December 14, 2016 (and subsequent amended complaints), the defendant generic drug companies exploited their interactions at industry trade shows, customer conferences and other similar events to develop relationships and sow the seeds for their illegal agreements.  These trade shows, such as those hosted by the Generic Pharmaceutical Association, the National Association of Chain Drug Stores, Healthcare Distribution alliance, and Efficient Collaborative Retail Marketing, were frequently attended by Lannett.  The anticompetitive agreements were then further refined and coordinated at regular "industry dinners," "girls nights out," lunches, parties and numerous and frequent telephone calls, emails and text messages.

31.     On March 1, 2017, the Connecticut Attorney General filed an amended complaint in the action against the initial 6 defendant generic drug companies, this time on behalf of 40 state Attorneys General.  Again, the amended complaint indicated, "Although the Plaintiff States have uncovered wide-ranging conduct implicating numerous different drugs and competitors, which will be acted upon at the appropriate time, this Complaint focuses on illegal and anticompetitive conduct with regard to two of those drugs: Doxy DR and Glyburide."

32.     On October 31, 2017, the Connecticut Attorney General sought leave to file an amended complaint on behalf of 45 states, the District of Columbia and Puerto Rico (the State AG Complaint, as previously defined), this time expanding the scope of the action to name 17 Generic

Drug manufacturers – *including* Lannett – with respect to 15 drugs, two of which were sold by Lannett.

33.     The State AG Complaint, submitted on October 31, 2017, stated:

> In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals.  Over time, the investigation expanded and Connecticut was joined in its efforts by forty-five (45) additional states.  As a result of the information and evidence developed through that investigation, which is still ongoing, the Plaintiff States allege that the Defendants, and several as-of-yet unnamed coconspirators, entered into numerous contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the generic pharmaceutical industry throughout the United States, including by limited to, the markets for the following fifteen (15) generic drugs:  Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil, and Zoledronic Acid.

34.     As referenced, the State AG Complaint naming Lannett as a defendant was based, in part, on information received from Lannett in response to a subpoena received by the Company in July 2014, as part of Connecticut's "non-public investigation into suspicious price increases for generic pharmaceuticals."

35.     As alleged in the expanded State AG Complaint, the generic drug manufacturers defendants, including Lannett, operated as a cartel to effect two separate but related types of anticompetitive acts: (i) market allocation, which means that the companies controlled and divided customers to maintain certain market share; and (ii) price-fixing, which means that the companies colluded to establish uniform (and increased) prices for certain pharmaceuticals.  Though distinct in conduct, both acts served to maintain artificially inflated generic drug pricing without triggering a "fight to the bottom" amongst competitors.

13

36.     Notably, two executives from one of the defendant drug companies that figures heavily in the allegations in the State AG Complaint, Heritage Pharmaceuticals, Inc. ("Heritage Pharmaceuticals"), have pleaded guilty to federal prices-fixing charges brought by the DOJ. Specifically, Heritage Pharmaceuticals' CEO Jeffrey Glazer, and its Vice President of Commercial Operations, Jason Malek, pleaded guilty to the price-fixing charges in January 2017, and they are cooperating with the Connecticut Attorney General's on-going investigation.

37.     As summarized, the State AG Complaint alleges against the named defendant generic drug companies – *included* Lannett – that:

- There was a common understanding among the defendant generic drug companies regarding each company's market share for a specific drug.  State AG Complaint ¶91.

- The overarching agreement among the generic drug companies was widespread across the industry; and, in terms of parties involved, was broader than the defendant drug companies named in the State AG Complaint.  *Id.* at ¶92

- When necessary, this anticompetitive scheme was reinforced through phone calls and text messages between the generic drug companies to discuss each company's fair share and the desire to maintain or raise prices with respect to specific drugs. *Id*. at ¶92.

- There was a shared understanding between the named defendant generic drug companies and their co-conspirators that competitors would be able to reach an agreement regarding market share.  *Id.* at ¶97.

- When the defendant drug companies needed to obtain one or more customers to reach its fair share within the market for a generic drug, a competitor would walk

14

away from a customer by informing that customer of a significant price increase. The company looking to obtain its allocated market share would then submit a supra-competitive bid at an amount slightly less than the original competitor to win that customer's business. *Id*. at ¶99.

- Each member of the alleged pricing cartel agreed not to compete or take advantage of a competitor's price increase by bidding a lower price to take the business. *Id.* at ¶106.

- The defendant drug companies routinely shared information with each other about bids and pricing strategy, the terms of their contracts with customers, pricing terms, price protection, and rebates. *Id*. at ¶108-09.

38.     As the Connecticut Attorney General was investigating Lannett and other generic drug companies, members of Congress were also scrutinizing industry practices.  On October 2, 2014, Senator Bernard Sanders and Representative Elijah E. Cummings sent Lannett  a letter (care of Defendant Bedrosian) regarding an investigation into "the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  In connection with their investigation, Senator Sanders and Representative Cummings requested:

> Documents and information for the time period covering January 1, 2012, to the present regarding:
>
> (1)     total gross revenues from the company's sales of these drugs;
>
> (2)     the dates, quantities, purchasers, and prices paid for all sales of these drugs;
>
> (3)     total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

15

(4)     sales contracts or purchase agreements for active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity, if applicable;

(5)     a description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of these drugs;

(6)     any cost estimates, profit projects, or other analyses relating to the company's current and futures sales of these drugs;

(7)     prices of these drugs in all foreign countries or markets, including price information or the countries paying the highest and lowest prices; and

(8)     the identity of company official(s) responsible for setting the prices of these drugs over the above time period.

39.     The DOJ, through its antitrust division, was also pursuing regulatory investigations of the generic drug industry.  On November 6, 2014, Lannett disclosed in a Form 10-Q filed with the SEC that Lannett's "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act" governing anticompetitive conduct.  Soon after it was revealed that several of Lannett's market competitors also received grand jury subpoenas concerning generic drugs sold by Lannett.

40.     On November 7, 2014, Impax, a competing seller of Digoxin, announced that one of its sales representatives also received a grand jury subpoena from the DOJ related to the sale of Digoxin and other generic drugs.  On December 5, 2014, Par Pharmaceuticals also received a grand jury subpoena with respect to the sale of Digoxin.

41.     On December 8, 2014, Lannett announced that the Company itself "was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act," which requested "corporate documents from

16

the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products."

42.     On November 3, 2016, media outlets reported that DOJ prosecutors would possibly file criminal charges by the end of 2016 against Lannett and several other generic pharmaceutical companies for unlawfully colluding to fix generic drug prices.  *Bloomberg* specifically named Lannett as one of the manufacturers implicated through Digoxin.  In the article titled "U.S. Charges in Generic-Drug Probe to be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said
>
> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic.  Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceuticals Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, ***Lannett Co.***, Impax Laboratories, Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

43.     Despite the passage of time since the filing of the first actions against generic drug companies, which themselves are still on-going, every indication is that the regulatory investigations of the States Attorney Generals and DOJ are still active.  As reported by *The New York Times* on December 15, 2016, Connecticut Attorney General George Jepsen indicated an intention to pursue additional lawsuits, stating, "We believe that this is just the tip of the iceberg

… I stress that our investigation is continuing and it goes way beyond the two drugs in his lawsuit, and it involves many more companies than are in this lawsuit."

44.     The DOJ has also stated that its investigations are ongoing.  In Court filings in active civil actions that comprise the generic drug pricing MDL, the DOJ has emphasized the broad-ranging nature of its ongoing investigation into the "numerous corporations and individuals" implicated, and the "plethora of evidence" amassed against these corporations and individuals. For example, in a filing in the MDL action on February 24, 2017, the DOJ affirmed the ongoing nature of its investigation:

> The Complaints refer to the United States' criminal investigation into the generic pharmaceutical industry as part of the factual basis for their antitrust claims...
>
> The United States unsealed the first criminal information in that investigation on December 14, 2016... the two executives – Jeffrey Glazer and Jason Malek – pled guilty to these charges on January 9, 2017, and both are cooperating with the United States' ongoing criminal investigation.
>
> Although, to date, the United States has filed charges against only Glazer and Malek, as described in this Memorandum and detailed more fully in the Grundvig declaration, the criminal investigation into the generic pharmaceutical industry is ongoing and broad-ranging, and it has already implicated numerous corporations and individuals.  Additional corporations and individuals may be implicated as the investigation continues to develop.

This same view point was expressed by the DOJ filing in the *In re Generic Digoxin and Doxycycline Antitrust Litigation*, which names Lannett as a defendant.  On January 5, 2017, the DOJ filed a motion affirming that the litigation "shared common questions of law and fact with an ***ongoing federal criminal investigation***."

C.      **Specific Evidence Of Price-Fixing And Anticompetitive Conduct With Respect To Lannett And Lannett's Generic Drug Products**

1.      **Doxycycline Monohydrate**

45.      Doxycycline Monohydrate ("Doxy Mono"), known by the brand names of "Acticlate" and "Monodox," is an oral medicine used to treat bacterial infections, and is also a preventative medication designed to protect against malaria.

46.      In 2003, Heritage Pharmaceuticals, a manufacturer of Doxy Mono, learned that demand for Doxy Mono was about to increase significantly due to a materials supply problem among manufacturers of a competing form of doxycycline.  Heritage Pharmaceuticals sought to increase the price of Doxy Mono to maximize the benefit of the expected increase in demand; and, to avoid being undercut on pricing, Heritage Pharmaceuticals sought to coordinate a price increase with Lannett and other competitors in the Doxy Mono market.

47.      The State AG Complaint alleges that Lannett and its three main Doxy Mono competitors, Heritage Pharmaceuticals, Mylan Pharmaceuticals, and Par Pharmaceuticals, colluded to fix the prices of Doxy Mono, employing stratagems that were designed to conceal the nature of their anticompetitive conduct.

48.      As alleged in the State AG Complaint, by no later than March 13, 2013, Lannett became aware that Heritage Pharmaceuticals would increase its Doxy Mono prices, and that Heritage Pharmaceuticals was seeking to coordinate its price increases with Lannett and other market competitors.  On March 25, 2013, Lannett employees had internal communications regarding a Doxy Mono price increase, considering what was learned from Heritage Pharmaceuticals.

49.     On June 12, 2013, Lannett raised the price of Doxy Mono.  As alleged in the State AG Complaint, based on evidence gathered from subpoenaed discovery, Lannett and its competitors began to engage in a pattern of increased communications starting on June 11, 2013 – the day before the price hike – and continuing into the Class Period.  An unidentified employee of Lannett was engaged in frequent communications with an unidentified employee of Par Pharmaceuticals.  In addition, senior management at Heritage Pharmaceuticals directed one of the company's employees to obtain specific Doxy Mono pricing from Lannett.  As alleged, representatives of Lannett, Heritage Pharmaceuticals, Par Pharmaceuticals and Mylan further coordinated Doxy Mono pricing at industry conferences and through a variety of communication platforms.

50.     According to the evidence discovered by the investigation of Connecticut Attorney General and as alleged in the State AG Complaint, on April 22, 2014, the President of Heritage Pharmaceuticals, Jason Malek, commenced a price-fixing scheme with respect to 18 drugs that Heritage Pharmaceuticals targeted for coordinated price increases.  Malek circulated to his employees a list of the targeted drugs along with market competitors and each competitors market share.  Malek then instructed members of the sales team to contact each competitor to seek an agreement on coordinated price increases.  Following that instruction, a member of the Heritage Pharmaceuticals sales team held a 29-minute phone call with an unidentified counterpart at Lannett, resulting in an agreement to raise the price of Doxy Mono.

