# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN UTESCH,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **LANNETT COMPANY, INC., ARTHUR P.** | **NO. 16-5932** |
| **BEDROSIAN AND MARTIN P. GALVAN,** | |
| **Defendants.** | |

## <u>OPINION</u>

This putative class action concerns statements made by pharmaceutical firm Lannett Company and two of its top executives, Arthur P. Bedrosian and Martin P. Galvan (collectively "Defendants"), which allegedly misled investors about the state of the market for Defendants' products in violation of federal securities laws. Specifically, Defendants are alleged to have made false or misleading statements between July 2014 and October 2017 (the "Class Period") both about the impact of competition on prices and sales of certain drugs and about the potential effects on the company of regulatory investigations and antitrust actions relating to industry-wide anticompetitive conduct.

Pending now is Defendants' motion to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). At issue are securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 ("the Act") and Rule 10b-5 against all Defendants, and individual claims against Defendants Bedrosian and Galvan under Section 20(a) of the Act. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a). For the following reasons, Defendants' motion will be denied.

# I.   FACTUAL ALLEGATIONS[1]

## A.  The Parties

Lannett is a pharmaceutical corporation that derives most of its revenue from the sale of generic drugs.  Bedrosian and Galvan were formerly two of its high-ranking corporate officers (Chief Executive Officer and Chief Financial Officer, respectively).

Plaintiffs the University of Puerto Rico Retirement System and Ironworkers Locals 40, 361 & 417 Union Security Funds are entities that purchased Lannett common stock during the Class Period at prices that they allege were inflated due to Defendants' materially misleading statements.[2]

## B.  The Generic Drug Market

Generic drugs are exact copies of patented brand-name drugs, which may be produced and sold once the patent has expired.  According to Plaintiffs, after a patent for a particular drug expires, the first generic drug manufacturer to file the required application with the Food and Drug Administration is entitled to a period of "exclusivity," where no additional generic drug manufacturers may produce the drug.  Plaintiffs state that, generally, once the "exclusivity" period ends and other manufacturers enter the market, the price for the drug in question drops "precipitous[ly]."  However, recently this trend has dissipated.

## C.  State and Federal Investigations

In the past few years, various governmental authorities have initiated investigations into price fixing and other anticompetitive conduct across the generic drug industry.  The Complaint

---

[1] The facts are drawn from the Third Amended Complaint (the "Complaint," unless otherwise noted) and, for purposes of this opinion, taken as true.  *Quinones v. United States*, 492 F.2d 1269, 1271 (3d Cir. 1974).

[2] John Utesch, who is named in the case caption but otherwise not mentioned in the operative complaint, is an investor who purchased Lannett securities during the Class Period.  The Court draws this information from a prior complaint and conveys it here to the reader for the sake of context.

details three such concurrent investigations, each of which involve both Lannett and its competitors.

First, in December 2016, the Connecticut Attorney General (on behalf of the attorneys general of 20 states), charged various generic drug companies—though at this point not Lannett—with engaging in anticompetitive conduct. Specifically, the complaint accused defendant companies of "market allocation"—that is, controlling and dividing customers to maintain market share—and "price-fixing"—that is, colluding to establish uniform (above-market) prices for individual drugs. In October 2017, the complaint was amended to expand the lawsuit such that 45 state attorneys general were represented as plaintiffs, 17 generic drug manufacturers—now including Lannett—were named as defendants, and 15 generic drugs—now including two manufactured by Lannett—were implicated. The Connecticut AG alleges that Lannett, as well as its co-defendants, participated in widespread price fixing that reached across the industry; that price fixing was achieved through phone calls, text messages and other forms of communication; that the defendant companies agreed amongst themselves as to the market share each would occupy; that the defendant companies agreed not to undercut their purported competitors' prices; that the defendant companies shared information about pricing strategy; and more. The investigation and prosecution are ongoing.

Second, the federal Department of Justice ("DOJ") is engaged in an investigation into price collusion in the generic drug industry, and as early as November 2014 was investigating whether more than 12 generic drug manufacturers—including Lannett—had engaged in criminal conduct. Various generic drug manufacturers, including Lannett and several of its competitors who manufacture the same medications as Lannett, received grand jury subpoenas from the DOJ relating to possible anticompetitive conduct in violation of the Sherman Act. By January 2017,

two executives from one of the companies under investigation by the DOJ that produced some of the same drugs as Defendants, Heritage Pharmaceuticals, had pleaded guilty to federal price-fixing charges and were cooperating with investigators. The investigation is ongoing.

Third, in October 2014, members of the United States Senate and House of Representatives requested Lannett provide significant financial information to a Congressional investigation into price spikes in the generic drug industry.

