**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN UTESCH, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 2:16-cv-05932-WB |
| Plaintiff(s), | <u>ORAL ARGUMENT REQUESTED</u> |
| v. | Judge Wendy Beetlestone |
| LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, and MARTIN P. GALVAN, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

I.      INTRODUCTION ............................................................................................1

II.     STATEMENT OF FACTS .................................................................................3

III.    ARGUMENT ...................................................................................................6

        A.      The Requirements Of Rule 23(a) Are Satisfied .........................................7

                1.      Numerosity: The Proposed Class Is So Numerous
                        That Joinder Of All Members Is Impracticable .............................7

                2.      Commonality: There Are Questions Of Law And Fact
                        Common To The Proposed Class ..................................................9

                3.      Typicality: Plaintiffs' Claims Are Typical Of The
                        Claims Of Other Class Members .................................................10

                4.      Adequacy: Plaintiffs Will Fairly And Adequately
                        Protect The Interests Of The Class ..............................................11

        B.      The Requirements Of Rule 23(b)(3) Are Satisfied ...................................13

                1.      Common Questions Predominate ................................................13

                        a.      Reliance May Be Presumed For Class Members Under the
                                "Fraud On The Market" Doctrine ....................................14

                                (1)     Lannett Stock Traded On An Efficient Market................16

                                (2)     The *Cammer* Factors Demonstrate Market
                                        Efficiency ........................................................17

                                (3)     Additional Well-Accepted Factors Further
                                        Supporting Market Efficiency.............................21

                        b.      Damages Are Measurable Using A Common Methodology .........23

                2.      Class Treatment Is Superior To Other Methods Of
                        Adjudication.............................................................................24

                3.      The Proposed Class Is Ascertainable ..........................................26

IV.     CONCLUSION..............................................................................................26

# TABLE OF AUTHORITIES

**Case**                                                                          **Page(s)**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) .................................................................................. 24

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................... 12, 13, 14

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*,
  568 U.S. 455 (2013) ............................................................... 7, 13, 14, 15

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...................................................................... 15, 16, 17

*Bing Li v. Aeterna Zentaris, Inc.*,
  324 F.R.D. 331 (D.N.J. 2018) .................................................................... 9

*Bing Li v. Aeterna Zentaris, Inc.*,
  2018 WL 1143174 (D.N.J. Feb. 28, 2018) .............................................. 23

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015).................................................................... 26

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................... 17, 18, 19, 20

*Carr v. Flowers Foods, Inc.*,
  2019 WL 2027299 (E.D. Pa. May 7, 2019) ............................................ 26

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ............................................................ 19

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) ........................... 6, 16, 20, 21

*City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*,
  867 F.3d 434 (3d Cir. 2017)..................................................................... 26

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................................. 23, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) .................................................................................. 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................... 15, 16

*Hicks v. Morgan Stanley & Co.*,
  2003 WL 21672085 (S.D.N.Y. July 16, 2003) ....................................... 14

*Howard v. Liquidity Services Inc.*,
   322 F.R.D. 103 (D.D.C. 2017) ............................................................................ 24

*Hull v. Glob. Digital Sols., Inc.*,
   2018 WL 4380999 (D.N.J. Sept. 14, 2018) .......................................................... 17

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................... 20

*In re CIGNA Corp. Sec. Litig.*,
   2006 WL 2433779 (E.D. Pa. Aug. 18, 2006) .......................................................... 8

*In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*,
   795 F.3d 380 (3d Cir. 2015) ........................................................................ 11, 26

*In re Constar Int'l Inc. Sec. Litig.*,
   585 F.3d 774 (3d Cir. 2009) ................................................................................ 7

*In re Corel Corp. Secs. Litig.*,
   206 F.R.D. 533 (E.D. Pa. 2002) ........................................................................... 9

*In re DaimlerChrysler AG Sec. Litig.*,
   216 F.R.D. 291 (D. Del. 2003) ........................................................................... 11

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) ........................................................ 6, 9, 18, 21, 25

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011) ........................................................... 6, 12, 16, 21

*In re Gaming Lottery Sec. Litig.*,
   2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ........................................................... 23

*In re Heckmann Corp. Sec. Litig.*,
   2013 WL 2456104 (D. Del. Jun. 6, 2013) ....................................................... 16, 25

*In re Herley Indus. Inc. Sec. Litig.*,
   2009 WL 3169888 (E.D. Pa. Sept. 30, 2009) ........................................................ 15

*In re K-Dur Antitrust Litig.*,
   2008 WL 2699390 (D.N.J. Apr. 14, 2008) ........................................................... 11

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
   2013 WL 396117 (D.N.J. Jan. 30, 2013) ...................................................... 6, 10, 16, 25

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*,
   2012 WL 4482041 (D.N.J. Sept. 25, 2012) ....................................................... 9, 19

*In re Modafinil Antitrust Litig.*,
   837 F.3d 238 (3d Cir. 2016) ............................................................................... 8

*In re NII Holdings, Inc. Sec. Litig.*,
  311 F.R.D. 401 (E.D. Va. 2015) ........................................................................... 20

*In re Novo Nordisk Sec. Litig.*,
  2020 WL 502176 (D.N.J. Jan. 31, 2020) ............................................................... 23

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ................................................................................... 10

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
  2012 WL 4482032 (D.N.J. Sept. 25, 2012) ............................................... 12, 13, 25

*In re Urban Outfitters, Inc. Sec. Litig.*,
  2016 WL 1043014 (E.D. Pa. 2014) ........................................................................ 26

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ............................................................................. 10, 11

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................... 21, 22

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) .......................................................................... 22

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ........................................................................ 7, 8, 9, 26

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ...................................................................... 22