### 2. Digoxin

51.     Digoxin is used to treat heart failure and chronic atrial fibrillation.  The drug is used primarily by elderly patients for the treatment of rapid rhythm disturbance.  The World Health Organization has classified Digoxin as an essential medicine.  No effective substitute exists for many patients, and none of the comparable molecules or therapeutic equivalents are prescribed in any significant volume.  Millions of people in the U.S. rely on the pill every day. During 2013, the overall market for Digoxin was $198 million.  Sales by Global Pharma, which is the generics division of Impax, and Lannett represented a substantial portion of the generic market.

52.     Prior to the Class Period, in 2004, Lannett entered into a contract with Jerome Stevens Pharmaceuticals ("JSP") to be the distributor of Digoxin produced by JSP (along with two other of JSP products, including Levothyroxine) until March 2014.  On August 19, 2013, Lannett announced that it had extended its contract with JSP to distribute Digoxin and Levothyroxine (as well as another drug, Butalbital) in the United States until March 2024.  The JSP contract accounted for a substantial amount of Lannett's gross profit.  For example, in 2013, just two of JSP's drugs, Levothyroxine and Digoxin, accounted for 46% of Lannett's sales.

53.     Figure 1 below breaks down the total market for Digoxin by percentage of total sales.  Figure 1 clearly illustrates that the total sales of generic Digoxin were concentrated among Lannett, and Global Pharma/Impax during the Class Period with Par Pharmaceutical ("Par") beginning to enter the market later in the Class Period.  Figure 1.1 further breaks down the generic Digoxin market share for the years of 2013 and 2014.

**Figure 1**[4]



Source: Symphony Health Solutions

**Figure 1.1**



_____

[4] The Wholesale Acquisition Cost ("WAC") is the manufacturers reported list price of the drug when sold to the wholesaler.  WAC does not represent actual transaction prices as it does not include prompt pay, rebates or other discounts in price, but it does form the baseline price at which wholesalers purchase drugs.

54.     From October 28, 2013, to October 30, 2013, Impax, Lannett and Par Pharmaceuticals attended the Generic Pharmaceutical Association's ("GPhA") 2013 Fall Technical Conference in Bethesda, Maryland.  GPhA is a trade association for generic drug manufacturers and distributors.

55.     In November 2013, following the GPhA conference, Lannett, Impax and Par Pharmaceuticals, in lock-step, increased Digoxin prices by over 700%.  This increase marked the first significant price increase for this essential drug in more than four years.  Figure 2 below illustrates this price hike.

**Figure 2**



Source: Symphony Health Solutions

56.     Following the coordinated price increases, market sales of Digoxin increased almost three-fold from $198 million in 2013 to $577 million in 2014.  Lannett and the other market competitors maintained the coordinated price increase through at least 2015, during which total sales of Digoxin equaled $505 million.  The sales increase was solely attributable to the November 2013 price hike as the quantity of Digoxin Tablets sold in the market remained relatively stable.

57.     The price moves by Lannett and Impax were correlated with an unusual degree of uniformity, registering at 99% correlation.[5]  At the time of the coordinated price hike, Digoxin had no supply or production issues forced the price increase for competitive business reasons.  For instance, there were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent.

58.     During an earnings call on February 6, 2014, Defendant Bedrosian discussed Digoxin pricing issues.  For example, Oppenheimer analyst Rohit Vanjani asked, "On Digoxin, you said that Par [Pharmaceuticals] is a rational competitor.  Are you seeing anything on the pricing front from them, in terms of discounting?"  To which, Defendant Bedrosian responded, "Well with discounting to our price, no.  We've seen their prices discounted to the brand of course, but we're not troubled by their pricing in the market place."

---

[5] A correlation is a numerical representation of the degree of relationship between two variables. *See* (https://www.socialresearchmethods.net/kb/statcorr.php).  In cartels, or collusive markets, there is often a higher correlation between competitors' prices than in competitive markets. *See Hide and seek: the effective use of cartel screens*, OXERA, http://www.oxera.com/getmedia/210bc5bc-0cc9-40ea-8bc9-6c8b2406b485/Cartel-screens.pdf.aspx?ext=.pdf (last visited May 17, 2017).

59.     Although Digoxin is not currently implicated as a focus of the State AG Complaint, there has been a recent indication that the companies who sell Digoxin – including Lannett – may become the focus of a criminal action brought by the DOJ.  On January 5, 2017, the DOJ Antitrust Division submitted a Motion to Intervene in *In re Generic Drug Digoxin and  Doxycycline Antitrust Litigation*, in which Lannett is currently a named defendant.  In the Motion to Intervene, the DOJ asserts that the Digoxin litigation "shares common questions of law and fact with the ongoing federal criminal investigation."

### 3.     Levothyroxine

60.     Levothyroxine Sodium ("Levothyroxine") replaces a hormone (thyroxine) the body would normally produce in the thyroid gland.  Levothyroxine is the preferred treatment for hypothyroidism, which afflicts approximately 10 million Americans.  Treatment consists of daily consumption of the oral tablet form of Levothyroxine.  Levothyroxine is also used to treat goiters, nodular thyroid disease, thyroid cancer and myxedema coma.  Levothyroxine is on the World Health Organization's core list of essential medicines.  These are medicines that are necessary to meet the minimum needs for a basic health-care system.

61.     The market for Levothyroxine was highly concentrated primarily among five manufacturers, including during the Class Period, Lannett controlling approximately 16% of the market, Abbvie US LLC, which sold a branded version, controlling approximately 37-51% of the market; Mylan controlling approximately 33%; and Sandoz and Pfizer having the remaining market share.  Figure 3, below, shows how the market share of the competitors stabilized once they engaged in price-fixing with respect to Levothyroxine.

**Figure 3**



62.     Figures 4, below, shows the price history of Levothyroxine, and how the coordinated price increases coincide with the stabilized market share.

**Figure 4**



Source: Symphony Health Solutions, Fideres' Calculations

63.     The price movements depicted in Figures 4, effected by the generic drug market participants, Lannett, Mylan and Sandoz, were registered at 99.9% correlation.  At the time of the coordinated price hike, Levothyroxine had no supply or production issues to justify the price increase.  There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patents.

27

### 4.   Acetazolamide

64.    Acetazolamide is a medication used to treat glaucoma, epilepsy, altitude sickness, paralysis and heart failure.  The World Health Organization has classified Acetazolamide as an essential medicine.   Acetazolamide is one of the drugs that is the subject of the State AG Complaint.

65.    The market for the Acetazolamide is divided into a market for tablets and a market for sustained release capsules.[6]  The market for Acetazolamide tablets was approximately $276.9 million during the Class Period; and, the market for the sustained release capsules was worth approximately $201.6 million.

66.    The market for generic Acetazolamide is highly concentrated.  For the majority of the Class Period, the only two producers of Acetazolamide were Lannett and Taro Pharmaceuticals ("Taro").  Figure 5 below illustrates the highly concentrated nature of this market as close to 100% of the total sales were distributed between Lannett and Taro.

---

[6] Throughout this complaint, unless otherwise noted, Acetazolamide only refers to the tablet form.

**Figure 5**



Source: Symphony Health Solutions, Fideres Calculations

67.     Prior to the Class Period, Lannett had roughly 20% of the market share for Acetazolamide.  However, as evidenced by the above Figure 5, from January 2009 through July 2011, Lannett's market share significantly increased, almost doubling within two years.  Figure 6 shows the reason for this rapid increase in market share.  Lannett **_had dropped its price to grab market share_** away from Taro.  In fact, Lannett's prices moved in the complete opposite direction of Taro's price prior to the Class Period with a –99% correlation.[7]  Once the Class Period started Lannett's and Taro's prices for Acetazolamide had a 98% correlation.

---

[7] The main result of a correlation is called a correlation coefficient and it ranges from -100% to 100% (some studies use -1.0 to +1.0).  If the correlation coefficient is closer to 0 then there is no relationship between the variables.  If the correlation coefficient is positive then, for example, as one variable gets larger the other gets larger.  If, however, the correlation coefficient is negative then, for example, as one variable gets larger the other gets smaller.

**Figure 6**



68.     The high market concentration of Acetazolamide enabled Lannett and Taro to immediately benefit from their lock-step price increases.  As evidenced by Figure 7, the price of Acetazolamide jumped nearly 500% immediately following the October 2013 GPhA meeting.

**Figure 7**



*Source: Symphony Health Solutions, Fideres Calculations*

69.     These abnormal price moves by Lannett and Taro were correlated with an unusual degree of uniformity, registering at 98% correlation.  At the time of the price hike, none of the typical reasons for a price increase existed at the time these companies increased the price of Acetazolamide substantially.  Acetazolamide had no supply or production issues to justify the price increase.  There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation and no new patent.

31

### 5.    Ursodiol

70.    Generic Ursodiol, or Ursodeoxycholic Acid, in capsule form ("Ursodiol")[8] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution.  Ursodiol is a widely prescribed drug in the United States, particularly for older Americans.  Ursodiol has been available on the generic market since 2000.  Annual sales of Ursodiol in capsule form for 2015 were $433 million.

71.    The market for Ursodiol is divided between capsule and tablet forms.  The Ursodiol Capsule market is dominated by Lannett, Actavis Generics ("Actavis") and Epic Pharma ("Epic"), as illustrated in Figure 8 below.  Lannett's Ursodiol sales in 2014 were $86.8 million, Actavis's sales of Ursodiol exceeded $155.2 million, and Epic's Ursodiol sales exceeded $60.7 million.

**Figure 8**



---

[8] Ursodiol only refers to the Ursodiol Capsule market.  If references are made to the Ursodiol Tablet market that will be specifically noted.

72.     Prior to the Class Period, competitive market forces had drawn down the price of Ursodiol to approximately $2 per capsule.  Following two generic pharmaceutical manufacturers meetings attended by Actavis, Lannett and Epic, in February and June of 2014, the price of Ursodiol shot up over 200% from $2 a unit to $5-$6 per unit, as depicted in Figure 9.

**Figure 9**



73.     There were no supply shortages of Ursodiol prior to, after or during mid-2014.  The FDA reported no Ursodiol shortages, there were no new patents or formulations, no labelling changes, and once in production, it is not difficult to make.  Moreover, Lannett never provided a meaningful explanation for the coordinated price increases.  There were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway.  Thus, none

of the typical reasons for a price increase existed at the time these companies increased the price of Ursodiol substantially.

        **D.**      **Lannett's Financial Results Were Dependent On The Increased Prices Of A Few Key Drug Products**

      74.    During the Class Period, Lannett's financial condition and results were dependent on revenues from a few key products.  Further, Lannett relied on high profit margins and increased revenues that resulted from significant price increases with respect to these key products to service increased debt loads and to meet revenue estimates.  These drugs included those that have become the subject of regulatory scrutiny and legal actions alleging price-fixing and anticompetitive conduct (the "Price Fixed Drugs").

      75.    As explained in article on *SeekingAlpha* (January 18, 2017),[9] even if modest price cuts were imposed on Lannett's main drugs, the Company would be at risk to violate certain debt covenants that would substantially impact its financial condition.

      76.    The extent of Lannett's reliance on a small group of drugs is demonstrated in Figures 10-13.  These figures display the product mix as a percentage of Lannett's total sales, as listed in various Lannett Form 10-Ks filed with the SEC.  These charts demonstrate that the Price Fixed Drugs (Doxy Mono, an "Antibiotic;" Levothyroxine, for treatment of "Thyroid Deficiancy;" Digoxin, for treatment of "Cardiovascular;" Acetazolamide, for treatment of "Glaucoma;" and Ursodiol, for treatment of "Gallstone.") made up a substantial portion of Lannett's total product mix from 2013 to 2016.