### D.  Allegations as to Each Generic Drug

Plaintiffs assert price-fixing and anticompetitive conduct that raised the prices of five specific drugs produced by Lannett: Doxycycline Monohydrate, Digoxin, Levothyroxine, Acetazolamide, and Ursodiol. These products represented most of Lannett's revenue during the Class Period. In 2015, Levothyroxine and Ursodiol alone accounted for half of Lannett's revenue. From 2013 to 2016, the five drugs together accounted for as much as 72% of Lannett's total annual sales.

#### 1.  Doxycycline Monohydrate

Doxycycline Monohydrate ("Doxy Mono") is a medicine used to treat bacterial infections and to prevent malaria. In 2013, Heritage Pharmaceuticals, another generic drug manufacturer that produces Doxy Mono, learned that demand was expected to increase significantly. Plaintiff alleges that, based on this information, Heritage sought to coordinate a price increase with Lannett—that is, Heritage sought agreement from Lannett such that Lannett would raise its prices when Heritage did, and that Lannett would not subsequently undercut Heritage by lowering prices. In support of this allegation, Plaintiffs refer to the State AG complaint, which states, based on subpoenaed discovery, that Lannett employees corresponded with one another through written documents considering Heritage's proposal, that Heritage personnel and Lannett

personnel spoke on the phone to coordinate price increases, and that each of the principal

manufacturers of Doxy Mono (Lannett, Heritage, Mylan Pharmaceuticals, and Par

Pharmaceuticals) increased their prices in tandem.[3]

## 2. *Digoxin*

Digoxin is a medicine that treats heart failure, chronic atrial fibrillation, and rapid rhythm

disturbance, primarily in elderly patients. The medication is consumed by millions of patients

daily, and for many, there is no effective substitute. In late October 2013, the market for

Digoxin was almost entirely controlled by Lannett, Global Pharma, and Par Pharmaceuticals

(although Par's market share was comparatively smaller). That month, Lannett, Global Pharma,

and Par attended a trade association conference together. Immediately afterward, in November

of that year, the three manufacturers each increased their Digoxin prices by the same amount and

at the same time, causing a price spike of over 700%. Following the price spike, sales revenue of

Digoxin increased from $198 million in 2013 to $577 million in 2014—Plaintiffs assert that

because during that time the number of tablets sold on the market remained stable, the increase

in sales revenue was "solely attributable to the November 2013 price hike."

## 3. *Levothyroxine*

Levothyroxine is a medication that is the preferred treatment for hypothyroidism, and is

also used to treat goiters, nodular thyroid disease, thyroid cancer, and myxedema coma.

Hypothyroidism on its own afflicts about 10 million Americans. The market for Levothyroxine

is controlled by five pharmaceutical companies—four selling generic versions of the drug, and

---

3 Regarding DoxyMono, Defendants assert that Plaintiffs "do not allege when—or even whether—any subsequent price increase actually occurred pursuant to" (emphasis in original) an agreement between Lannett and Heritage. However, reading of the Complaint in the light most favorable to Plaintiffs, shows that they have indeed alleged a subsequent price increase pursuant to an agreement. The Complaint describes outreach from Heritage, internal discussions among Lannett employees considering Heritage's proposal, resumed communications between Lannett and its competitors on June 11, 2013, and the following day, June 12, a price increase.

the fifth selling a brand-name version.  In late 2013 and again in mid-2014, the generic manufacturers increased their prices simultaneously, and to the same price point.

### 4.  *Acetazolamide*

Acetazolamide is a medication that treats glaucoma, epilepsy, altitude sickness, paralysis and heart failure.  The market for Acetazolamide tablets is almost entirely dominated by only two companies, Lannett and Taro Pharmaceuticals.  Prior to the Class Period, from 2009 to 2011, Lannett decreased its price for Acetazolamide tablets, and as a result Lannett took some market share away from Taro—over those two years, Lannett increased its market share from about 20% to almost 40%.  Beginning in 2012, however, Lannett and Taro's pricing began to move in lockstep, including a simultaneous 500% price increase (which occurred immediately after the same trade association conference that preceded the Digoxin price spike).

### 5.  *Ursodiol*

Ursodiol is a medication that treats gallbladder stone dissolution.  The market for Ursodiol tablets is almost entirely occupied by three companies: Lannett, Actavis Generics, and Epic Pharma.  Prior to mid-2014, the three companies charged different prices for Ursodiol tables—Lannett charged about $2 per tablet, Actavis charged about $.75 per tablet, and Epic charged about $.50 per tablet.  But in mid-2014, each company raised its price to about $5 per tablet.  There were no similar price hikes in other countries where Ursodiol was available.