*Milbeck v. TrueCar, Inc., et al.*,
  2019 WL 2353010 (C.D. Cal. May 24, 2019) ................................................... 2, 3, 4

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) .......................................................................... 13, 23, 24

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ................................................................................... 10

*Roofer's Pension Fund v. Papa*,
  333 F.R.D. 66 (D.N.J. 2019) ............................................................... 10, 18, 23, 25

*Sharp v. Coopers & Lybrand*,
  83 F.R.D. 343 (E.D. Pa. 1979) ............................................................................... 24

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................ 14

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) ..................................................................................... 9

*Tatz v. Nanophase Techs. Corp.*,
   2003 WL 21372471 (N.D. Ill. June 13, 2003) ........................................................ 22

*Tech. Corp. Sec. Litig.*,
   147 F. Supp. 2d 1049 (D. Colo. 2001) .................................................................. 18

*Thomas v. Duralite Co., Inc.*,
   524 F.2d 577 (3d Cir. 1975) ............................................................................... 24

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ............................................................................... 20

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
   2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .................................................... 8, 12, 16, 17, 20

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ............................................................................. 14, 16

*Williams v. Jani-King of Phila., Inc.*,
   837 F.3d 314 (3d Cir. 2016) ................................................................................. 7

*Yang v. Odom*,
   392 F.3d 97 (3d Cir. 2004) .................................................................................. 6

Lead Plaintiff University of Puerto Rico Retirement System ("Lead Plaintiff") and plaintiff Ironworkers Locals 40, 361 & 417 Union Security Funds (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for motion for (i) class certification pursuant to Fed. R. Civ. P. ("Rule") 23(a) and (b)(3); (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of Lead Counsel Abraham, Fruchter & Twersky, LLP as Class Counsel pursuant to Rule 23(g).

## I.  **INTRODUCTION**

Pursuant to Rule 23, Plaintiffs seek certification of a class of all persons and entities who purchased or acquired the publicly traded common stock of Lannett Company, Inc. ("Lannett" or the "Company") during the period from July 15, 2014 and October 31, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[1]  This action asserts claims against Lannett, Lannett's former Chief Executive Officer Arthur P. Bedrosian ("Bedrosian"), and Lannett's former Chief Financial Officer Martin P. Galvan ("Galvan") (collectively, "Defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Specifically, Plaintiffs allege that Defendants made materially false and misleading statements about the competitiveness of the generic drug markets in which they participated and about the potential effects on the Company of regulatory investigations and antitrust actions relating to industry-wide generic drug price-fixing agreements and other anticompetitive conduct.  On May 15, 2019, the Court entered an Order sustaining Plaintiffs' securities fraud claims against Defendants (ECF No. 89).  In securities class actions such as this, the Third

---

[1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

Circuit and courts across the country have long recognized that class certification is appropriate and desirable.  Indeed, this action is ideally suited for class treatment, as it satisfies each of the requirements of Rule 23(a) and (b)(3).

*First*, this action meets all of the requirements of Rule 23(a).  Courts regularly recognize that the "numerosity" requirement of Rule 23(a)(1) is easily met where, as here, the securities are traded on the New York Stock Exchange ("NYSE") by investors spread across the country.  The "commonality" and "typicality" requirements of Rule 23(a)(2) and (3) are met because legal and factual issues such as the falsity of Defendants' statements and their intent to defraud can be resolved on a classwide basis, and all claims arise from Defendants' singular course of fraudulent conduct.

Furthermore, Plaintiffs are sophisticated institutional investors – the precise type of investors that Congress envisioned should lead securities fraud class actions – that will fairly and adequately protect the interests of the Class in accordance with Rule 23(a)(4).  Plaintiffs have no interest antagonistic to or in conflict with the Class, and have already demonstrated their adequacy by (i) defeating the motion to dismiss; (ii) participating in litigation and discovery efforts; and (iii) retaining highly experienced and qualified counsel to serve as Class Counsel.

*Second*, this action meets all of the requirements of Rule 23(b)(3).  Plaintiffs are entitled to rely on the "fraud-on-the-market" presumption of reliance because the market for Lannett common stock was efficient, and issues common to the Class predominate over any individual issues.  To demonstrate market efficiency, Plaintiffs submit the Expert Report of Chad Coffman, CFA,[2] a widely respected expert whose opinions have been relied upon and accepted by courts across the country in certifying securities fraud class actions.  *See, e.g., Milbeck v. TrueCar, Inc.,*

---

[2] The Expert Report of Chad Coffman, CFA (the "Coffman Report") is attached as Exhibit A to the Declaration of Ian D. Berg (the "Berg Decl."), filed herewith.

*et al.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (certifying class and finding "[v]arious courts have considered the same Coffman report as that offered in this case and have found it sufficient").  The Coffman Report also explains how damages in this case can be easily quantified and measured on a class-wide basis, as courts have regularly reaffirmed in securities fraud cases.

*Finally*, given that Class members are geographically dispersed throughout the country and unlikely to bring small individual claims, a class action is superior to a multitude of individual actions.  By certifying this case as a class action, this Court will allow Plaintiffs and thousands of other investors to prosecute their claims efficiently and effectively.  Accordingly, Plaintiffs respectfully requests that this Court certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint Abraham, Fruchter & Twersky, LLP as Class Counsel.

## II.   STATEMENT OF FACTS

Lannett is a pharmaceutical corporation that manufactures and sells generic drugs.  This case alleges that throughout the Class Period, Defendants knowingly or recklessly misled Plaintiffs and other investors through materially false and misleading statements and omissions regarding Lannett's generic drug pricing and the risk that Lannett would be implicated in, or impacted by, a regulatory investigation or legal action concerning unlawful price-fixing and anticompetitive conduct.  ¶1.[3]  Defendants' misleading statements and omissions caused and maintained artificial inflation in the price of Lannett's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market.  ¶¶172-73. As a result of Defendants' wrongful conduct, Plaintiffs and the Class purchased Lannett common

---

[3] References to "¶_" are to paragraphs of the Third Amended Consolidated Securities Class Action Complaint, filed on September 21, 2018 (ECF No. 81; herein, the "Complaint").

stock at artificially inflated prices and were damaged thereby when the price of Lannett common stock declined when the truth was revealed. *Id*.