---

[9] *SeekingAlpha* is a crowd-sourced content service for financial markets.  Article and research covers a broad range of stocks, asset classes, ETFS and investment strategies.

**Figure 10**



**Figure 11**



**Figure 12**



**Figure 13**



77.     Lannett provided a chart in its Form 10-K which showed the medical indication of the drugs and the name of Lannett's affiliated product.[10]  This chart has been reproduced from Lannett's 2016 Form 10-K as Figure 14 below.

### Figure 14

| Name of Product(1) | | Medical Indication |
|---|---|---|
| 1 | Acetazolamide Tablets | Glaucoma |
| 2 | Butalbital, Acetaminophen and Caffeine Tablets | Migraine |
| 3 | Butalbital, Aspirin and Caffeine Capsules | Migraine |
| 4 | C-Topical ® Solution | Anesthetic |
| 5 | Digoxin Tablets* | Congestive Heart Failure |
| 6 | Glycolax Rx | Gastrointestinal |
| 7 | Isosorbide Mononitrate CR | Cardiovascular |
| 8 | Levothyroxine Sodium Tablets* | Thyroid Deficiency |
| 9 | Methylphenidate HCL CD | Central Nervous System |
| 10 | Methylphenidate ER | Central Nervous System |
| 11 | Nifedipine CR | Cardiovascular |
| 12 | Omeprazole DR | Gastrointestinal |
| 13 | Oxbutynin ER | Urinary |
| 14 | Pantoprazole DR | Gastrointestinal |
| 15 | Pilocarpine HCl Tablets | Dryness of the Mouth |
| 16 | Triamterene w/Hydrochlorothiazide Capsules | Hypertension |
| 17 | Ursodiol Capsules | Gallstone |

78.     As Figures 10-13 illustrate, Lannett was highly dependent on a very small group of drugs to generate a disproportionate amount of its annual sales.  In fact, the Price Fixed Drugs made up approximately *56% to 72% of Lannett's total annual sales from 2013 to 2016*.  Thus, a substantial amount of Lannett's sales were dependent on maintaining high prices among the Price Fixed Drugs.

---

[10] The chart also includes the equivalent brand name of the drug but that row has been intentionally left out.

79.     Lannett's reliance on the Price Fixed Drugs to generate a substantial amount of its

profit was noted by *Forbes*.  On October 6, 2016, *Forbes* published an article titled "Another Drug

Company That Raises Prices Like Crazy." In that article, Lannett's pricing strategy was noted:

> Lannett's aggressive pricing strategy first centered largely around three
> popular drugs covered by Medicare—digoxin, ursodiol, and levothyroxine.
> At one of four offered dosages***, the average manufacturer price for
> Lannett's digoxin, a lifesaving treatment used for congestive heart
> failure, rose by 857%*** to 50 cents per pill from April 2013 to April 2015,
> according to Lannett's AMP pricing list. By September 2014, Lannett had
> received a subpoena from Connecticut's attorney general about the
> company's pricing practices for digoxin. The company maintains that it
> acted in compliance with all applicable laws and is cooperating with the
> investigation. ***Starting around April 2013, Lannett increased the price of
> levothyroxine, a widely used thyroid medicine, by 158%*** in two years to 14
> cents per pill. Between December 2013 and October 2014, ***Lannett boosted
> the price of a generic drug for gallstones, ursodiol, by 700% to $286 per
> prescription,*** IMS Health data shows. Ursodiol recently cost $2.29 per pill.
>
> Product price increases contributed $157.3 million of revenue in Lannett's
> fiscal 2015, an SEC filing says***. Levothyroxine and ursodiol accounted for
> half of Lannett's revenue in its fiscal 2015, according to research from
> Deutsche Bank.***

80.     The Levothyroxine price increases added approximately $78 million to Lannett's

revenue and its Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") during

the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

81.     Prior to the Class Period, Lannett experienced substantial growth and increased

sales revenues due in part to significant price increases with respect to a number of key generic

drug products and stabilized market share.   Throughout the Class Period, Defendants

misrepresented to Class members that Lannett's growth was the result of competitive market forces

that afforded an opportunity for Lannett's aggressive pricing campaign.   In truth, Lannett's

aggressive pricing strategy and increased sales revenues were born from extensive price-fixing

schemes and anticompetitive conduct throughout that generic drug industry that directly implicated Lannett's competitors in markets for key Lannett products.  As regulatory scrutiny into price-fixing and anticompetitive conduct increased, Defendants issued a series of misleading statements and omissions of material fact that misled Plaintiffs and Class members regarding the risk that Lannett would be implicated in price-fixing and anticompetitive conduct; and, the effects that the regulatory investigations into price-fixing and anticompetitive conduct might have on Lannett's business operations and prospects.

     **A.**     **July 15 & 16, 2014**

82.     On July 8, 2014, *The New York Times* published an article, titled "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," scrutinizing Lannett's significant price increases with respect to its cardiovascular drug Digoxin.  The article noted that Lannett and its leading market competitor Global Pharma (the generics division of Impax) had correlated price increases for Digoxin throughout 2013, despite the absence of competitive market conditions that would lead to, or justify, the price increases.  As a result of the price increases, Lannett's total sales revenues increased 84% year on year in 2014, according to Defendant Bedrosian, as reported in the article.

83.     On July 15, 2014, Oppenheimer analyst Rohit Vanjani issued a report on Lannett that addressed the topics raised in the July 8, 2014 *The New York Times* article.  In the July 15, 2014 report, Mr. Vanjani published statements made by Defendants Bedrosian and Galvan on behalf of Lannett, stating, "Lannett's view is that the company has a window of opportunity on price increases until 2016, when the generics wave begins to recede.  Management is even eyeing additional price increases later this year, although the company would not specify on which

franchises.  With respect to digoxin specifically, management still believes that it is at the low end of market pricing compared to competitors…."

84.     On July 16, 2014, Lannett revealed through a Form 8-K and press release filed with the SEC that it received a subpoena and interrogatories from the Connecticut Attorney General regarding Lannett's pricing of Digoxin.  As stated in the July 16, 2014 Form 8-K, the subpoena was part of the Connecticut Attorney General's investigation of "whether anyone engaged in activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."  Further, the July 16, 2014 Form 8-K filed with the SEC by Lannett and signed by Defendant Bedrosian, stated, "The Company maintains that it acted in compliance with all applicable laws and regulations and intends to cooperate with the Connecticut Attorney General's investigation."

85.     These statements, issued by Lannett through its CEO Defendant Bedrosian and CFO Defendant Galvan (with respect to the July 15, 2014 statements) and CEO Defendant Bedrosian (with respect to the July 16, 2014 statements) were misleading with respect to Lannett's pricing strategy of generic drugs, including with respect to Digoxin, and the risk that Lannett would be implicated or impacted by a regulatory investigation or action alleging unlawful anticompetitive conduct.  In addition, Defendant Bedrosian and Defendant Galvan misled investors, including Plaintiffs and other Class members, with respect to their knowledge and understanding of Lannett's pricing of Digoxin, and the extent to which they investigated whether Lannett engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate Lannett in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.

40

86.     Following Defendants' misleading statements on July 15, 2014, (as reported by Oppenheimer analyst Mr. Vanjani), the price per share of Lannett dropped only slightly from its previous of close of $47.70 on July 14, 2014 to a close price per share of $47.09 on July 15, 2014, on modest trading volume.  On the same day that Lannett issued the July 16, 2014 Form 8-K with the SEC (as signed by Defendant Bedrosian) revealing the investigation into the Company's pricing of Digoxin, however, the price per share of Lannett stock fell from its previous close of $47.09 on July 15, 2014, to close at $39.04 on July 16, 2014, on heavy trading volume.  The price per share of Lannett stock continued to fall the next day, closing at $36.96 on July 17, 2014.  The price per share of Lannett stock would have fallen more on July 16, 2014 and July 17, 2014, but for the misleading statements and assurances issued on July 15, 2014, and July 16, 2014.

**B.     August 27, 2014 Earnings Call**

87.     On August 27, 2014, Lannett held an earnings call regarding the Company's fourth quarter and full year financial results for the fiscal year 2014, during which Defendants Bedrosian and Galvan spoke and responded to analyst questions.  During the call, Defendant Bedrosian stated: "As we previously announced, the Attorney General's office of the state of Connecticut has initiated an investigation into pricing of Digoxin.  We firmly believe we have acted in full compliance with all applicable laws and regulations.  We are cooperating with the Attorney General's office.  I can assure you that our product pricing decisions are made independently by the Company, period."

88.     Later during the August 27, 2014 earnings call, analyst John Newman at Canaccord Genuity asked Defendant Bedrosian, "in terms of some of the noise regarding the investigation by the Connecticut AG, will that have any effect whatsoever on your attitude and stance on continuing

to raise price, when possible, going forward on your products?"  In response, Defendant Bedrosian

stated:

> None whatsoever.  Matter of fact, I think price increases are opportunistic
> things.  You don't know when you're going to have the opportunity and
> when you do, you take advantage of it.  We know we've done nothing
> wrong, so we're going to continue to operate our business regardless of any
> investigation.  And we certainly welcome it, so that it could be closed and
> everybody could be assured that nothing untoward occurred here.  But it's
> not going to drive our business decisions at all.

89.     Defendant Bedrosian's statements were misleading with respect to Lannett's

pricing strategy of generic drugs, including with respect to Digoxin, and the  risk that Lannett

would implicated or impacted by a regulatory investigation or legal action alleging unlawful

anticompetitive conduct.  In addition, Defendant Bedrosian misled investors, including Plaintiffs

and other Class members, with respect to his knowledge and understanding of Lannett's pricing

of Digoxin, and the extent to which Lannett investigated whether the Company engaged in, or was

aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory

action or have a negative impact on Lannett's business operations and financial results or

prospects.  Furthermore, Defendant Bedrosian lacked any rational basis to declare, or were aware

of facts contradicting the statement that, "We know we've done nothing wrong," as an internal

investigation being conducted by outside-counsel for the Company was on-going and had yet to

be concluded at that time of the statement.

90.     On August 27, 2014, the price per share of Lannett stock closed at $39.32.  The

next day, on August 28, 2014, the price per share of Lannett stock fell only slightly to close at

$38.81.  The price per share of Lannett stock would have fallen significantly more had Defendants

disclosed the truth about the anticompetitive market for generic pharmaceuticals and its risk of

being implemented or impacted by on-going regulatory investigations.

### C.    Fiscal Year 2014 Form 10-K filed August 29, 2014

91.    On August 29, 2014, Lannett filed a Form 10-K with the SEC for the fiscal year of 2014 ("2014 10-K"), which was signed and certified by Defendants Bedrosian and Galvan.  In that 10-K the Defendants stated in part:

**Competition**

\*        \*        \*

The generic pharmaceutical industry is highly competitive**.**

We face strong competition in our generic product business.  Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

\*        \*        \*

The Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods.  Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods.  Changes in future product sales mix may also occur.