*       *       *

At the times of the above-references price spikes for Digoxin, Levothyroxine, Acetazolamide, and Ursodiol, those drugs were not facing supply or production issues like clinical investigator inspections, drug safety labelling changes, post-market requirements and commitment studies required by the FDA, drug shortages, new patents, or otherwise.

6

### E.  Statements Issued by Defendants

Plaintiffs point to various specific statements that Defendants made during the Class Period in support of their allegation that Defendants knew about price-fixing conspiracies in the generic drug industry and lied to investors about their knowledge.  Those statements include the following:

- Form 10-Ks submitted in 2014, 2015, and 2016, stating that "[t]he generic pharmaceutical industry is highly competitive" and that "[w]e face strong competition in our generic product business."

- In response to a question from an analyst about the effect ongoing investigations into price-fixing would have on Lannett's products, Bedrosian stated, "None whatsoever.  Matter of fact, I think price increases are opportunistic things.  You don't know when you're going to have the opportunity and when you do, you take advantage of it."

- In a press release announcing that Lannett had received a subpoena from the Connecticut AG related to its pricing of Digoxin, Bedrosian was quoted as saying, "[W]e acted quickly to conduct an exhaustive review of our pricing practices. . . .  Results of the review, which included the examination of well over 700,000 documents, confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of digoxin."

- In response to a question from an analyst about the subpoena Lannett received from DOJ, Bedrosian said that, "[W]e're comfortable with the position we have taken with our price increases and how we've made those decisions."

### F.  Lannett Share Price Fluctuations

After Defendants made each of the statements described above, Lannett's share price changed only to a negligible degree.  However, as information both about potential wrongdoing in the generic drug industry and about the investigations into that wrongdoing became public, Lannett share prices fell sharply.  For example, when Lannett revealed that the SEC was investigating the pricing of Digoxin, Lannett stock fell in value from $47.09 to $36.96 over the next two days.  Similarly, when Lannett announced that it had been served with a subpoena relating to the federal investigation, its share price dropped from $48.00 to $41.92 over the

following two days. And on the day that *Bloomberg* published an article describing the possibility that criminal charges relating to collusion would be filed against various pharmaceutical companies (including Lannett), Lannett stock fell from $23.50 to $17.25.

## II.  PROCEDURAL HISTORY

The first complaint in this case was filed on November 16, 2016. It was subsequently amended twice. The securities fraud claims in the Second Amended Complaint were premised on the allegation that Defendants themselves had engaged in anti-competitive conduct including price-fixing. When Defendants moved to dismiss the Second Amended Complaint, the Court granted the motion, concluding that Plaintiffs had failed to allege that Defendants "participated in an anticompetitive scheme to price-fix" certain products with the required state of mind. *Utesch v. Lannett Co.*, 316 F. Supp.3d 895, 907 (E.D. Pa. 2018). In other words, the Second Amended Complaint "depend[ed]" on the assertion that "Lannett was committing antitrust violations." *Id.*

Plaintiffs then filed the currently pending Third Amended Complaint, this time alleging a modified set of facts and modified theories of liability. This time around, Plaintiffs do not rely on the theory that Defendants misrepresented their own anticompetitive conduct.[4] Rather, Plaintiffs' theory of liability in the Third Amended Complaint is that Defendants misled investors by stating that price increases were the result of legitimate and competitive market forces, despite Defendants' knowledge that the market was being driven by antitrust violations being committed by Defendants' competitors. Further, the Third Amended Complaint asserts

---

[4] Defendants, however, spend the majority of their briefing addressing this theory. Defendants' arguments as to this theory go without response from Plaintiffs, and therefore the theory is waived. *See, e.g.*, *Skirpan v. Pinnacle Health Hosps.*, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010). If Plaintiffs wish to later pursue this theory based on evidence obtained during discovery, they could do so only be requesting leave of court to amend or conform the Complaint.

that Defendants misrepresented both the scope of their internal investigation into potential anti-trust violations and the likelihood that Lannett would be implicated in the broader price-fixing prosecutions.[5] Defendants have filed a renewed motion to dismiss, which is now before the Court.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" will not suffice. *Id.* at 683. Instead, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 542 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 545). In determining whether a complaint satisfies this standard, a court must first outline the required elements, then "peel away . . . allegations that are no more than [legal] conclusions and thus not entitled to the assumption of truth," and finally decide whether the well-pled factual allegations—taken as true—entitle the plaintiff to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Here, however, Plaintiffs assert securities claims under Section 10(b) and Rule 10b-5 that are subject to certain heightened pleading standards pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1)-(2) (the "PSLRA"). To state a claim under Section 10(b)

---

[5] Because, as will be discussed below, the Complaint survives based on the allegations as to misrepresentations about Defendants' prices being based on "competitive" market forces, the Court will not reach the secondary allegations relating to Defendants' misrepresentations about the internal investigation or likelihood of Defendants' implication in the industry-wide probe.