The generic drug industry is a construct of rules and regulations established by the Food and Drug Administration ("FDA").  ¶24.  New, brand-named drugs are afforded a time of exclusive market share, which allows the manufacturer to set prices intended to recoup development costs and generate profit.  At the end of the exclusivity period, competitors are permitted to sell competing "generic" drugs, which are exact copies of the brand-name drugs, in terms of ingredients, dosage form, safety, strength, performance characteristics and intended use. ¶24.  Historically, and by intention, the introduction of generic drugs creates downward pricing pressure and leads to a precipitous drop in drug prices – including the prices for the original brand-name drug competing with the generics.  ¶¶25-27.

In the year prior to the Class Period, pricing trends of generic drugs took a dramatic change, such that there were no longer precipitous drops in pricing when generic drugs were introduced to the market.  ¶28.  In fact, drug prices – including generic drug prices – started to increase.  *Id.; see also, e.g.*, ¶¶55, 62, 67, 68, 72.  This market trend, which was contrary to basic market principles and against the long-term economic interests of the market participants, sparked the curiosity of market analysts and the concern of market regulators.  Although Lannett (and most of its competitors) claimed that the changed pricing trend and lack of pricing pressure was the result of competitive market forces, such as industry consolidation, FDA-mandated plant closures, and the elimination of unprofitable drug lines (¶28, ¶5), market analysts and regulators understood that there were no material increases in drug demand, production costs, or reported supply shortages that would have justified or otherwise explained the dramatic and correlated

price increases at the time of these price hikes, as claimed by Lannett and the competing market participants. *See* ¶¶5-6, 166.

The curiosity of market analysts and the concern of regulators led to a string of increased regulatory scrutiny of the industry – including Lannett, starting with the disclosure of a subpoena and interrogatories served on Lannett by the Connecticut Attorney General (at the beginning of the Class Period, July 15, 2014) (¶6); leading to the disclosure of a letter sent to Lannett requesting documents and information as part of a Congressional investigation of generic drug pricing (¶38); and culminating on October 31, 2017 (the end of the Class Period) with Lannett becoming a named defendant in the expanded action *State of Connecticut v. Aurobindo Pharma USA, Inc. et al.*, Case Nos. 17-cv-3768, 16-md-274 (E.D. PA), brought on behalf of the State of Connecticut and the Attorneys General of 44 other states, the District of Columbia and Puerto Rico, alleging a far reaching illegal price fixing and market share allocations conspiracy by Lannett and 19 other generic drug manufacturers.  ¶186.

Throughout the Class Period, Defendants stated with confidence and certainty that Lannett was not engaged in anticompetitive conduct, and that Lannett's price increases and financial results were the product of sustainable competitive market forces.  ¶158.  Defendants' false assurances that Lannett "did nothing wrong" and acted in compliance with all applicable laws and regulations were purportedly based on the results of an internal investigation performed by outside counsel.  ¶124.  These assurances created the false impression that Lannett, as directed by Defendant Bedrosian and the Board of Directors, had conducted a complete and thorough investigation as to whether Lannett engaged in anticompetitive conduct and the risk that Lannett would be implicated in the expanding action alleging anticompetitive conduct. ¶136.  In truth, at the time of those assurances, the Company's investigation was on-going, and

initially had a particularly limited scope of only one drug (Digoxin).   ¶158.  Also, it was later revealed that Defendant Bedrosian was not conducting the on-going and expanding investigation; rather, he was a target of the investigation that appears to have lasted throughout the entire Class Period and beyond Defendant Bedrosian's forced resignation on September 25, 2017 – just approximately one month before Lannett was named as a defendant in the Attorneys General's action.  ¶159, ¶171.

As the scope of the Class Period indicates – starting with the initial disclosure of a subpoena and interrogatories relating to a regulatory investigation involving Lannett (July 15, 2014) and ending with a regulatory action against Lannett (October 31, 2017) – this case is not about whether Lannett will be found guilty or liable of illegal anticompetitive conduct in the still pending action filed by the Attorneys General or a related private antitrust action.  Rather, this case is about Defendants' misleading statements with respect to Lannett's pricing strategy of generic drugs and the risk of Lannett being implicated in, or impacted by, a regulatory investigation or legal action concerning illegal anticompetitive behavior.  ¶157.

## III.   ARGUMENT

"[F]ederal securities actions are 'well suited' for litigation under Rule 23."  *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013). Indeed, "[i]n the context of securities fraud actions, the Third Circuit has observed that '[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device.'"  *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 200 (E.D. Pa. 2008) (quoting *Yang v. Odom*, 392 F.3d 97, 109 (3d Cir. 2004)), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011); *see also City of Sterling Heights Gen. Emps.' Ret. Sys.*

*v. Prudential Fin., Inc.*, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015) ("[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases.").

Class certification is appropriate where the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied.  *See Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009).  Rule 23(a) has four prerequisites—numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a)(1)-(4).  Rule 23(b)(3) requires that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

As Supreme Court and Third Circuit authority make clear, the inquiry at the class certification stage is not whether the plaintiff will ultimately prevail on the merits, but whether the requirements of Rule 23 are met.  *See Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the [class] certification stage."); *Williams v. Jani-King of Phila., Inc.*, 837 F.3d 314, 322 (3d Cir. 2016).  Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466.