43

92.     The Form 10-K also stated:

> The Company believes that under the current regulatory environment, the generic pharmaceutical industry as a whole will be the target of increased governmental scrutiny, especially with respect to state and federal anti-trust and price fixing claims.  In July 2014, the Company and at least one of its competitors each received a subpoena and interrogatories from the Connecticut Attorney General's Office concerning its investigation into the pricing of digoxin.  **The Company maintains that it has acted in accordance with all applicable rules and regulations with respect to the pricing of all of its products, including digoxin.**

93.     These statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory investigation or legal action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Furthermore, Defendants lacked any rational basis to declare, or were aware of facts contradicting, that the Company "acted in accordance with all applicable rules and regulations with respect to the pricing of all of its products, including digoxin," as an internal investigation being conducted by outside-counsel for the Company was on-going and had yet to be concluded at the time of the statement.  In addition, the Company's internal investigation focused only on Digoxin at that time.  Later, Lannett would become a named defendant in the State AG Complaint with respect to two drugs, and implicated in anticompetitive conduct with respect to three other drugs.

94.     Defendants' statements regarding "Competition," and specifically that the generic pharmaceutical market is "highly competitive" and that Lannett faced "strong competition" were misleading because at the time of the statements, there was collusion and anticompetitive conduct

in the generic pharmaceutical market.  Furthermore, Defendants' statement concerning market share, and specifically that market share is related to the number of competitors in the market, was misleading because, at the time, market share was being impacted by anticompetitive conduct in the generic pharmaceutical market.

95.  On August 29, 2014, the price per share of Lannett stock closed at $39.38, after closing at $38.81 the previous day.  The next trading day, September 2, 2014, the price per share of Lannett stock closed at $38.98.  The price per share of Lannett stock would have fallen following the August 29, 2014 statements had Defendants disclosed the truth about the anticompetitive market for generic pharmaceuticals and its risk of being implicated in, or impacted by, the ongoing regulatory actions.

**D.  September 16, 2014 Press Release**

96.  On September 16, 2014, Lannett announced in a press release that "upon receipt of the subpoena from the State of Connecticut Office of the Attorney General it voluntarily engaged outside counsel and other experts to conduct an internal review focusing on the company's pricing practices for digoxin.  The review has been completed and the company concluded that it has acted in compliance with applicable laws and regulations with regard to the pricing of digoxin."  In the press release, Defendant Bedrosian was quoted as follows: "We have and will continue to fully cooperate with the Connecticut Attorney General's ongoing investigation.  Furthermore, we acted quickly to conduct an exhaustive review of our pricing practices . . . Results of the review, which included the examination of well over 700,000 documents, confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of digoxin. We took the inquiry from the Connecticut Attorney General very seriously and conducted the

review, in part, to demonstrate to our stockholders and employees that we have acted in compliance with all applicable rules and regulations regarding the pricing of digoxin."

97.     Defendants' statements regarding the results of its internal investigation were misleading because they mispresented the risk that Lannett faced of being implicated in the investigation and legal action being conducted by the Connecticut Attorney General.  In fact, after complying with the Connecticut Attorney General's subpoena for information and documents, Lannett was named as a defendant in the State AG Complaint, with respect to Doxy Mono *and* Acetazolamide.  Furthermore, Defendants' statements were misleading, even to the extent that Lannett did not engage in anticompetitive conduct, because at the time Lannett knew, or was reckless not knowing, that the its market competitors were engaged in anticompetitive conduct that impacted the Company's business results and financial prospects.

98.     On September 16, 2014, the price per share of Lannett stock closed as at $40.64, after the closing the previous day at $38.94.  The next day, September 17, 2014, the price per share of Lannett stock closed at $40.66.  The price per share of Lannett stock would have fallen significantly had Defendants disclosed the truth about the anticompetitive market for generic pharmaceuticals and Lannett's risk of being implicated in, or impacted by, the ongoing regulatory actions.

### E.     Form 10-Q filed November 6, 2014

99.     On November 6, 2014, Lannett filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2014, which was certified and signed by Defendants Bedrosian and Galvan.  Lannett stated with respect to the investigation by the Connecticut Attorney General:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.  According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.  *The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.*

100.     Lannett also announced that involvement in the DOJ investigation:

> On November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period. *The Company maintains that it has acted in compliance with all applicable laws and regulations and intends to cooperate with the federal investigation.*

101.     Although these statements exposed that Lannett faced an increased risk of being implicated in, or impacted by, regulatory investigations and legal actions alleging anticompetitive conduct, these statements continued to mislead Plaintiffs and other Class members with respect to Lannett's pricing strategy of generic drugs, and the Company's true risk of being implicated in, or impacted by, a regulatory investigation of unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any

47

unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.  In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

102.    As a result of this partial disclosure of the risk that Lannett would be implicated in, or impacted by, regulatory investigations and potential legal actions, the price per share of Lannett stock closed at $50.99, down from its previous close of $53.15 on November 5, 2014, on extremely high volume.  However, the price per share of Lannett Stock would have fallen significantly more had Defendants disclosed the truth about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

F.      **December 8, 2014 Form 8-K**

103.    On December 8, 2014, Lannett announced in a Form 8-K signed by Defendant

Bedrosian that:

> On December 5, 2014, the Company was served with a grand jury subpoena
> related to the continuing federal investigation of the generic pharmaceutical
> industry into possible violations of the Sherman Act.   The subpoena
> requests corporate documents from the Company relating to corporate,
> financial, and employee information, communications or correspondence
> with competitors regarding the sale of generic prescription medications, and
> the marketing, sale, or pricing of certain products.
>
> The Company's Senior Vice President of Sales and Marketing was
> previously served with a grand jury subpoena related to a federal
> investigation of the generic pharmaceutical industry into possible violations
> of the Sherman Act as disclosed in its Form 10-Q filed on November 6,
> 2014.    The subpoena requested corporate documents similar to the
> information described above.
>
> **The Company maintains that it has acted in compliance with all
> applicable laws and regulations and intends to cooperate with the federal
> investigation.**

104.    Although these statements exposed that Lannett faced an increased risk of being

implicated in, or impacted by, regulatory investigations and legal actions alleging anticompetitive

conduct, these statements continued to mislead Plaintiffs and other Class members with respect to

the Company's risk of being implicated in, and impacted by, a regulatory action alleging unlawful

anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and

other putative Class members, with respect to the extent to which Lannett investigated whether the

Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate

the Company in a regulatory action or have a negative impact on Lannett's business operations

and financial results or prospects.  Later, senior executives at Heritage Pharmaceuticals, a market

competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale

of generic pharmaceuticals.  Although the guilty pleas did not pertain specifically to generic drugs

49

sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett..

105.    Following this partial disclosure of the risk that Lannett would be implicated in, or impacted by, regulatory investigations and potential legal actions, the price per share of Lannett stock closed at $43.21 on December 9, 2014, down from its previous close of $48.00, on high trading volume.  The price per share of Lannett stock would have fallen significantly more if the truth had been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

### G.    December 10, 2014 – Oppenheimer Healthcare Conference

106.    On December 10, 2014, Defendants Bedrosian and Galvan participated in a presentation at the Oppenheimer Healthcare Conference during which they answered analyst questions.  In response to a question regarding the DOJ subpoena to the Company, Defendant Bedrosian stated:

> So, we could reassure you, this Company has done nothing wrong, and the employees of the Company have done nothing wrong.  And that's why I attend these meetings, so you can see me face-to-face and ask me these questions. I'm proud that we are making money. I'm proud that we're taking advantage of the choices we made when we selected products, and I'm not ashamed to be a profitable company.  But let's understand, that money is not just going into mahogany walls.  We operate in very conservative surroundings, warehouse buildings and sheet rock walls for our offices.  It's going into growing the business, funding the additional buildings, funding the ANDAs that we have to file, keeping compliant with the FDA's requirements.  That's where the money is going to go.  And if you don't have the money when the government wants you to spend it, they'll just make you close your operations down.  So we're really doing this to continue to safeguard Lannett's future.

107.     When asked by analyst Rohit Vanjani from Oppenheimer whether "this is the same information that was asked for by the Connecticut Attorney General is now the DOJ is asking for," Defendant Bedrosian inadvertently identified Kevin Smith, Lannett's Senior Vice President of Sales and Marketing, as the recipient of the first DOJ subpoena and denied any wrongdoing, as follows:

> It's essentially the same information.  Remember, Connecticut was focusing on two products, one we made and one we didn't make.  So we didn't supply them any information when we pointed out we don't make the drug you're asking about.  And in this particular case, that's somewhat similar.  So, yes, it's essentially the same document because I believe Kevin [Smith] will -- excuse me, I shouldn't have mentioned his name -- but my colleague would have told him, I don't have these documents, or if you want these, you have to get them from the Company.  I can't provide them to you.  He could only provide his own personal documents.  So that's really what it is.  So it's the same investigation.  ***And as I've said before, it's not going to go anywhere because the Company hasn't done anything wrong, and we're comfortable with the position we have taken with our price increases and how we've made those decisions.***

108.     When Mr. Vanjani asked if "these subpoenas at all affected your ability to take price [increases]," Defendant Bedrosian stated: "No, we continue to raise.  We just raised prices a couple of weeks ago.  I'm not going to hide in the closet or stop behaving the way we are because we're not doing anything wrong.  So, if I can raise a price or I see an opportunity to increase prices, I'm going to continue to do that."

109.     These statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.   In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on

Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.  In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

110.    Following these misleading statements, the price per share of Lannett stock closed at $44.04 on December 11, 2014, up from its previous close of $41.92 on December 10, 2014.

### H.    Form 10-Q filed February 6, 2015 and Form 10-Q filed May 8, 2015

111.    On February 6, 2015, Lannett filed with the SEC its Form 10-Q for the quarterly period ended December 31, 2014, which was certified and signed by Defendants Bedrosian and Galvan.

112.    Lannett stated with respect to the investigation by the Connecticut Attorney General:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.  According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.  ***The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.***

113.    Lannett stated with respect to the investigation by the DOJ:

On November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.  ***The Company maintains that it has acted in compliance with all applicable laws and regulations and intends to cooperate with the federal investigation.***

On December 5, 2014, the Company was served with a grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products. ***The Company maintains that it has acted in compliance with all applicable laws and regulations and intends to cooperate with the federal investigation.***

114.    These same statements were repeated in the Form 10-Q for the quarterly period ended March 31, 2015, filed with the SEC on May 8, 2015, and certified and signed by Defendants Bedrosian and Galvan.

115.    These statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47

states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.  In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

116.   Following the filing of Lannett's February 6, 2015 10-Q, the price per share of Lannett stock closed at $55.09 on February 9, 2015, up from its previous close of $51.80 on February 6, 2015.  The price per share of Lannett Stock would not have increased to that extent had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

117.   Following the filing of Lannett's May 8, 2015 10-Q, the price per share of Lannett stock closed at $54.85 on May 11, 2015, having closed at $54.55 on May 8, 2015.  The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

### I.     2015 Form 10-K filed August 27, 2015

118.    On August 27, 2015, Lannett filed a Form 10-K with the SEC for the fiscal year of

2015 ("2015 10-K"), signed and certified by Defendants Bedrosian and Galvan.  In that 2015 10-

K the Defendants stated in part:

> **Competition**
>
> *          *          *
>
> The generic pharmaceutical industry is highly competitive.
>
> We face strong competition in our generic product
> business.  Revenues and gross profit derived from the sales of
> generic pharmaceutical products tend to follow a pattern based on
> certain regulatory and competitive factors.  As patents for brand
> name products and related exclusivity periods expire or fall under
> patent challenges, the first generic manufacturer to receive
> regulatory approval for generic equivalents of such products is
> generally able to achieve significant market penetration.  As
> competing off-patent manufacturers receive regulatory approvals on
> similar products or as brand manufacturers launch generic versions
> of such products (for which no separate regulatory approval is
> required), market share, revenues and gross profit typically decline,
> in some cases dramatically.  Accordingly, the level of market share,
> revenue and gross profit attributable to a particular generic product
> is normally related to the number of competitors in that product's
> market and the timing of that product's regulatory approval and
> launch, in relation to competing approvals and
> launches.  Consequently, we must continue to develop and introduce
> new products in a timely and cost-effective manner to maintain our
> revenues and gross margins.