and Rule 10b-5, a plaintiff must allege that Defendants (1) "made a misstatement or an omission of material fact," also known as "falsity"; (2) "with scienter"; (3) "in connection with the purchase or the sale of a security"; (4) "upon which plaintiffs reasonably relied"; and (5) that the reliance "was the proximate cause of [plaintiffs'] injury," also known as "loss causation." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009) (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). As to the "falsity" requirement, Plaintiffs must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d at 252-53. As to the "scienter" requirement, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

## IV.     DISCUSSION

Defendants urge dismissal of the Complaint for Plaintiffs' failure to plead falsity, scienter, and loss causation. They also argue that the Complaint fails to state a claim against Bedrosian and Galvan as "control persons" under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t. Each argument is addressed in turn below.

### A.  Falsity

To plead a material misstatement to the standards required by the PSLRA, Plaintiffs must plead "the who, what when where and how: the first paragraph of any newspaper story." *Avaya*, 564 F.3d at 253. "'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d

164, 172 n.7 (2d Cir. 2004)); *see also United States ex rel. Gohil v. Aventis, Inc.*, 2017 WL 85375, at *8 n.23 (E.D. Pa. Jan. 10, 2017).

Here, Plaintiffs allege that Defendants materially misled investors by repeatedly claiming that price increases for Defendants' various generic drugs were due to strong market competition and other legitimate market factors.[6] Plaintiffs plead who (Defendants Bedrosian and Galvan), what (repeated statements that the generic pharmaceutical market is highly competitive and that pricing decisions were based on competitive market pressures), when (specific dates are attached to each statement), and where (the context of the statements).

The key question, however, is the "how"—the way in which the statements were misleading. And, the Complaint meets that standard with respect to the statement: "[w]e face strong competition in our generic product business." Plaintiffs have alleged the opposite was true—that the market for Defendants' generic products was riddled with anticompetitive conduct. In support of this contention, Plaintiffs point to price spikes across all five medications at issue here without any market-based explanation for the price hikes (such as "supply or production issues," "clinical investigator inspections," "drug safety labelling changes," "post-market requirements and commitment studies required by the FDA," "FDA notification of drug shortages," "change[s] in formulation," or "new patent[s]"); various news articles questioning the unexplained and sharp price increases; repeated and ongoing investigations conducted by law enforcement at the state and federal level;[7] a Congressional investigation; criminal convictions

---

[6] It should be noted at the outset that while Defendants purport to be befuddled as to what theory of liability Plaintiffs are asserting in their Complaint, they do accurately divine in footnote 12 of their opening brief that Plaintiffs claim that Defendants misled investors by misrepresenting their knowledge of anticompetitive conduct that affected the prices of Defendants' generic drugs. Nevertheless, Defendants fail to address this theory, choosing instead to insist that Plaintiffs' theory of liability depends on the predicate allegations that Lannett participated in the underlying anticompetitive pricing scheme. The result is that much of Defendants' briefing fails to address the crux of Plaintiffs' allegations.

[7] Defendants argue both here in the context of falsity, and later in the context of scienter, that Plaintiffs should not be

of competitors in the market for anti-competitive conduct; various agreements to raise prices among Lannett's competitors; and specific allegations of Defendants' own participation in the anti-competitive conduct, including external phone calls with competitors and internal communications discussing whether and how to collude. Given these allegations that the market was not competitive, Defendants' public contradiction of that fact certainly "would have misled a reasonable investor." *In re Vivendi*, 838 F.3d at 250.

Defendants make five separate arguments in support their contention that falsity is not properly pleaded. First, Defendants contend that Plaintiffs have not adequately plead the existence of "any illegal price-fixing conspiracy," and therefore that the statements at issue were neither false nor misleading. As a preliminary note, Defendants focus primarily on the Complaint's purported failure to allege Defendants' participation in collusion—for instance, by arguing that there "has been no adjudication that Lannett has engaged in price-fixing or other collusive conduct"—but this approach, once again, misapprehends the Complaint. Plaintiffs do not hang their hat on Defendants' participation in the price-fixing scheme, but instead, *inter alia*, on Defendants' misrepresentations regarding the anticompetitive nature of pricing in the generic drug market. *See supra* section II (explaining how the operative Third Amended Complaint differs from the previously dismissed Second Amended Complaint).