### A.       The Requirements Of Rule 23(a) Are Satisfied

The proposed Class satisfies the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a).  *See* Fed. R. Civ. P. 23(a)(1)-(4).

### 1.       Numerosity: The Proposed Class Is So Numerous That Joinder Of All Members Is Impracticable

The numerosity requirement is met where "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  To establish numerosity, a plaintiff is not required to "offer direct evidence of the exact number and identities of the class members."

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012).  Instead, "circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition" is sufficient.  *Id*.  Moreover, "[w]hile no minimum number of plaintiffs is required to maintain a suit as a class action," as a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *In re Modafinil Antitrust Litig*., 837 F.3d 238, 249-50 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (internal punctuation omitted); *see also* Defendants' Response to Requests for Admission ("RFA Resp.") No. 22, attached as Ex. B to the Berg Decl. ("Defendants admit that at least 40 persons purchased or otherwise acquired Lannett common stock between July 15, 2014 and October 31, 2017").  Indeed, there is "a presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security," such as Lannett stock.  *In re CIGNA Corp. Sec. Litig.*, 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18, 2006).

The proposed Class readily satisfies the numerosity requirement.  *First*, throughout the Class Period, Lannett common stock traded on the NYSE.  Coffman Report ¶11; *see also* RFA Resp. No. 1.  *Second*, there were at minimum 35.6 million shares of Lannett common stock outstanding throughout the Class Period.  Coffman Report ¶69.  The average weekly trading volume for Lannett common stock was 4.56 million shares, which represents 12.47% of shares outstanding.  *Id*. at ¶25; RFA Resp. No. 5 and 6.  These facts easily establish numerosity.  *See CIGNA*, 2006 WL 2433779, at *2 (numerosity satisfied where "stock was actively traded on the [NYSE]"); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *7 (E.D. Pa. Aug. 4, 2016) (numerosity satisfied where millions of shares were outstanding).

### 2. Commonality: There Are Questions Of Law And Fact Common To The Proposed Class

The commonality requirement is met where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class members." *Marcus*, 687 F.3d at 597 (internal punctuation and citation omitted). "For purposes of Rule 23(a)(2), even a single common question will do." *Id*. "Courts in this circuit ... have recognized that securities fraud cases often present a 'paradigmatic common question of law or fact' of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018) (quoting *In re Corel Corp. Secs. Litig.*, 206 F.R.D. 533, 540 (E.D. Pa. 2002) (citations omitted)).

Here, there are many questions of law and/or fact common to all Class members, including whether: (i) Defendants' statements and omissions were materially false or misleading; (ii) Defendants' misrepresentations and omissions were made with scienter; (iii) the price of Lannett common stock was artificially inflated during the Class Period; (iv) Defendants' misrepresentations and omissions caused economic harm to Class members; and (vi) Defendants Bedrosian and Galvan were control persons. *See DVI*, 249 F.R.D. at 201 ("whether Defendants' conduct violated securities laws is common to all class members"); *In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *4 (D.N.J. Sept. 25, 2012) ("questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact") (alteration in original). Further, class certification is appropriate here because these common questions will "generate common answers 'apt to drive the resolution of the litigation.'" *Sullivan v. DB Invs.*, Inc., 667 F.3d 273, 299 (3d Cir. 2011) (citation omitted). Accordingly, commonality is satisfied.

### 3.   Typicality: Plaintiffs' Claims Are Typical
### Of The Claims Of Other Class Members

The typicality requirement is met where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The standard for demonstrating typicality is undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 75 (D.N.J. 2019) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)). Rule 23(a)(3) "does not require that the putative class members all share identical claims." *Id.* at 75 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004); *see also In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 598 (3d Cir. 2009) ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

The requisite similarity between Plaintiffs' claims and those of other Class members is established here, as Plaintiffs and all other Class members assert the same claims under the federal securities laws based on the same conduct by Defendants. Specifically, Plaintiffs and the other members of the Class allege that Defendants made material misrepresentations and omissions during the Class Period regarding Lannett's generic drug pricing and the risk that Lannett would be implicated in, or impacted by, a regulatory investigation or legal action concerning unlawful price-fixing and anticompetitive conduct. Moreover, the injury Plaintiffs suffered is the same injury suffered by the Class as a whole, as all Class members—including Plaintiffs—purchased or acquired Lannett common stock at prices that were artificially inflated by Defendants' fraud. *See Merck*, 2013 WL 396117, at *6 (typicality established where "[t]he

class claims . . . arise out of the same conduct—transactions in [the company's] securities that were based on an allegedly artificially inflated stock price as a result of Defendants' misrepresentations and omissions"). Thus, the claims of both Plaintiffs and the Class relate to the adequacy of Defendants' public disclosures and will rely on the same facts and legal theories to establish liability. Accordingly, the shared circumstances and legal arguments supporting the claims of Plaintiffs and the Class support a finding of typicality. *See In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 298 (D. Del. 2003) ("A representative's claim is typical if it arises from the same event, practice, or conduct that gives rise to the claim of the other class members, and is based on the same legal theory") (citations omitted).

### 4.    Adequacy: Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "has two components": "[f]irst, the adequacy inquiry tests the qualifications of the counsel to represent the class"; and, "[s]econd, it seeks to uncover conflicts of interest between named parties and the class they seek to represent." *Warfarin*, 391 F.3d at 532 (internal citations and quotation marks omitted). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). To preclude class certification, an alleged conflict of interest between the class representative and other class members "must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re K-Dur Antitrust Litig.*, 2008 WL 2699390, at *9 (D.N.J. Apr. 14, 2008) (citations omitted). Moreover, the adequacy requirement "does not mandate that the

interests of all class members be identical." *In re Schering-Plough Corp./ENHANCE Sec. Litig.,* 2012 WL 4482032, at *6 (D.N.J. Sept. 25, 2012).