119.    Defendants' statements regarding "Competition," and specifically that the generic

pharmaceutical market is "highly competitive" and that Lannett faced "strong competition" were

misleading because at the time of the statements, there was collusion and anticompetitive conduct

in the generic pharmaceutical market.  Furthermore, Defendants' statement concerning market

share, and specifically that market share is related to the number of competitors in the market, was

55

misleading because, at the time, market share was being impacted by anticompetitive conduct in

the generic pharmaceutical market.

120.   The 10-K stated also stated:

> The Company believes that under the current regulatory environment, the
> generic pharmaceutical industry as a whole will be the target of increased
> governmental scrutiny, especially with respect to state and federal anti-trust
> and price fixing claims.

> In July 2014, the Company and at least one of its competitors each received
> a subpoena and interrogatories from the Connecticut Attorney General's
> Office concerning its investigation into the pricing of Digoxin.   The
> Company maintains that it acted in compliance with all applicable laws and
> regulations and continues to cooperate with the Connecticut Attorney
> General's investigation.

> In fiscal year 2015, the Company and certain affiliated individuals each
> were served with a grand jury subpoena relating to a federal investigation
> of the generic pharmaceutical industry into possible violations of the
> Sherman Act.  The subpoenas request corporate documents of the Company
> relating to corporate, financial, and employee information, communications
> or correspondence with competitors regarding the sale of generic
> prescription medications, and the marketing, sale, or pricing of certain
> products, generally for the period of 2005 through the dates of the
> subpoenas.   Based on reviews performed to date by outside counsel, the
> Company currently believes that it has acted in compliance with all
> applicable laws and regulations and continues to cooperate with the federal
> investigation.

121.   Defendants' statements were misleading with respect to Lannett's pricing strategy

of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory

action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors,

including Plaintiffs and other putative Class members, with respect to the extent to which Lannett

investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive

conduct that might implicate the Company in a regulatory action or have a negative impact on

Lannett's business operations and financial results or prospects.  Later, Lannett became a named

defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47

states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.   In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.   Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

122.    Following Lannett's filing of its 2015 10-K, the price per share of Lannett stock closed at $49.87 on August 28, 2015, after its previous close of $50.04.   The price per share of Lannett Stock would have significantly declined had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

**J.      Form 10-Qs filed November 5, 2015, February 9, 2016, and May 10, 2016**

123.    On November 5, 2015, Lannett filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2015, which was certified and signed by Defendants Bedrosian and Galvan.  Lannett repeated statements concerning the Connecticut Attorney General investigation:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.   According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.   The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.

124.    Lannett modified and updated their statement concerning the DOJ investigation
"[b]ased on the reviews performed to date by outside counsel" as follows:

> In fiscal year 2015, the Company and certain affiliated individuals each
> were served with a grand jury subpoena relating to a federal investigation
> of the generic pharmaceutical industry into possible violations of the
> Sherman Act.  The subpoenas request corporate documents of the Company
> relating to corporate, financial, and employee information, communications
> or correspondence with competitors regarding the sale of generic
> prescription medications, and the marketing, sale, or pricing of certain
> products, generally for the period of 2005 through the dates of the
> subpoenas.
>
> ***Based on reviews performed to date by outside counsel, the Company
> currently believes that it has acted in compliance with all applicable laws
> and regulations and continues to cooperate with the federal investigation.***

125.    These same statements were repeated in the Company's Form 10-Qs filed with the

SEC on February 9, 2016, and May 10, 2016, which were signed and certified by Defendants

Bedrosian and Galvan.

126.    Defendants' statements were misleading with respect to Lannett's pricing strategy

of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory

action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors,

including Plaintiffs and other putative Class members, with respect to the extent to which Lannett

investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive

conduct that might implicate the Company in a regulatory action or have a negative impact on

Lannett's business operations and financial results or prospects.  Later, Lannett became a named

defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47

states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with

respect to two of its generic drug products.  In addition, senior executives at Heritage

Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive

conduct with respect to the sale of generic pharmaceuticals. Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

127.     Following Lannett's filing of its 10-Q on November 5, 2015, the price per share of Lannett stock closed at $37.77 on November 6, 2015, down slightly from its previous close of $38.62. The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

128.     Following Lannett's filing of its 10-Q on February 9, 2016, the price share for Lannett stock closed at $24.45 on February 10, 2016, after its previous close of $24.46. The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

129.     Following Lannett's filing of its 10-Q on May 10, 2016, the price share for Lannett stock closed at $18.65 on May 11, 2016, down slightly from its previous close of $19.18. The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

**K.      2016 Form 10-K**

130.    On August 29, 2016, Lannett filed its Form 10-K with the SEC for the fiscal year of 2016 ("2016 10-K"), which was signed and certified by Defendants Bedrosian and Galvan.  In that 10-K the Defendants stated in part:

**Competition**

*        *        *

The generic pharmaceutical industry is highly competitive.

We face strong competition in our generic product business.  Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically.  Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches.  Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins.

131.    Defendants' statements regarding "Competition," and specifically that the generic pharmaceutical market is "highly competitive" and that Lannett faced "strong competition" were misleading because at the time of the statements, there was collusion and anticompetitive conduct in the generic pharmaceutical market.  Furthermore, Defendants' statement concerning market share, and specifically that market share is related to the number of competitors in the market, was misleading because, at the time, market share was being impacted by anticompetitive conduct in the generic pharmaceutical market.

60

132.    In the Form 10-K, Lannett stated:

The Company believes that under the current regulatory environment, the generic pharmaceutical industry as a whole will be the target of increased governmental scrutiny, especially with respect to state and federal anti-trust and price fixing claims.

In July 2014, the Company and at least one of its competitors each received a subpoena and interrogatories from the Connecticut Attorney General's Office concerning its investigation into the pricing of Digoxin.  In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company.  The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.

In Fiscal 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.  Based on reviews performed to date by outside counsel, the Company currently believes that it has acted in compliance with all applicable laws and regulations and continues to cooperate with the federal investigation.

133.    Defendants' statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with

respect to two of its generic drug products.   In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.   Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

### L.    November 3, 2016 Earnings Call

134.    On November 3, 2016, Lannett hosted an earnings call with analysts and investors during which Defendants Bedrosian and Galvan spoke and answered analyst questions.

135.    During the call, analyst Gregg Gilbert from Deutsche Bank brought up the "probe into potentially collusive behavior" and asked for "some detail as to what you [Bedrosian] and the Board did to look into this matter," to which Defendant Bedrosian stated:

> Actually, the Board of Directors was very proactive in making sure that outside counsel was brought in to thoroughly investigate the matter.  And a number of people involved in sales -- because obviously this was a sales issue, including myself -- of course, I'm not in sales. But we were subjected to a thorough investigation, which included our computers, our laptops, et cetera, being copied by outside counsel.  And they reviewed all that data against all the information they had, starting with the department -- excuse me, the Attorney General of Connecticut, who first raised these questions in a subpoena.  And they have been only questions, I might point out.
>
> After a number of months of investigating and talking to all the individuals involved -- all of us were interviewed; all the sales people that are currently on board, sales people that have left us in the past, were interviewed. They left no stone unturned.  The report to the Board of Directors was that they found absolutely no wrongdoing on the part of anybody in Lannett. They searched, interviewed -- they searched and interviewed, and went further than just the laptops.  They actually went ahead and looked at people's cell phones, texting. There's a lot of new ways to communicate these days.  So their investigation was rather thorough.  And they were convinced that there

was no wrongdoing on the part of any of my employees here at the Company.

So we're taking the same position we've taken when that was first revealed to the Board of Directors, and telling the public that we continue to cooperate and have cooperated with the Department of Justice. And there has been no change with regards to any information that's come to our attention since this matter was investigated by outside counsel.

As more companies were involved, as you now from the article, our outside counsel went ahead and re-examined all the data from everybody's laptops, all their communications, to make sure there was no communications with any of the new potential invitees, let's say. I don't know what you would call them, but the other companies that were suddenly involved and getting subpoenas -- caused our outside counsel to re-examine everything again to make sure there was no communications between staff here at Lannett and any of those companies and any of their employees.  So I'd say we did a thorough investigation. It didn't just stop in the summer almost 2 years ago at this point; it continued as more companies were subpoenaed for documents, et cetera.

136.    These statements revealed to investors that Defendants had previously misrepresented the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Specifically, Defendants created the false impression that the Lannett, as directed by Defendant Bedrosian and the Board of Directors, had conducted a complete and thorough investigation as to whether Lannett engaged in anticompetitive conduct, and the risk that Lannett would be implicated in an action alleging anticompetitive conduct.  In addition, Defendants had misrepresented the possibility that Lannett was aware that its market competitors were engaged in anticompetitive conduct that had an impact on Lannett's ability to sustain elevated prices for its generic pharmaceutical products.  In truth, Defendants lacked a reasonable basis make those representations, or were aware of facts that contradicted these statements.  These statements reveal

that the time of Defendants' misleading statement, the internal investigation was no completed, and had a limited focus.

137.    Despite the partial disclosure of the truth, Defendants' statements were misleading as to the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.  In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

138.    On November 3, 2016, the price per share of Lannett stock closed at $17.25, down from its previous close of $23.50.

**M.    December 14, 2016 – BMO Capital Markets Prescriptions For Success Healthcare Conference**

139.    On December 14, 2016, Defendant Bedrosian presented at the BMO Capital Markets Prescriptions for Success Healthcare Conference.  During the presentation, analyst Gary Nachman at BMO Capital Markets asked Defendant Bedrosian "what has your strategy been around taking price increases, and any comment on the DOJ investigation looking at potential price collusion…?"  Defendant Bedrosian stated:

Okay, I will be fast. I will speak in New York-ese, right. First of all, the pricing. I'm not ashamed of the pricing. First of all, we haven't done anything a la Turing Pharmaceuticals, but we raised prices because nobody bothers to ask me about all the prices we drop. And on a day-to-day basis, we do face competition and we do lower prices. And when I am able to raise a price, I raise the price to offset the ones we lower.

I was expecting a lot of kickback on price increases. I actually predicted that the price increase phenomenon -- I called it an aberration -- would end by December of 2016. Give me a few months, I was off, you might say, but I did expect it to end. But there was nothing wrong that was done because the price was raised. I also documented -- 2 inches worth of documents, by the way -- of all the FDA guidance, every FDA requirement, every GMP change that we had to meet that raised my costs. If I don't raise prices, I will go out of business.

So sometimes we raise prices and people want to just look at that product, that price increase, and ignore the other products it has to carry. And it's the same with big pharma. Every product it brings to market doesn't talk about the ones that were left behind that didn't make it to the marketplace.

It's the same in our world. We lose money on some products; we don't make a lot of money on others, and others we make a lot of money on. But collectively, that's my revenue from all of them. So we will raise prices whenever we see the opportunity because if you are not doing anything wrong, you shouldn't be worrying about raising a price.

And as all of you in this room probably do know, we did raise some prices in May and June, and it wasn't because I want to thumb my nose at society. But I can document why I raise them. I can also show you examples where we lower the prices. And just ask you, what am I supposed to do, just lower them and never raise the price and then eventually not have any revenue?