---

able to refer to the State AG complaint (and presumably the other investigations) in pleading their claims. In Defendants' words: "[T]he Federal Rules do not permit a litigant to plead a claim merely by Xeroxing unproven allegations made by another litigant." Defendants' approach fails for several reasons. First, Defendants' argument distorts Plaintiffs' Complaint. The Complaint does not "merely . . . Xerox[]" the State AG complaint, but rather points to specific allegations that support or provide additional information surrounding Plaintiffs' core allegations. Second, the only binding authority to which Defendants cite bears solely on the caricature that Defendants have attacked rather than on the Complaint that Plaintiffs indeed filed. *See Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1276 (3d Cir. 1994) (holding that it was impermissible for attorneys to have filed securities complaints that "repeated the allegations word for word from [another complaint] except that the name of the plaintiff and the number of shares . . . owned were changed"). Third, it is not unusual for courts to recognize, "[e]ven under the PSLRA's more particularized pleading requirements," that it is appropriate for plaintiffs to "rely 'on documentary evidence that qualifies as a reliable source for pleading purposes,'" *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *6 (S.D.N.Y. June 28, 2010) (quoting *In re New Century*, 588 F. Supp.2d 1206, 1221 (C.D. Cal. 2008)), and have concluded that in some cases SEC complaints and other court pleadings may be considered, *see, e.g.*, *In re Cylink Sec. Litig.*, 178 F. Supp.2d 1077, 1080 (N.D. Cal. 2001); *In re New Century*, 588 F. Supp.2d at 1220-21.

However, to the extent that Defendants do challenge whether the Complaint pleads an illegal price fixing conspiracy on the part of other market competitors, that argument fails as well. Defendants' strategy is to challenge the viability of each individual allegation—without reference to the others—and conclude that none demonstrate falsity. For example, Defendants point to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to argue that mere evidence of "parallel business behavior"—*i.e.*, raising prices in unison—"falls short of conclusively establishing" an agreement in violation of antitrust laws. *Id.* at 553 (internal quotation marks omitted). This approach is ineffective because the individual allegations cannot be viewed in isolation from one another—rather, they must be "taken together and in context." *In re Vivendi*, 838 F.3d at 250; *see also Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 467 (2013). And, as the Supreme Court in *Twombly* explained, "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim." 550 U.S. at 557. Here, the Complaint has crossed the threshold from possibility to plausibility: The Complaint not only alleges parallel conduct, but also alleges various other facts suggesting anti-competitive conduct within the marketplace, from the increase of prices of certain medications in the United States but not in other countries where they are sold, to the lack of a supply-side explanation for the pricing changes, to the three separate investigations and various allegations arising out of them, to the criminal pleas entered into by high level officials at competitor firms selling the same medications as Defendants and alleged to have directly solicited Defendants' collusion, to the specific conduct of employees of both Defendants and their competitors.[8] Therefore, the Complaint adequately pleads anti-competitive pricing in the generic drug markets at issue here.

---

[8] Another example of Defendants' piece-by-piece strategy is to argue that Lannett and other companies being investigated and charged in the State AG action proves neither that Defendants participated in any anti-competitive behavior nor that they were aware of other competitors' anti-competitive behavior. True enough, it may not prove underlying anti-competitive conduct *on its own*, but it is probative when considered in context with the rest of the allegations laid out on the Complaint. *See In re Gentiva Sec. Litig.*, 932 F. Supp.2d 352, 380 (E.D.N.Y. 2013).

Second, Defendants assert that the Complaint fails to "state the reason . . . why" the statements at issue were false or misleading. But Plaintiffs have laid out exactly how at least certain statements at issue—in particular the statements that "[t]he generic pharmaceutical industry is highly competitive" and that "[w]e face strong competition in our generic product business"—are plausibly false. As already discussed, the Complaint pleads that the opposite of these statements were true: that the generic pharmaceutical industry was riddled with anticompetitive conduct and that Lannett did not face strong competition because prices for the drugs that it sold were illegally inflated by industry competitors' collusive behavior.

Third, Defendants assert that the Complaint "fail[s] to state with particularity all of the facts" on which it claims Defendants' statements were false. As discussed, Plaintiffs have pleaded such facts. Defendants, however, key in on the observation that some facts are alleged based on information and belief, and that when pleading based on information belief in securities lawsuits, "plaintiffs must also 'state with particularity all facts on which that belief is formed.'" *Avaya*, 564 F.3d at 253 (quoting 15 U.S.C. § 78u-4(b)(1)). Plaintiffs have cleared this bar, identifying in detail the sources of their information and the bases upon which they have come to factual conclusions that they assert upon information and belief.[9] But to the extent that Defendants are in fact arguing that the Complaint must state "all facts" that support the underlying allegation, the argument overreaches in that it misreads the text of the PSLRA, which explicitly is limited to "all facts" upon which the "belief is formed," rather than all facts that support the underlying allegation. Moreover, to read the provision otherwise, as Defendants