Here, there are no fundamental conflicts between Plaintiffs and the putative Class.  In fact, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem Prods. v. Windsor,* 521 U.S. 591, 625-26 (1997), and thus no conflicts exist.  Based upon their purchases of Lannett common stock during the Class Period and the losses suffered as a result of Defendants' fraud, Plaintiffs' interests are directly aligned with the interests of other Class members, who were injured by the same materially false and misleading statements as Plaintiffs.  Thus, in proving their own claims to establish liability, Plaintiffs will also prove the claims of the Class.  *See Schering-Plough,* 2012 WL 4482032, at *6 ("[W]hen Lead Plaintiffs have a strong interest in establishing liability under federal securities law, and seek similar damages for similar injuries, the adequacy requirement can be met.").

In addition, Plaintiffs have demonstrated a willingness and ability to take an active role in and control of the litigation to protect the interests of the absent Class members.  As institutional investors, Plaintiffs are precisely the type of investors that Congress sought to ensure would lead securities class actions.  *See DVI,* 639 F.3d at 641 ("[S]ophisticated institutional investors . . . are preferred as class representatives").  Indeed, Plaintiffs understand their fiduciary duties and responsibilities as Class Representatives and are well-suited to protect the interests of the Class as well as they protect their constituents and plan participants.  To date, Plaintiffs have, for example, received and reviewed periodic updates from counsel, participated in discussions with counsel regarding the case, discovery, and significant developments in the litigation, searched for documents, and reviewed discovery responses.  *See, e.g., DFC Global,* 2016 WL 4138613, at *10 (adequacy satisfied where plaintiffs "communicated with their lawyers, reviewed filings

prior to their submission to the Court, and have aided counsel in responding to discovery requests").

Finally, to satisfy the adequacy requirement, class counsel must be "qualified, experienced, and generally able to conduct the litigation." *Schering-Plough*, 2012 WL 4482032, at *6. Here, Lead Counsel Abraham, Fruchter & Twersky, LLP, is highly experienced in complex securities class litigation such as this and has achieved significant results on behalf of shareholders. *See* Firm Resume (Ex. C to Berg Decl.). Moreover, because Abraham, Fruchter & Twersky, LLP, has devoted substantial time and resources to this action and will continue to do so, the firm satisfies Rule 23(g) and should be appointed as Class Counsel.

## B.  The Requirements Of Rule 23(b)(3) Are Satisfied

In addition to meeting the requirements of Rule 23(a), the proposed Class satisfies the two requirements under Rule 23(b)(3) that: (a) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (b) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied here.

### 1.  Common Questions Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Where, as here, common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015); *see also Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."). Indeed, "as the Supreme Court observed, the predominance requirement of Rule 23(b)(3) is readily met in securities-fraud class actions" such as this case. *Hicks v. Morgan*

*Stanley & Co.,* 2003 WL 21672085, at *1 (S.D.N.Y. July 16, 2003) (citing *Amchem*, 521 U.S. at 625).

The elements of Plaintiffs' Section 10(b) claim are: "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61. Falsity, scienter, materiality, and loss causation are indisputably issues common to the Class because "failure of proof" on any of these elements "would end the case" for all Class members. *See id.* at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alteration in original); *id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *see also Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 813 (2011) ("*Halliburton I*") (plaintiff need not prove loss causation at class certification).

### a.   Reliance May Be Presumed For Class Members Under the "Fraud On The Market" Doctrine

There are no significant (let alone predominate) individual issues to preclude class certification, even with respect to issues such as reliance. *See Halliburton I*, 563 U.S. at 810 ("Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security."). Reliance here will also be proven with

evidence common to the Class, as Plaintiffs and the Class satisfy all of the prerequisites for applying the presumption of reliance under the "fraud-on-the-market" theory. *Basic Inc. v. Levinson*, 485 U.S. 224, 247-48 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."); *see In re Herley Indus. Inc. Sec. Litig.*, 2009 WL 3169888, at *14 (E.D. Pa. Sept. 30, 2009) ("The availability of the fraud-on-the-market theory in securities class actions such as this one alleviates any concern questions of individual reliance would dominate class-wide issues.").

A party who purchases a stock traded on an efficient market need not show that it directly relied upon or even knew about the alleged misrepresentations. *Amgen*, 568 U.S. at 460-62. "The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information.  In such markets, the 'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen*, 568 U.S. at 461 (citing *Basic*, 485 U.S. at 246).  Accordingly, "courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities." *Id*.  As stated by the Supreme Court, "[i]t is hard to imagine that there ever is a buyer or seller who does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap [sic] game?" *Basic*, 485 U.S. at 246-47 (citations and footnotes omitted).  "Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed . . . or if the misrepresentation had not been made . . . would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id*. at 245 (citations omitted).  Thus, the central inquiry in determining whether the fraud-on-the-

market presumption of reliance can be applied is whether the security traded in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 278 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 248 n.27.

With respect to the required showing of an efficient market, "the Supreme Court has suggested that the burden required to establish market efficiency is not an onerous one." *Waggoner*, 875 F.3d at 97.  Indeed, the Supreme Court has admonished that "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point." *Halliburton II*, 573 U.S. at 272 (emphasis in original).