We are running a business and a business needs to be profitable to survive, and we provide low-cost generic drugs in the marketplace ultimately. Out of 106 products, only 6 products had what anybody in this room might say was a higher price than normal, an exorbitant price increase you might say; a la not like the others that are in the news, but something that you might think is indefensible. 6 out of 104 products on the market. I'm not going to apologize for that. I think it's a balanced approach to our business.

140.  Defendant Bedrosian was then asked by Mr. Nachman "And you are comfortable in terms of the investigation into the price collusion."

141.    Defendant Bedrosian stated:

Yes. Any of you lawyers in the room know, lawyers tell you don't talk about it. But when you don't do something wrong, it's hard to not say, look, we were investigated; I get that. I understand that people have suspicions, but it's been two-and-a-half years. Nothing has been brought to our attention to indicate that there is any wrongdoing on Lannett's behalf.  Two and half years, I point out.  You still see the articles. My stock still gets impacted. My shareholders get hurt by the news, even though there has been no accusations leveled against this Company. We raised the price on digoxin, which precipitated this investigation when we received the subpoena from Connecticut Attorney General.  And quite frankly, the other product that they asked us about we didn't even make, the doxycycline product they were talking about. So, the digoxin, we want from $0.06 per tablet per day, which is a one-tablet day dose, to $0.60. And when you look at where the other price increases come [about], no one is looking at the PBMs; no one is looking at the wholesalers; no one is looking at the retailer who take those products and charge what they want for them in their distribution.  So it's hard to really put all of the blame on the manufacturer and say, well, the manufacturer raised the price so, therefore, the retail price is X.  It doesn't really correlate.

142.    Defendants' statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.   In addition, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although the guilty pleas did not

pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

143.    On December 16, 2016, the price per share of Lannett stock closed at $23.80, down from its previous close of $24.30.  On December 17, 2016, the price per share of Lannett stock closed at $24.20.  The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

**N.     Form 10-Q filed November 4, 2016, February 3, 2017, and May 5, 2017**

144.    On November 4, 2016, Lannett filed its Form 10-Q for the quarterly period ended September 30, 2016, which were signed and certified by Defendants Bedrosian and Galvan.

145.    The Company updated its statement regarding the Connecticut Attorney General investigation:

> In July 2014, the Company received interrogatories and subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into pricing of digoxin.  According to the subpoena, the Connecticut Attorney General is investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law.  In June 2016, the Connecticut Attorney General issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the Department of Justice.  The Company maintains that it acted in compliance with all applicable laws and regulations and continues to cooperate with the Connecticut Attorney General's investigation.

146.    With respect to the DOJ investigation, the Company continued to state:

> In fiscal year 2015 and 2016, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoenas request corporate documents of the Company relating to corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.

> Based on reviews performed to date by outside counsel, the Company currently believes that it has acted in compliance with all applicable laws and regulations and continues to cooperate with the federal investigation.

147.    These same statements were repeated in the Company's Form 10-Qs filed with the SEC on February 3, 2017, and May 5, 2017, which were signed and certified by Defendants Bedrosian and Galvan.

148.    Defendants' statements were misleading with respect to Lannett's pricing strategy of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors, including Plaintiffs and other putative Class members, with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects.  Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.  In addition, after the November 4, 2016 statements, senior executives at Heritage Pharmaceuticals, a market competitor of Lannett, pleaded guilty to criminal anticompetitive conduct with respect to the sale of generic pharmaceuticals.  Although

the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

149.    After Lannett filed its November 4, 2016 10-Q, the price per share of Lannett stock closed at $18.65 on November 7, 2016, up slightly from its previous close of $18.05. The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

150.    After Lannett filed its February 3, 2017 10-Q, the price per share of Lannett stock closed at $20.25 on February 6, 2017, up slightly from its previous close of $19.95. The price per share of Lannett stock would have fallen significantly had the truth been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

151.    After Lannett filed its May 5, 2017 10-Q, the price per share of Lannett stock closed at $21.40 on May 8, 2017, down slightly from its previous close of $21.50. The price per share of Lannett stock would have fallen significantly if the truth had been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

O.      **Form 10-K filed August 28, 2017**

152.    On August 28, 2017, Lannett filed with the SEC its Form 10-K for the fiscal year

ended June 30, 2017, which was signed and certified by Defendants Bedrosian and Galvan.

153.    The Form 10-K stated:

> The Company believes that under the current regulatory environment, the
> generic pharmaceutical industry as a whole will be the target of increased
> governmental scrutiny, especially with respect to state and federal anti-trust
> and price fixing claims.
>
> In July 2014, the Company and at least one of its competitors each received
> a subpoena and interrogatories from the Connecticut Attorney General's
> Office concerning its investigation into the pricing of Digoxin.  In June
> 2016, the Connecticut Attorney General issued interrogatories and a
> subpoena to an employee of the Company.  The Company maintains that it
> acted in compliance with all applicable laws and regulations and continues
> to cooperate with the Connecticut Attorney General's investigation.
>
> In Fiscal 2015 and Fiscal 2016, the Company and certain affiliated
> individuals each were served with a grand jury subpoena relating to a
> federal investigation of the generic pharmaceutical industry into possible
> violations of the Sherman Act.  The subpoenas request corporate documents
> of the Company relating to corporate, financial and employee information,
> communications or correspondence with competitors regarding the sale of
> generic prescription medications and the marketing, sale, or pricing of
> certain products, generally for the period of 2005 through the dates of the
> subpoenas.  Based on reviews performed to date by outside counsel, the
> Company currently believes that it has acted in compliance with all
> applicable laws and regulations and continues to cooperate with the federal
> investigation.

154.    Defendants' statements were misleading with respect to Lannett's pricing strategy

of generic drugs, and the Company's risk of being implicated in, or impacted by, a regulatory

action alleging unlawful anticompetitive conduct.  In addition, these statements misled investors,

including Plaintiffs and other putative Class members, with respect to the extent to which Lannett

investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive

conduct that might implicate the Company in a regulatory action or have a negative impact on

70

Lannett's business operations and financial results or prospects. Later, Lannett became a named defendant in an expanded action brought by the Connecticut Attorney General, on behalf of 47 states, the District of Columbia and Puerto Rico, alleging anticompetitive conduct by Lannett with respect to two of its generic drug products.

155. On August 28, 2017, the price per share of Lannett stock closed at $17.20, up slightly from its previous close of $16.05. On August 29, 2017, the price per share of Lannett stock closed at $17.55. The price per share of Lannett stock would have fallen significantly if the truth had been disclosed about the anticompetitive market for generic pharmaceuticals and Lannett's true risk of being implicated in, or impacted by, the ongoing regulatory actions.

156. On October 31, 2017, it was finally revealed that Lannett was named as a defendant in the action brought by the State Attorney Generals. After the State AG Complaint and the details of the expanded scope became public, Lannett's share price fell $3.25, or approximately 14%, from an opening price of $23.15 per share on October 31, 2017, to a closing price of $19.90 per share that day, on extremely high trading volume.

## SUMMARY OF SCIENTER ALLEGATIONS

157. Throughout the Class Period, Defendants knowingly or recklessly misled Plaintiffs and other investors with respect to Lannett's pricing strategy of generic drugs and the Company's risk of being implicated in, or impacted by, a regulatory investigation or legal action concerning unlawful price-fixing and anticompetitive conduct. Regardless of whether Lannett is adjudicated to have participated in unlawful conduct, Defendants knowingly or recklessly misled Plaintiffs and other investors concerning their knowledge of anticompetitive conduct that led to increased prices for key generic drug products sold by Lannett. In addition, Defendant Bedrosian and Defendant Galvan misled Plaintiffs and other investors with respect to their involvement in pricing decisions,

71

as well as the level of investigation and diligence that Lannett conducted to investigate whether Lannett and its employees engaged in, or had knowledge of, anticompetitive conduct with respect to the Company's generic drug sales.  Having knowingly or recklessly misleading Plaintiffs and other investors about these material facts, Defendants created the impression that Lannett would be isolated from regulatory scrutiny and legal actions alleging anticompetitive conduct while knowing that any implication that Lannett was engaged in, or aware of, anticompetitive conduct would likely impact Lannett's business operations and financial prospects.

158.   Throughout the Class Period, Defendants stated with confidence and certainty that Lannett was not engaged in anticompetitive conduct, and that Lannett's financial results were the result of Lannett *and* its competitors aggressively raising prices in a competitive market.  Starting on July 15, 2014, soon after Lannett disclosed that it received a subpoena from the Connecticut Attorney General investigation anticompetitive conduct, Lannett, through Defendants Bedrosian and Galvan, assured analysts and investors that Lannett acted in compliance with all applicable laws and regulations.  At that time, however, Defendants Bedrosian and Galvan had no basis support their representation, or they were aware of facts contradicting their representation.  In fact, following that statement, Lannett, through its Board of Directors, commenced an internal investigation of Defendant Bedrosian's conduct and the conduct of Lannett's sales team, to determine if Lannett engaged in anticompetitive conduct with respect to the pricing of Digoxin.  Importantly, the initial investigation pertained only to Digoxin.  On November 3, 2016, Defendant Bedrosian indicated that the investigation was expanded to encompass other drugs at some points during the Class Period.

159.   Lannett's internal investigation was conducted by outside counsel, and not Defendant Bedrosian, who was a subject of the investigation.  While the timing of the investigation

has not been disclosed, Defendant Bedrosian made clear that it continued past his repeated assurances that Lannett did not engage in anticompetitive conduct.  On November 3, 2016, Defendant Bedrosian stated that Lannett's "rather thorough investigation" that "left no stone unturned" concluded that Lannett did not engage in anticompetitive conduct.  Yet, based on the information provided in response to the Connecticut Attorney General's subpoena, Lannett was added as a named defendant in the State AG Complaint, alleged to have participated in unlawful anticompetitive conduct.

160.    Through regulatory and criminal actions, there is substantial evidence that Lannett was in fact able to raise and maintain increased prices due to unlawful conduct in an anticompetitive market.  Two former executives of Heritage Pharmaceuticals, a competitor to Lannett, pleaded guilty to fixing drug prices, and also settled regulatory claims with the respect to the State AG Complaint.  The admitted conduct of the Heritage Pharmaceutical executives, Jeffrey Glazer and Jason Malek, substantiates anticompetitive conduct and facts alleged that implicate Lannett as a co-conspirator to that conduct.  It is an implausible inference that Heritage Pharmaceuticals and its co-conspirators would have been able to effectuate a price-fixing scheme without the cooperation of market competitors.

161.    Evidence of increased communications between Lannett and Heritage Pharmaceuticals, and the timing of those communications with respect to the degree of correlation of price increases among Lannett, Heritage Pharmaceuticals and other market competitors, suggests that Lannett either participated in, or was aware of, an anticompetitive scheme to raise generic drug prices.  It is implausible to suggest that Lannett raised prices across its generic drug products without knowledge of anticompetitive conduct among market competitors in light of

Defendant Bedrosian's acknowledgment that with "one or two exceptions," Lannett tends to "lead in the way of price increases."[11]

162.   Prior to, and throughout the Class Period, Defendant Bedrosian stated how important it was to Lannett that the Company be able to maintain its aggressive pricing strategy through 2016, and how the strategy depended on market competitors remaining "responsible" and "rational" on pricing.   During the Class Period, as Lannett continued to aggressively raise prices, Defendant Bedrosian credited those decisions to the work and diligence of Lannett's Sales Vice President, Kevin Smith, who took "a businesslike approach" to products and identifying unique opportunities for price increases.   For example, on March 9, 2015 and April 14, 2015, Defendant Bedrosian gave Mr. Smith credit for not being "lazy" and finding price increase opportunities.