---

[9] Plaintiffs note that their allegations upon information and belief are based upon counsel's investigation, which includes "review and analysis of, *inter alia*, (i) regulatory filings made by Lannett with the United States Security and Exchange Commission (the 'SEC'); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Lannett; (iv) interviews with former Lannett employees; (v) news articles; (vi) state regulatory complaints filed against Lannett; (vii) other publicly available information concerning Defendants, including pending and closed litigation matters involving Lannett; and (viii) consultation with experts, including a forensic accounting expert."

would have it, would defeat both the purpose of "information and belief pleading"—that is, to not foreclose an action where "the necessary information lies within defendants' control," *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 646 (3d Cir. 1989))—and the purpose of discovery itself—that is, "to uncover facts about the claims and defenses set forth in the pleadings," *Prall v. Bocchini*, 2013 WL 12334127, at *1 (D.N.J. Apr. 4, 2013) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).

Fourth, Defendants argue that the Complaint relies on statements made by Defendants that are "non-actionable puffery." The Third Circuit has held that "[c]ertain vague and general statements of optimism" may not be actionable because they "constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997). Defendants only identify statements "regarding 'regulatory inquiries' and the prospect of 'litigation against' the defendant company" as potential puffery. They do not, however, argue that the statements related to the price-fixing committed by their competitors were puffery (*e.g.*, the statement that "[w]e face strong competition in our generic product business"), and therefore this argument cannot require the claim's dismissal.

Fifth, Defendants argue that certain claims upon which Plaintiffs rely are non-actionable opinions. "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council v. Pfizer, Inc.*, 764 F.3d 159, 170 (3d Cir. 2014) (citing *In re Merck & Co., Inc., Sec.., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008)). As with their arguments as to puffery, Defendants primarily address statements relating to their compliance with regulatory inquiries, but do not address statements related to the price-fixing allegedly committed by Defendants' competitors.

Taking the facts alleged in the Complaint together and as true, which is required at this

stage in the litigation, Plaintiffs have adequately pleaded that Defendants made material misstatements about the competitiveness of the generic drug markets in which they participated, and that these statements would have misled reasonable investors.

## B. Scienter

To successfully plead a violation of Section 10(b), Plaintiffs must allege that Defendants acted with "scienter," which is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Scienter can be shown via recklessness, which is defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must be aware of it." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989) (internal quotation marks omitted). The pleading standard for scienter under the PSLRA "marks a sharp break," *Avaya*, 564 F.3d at 253, from traditional fraud pleading under Federal Rule of Civil Procedure 9(b), in that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has explained that allegations "give rise to the requisite 'strong inference' of scienter," only where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323-24. To arrive at that inference, the allegations in a complaint must be assessed "collectively rather than individually." *Avaya*, 564 F.3d at 280. However, "[t]he inference that the defendant acted with scienter need not be irrefutable." *Tellabs*, 551 U.S. at 324. Ultimately, the scienter determination "will . . . not rest on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture

painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. Taking the factual allegations in the Complaint as true, Plaintiffs have adequately pled scienter for several reasons.

First, "the most powerful evidence of scienter is the content and context" of the misleading statements. *Avaya*, 564 F.3d at 269. And, as the Third Circuit explained in *Avaya*, that contextual analysis makes it significant when a high-ranking officer "evinc[es] certitude" as to a matter, particularly where the underlying substance is being publicly questioned. 564 F.3d at 270. Defendants' statements that the market was "highly competitive," that they faced "strong competition" were made without equivocation in the context of an ongoing set of investigations initiated by multiple law enforcement and oversight bodies, significant public evidence that price patterns were not following ordinary trends, and ongoing questions in the press about collusive conduct. Defendants statements denying any such anti-competitive conduct—made with such "certitude"—when viewed in the "context" of such persistent and significant underlying questions, is suggestive that they were made with the requisite scienter.

Second, according to the Complaint, the false statements at issue relate to "core matters of central importance to [a] company and its high-level executives." *In re Urban Outfitters*, 103 F. Supp.3d 635, 653-54 (E.D. Pa. 2015) (internal quotation marks omitted). When misrepresentations involve such core matters, "an inference of scienter may arise," *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp.3d 874, 905-06 (E.D. Pa. 2018), because it is particularly likely that high ranking officers will speak from a place of knowledge, *see Avaya*, 564 F.3d at 268; *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013). Here, the Complaint alleges that Lannett "derives the majority of its revenue from the sale of generic drugs," that the business "relied on high profit margins" from the drugs at issue in this case,

which made up as much as 72% of Lannett's sales. Therefore, it is reasonable to infer that Defendants Bedrosian and Galvan had knowledge of pricing in the industry when they spoke of such matters publicly—which supports an inference of scienter.