### (1)      Lannett Stock Traded On An Efficient Market

Although not dispositive of efficiency in itself, the Third Circuit and Courts in this District have repeatedly held that a listing on a major national stock exchange such as the NYSE, as Lannett stock did throughout the entire Class Period, is a good indicator of market efficiency. *See, e.g, DVI,* 639 F.3d at 634 ("the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"); *DFC Global*, 2016 WL 4138613, at *12 ("Some courts have concluded that being listed on a major exchange is sufficient for a plaintiff to demonstrate market efficiency"); *see also City of Sterling Heights*, 2015 WL 5097883, at *10 ("Lead Plaintiffs have proven that Prudential's stock traded in an efficient market. For one, Prudential's stock trades on the NYSE"); *In re Heckmann Corp. Sec. Litig.,* 2013 WL 2456104, at *13 (D. Del. Jun. 6, 2013) ("Since the stock indisputably traded on the NYSE during the class period, . . . the market is efficient"); *Merck Sec. Deriv. & ERISA*, 2013 WL 396117, at *11 ("a *Cammer* analysis is not required" where the "stock trades on the [NYSE], consistently recognized by courts – including the Third Circuit and other United States Courts of Appeals – as 'open and developed' and thus 'well suited for application of the fraud on

the market theory.'" (citations omitted)).  While this fact alone weighs strongly in favor of a finding of market efficiency, the additional indicia of an efficient market are also present here.

### (2)      The *Cammer* Factors Demonstrate Market Efficiency

In order for the fraud-on-the-market presumption of reliance to apply, publicly available information must be reflected in the market price of the stock; however, the Supreme Court has refused to "conclusively [] adopt any particular theory of how quickly and completely" publicly available information must be reflected in order to show market efficiency.  *Basic*, 485 U.S. at 248 n.28.  District Courts in this Circuit (and throughout the country) regularly assess market efficiency by applying the *Cammer* factors, which consist of: "(1) the company's average weekly trading volume; (2) the number of analysts who follow the stock; (3) the existence of market makers and arbitrageurs; (4) the ability of the company to file a Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price."  *DFC Global*, 2016 WL 4138613, at *12 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).  However, "[c]ourts should not view these factors as a checklist that a plaintiff must pass in order to plead market efficiency, but rather should use them as an analytical tool to assist in its analysis."  *Hull v. Glob. Digital Sols., Inc.*, 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018).

To demonstrate market efficiency, Plaintiffs submit the Expert Report of Chad Coffman, CFA ("Coffman Report," attached as Ex. A to Berg Decl.).  Mr. Coffman determined that the market for Lannett stock during the Class Period satisfies each of the *Cammer* factors, as well as additional factors, which all confirm that Lannett stock traded on an open, well-developed, and efficient market during the Class Period:

*Cammer* **Factor One: A Large Weekly Trading Volume.**  A high weekly trading volume is indicative of market efficiency because it "implies significant investor interest in the

company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *see also DVI*, 249 F.R.D. at 208 (same).  During the Class Period, the average weekly trading volume for Lannett Common Stock was 4.56 million shares, which represents 12.47% of shares outstanding, higher than the average security traded (of 2.07%) on the NYSE and/or NASDAQ.  Coffman Report ¶¶25, 28.  This volume of trading is much higher than the 2% benchmark indicated in *Cammer* and supports a "strong presumption" of market efficiency.  711 F. Supp. at 1286; *see also Roofer's Pension*, 333 F.R.D. at 81 ("[T]rading volume of two percent or more justifies a strong presumption of market efficiency."); Coffman Report ¶31.

    ***Cammer* Factor Two: Wide Analyst Coverage.**  "Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis." *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at 1286).  During the Class Period, there was an abundance of analyst coverage for Lannett with at least 432 reports issued during the Class Period and 16 separate firms that had equity analysts issue reports on Lannett, including major firms such as Roth Capital Partners, LLC, Oppenheimer and Co., BMO Capital, and Deutsche Bank.  Coffman Report at ¶34.  Under *Cammer*, this type of coverage of Lannett by securities analysts supports the conclusion that Lannett securities traded in an efficient market during the Class Period.  *See DVI*, 249 F.R.D. at 210 (coverage by three analysts "sufficient to favor a finding of market efficiency"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1057 (D. Colo. 2001) (two analysts sufficient); Coffman Report ¶37.

    ***Cammer* Factor Three: Numerous Market Makers.**  The existence of numerous market makers is further evidence of market efficiency, since the "existence of market makers …

ensure[s] completion of the market mechanism." *Cammer*, 711 F. Supp. at 1286-87. Because Lannett common stock traded on the NYSE, the Court need not consider the existence of market makers. *See Merck/Vytorin*, 2012 WL 4482041 at *5 n.1 (finding this factor "'not relevant'" in the context of securities traded on the NYSE); *see also* Coffman Report ¶¶40-41 (concerns about liquidity and information dissemination—which motivate the market makers analysis—"are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market"). Nevertheless, there were at least 130 market makers for Lannett common stock, which amply satisfies the parameters set forth in *Cammer* and further supports a finding of market efficiency. *See* Coffman Report ¶42; *see also Cammer*, 711 F. Supp. at 1283 n.30 (finding 11 market makers sufficient).

*Cammer* **Factor Four: Form S-3 Eligibility.** During the Class Period, Lannett was eligible to file a Form S-3 Registration Statement with the SEC, and in fact, Lannett filed a Form S-3ASR (a type of Form S-3, but only "well-known seasoned issuers" are eligible to file S-3ASRs) on May 12, 2017. Coffman Report ¶45; *see also* RFA Resp. 2 and 3 ("Defendants admit that Lannett was eligible to file a Form S-3 between July 15, 2014 and October 31, 2017."). The Form S-3 is an abbreviated disclosure form, which may only be used when the SEC "belie[ves] that the market operates efficiently for these companies, *i.e.*, [all public information] has already been disseminated and accounted for by the market place." *Cammer*, 711 F. Supp. at 1284. Accordingly, "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Id*. at 1285; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) ("Eligibility to complete a S-3 Form is helpful because the SEC permits

registration 'only on the premise that the stock is already traded on an open and efficient market. . .'") (citation omitted).