163.   Prior to the Class Period, Defendant Bedrosian touted his own experience and involvement in setting prices for Lannett's generic drug products.   For example, on March 12, 2014, at a Roth Capital Partners investment conference, Defendant Bedrosian touted, "I have a sales background myself, so I understand the need to raise a price on the opportunities present themselves [sic].   Generally, generics are going to spiral downward.   You introduce a product price, and then you are selling it for a lower price as more competition comes in the market."   Then, early in the Class Period, on September 8, 2014, Defendant Bedrosian explained during a Morgan Stanley Healthcare Conference, that "two people made the decision on the price increase of digoxin. My sales Vice President Kevin Smith was the one who came to me when Kogas bought the brand and raised the price on the brand.   He suggested we raise the price on the generic.   And I said, -- what we wanted from me was what did I think a competitor of ours would do."   Defendant Bedrosian then provided Mr. Smith with his own analysis.

---

[11] September 10, 2013 Earnings Conference Call.

164.    On November 6, 2014, Lannett disclosed in a Form 10-Q filed with the SEC that Lannett's "Senior Vice President of Sales and Marketing" – *i.e.*, Mr. Smith – was served with a grand jury subpoena from the DOJ relating to a federal investigation into antitrust violations in the generic pharmaceutical industry.   A month later, on December 5, 2014, the Company itself received a grand jury subpoena.  The known evidence, including the grand jury subpoenas issued by the DOJ, discovery relating to Lannett's cooperation with the investigation of the Connecticut Attorney General, and the on-going internal investigation commenced by the Lannett Board of Directors, most plausibly suggests that to the extent that Defendant Bedrosian did not know that Lannett was involved in, or had knowledge of, anticompetitive conduct, Defendant Bedrosian turned a blind-eye to any misconduct and recklessly failed to question, or demand documentation supporting Mr. Smith's recommendation to aggressively raise prices on Lannett's generic drug prices.  This was particularly reckless in the sense that while Defendant Bedrosian was turning a blind-eye to any misconduct, which was a departure from his previous conduct, he was simultaneously assuring investors that Lannett did not engage in anticompetitive conduct and would not be implicated in regulatory investigations and actions.

165.    As set forth herein, throughout the Class Period, Defendants were repeatedly asked specific questions from analysts about Lannett's aggressive pricing strategy, and whether Lannett's price increases could be maintained in a competitive pricing market; and, the risk that Lannett faced of being implicated in, or impacted by, ongoing regulatory investigations and actions, including those being conducted by the Connecticut Attorney General, the DOJ and members of Congress.   Moreover, these analyst inquires focused on Lannett's key products, responsible for a substantial portion of Lannett's sales revenues.  In the context of these specific inquiries, Defendants emphatically and flatly denied with certainty that Lannett was involved in,

or aware of, anticompetitive conduct, such that there was a risk of Lannett being implicated in, or impacted by, an action alleging anticompetitive conduct.  Defendants' confident and unhedged denial of being involved in, or aware of, anticompetitive conduct that cultivated Lannett's aggressive pricing strategy misled investors about the true risk of Lannett being implicated in, or impacted by, the regulatory investigations and actions.

166.    Despite Defendant Bedrosian's representations that Lannett's aggressive pricing strategy and price increases were based on Lannett's ability to discover opportunities based on competitive business factors, at the time of the most substantial price hikes to Lannett's key products, there were no material increases in demand or production costs or reported supply shortages that would have justified or otherwise explained the dramatic and correlated price increases for these drugs in a competitive market.

167.    The historic rise in generic drug prices prior to the Class Period led to significant regulatory scrutiny and industry-wide investigation.  In July 2014, Lannett disclosed that the Connecticut Attorney General was investigating the Company in connection with Lannett's pricing of Digoxin.  Throughout the Class Period, Lannett indicated that it was cooperating fully with Connecticut Attorney General investigation in anticompetitive conduct.   After Lannett's cooperation with the investigation, the Connecticut Attorney General, on behalf of 47 State Attorney Generals, the District of Columbia and Puerto Rico, named Lannett as a Defendant in the State AG Complaint alleging unlawful anticompetitive conduct.

168.    On October 2, 2014, Lannett received a letter from Senator Sanders and Representative Cummings, with respect to a Congressional investigation of anticompetitive conduct in the generic drug industry.  Specifically, the letter requested pricing data and other information regarding Lannett's generics business, including information regarding who was

responsible for determining prices and implementing price increases.  In December 2014, Lannett disclosed that it had received a subpoena from the DOJ's antitrust division.  As the scope of regulatory scrutiny into generic drug pricing increased, Lannett's Board of Directors correspondingly increased its investigation into Lannett's pricing and potential anticompetitive conduct.  Although the internal investigation was conducted by outside counsel, and *before* the investigations were complete, Defendant Bedrosian misled Plaintiffs and other investors to believe that Lannett did not engage in anticompetitive conduct, and that Lannett would not be implicated in, or impacted by, any regulatory investigations or legal actions.

169.    The Price Fixed Drugs, which made up between 56% and 72% of Lannett's total annual sales from 2013 to 2016, were central to the Company's business operations and financial results.  The significance of Levothyroxine and Digoxin to Lannett's financial prospects was described in the Lannett's 2014 10-K:

> ***We materially rely on an uninterrupted supply of finished products from JSP for a majority of our sales.  If we were to experience an interruption of that supply, our operating results would suffer.***
>
> 58% of our fiscal year 2014 net sales are of distributed products, primarily manufactured by JSP.  ***Two of these products are Levothyroxine Sodium and Digoxin, which accounted for 37% and 20%, respectively, of our Fiscal 2014 net sales, and 38% and 8%, respectively, of our net sales for Fiscal 2013***.  On August 19, 2013, the Company entered into an agreement with JSP to extend its initial contract to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; Levothyroxine Sodium Tablets USP.  The amendment to the original agreement extends the initial contract, which was due to expire on March 22, 2014, for five years through March 2019.  Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party.  If the supply of these products is interrupted in any way by any form of temporary or permanent business interruption to JSP, including but not limited to fire or other naturally-occurring, damaging event to their physical plant and/or equipment, condemnation of their facility, legislative or regulatory cease and desist declaration regarding their operations, FDA

action, and any interruption in their source of API for their products, our operating results could be materially adversely affected.  We do not have, at this time, a second source for these products.

170.    Evidence discovered and alleged in the State AG Complaint implicates that Lannett, through its senior officers and Individual Defendants regularly attended generic drug industry events where anticompetitive schemes were developed.  Furthermore, Lannett employees had an increased and irregular pattern of communications, including emails and telephone calls, that coincided with correlated price increases by Lannett and its market competitors.  In fact, executive officers of one of Lannett's market competitors, Heritage Pharmaceuticals, pleaded guilty to criminal charges of anticompetitive conduct related. Although the guilty pleas did not pertain specifically to generic drugs sold by Lannett, they substantiated anticompetitive conduct and facts alleged, such as atypical communications prior to coordinated price movements, that implicate Lannett's involvement with, or knowledge of, anticompetitive conduct with respect to multiple generic pharmaceuticals sold by Lannett.

171.    As regulatory scrutiny of Lannett increased and Lannett became implicated in having participated in anticompetitive conduct, Defendant Bedrosian was forced to resign as CEO on September 25, 2017.  Lannett was publicly named as a defendant in the State AG Complaint on October 31, 2017, as related to five of Lannett's generic drug products.  The State AG Complaint made clear that the scope of the action would likely continue to broaden to include more generic drugs.

## LOSS CAUSATION

172.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial losses.  During the Class Period, Plaintiffs and the Class purchased Lannett common stock at artificially inflated prices and were damaged thereby when the price of Lannett common stock declined when the truth was revealed.  The price of Lannett common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

173.    Throughout the Class Period, Defendants issued a series of misleading statements and omissions that misled Plaintiffs and other investors with respect to Lannett's pricing strategy of generic drugs and the Company's risk of being implicated in, or impacted by, a regulatory investigation or legal action concerning unlawful price-fixing and anticompetitive conduct. Defendants' misleading statements and omissions further misled Plaintiffs and other investors concerning Lannett's involvement in, or knowledge of, anticompetitive conduct by Lannett's market competitors, which has an impact on Lannett's business operations and financial results, including the Company's ability to raise prices on generic drug products and maintain those higher prices.

174.    Defendants' misleading statements and omissions caused and maintained artificial inflation in the price of Lannett's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market.  The timing and magnitude of Lannett's common stock price declines, as detailed herein, negate any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors

unrelated to Defendants' fraudulent conduct.  The market for the Company's common stock promptly digested current information with respect to Lannett from all publicly available sources and reflected such information in the price of the Company's common stock.

175.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the market in a series of partial adverse disclosures and third-party reports in the media.  When Defendants' prior misleading statements and omissions were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of Lannett common stock declined because the price inflation was removed.  As a result of their purchases of Lannett common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

176.    On July 15, 2014, Oppenheimer analyst Rohit Vanjani issued a report on Lannett that addressed concerns over Lannett's price increases that were raised in the July 8, 2014 *The New York Times* article, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise." In the July 15, 2014 report, Mr. Vanjani published statements made by Defendants Bedrosian and Galvan on behalf of Lannett, stating, "Lannett's view is that the company has a window of opportunity on price increases until 2016, when the generics wave begins to recede.  Management is even eyeing additional price increases later this year, although the company would not specify on which franchises.  With respect to digoxin specifically, management still believes that it is at the low end of market pricing compared to competitors…."

177.    Following Defendants' misleading statements on July 15, 2014 (as reported by Oppenheimer analyst Mr. Vanjani), the price per share of Lannett dropped only slightly from its previous of close of $47.70 on July 14, 2014 to a close price per share of $47.09 on July 15, 2014,

on modest trading volume.  Had Defendants disclosed the truth about the anticompetitive market, and Lannett's true risk of being implicated in a regulatory investigation or legal action, the price per share of Lannett stock would have sustained a significant drop.

178.    On July 16, 2014, Lannett revealed through a Form 8-K filed with the SEC that it received a subpoena and interrogatories from the Connecticut Attorney General regarding Lannett's pricing of Digoxin.  As stated in the July 16, 2014 Form 8-K, the subpoena was part of the Connecticut Attorney General's investigation of "whether anyone engaged in activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law." Further, the July 16, 2014 Form 8-K filed with the SEC by Lannett and signed by Defendant Bedrosian, stated, "The Company maintains that it acted in compliance with all applicable laws and regulations and intends to cooperate with the Connecticut Attorney General's investigation."

179.    On the same day that Lannett issued the July 16, 2014 Form 8-K with the SEC revealing the investigation into the Company's pricing of Digoxin, the price per share of Lannett stock fell from its previous close of $47.09 on July 15, 2014 to close at $39.04 on July 16, 2014, on heavy trading volume.  The price per share of Lannett stock continued to fall the next day, closing at $36.96 on July 17, 2014.  The price per share of Lannett stock would have fallen more on July 16, 2014 and July 17, 2014, but for the misleading statements and assurances issued on July 15, 2014 and July 16, 2014.

180.    On November 6, 2014, the Company filed a Form 10-Q for the period ended September 30, 2014, revealing that a grand jury subpoena had been served on the Company's Senior Vice President of Sales and Marketing relating to a federal investigation of the generic pharmaceutical industry.  That Form 10-Q stated, in part, as follows:

> Federal Investigation into the Generic Pharmaceutical Industry
>
> On November 3, 2014, the Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.  The subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period.