The "core matters" inference is particularly important in evaluating the Complaint's allegations regarding specific instances where Lannett employees learned that the prices for individual drugs at issue in this case were being driven by anti-competitive conduct. For example, the Complaint pleads Heritage Pharmaceuticals approached Lannett employees seeking to coordinate an increase of the price of Doxy Mono, and that Lannett employees exchanged "internal communications" in which they "consider[ed] what was learned from Heritage." The Complaint also alleges that a phone call was held between Heritage and Lannett employees that "result[ed] in an agreement to raise the price of Doxy Mono." Similarly, the Complaint alleges that Lannett and its competitors simultaneously raised the prices of several drugs almost immediately after they had jointly attended a trade conference. While these allegations do not directly mention Defendants Bedrosian and Galvan, knowledge of the conduct at issue can be "imputed" to them because it involves "core business" activities. *In re Stonepath Grp. Inc. Sec. Litig.*, 397 F. Supp.2d 575, 589 (E.D. Pa. 2005) (collecting cases). Knowledge of this conduct would make it clear that the market for the drugs at issue was not competitive. Thus, the conduct alleged, combined with the core business inference, supports an inference of scienter.

Third, ongoing investigations into anticompetitive pricing in the market may represent a "piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *In re Gentiva Sec. Litig.*, 932 F. Supp.2d 352, 380 (E.D.N.Y. 2013). Here, Plaintiffs allege that Defendants were scrutinized by State Attorneys General (which have thus far resulted in criminal charges levied against Lannett and its market competitors, and a criminal conviction

as to at least one competitor), the Department of Justice's Antitrust Division, and the United States Congress. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp.2d 148, 168 (S.D.N.Y. 2008) (considering governmental investigation in scienter analysis). These various entities were each investigating whether collusion led to the recent increases in generic drug prices. While not dispositive, so many different governmental entities investigating pricing in the industry provides support—at this stage of the litigation—for an inference of scienter.

Fourth, the Complaint affirmatively alleges that there were no external factors (that is, "supply or production issues," such as "clinical investigator inspections," "drug safety labelling changes," "post-market requirements and commitments studies required by the FDA," FDA notification[s] of drug shortages," "changes in formulation" or "new patent[s]") that could have caused the price spike. A "reasonable person," *Tellabs*, 551 U.S. at 323, assessing whether Defendants Bedrosian and Galvan acted with scienter could "deem . . . cogent," *id.* at 324, the inference that, in the absence of legitimate explanations, the price spikes were caused by illegitimate anti-competitive conduct.

While Plaintiffs have alleged facts supporting an inference of scienter, that alone is not enough. The Complaint may only survive "if a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Defendants assert that this Court's conclusion in dismissing the Second Amended Complaint remains true here—that "Bedrosian and Galvan made representations about price competition . . . based on their understanding that the Generic Drugs market, though otherwise legal, was dominated by few competitors[.]" *Utesch*, 316 F. Supp.3d at 907. But Defendants cannot rest on that conclusion, because, as discussed, the theory of the currently operative complaint has changed significantly from the dismissed complaint. Most importantly, the

Complaint now focuses on whether Defendants misrepresented the competitive nature of the market, rather than whether Defendants misrepresented their own "participat[ion] in an anticompetitive scheme to price-fix the Generic Drugs." *Id.* at 902. Given that change in focus, the inference of scienter is "at least as compelling as any opposing inference." *Tellabs*, 551 F.3d at 324. Indeed, accepting the facts as pleaded, it would appear implausible that Defendants were unaware of the anti-competitive conduct driving prices for their products. Therefore, Plaintiffs have successfully pleaded that Defendants acted at least recklessly—that is, that Defendants engaged in "an extreme departure from the standards of ordinary care . . . which present[ed] a danger of misleading . . . that [was] either known to the defendant or [was] so obvious that the actor[s] must [have been] aware of it[.]" *Phillips*, 881 F.2d at 1244 (internal quotation marks omitted). Accordingly, the Complaint will not be dismissed on scienter grounds.

### C. Loss Causation

Loss causation refers to "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Unlike falsity and scienter, ordinary pleading rules apply, *see id.* at 347, and adequately alleging loss causation requires only pleading a "sufficient causal nexus between the loss and the alleged misrepresentation," *EP Medsystems, Inc. v. EchoCath, Inc*, 235 F.3d 865, 883 (3d Cir. 2000) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000)). Thus, Plaintiffs must allege that they "'purchased a security at market price that was artificially inflated due to a fraudulent misrepresentation'" and that "the artificial inflation was actually 'lost' due to the alleged fraud . . . that is, that the stock price 'dropped in response to disclosure of the alleged misrepresentations.'" *In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp.2d 680, 687 (E.D. Pa. 2001) (quoting *Semerenko*, 223 F.3d at 184-85).