*Cammer* **Factor Five: Price Reaction to New Information.**  The final *Cammer* factor examines whether a plaintiff can illustrate "over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. While "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," empirical evidence of a cause and effect relationship between corporate news events and a company's share-price movements supports a finding of market efficiency.  *DFC Global*, 2016 WL 4138613, at *12.

To assess this factor, Mr. Coffman conducted an event study on daily common stock prices (and related analysis).  *See* Coffman Report ¶¶46-67.  An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *DFC Global*, 2016 WL 4138613, at *13 (quoting *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010)).  "[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by the fifth *Cammer* factor. *City of Sterling Heights*, 2015 WL 5097883, at *6.  Moreover, Mr. Coffman's methodology has be accepted by numerous courts. *See, e.g., In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104-06 (S.D.N.Y. 2016).

As detailed in the Coffman Report (*see* ¶¶49-67), Mr. Coffman's event study analysis evidences "a clear cause-and-effect relationships between new public information about Lannett and the market price of Lannett Common Stock," thus further demonstrating that the market for Lannett common stock was efficient during the Class Period.  Coffman Report ¶¶49, 67.

20

In sum, each of the *Cammer* factors support a finding of market efficiency during the Class Period. Accordingly, Plaintiffs and the Class may rely on the "fraud-on-the-market" presumption to establish reliance.

### (3)   Additional Well-Accepted Factors Further Supporting Market Efficiency

In addition to the *Cammer* factors, courts in this Circuit and elsewhere have considered whether the factors identified in the *Krogman* decision support a finding of market efficiency. *See Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *see DVI*, 639 F.3d at 633, n.14 (considering *Krogman* factors). These factors are: (1) the company's market capitalization, (2) a low bid-ask spread, and (3) a large public float. As with the *Cammer* factors, each *Krogman* factor is indicative of market efficiency in this action.

**Market Capitalization.** "'Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.'" *DVI*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478). During the Class Period, the market capitalization for Lannett common stock averaged $1.28 billion, and its market capitalization was larger than 46% of all companies trading on the NYSE and NASDAQ. Coffman Report ¶69. These factors support market efficiency. *See id.* ¶70; *see also DVI*, 249 F.R.D. at 212 (market capitalization ranging "between $300 million to $12 million" indicative of market efficiency).

**Bid-Ask Spread.** The bid-ask spread is "the difference between the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell." *City of Sterling Heights*, 2015 WL 5097883, at *6. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202

F.R.D. at 478.   Here, the bid-ask spread of Lannett common stock ranged from 0.04% and 0.24%.  Coffman Report ¶72. This is much lower than the bid-ask spreads of a random sample of 100 other common stocks trading on the NYSE and NASDAQ (average of 1.59%) and is thus supportive of market efficiency.  *Id.*

**Public Float.**  The final *Krogman* factor is that the public float (*i.e.,* the amount of shares not held by insiders) is considered to be indicative of market efficiency.  The public float for Lannett common stock during the Class Period was 71.96% of shares outstanding.  Coffman Report at ¶73.  This far exceeds the 31% that courts have found as indicative of market efficiency.  *See, e.g., McIntire v. China MediaExpress Holdings, Inc*., 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (a public float of only 31% to 43% supported a finding of an efficient market).

Finally, ***three additional factors*** analyzed by Mr. Coffman – the substantial number of institutional holders, an autocorrelation analysis, and considerable option trading – further establish that the market for Lannett common stock was efficient:

**Substantial Number of Institutional Investors.**   A large number of institutional investors holding a stock further supports a finding of market efficiency.   Here, 633 separate institutions owned Lannett Common Stock during the Class Period, holding on average 86.28% of public float.  Coffman Report at ¶74; *see Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012) (institutional holdings of 29% to 71% of outstanding shares supported efficiency); *Tatz v. Nanophase Techs. Corp.*, 2003 WL 21372471, at *7 (N.D. Ill. June 13, 2003) (market efficiency found where "numerous" institutional investors held 11% to 13% of total outstanding shares).

**Autocorrelation.**  Autocorrelation is a statistical property testing to what degree a future price movement can be systematically predicted with a reasonable degree of statistical certainty based solely on observed historical price movement.  Coffman Report at ¶¶75-78. Mr. Coffman

determined that there was no statistically significant autocorrelation for Lannett's abnormal returns, thus supporting the conclusion that Lannett Common Stock traded in an efficient market throughout the Class Period.  *Id.* at 78; *see In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation").

**Options Trading.**  Mr. Coffman also found that there was considerable option trading in Lannett Common Stock during the Class Period, which further supports that Lannett Common Stock traded in an efficient market throughout the Class Period.  Coffman Report ¶79.

For each of these reasons, the market for Lannett common stock was efficient during the Class Period, and the fraud-on-the-market doctrine applies in this case.

### b.  Damages Are Measurable Using A Common Methodology

"Plaintiffs are not required to produce a detailed damages model" at the class certification stage.  *Bing Li v. Aeterna Zentaris, Inc.*, 2018 WL 1143174, at *2 (D.N.J. Feb. 28, 2018).  The Third Circuit has made clear that "it is a misreading of [the Supreme Court's decision in] *Comcast* to interpret it as preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement."  *Neale*, 794 F.3d at 375 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-38 (2013)); *see also id.* at 374 ("*Comcast* is inapposite to the case before us.  *Comcast* held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class action treatment. . . . A close reading of the text . . . makes it clear that the predominance analysis was specific to the antitrust claim at issue."); *Roofer's Pension*, 333 F.R.D. at 87 (same); *In re Novo Nordisk Sec. Litig.,* 2020 WL 502176, at *9 (D.N.J. Jan. 31, 2020) (certifying class and noting that the court "need not assess the validity of Plaintiffs' damages model at this stage").