181.    On this news, the price of Lannett common stock dropped approximately 6%, falling from an opening price of $53.39 to close at $50.17 per share on November 7, 2014, a drop of $3.22 per share on extremely high trading volume.  Nonetheless, the stock price remained artificially inflated, and would have fallen more but for Defendants' misleading statements and assurances.  The Form 10-Q also included Defendants' statement that "The Company maintains that it has acted in compliance with all applicable laws and regulations and intends to cooperate with the federal investigation."

182.    On December 8, 2014, after the market closed, Lannett filed a Form 8-K with the

SEC, disclosing that it was served with a grand jury subpoena relating to the federal investigation

of the generic pharmaceutical industry.  The Form 8-K stated, in part, as follows:

> On December 5, 2014, the Company was served with a grand jury
> subpoena related to the continuing federal investigation of the
> generic pharmaceutical industry into possible violations of the
> Sherman Act.  The subpoena requests corporate documents from the
> Company relating to corporate, financial, and employee
> information, communications or correspondence with competitors
> regarding the sale of generic prescription medications, and the
> marketing, sale, or pricing of certain products.

183.    On this news, shares of Lannett dropped approximately 13%, falling from a closing

price of $48.00 per share on December 8, 2014 to close at $41.92 per share on December 10, 2014,

a drop of $6.08 per share on extremely high trading volume.  The stock price remained artificially

inflated, and would have fallen more but for Defendants' misleading statements and assurances.

The Form 8-K also included Defendants' statement that "The Company maintains that it has acted

in compliance with all applicable laws and regulations and intends to cooperate with the federal

investigation."

184.    On November 3, 2016, during the middle of the trading day, *Bloomberg* revealed

that criminal charges would likely be filed against Lannett for unlawful price collusion in the

generic drug industry.  The *Bloomberg* article reported, in part, as follows:

> U.S. prosecutors are bearing down on generic pharmaceutical
> companies in a sweeping criminal investigation into suspected price
> collusion, a fresh challenge for an industry that's already reeling from
> public outrage over the spiraling costs of some medicines.
>
> The antitrust investigation by the Justice Department, begun about
> two years ago, now spans more than a dozen companies and about two
> dozen drugs, according to people familiar with the matter. The grand
> jury probe is examining whether some executives agreed with one
> another to raise prices, and the first charges could emerge by the end
> of the year, they said
>
> Though individual companies have made various disclosures about
> the inquiry, they have identified only a handful of drugs under
> scrutiny, including a heart treatment and an antibiotic. Among the
> drugmakers to have received subpoenas are industry giants Mylan NV
> and Teva Pharmaceuticals Industries Ltd. Other companies include
> Actavis, which Teva bought from Allergan Plc in August, ***Lannett
> Co.***, Impax Laboratories, Inc., Covis Pharma Holdings Sarl, Sun
> Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo
> International Plc's subsidiary Par Pharmaceutical Holdings and Taro
> Pharmaceutical Industries Ltd.
>
> \*        \*        \*
>
> Digoxin prices increased nearly sevenfold in late 2013. Lannett raised
> the list price to $1.185 a pill from 17 cents on Oct. 16, 2013, for a 100
> pack of 250 microgram tablets, according to data from First Databank
> complied by Bloomberg.  Six days later, Impax matched Lannett's
> price, up from 14 cents a pill.  At the time, the two companies
> dominated the market.
>
> Par introduced its own version to the market in January 2014, also at
> $1.185 a pill.  In March 2015, Sun Pharma followed suit.

185.    On this news, Lannett's share price plunged approximately 26%, falling from an

opening price of $23.45 per share on November 3, 2016 to a closing price of $17.25 per share that

day, a drop of $6.20 on extremely high trading volume.

186. Finally, on October 31, 2017, a complaint filed by the Attorney General for the State of Connecticut, as well as by the attorneys general of 44 other states and the District of Columbia and Puerto Rico, became public alleging a far-reaching price-fixing conspiracy by numerous makers of generic drugs, greatly expanding the scope of the lawsuit initiated in 2016 to go from six drug makers to 20, including Lannett, and to involve the price fixing of now 15 drugs, an addition of 13, doxycycline monohydrate, made by Lannett.  The State AG Complaint alleges that the drugmakers and executives divided customers for their drugs among themselves, agreeing that each company would have a certain percentage of the market, and that the companies agreed on price increases for generic drugs in advance. The Connecticut Attorney General said in connection to the Amended Complaint that "It is our belief that price-fixing is systematic, it is pervasive, and that a culture of collusion exists in the industry" and that the facts supporting the allegations of price-fixing and collusion by these generic drugmakers were "shocking" and "mind-blowing"

187. On this news, Lannett's share price plunged approximately 14%, falling from an opening price of $23.15 per share on October 31, 2017 to a closing price of $19.90 per share that day, a drop of $3.25 on extremely high trading volume.

188. Accordingly, as a result of their purchases of Lannett's publicly traded common stock during the Class Period, Plaintiffs and other members of the Class suffered significant economic loss and damages.

## PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

189.   The market for Lannett's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions made by Defendants and alleged herein, Lannett's common stock traded at artificially inflated prices during the Class Period.  On April 10, 2015, the Company's stock closed at a Class Period high of $71.15 per share.  Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Lannett's common stock and market information relating to Lannett, and have been damaged thereby.

190.   During the Class Period, the artificial inflation of Lannett's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements or omissions about Lannett's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Lannett and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and the other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

191.   At all relevant times, the market for Lannett's common stock was an efficient market for the following reasons, among others:

a)  Lannett stock met the requirements for listing, and was listed, and actively traded on the NYSE, a highly efficient and automated market;

b)  As a regulated issuer, Lannett filed periodic public reports with the SEC and/or the NYSE;

c)  Lannett regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuit of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)  Lannett was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

192.   As a result of the foregoing, the market for Lannett's common stock promptly digested current information regarding Lannett from all publicly available sources and reflected such information in Lannett's public stock price.  Under these circumstances, all purchasers of Lannett's common stock during the Class Period suffered similar injury through their purchase of Lannett's common stock at artificially inflated prices and a presumption of reliance applies.

193.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants material omissions.  Because this action involves Defendants' failure to disclose material adverse information identified above, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld

be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Specifically, Defendants misled Plaintiffs and other investors regarding the risk that Lannett would be implicated in regulatory investigations or actions related unlawful anticompetitive conduct; and, the extent to which Lannett's business operations and financial results were and would be impacted by anticompetitive market conduct in the generic drug industry.  Given the importance of these facts, that requirement is satisfied.

## <u>INAPPLICABILITY OF THE STATUTORY SAFE HARBOR</u>

194.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

195.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Lannett who knew that the statement was materially false or misleading when made.  Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Lannett's common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

197.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lannett's common stock actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Lannett shares were traded publicly during the Class Period on the NYSE.  As of May 15, 2017, Lannett had 37.19 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from the records maintained by Lannett or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

198.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

199.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

200.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.   Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

        b.   Whether the statements and omissions made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Lannett;

        c.   Whether Lannett engaged in collusion to fix prices for the Price Fixed Drugs;

        d.   Whether Defendants acted with scienter; and

        e.   To what extent the members of the Class have sustained damages and the proper measure of damages.

201.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

202.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (ii) cause Plaintiffs and the other members of the Class to purchase Lannett's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

204.    Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lannett's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lannett's financial well-being, operations and prospects, as specified herein.

206.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lannett's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lannett and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

207.    Each of the Individual Defendants' primary liability, and controlling person liability arises from the following facts:  (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, products, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times, including communications with governmental and regulatory agencies; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

208.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lannett's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lannett's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Lannett's common stock during the Class Period at artificially high prices and were damaged thereby.

210.    At the time of said misrepresentations and/or omissions, Plaintiffs and the other members of the Class believed them to be true.  Had Plaintiffs and the other members of the Class

and the marketplace known the truth regarding Lannett's risk of being implicated in, or impacted

by, regulatory investigations or actions regarding anticompetitive conduct; or, the impact that

anticompetitive conduct by market competitors, which was known, or should have been known,

by Defendants, had on Lannett's business operations and financial results and prospects, Plaintiffs

and other members of the Class would not have purchased or otherwise acquired their Lannett

common stock, or, if they had acquired such common stock during the Class Period, they would

not have done so at the artificially inflated prices which they paid.

211.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

the other members of the Class suffered damages in connection with their respective purchases of

the Company's common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violations Of Section 10(b) Of The Exchange Act And
### Rule 10b-5(a) & (c) Against All Defendants

213.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

214.    During the Class Period, Defendants violated SEC Rules 10b-5(a) and (c) in that

they employed devices, schemes and artifices to defraud and engaged in acts, practices and a

course of business that operated as a fraud or deceit upon Plaintiffs and the members of the Class

with their purchases of Lannett common stock during the Class Period as alleged herein.

215.    During the Class Period, Defendants participated in the preparation of and/or

disseminated or approved the false statements specified above, which they knew or deliberately

disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

216.    Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading.  Defendants individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Lannett as specified herein.

217.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Lannett's true financial condition from the investing public and supporting the artificially inflated price of Lannett common stock.

218.    Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lannett common stock.  Plaintiffs and the Class would not have purchased Lannett common stock at the prices they paid, or at all, had they been aware that the market prices for the common stock had been artificially inflated by the materially false and misleading statements and omissions alleged herein.

## THIRD CLAIM FOR RELIEF

### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

219.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

220.    The Individual Defendants acted as controlling persons of Lannett within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

221.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

222.    As set forth above, Lannett and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions, each as controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Lannett's and the Individual Defendants'

wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows

(a)     Declaring this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Finding Defendants violated the law as allege above;

(c)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly or severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(d)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable

DATED: September 21, 2018                 Respectfully submitted,

By: _____
David M. Promisloff (ID# 200971)
**PROMISLOFF LAW, P.C.**
5 Great Valley Parkway, Suite 210
Malvern, Pennsylvania 19355
(215) 259-5156
(215) 600-2642 (fax)
David@prolawpa.com

*Liaison Counsel for the Class*

**ABRAHAM, FRUCHTER &
TWERSKY, LLP**
Mitchell M.Z. Twersky (*Pro Hac Vice*)
Atara Hirsch (*Pro Hac Vice* forthcoming)
Lawrence Levit (*Pro Hac Vice*)
Todd Kammerman (*Pro Hac Vice*)
Matthew E. Guarnero (*Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050
(212) 279-3655 (fax)
MTwersky@aftlaw.com
AHirsch@aftlaw.com
LLevit@aftlaw.com
TKammerman@aftlaw.com
MGuarnero@aftlaw.com

*Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*Pro Hac Vice*)
Tamar A. Weinrib (*Pro Hac Vice*)
600 Third Avenue
New York, New York 10016
(212) 661-1100
(917) 463-1044 (fax)
JALieberman@pomlaw.com
TAWeinrib@pomlaw.com

*Counsel for Plaintiff Ironworkers Locals
40, 361 & 417 Union Security Funds*

## CERTIFICATE OF SERVICE

I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on September 21, 2018, a true and correct copy of the foregoing was filed with the Clerk of the Court.  Plaintiffs' counsel will serve the foregoing Amended Complaint on counsel of record via electronic mail on September 21, 2018.  Defendants' counsel includes:

Ian M. Comisky (Icomisky@foxrothschild.com)

Matthew D. Lee (Mlee@foxrothschild.com)

Matthew E. Guarnero