Plaintiffs have adequately pleaded loss causation by alleging that Lannett stock prices dropped steeply after the purportedly misleading statements were publicly corrected. Specifically, they allege that prices dropped immediately after, among other public disclosures, the revelation of an investigation into the pricing of Digoxin, the revelation that Lannett had received grand jury subpoenas relating to anti-competitive conduct across the generic pharmaceutical industry, and the revelation that criminal charges would likely be filed against many competitors in the industry (including against Lannett).

Defendants contend, relying on *Loos v. Immersion Corp.*, 762 F.3d 880, (9th Cir. 2014), that these corrective disclosures do not plead loss causation because the decline in price could be based only on "market speculation about whether fraud has occurred," not on a genuine "revelation" of a false statement. *Id.* at 889-90. This argument is unpersuasive for several reasons. First, as Defendants appropriately acknowledge, *Loos* has subsequently been limited by *Lloyd v. CVB Financial Corp.*, which held that although an "the announcement of an investigation . . . standing alone" does not qualify as a corrective disclosure, it "can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant." 911 F.3d 1200, 1209-10 (9th Cir. 2016) (internal quotation marks omitted). As was the case in *Lloyd*, "much more [that simply an investigation] is alleged here," *id.* at 1210, including the subpoenas, the criminal charges, and reporting about suspicious pricing patterns. Second, Defendants' legal argument proves too much: taken at its terms, Defendants' argument would mean that loss causation could only be proven through a criminal conviction— the point at which the fraud is no longer "speculative." But that is not the law. Instead, any "exposure of the fraudulent representation . . . is the critical component of loss causation." *Lapin*, 506 F. Supp.2d at 243 (internal quotation marks omitted). That exposure can be made

through the announcement of an SEC investigation, *see, e.g.*, *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp.2d 822, 828-29 (D.N.J. 2006); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp.2d 261, 282 (S.D.N.Y. 2012), news articles, *see, e.g.*, *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *21 (E.D. Pa. Sept. 3, 2010), or other "unproven" allegations, *Hull*, 2017 WL 6493148 at *14. Third, courts across the country have rejected Defendants' theory as "overly rigid," *Pub. Emps. Retirement Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324-25 (5th Cir. 2014), instead recognizing that "a corrective disclosure need not take a particular form," *Hull v. Global Digital Solutions, Inc.*, 2017 WL 6493148, at *14 (D.N.J. Dec. 19, 2017) (citing *Dura Pharms*, 544 U.S. at 346). *See also In re Bristol Myers Squibb*, 586 F. Supp.2d at 165 ("[T]here is no requirement 'that a corrective disclosure take a particular form or be of a particular quality[.]'" (quoting *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp.2d 221, 243 (S.D.N.Y. 2006)). As a result, Plaintiffs have adequately pleaded that Defendants' misrepresentations caused economic loss to investors.

### D. Liability of Individual Defendants

Defendants seek to dismiss Plaintiffs' claims against Defendants Bedrosian and Galvan, which are premised on the theory that each is a "controlling person" under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). To plead liability under Section 20(a), Plaintiffs must allege "(1) an underlying violation [of the Act] by a controlled person or entity; (2) that the defendants are controlling persons; and (3) that they were in some meaningful sense culpable participants in the fraud." *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp.2d 551, 588 (D.N.J. 2001) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)); *see also SEC v. J.W. Barclay & Co., Inc.*, 442 F.3d 834, 841-42 (3d Cir. 2006).[10]

Defendants first argue that Plaintiffs have not pleaded an "underlying violation" of the

---

[10] Defendants do not challenge their status as "controlling persons."

Act.  This contention is foreclosed by the Court's conclusion that Plaintiffs have adequately pleaded a securities fraud claim.

Defendants secondarily assert in passing that Plaintiffs have not pleaded that Defendants were "in some meaningful sense culpable participants in the fraud," because Plaintiffs do not allege individual Defendants "sen[t] or receiv[ed] a single email, text message, or other written or recorded communication with any of their alleged co-conspirators in furtherance of the purported price-fixing scheme."  This contention is inapposite for two independent reasons. First, as noted above, it misunderstands the nature of Plaintiffs' claims—Plaintiffs do not allege that Defendants engaged in price-fixing, but rather that Defendants knew about the price fixing committed by others, and then that Defendants lied about their knowledge.  So whether Defendants engaged in communications "in furtherance of the purported price-fixing scheme" is not directly dispositive of the claims at issue here.  Second, the Complaint does assert Defendants' participation in the fraud at issue—it asserts that Defendants made oral and written public statements misleading investors about the competitiveness of the market and the forces contributing to price spikes.

Therefore, Plaintiffs have adequately pleaded their Section 20(a) claim.

An appropriate order follows.

**May 15, 2019**

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

**_____**

**WENDY BEETLESTONE, J.**