Here, the Coffman Report demonstrates that damages in this action are capable of being calculated on a class-wide basis using the out-of-pocket damages methodology, which is consistent with Plaintiffs' theory of the case. *See* Coffman Report ¶¶80-85; *see also Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347 (E.D. Pa. 1979) ("The out-of-pocket method is in fact the traditional method employed in securities fraud cases for calculating damages") (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); *Thomas v. Duralite Co., Inc.*, 524 F.2d 577 (3d Cir. 1975)); *see also Howard v. Liquidity Services Inc.*, 322 F.R.D. 103, 139 (D.D.C. 2017) (finding "Mr. Coffman explained how an event study could be used to ascertain the effect of each alleged misrepresentation on [defendant's] stock price, and how the study could be applied formulaically to calculate out-of-pocket expenses for an individual class member;" holding, "even after *Comcast*, other courts have approved of this methodology at the class certification stage" (certifying class)). While the actual amount of damages sustained will differ depending on each Class member's transactions in Lannett common stock, the Third Circuit has emphasized that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," a recognition that is "'well nigh universal.'" *Neale*, 794 F.3d at 374-75 (quoting *Comcast*, 569 U.S. at 41 (2013) (Ginsburg, J. & Breyer, J., dissenting)). Thus, damages are calculable based on a common method on a class wide basis.

## 2.      Class Treatment Is Superior To Other Methods Of Adjudication

The superiority requirement of Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making this assessment, courts must consider: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Superiority "'is

easily satisfied in securities fraud cases where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant.'" *Heckmann,* 2013 WL 2456104, at *8. Indeed, "[a] class action is certainly the superior method for adjudicating" securities fraud claims because "[g]enerally, 'as a practical matter, investors defrauded by securities law violations have no recourse other than class relief.'" *Roofer's Pension*, 333 F.R.D. at 78.

Here, the Class members' interests in individually controlling the prosecution of separate actions are minimal, and Plaintiffs are not aware of any related individual actions. In addition, "individual damages may well be small enough to render individual litigation prohibitively expensive," particularly in light of the high hurdles—and corresponding litigation costs—set by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Schering-Plough*, 2012 WL 4482032, at *7. Also, the maintenance of a consolidated class action will avoid "needless waste of both private and judicial resources" that would result from the prosecution of thousands of "individual actions that would involve similar if not identical evidence and certainly identical legal theories . . . ." *Merck*, 2013 WL 396117, at *13. Class treatment here will also avoid "the risk of inconsistent adjudications." *Id.* Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action. In fact, the alternative of numerous individual actions by each Lannett shareholder during the Class Period would be, at best, impracticable to manage. *See DVI*, 249 F.R.D. at 218 ("Absent a class action, courts could theoretically be inundated with hundreds of lawsuits presenting near-identical factual and legal issues"). Thus, class certification in this case appears to be superior to other available methods of fairly and efficiently adjudicating the controversy.

### 3.    The Proposed Class Is Ascertainable

This Court has noted "[t]hough not an explicit requirement of Rule 23, 'an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria.'" *Carr v. Flowers Foods, Inc.*, No. CV 15-6391, 2019 WL 2027299, at *10 (E.D. Pa. May 7, 2019) (quoting *Marcus*, 687 F.3d at 592-93). "The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss." *Id.*  Plaintiffs "need not be able to identify all class members at class certification—instead, a plaintiff need only show that class members can be identified." *City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 439 (3d Cir. 2017). Thus, where "[t]here are 'objective records' that can 'readily identify' … class members," the ascertainability requirement is satisfied. *Byrd v. Aaron's Inc*., 784 F.3d 154, 169 (3d Cir. 2015) (citation omitted); *see also In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (ascertainability satisfied where class members identifiable by reference to bank records).  Here, the proposed Class includes all persons and entities who purchased or otherwise acquired Lannett common stock during the Class Period, a group that can be readily identified by reference to records of shareholder acquisitions. *See, e.g., In re Urban Outfitters, Inc. Sec. Litig*., 2016 WL 1043014, at *4 (E.D. Pa. 2014) ("[A]s the identity of the Class Members can be determined through their registered shares, the Class members are readily ascertainable.").  Accordingly, the proposed Class is ascertainable.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion, certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint Abraham, Fruchter & Twersky, LLP as Class Counsel.

Dated: October 1, 2020                    Respectfully submitted,

                                    s/ *Ian D. Berg*
                                     Ian D. Berg (PA# 90490)

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Mitchell M.Z. Twersky (*Pro Hac Vice*)
Ian D. Berg (PA# 90490)
Todd Kammerman (*Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050
(212) 279-3655 (fax)
*MTwersky@aftlaw.com*
*Iberg@aftlaw.com*
*TKammerman@aftlaw.com*

  -and-

Takeo A. Kellar
11622 El Camino Real, Suite 100
San Diego, CA 92130
(858) 764-2580
(858) 764-2582 (fax)
*tkellar@aftlaw.com*

*Counsel for Lead Plaintiff the University of*
*Puerto Rico Retirement System and Lead*
*Counsel for the Class*

**PROMISLOFF LAW, P.C.**
David M. Promisloff (PA# 200971)
5 Great Valley Parkway, Suite 210
Malvern, Pennsylvania 19355
(215) 259-5166
(215) 600-2642 (fax)
*David@prolawpa.com*

*Liaison Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*Pro Hac Vice*)
Tamar A. Weinrib (*Pro Hac Vice*)
600 Third Avenue
New York, New York 10016
(212) 661-1100
(917) 463-1044 (fax)
*JALieberman@pomlaw.com*
*TAWeinrib@pomlaw.com*

*Counsel for Plaintiff Ironworkers Locals 40,*
*361 & 417 Union Security Funds*

27