IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN UTESCH,<br>            **Plaintiff,**<br><br>          **v.**<br><br>**LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN AND MARTIN P. GALVAN,**<br>            **Defendants.** | **CIVIL ACTION**<br><br><br><br>NO.  16-5932 |

## MEMORANDUM OPINION

This is a securities fraud class action in which Plaintiffs allege that Defendants misled investors by claiming that price increases by Defendant Lannett Company, Inc. ("Lannett") on various generic drugs were due to strong market competition and other legitimate market factors, rather than anticompetitive conduct within the generic drug industry.  Plaintiffs also allege that Defendants made material misrepresentations concerning Lannett's internal investigation into potential antitrust violations and the likelihood that Lannett would be implicated in broader price-fixing prosecutions.

Lead Plaintiff University of Puerto Rico Retirement System ("UPRRS")[1] has filed a motion to compel Defendants Lannett, Arthur P. Bedrosian, and Martin P. Galvan (together, "Defendants") to produce documents in response to its Amended First Request for the Production of Documents.  Specifically, UPRRS seeks to compel discovery relating to alleged

---

[1] John Utesch, named in the case caption, is an investor who purchased Lannett securities during the class period. On November 16, 2016, Utesch filed this suit individually and on behalf of similarly-situated purchasers of Lannett securities.  Pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, the Court was then tasked with identifying and "appoint[ing] as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id.* § 78u-4(a)(3)(B)(i).  On March 17, 2017, the Court appointed UPRRS as Lead Plaintiff in this action, finding UPRRS to be the most adequate plaintiff under 15 U.S.C. § 78u-4(a)(3)(B).

misrepresentations concerning the scope, substance, and results of Lannett's internal investigation.

## I.      FACTUAL BACKGROUND

The facts relevant to this discovery dispute are as follows.[2]

### A.   The Internal Investigation

On July 8, 2014, The New York Times published an article about rapid price increases in the generic drug industry.  The article focused on significant price increases for digoxin, a cardiovascular drug sold primarily by Lannett and two other pharmaceutical manufacturers, Global Pharma and Par Pharmaceutical.  Shortly thereafter, Lannett received a subpoena from the Connecticut Attorney General (the "Connecticut AG") requesting documents in connection with an investigation into price fixing and market allocation relating to the sale of generic drugs. On July 16, 2014, Lannett disclosed in a Securities and Exchange Commission ("SEC") filing that it received the Connecticut AG's subpoena concerning price fixing and market allocation with respect to digoxin.  The SEC filing, signed by Lannett's then-CEO Defendant Bedrosian, stated: "The Company maintains that it acted in compliance with all applicable laws and regulations and intends to cooperate with the Connecticut Attorney General's investigation." During an earnings call held on August 27, 2014, Defendant Bedrosian informed analysts that "[w]e know we've done nothing wrong."  In a Form 10-K filed with the SEC on August 29, Lannett stated "that it has acted in accordance with all applicable rules and regulations with respect to the pricing of all of its products, including digoxin."

As explained in a September 16, 2014 press release, upon receipt of the Connecticut AG's subpoena, Lannett hired outside counsel to commence "an internal review focusing on the

---

[2] This factual background is drawn from the Third Amended Complaint (the "Complaint"), unless otherwise indicated.

company's pricing practices for digoxin."  According to this release, Lannett "conducted the review, in part, to demonstrate to our stockholders and employees that we have acted in compliance with all applicable rules and regulations regarding the pricing of digoxin."  Lannett claimed that, as of September 16, 2014, the "exhaustive review of our pricing practices" had been completed, and that it "included the examination of well over 700,000 documents."  It claimed further that the "[r]esults of the review . . . confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of digoxin."

In November 2014, Lannett disclosed that the Department of Justice ("DOJ") had served the company with a subpoena seeking documents regarding "the sale of generic prescription medications."  The DOJ served Lannett with a second subpoena the following month.  Lannett continued to deny any wrongdoing, and maintained in its SEC filings that it "ha[d] acted in compliance with all applicable laws and regulations."  On December 10, 2014, Defendant Bedrosian, participating in a healthcare conference, reiterated that Lannett and its employees "ha[d] done nothing wrong."

During a November 3, 2016 earnings call, an analyst from Deutsche Bank asked Defendants Bedrosian and Galvan for "some detail as to what [Bedrosian] and the Board did to look into this matter," referring to the "probe into potentially collusive behavior" within the generic drug industry.  In response, Bedrosian referenced the "thorough" internal review, "which included our computers, our laptops, *et cetera*, being copied by outside counsel" and a review of "all that data."  Bedrosian stated:

> After a number of months of investigating and talking to all the individuals involved—all of us were interviewed; all the sales people that are currently on board, sales people that have left us in the past, were interviewed.  They left no stone unturned.  The report to the Board of Directors was that they found absolutely no wrongdoing on the part of anybody in Lannett.  They searched,

3

interviewed—they searched and interviewed, and went further than just laptops.  They actually went ahead and looked at people's cell phones, texting.  There's a lot of new ways to communicate these days.  So their investigation was rather thorough.  And they were convinced that there was no wrongdoing on the part of any of my employees here at the Company.

So we're taking the same position we've taken when that was first revealed to the Board of Directors, and telling the public that we continue to cooperate and have cooperated with the Department of Justice.  And there has been no change with regards to any information that's come to our attention since this matter was investigated by outside counsel.

As more companies were involved . . . our outside counsel went ahead and re-examined all the data from everybody's laptops, all their communications . . . to make sure there was no communications between staff here at Lannett and any of those companies and any of their employees.  So, I'd say we did a thorough investigation.  It didn't just stop in the summer almost 2 years ago at this point; it continued as more companies were subpoenaed for documents, *et cetera*.

As relevant here, UPRRS alleges that these public statements misled investors about the timing, scope, and completion of Lannett's internal investigation, and that Defendants recklessly reassured investors based on the results of the internal investigation and Fox Rothschild's report to Lannett's Board of Directors.

A declaration submitted by Patrick Egan, a partner at the law firm of Fox Rothschild, in support of Defendants' opposition to UPRRS's motion provides more detail regarding the genesis of the internal investigation.  Egan avers that on or around July 16, 2014, Lannett received interrogatories and a subpoena from the Connecticut AG in connection with its investigation into the pricing of digoxin, and retained Fox Rothschild to provide legal advice regarding the investigation.  As part of its request for legal advice, Lannett asked Fox Rothschild to conduct an internal review concerning, among other things, Lannett's business practices in connection with the pricing of digoxin and possible violations of laws related to Lannett's

business practices.  When Lannett received additional interrogatories and subpoenas from the

Connecticut AG as well as the DOJ, Lannett enlarged Fox Rothschild's representation to include

those as well.  Accordingly, Fox Rothschild expanded its internal review to include Lannett's

business practices in connection with additional generic pharmaceutical products and possible

violations of laws related to Lannett's business practices.

As part of their review, Fox Rothschild attorneys interviewed and corresponded with

current and former Lannett employees to gather information.  According to Egan, at the outset of

each interview, Fox Rothschild informed the witness that: (1) Fox Rothschild did not represent

that witness; (2) the purpose of the interview was to gather information to assist in providing

legal advice to Lannett; (3) the interview was privileged; (4) this privilege belonged to Lannett;

and, (5) the witness should keep confidential the matters discussed in the interview.  Egan

declares further that the information collected and generated by Fox Rothschild included

memoranda, summaries, and reports which were not shared with the Connecticut AG or the DOJ.

In August 2014 and August 2016, Fox Rothschild presented its findings to Lannett's Board of

Directors.

### B.  Discovery Dispute

On March 31, 2020, UPRRS served its Amended First Request for Production of

Documents on Defendants.  On May 4, Defendants served their Responses and Objections to

these requests.  As relevant here, Defendants objected to Request No. 16 ("All Documents dated

from July 1, 2014 to November 3, 2016 concerning Lannett's internal review focused on the

Company's generic drug pricing practices, as referenced in paragraph 96, 135 and 158 of the

Complaint"); Request No. 17 ("All Documents that Defendants will rely upon to support their

denials in ¶¶ 89, 93, 101, 104, 109, 115, 121, 126, 133, 136, 142, 148, and 154 of their Answer

that Defendants misled investors with respect to the extent to which Lannett investigated whether the Company engaged in, or was aware of, any unlawful anticompetitive conduct that might implicate the Company in a regulatory action or have a negative impact on Lannett's business operations and financial results or prospects"); Request No. 18 ("All Documents that Defendants will rely upon to support their denial in ¶ 97 of their Answer that Defendants' statements regarding the results of its internal investigation were misleading because they misrepresented the risk that Lannett faced of being implicated in the investigation and legal action being conducted by the Connecticut Attorney General"); and, Request No. 19 ("All Documents that Defendants will rely upon to support their denials regarding Lannett's internal investigation in ¶¶ 137, 157-59, 164 and 168 of their Answer").  In short, Defendants object to UPRRS's requests for documents pertaining to the internal investigation.

The question before the Court is not whether documents generated during Lannett's internal investigation are relevant.  These materials are clearly relevant to UPRRS's allegations that Lannett issued false or misleading statements concerning the scope and results of the internal review and, moreover, Defendants have not objected to the above discovery requests on relevancy grounds.[3]  Still, relevancy "is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the

---

[3] Despite failing to object to Request Nos. 16 through 19 on relevance grounds, Defendants now suggest, via footnote, that documents relating to the internal investigation are not relevant because UPRRS's allegations concerning the internal investigation did not survive this Court's ruling denying Defendants' motion to dismiss.  Not so.  In that opinion, the Court found that UPRRS's "Complaint survive[d] based on the allegations as to misrepresentations about Defendants' prices being based on 'competitive' market forces," and in so holding expressly declined to address UPRRS's "secondary allegations relating to Defendants' misrepresentations about the internal investigation or likelihood of Defendants' implication in the industry-wide probe."  *Utesch v. Lannett Co., Inc.*, 385 F. Supp.3d 408, 417 n.5 (E.D. Pa. 2019).  Further, at a later conference with the parties, the Court instructed that there should be no restrictions on discovery based on subject or theory of liability.

heart of an issue." *Rhône-Poulenc Rorer Inc. v. Home Indem. Co*., 32 F.3d 851, 864 (3d Cir.

1994).  Defendants object to UPRRS's requests on privilege grounds, and contend that to the

extent responsive documents generated during the course of the internal review are protected by

the attorney-client privilege or work product doctrine, they need not be produced.

The question thus before the Court is whether, and to what extent, certain documents

concerning the internal review are protected from discovery by the attorney-client privilege or

work-product doctrine.

## II.    LEGAL FRAMEWORK

As it pertains to this dispute, Federal Rule of Civil Procedure 26(b) provides that

"[u]nless otherwise limited by court order, [p]arties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).

In addition, Rule 26(b)(3) generally prohibits discovery into attorney work product, namely,

materials "prepared in anticipation of litigation."  Fed. R. Civ. P. 26(b)(3)(A).  This rule reflects

a "strong public policy" that maintaining the privacy of work product promotes efficiency,

fairness, the interests of clients, and justice.  *See Upjohn Co. v. United States,* 449 U.S. 383, 398

(1981).  While the attorney-client privilege and work product doctrine "function similarly in that

they serve as a bar to the discovery of certain information," *In re Linerboard Antitrust Litig.*, 237

F.R.D. 373, 380 (E.D. Pa. 2006), each serves a distinct purpose:

> [T]he attorney-client privilege promotes the attorney-client
> relationship, and, indirectly, the functioning of our legal system, by
> protecting the confidentiality of communications between clients
> and their attorneys.  In contrast, the work-product doctrine promotes
> the adversary system directly by protecting the confidentiality of
> papers prepared by or on behalf of attorneys in anticipation of
> litigation.  Protecting attorneys' work product promotes the
> adversary system by enabling attorneys to prepare cases without fear
> that their work product will be used against their clients.

*Westinghouse Elec. Corp. v. Rep. of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).

The attorney-client privilege protects: "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007)). The privilege exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *In re Teleglobe*, 493 F.3d at 360 (quoting *Upjohn*, 449 U.S. at 389); *see also Upjohn*, 449 U.S. at 389 ( "The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980))). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *In re Teleglobe*, 493 F.3d at 359.

With respect to the work-product doctrine, Rule 26(b)(3) allows a party to discover material prepared in anticipation of litigation or for trial only upon a showing that the requesting party has a substantial need for the material and cannot obtain the material or its equivalent elsewhere without incurring undue hardship. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii). When the requesting party makes such a showing and the court orders discovery of protected materials, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

Thus, while a party may discover materials prepared in anticipation of litigation, the circumstances in which it can do so are limited. In essence, Rule 26(b)(3) establishes two levels

of protection with respect to the work product of a client's attorney.  First, work prepared in anticipation of litigation by an attorney or his agent is discoverable only upon a showing of substantial need and undue hardship; second, "core" or "opinion" work product that encompasses the "mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation" is "generally afforded near absolute protection from discovery."  *In re Ford Motor Co.*, 110 F.3d 954, 962 n.7 (3d Cir. 1997).  Core or opinion work product therefore receives greater protection than ordinary work product and is discoverable only in "rare and exceptional circumstances," *In re Cendant*, 343 F.3d at 663, as "any slight factual content that such items may have is generally outweighed by the adversary system's interest in maintaining the privacy of an attorney's thought processes," *In re Linerboard*, 237 F.R.D. at 381-82 (quoting *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985)).

The burden of demonstrating that a document is protected is on the party asserting the doctrine.  *Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir. 1982) (work product doctrine); *In re Grand Jury Empaneled Feb. 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979) (attorney-client privilege).

## III. DISCUSSION

UPRRS forges a four-pronged attack on Defendants' assertion that the documents UPRRS seeks are protected from discovery.  First, it urges that the attorney-client privilege and work product doctrine are inapplicable in this case, because Defendants fail to establish that the internal investigation was conducted by Fox Rothschild for the purpose of providing Lannett with legal advice, or that the materials generated during the investigation were prepared in anticipation of the present litigation.  Second, it contends that regardless of whether the attorney-client privilege and work product doctrine generally apply to internal investigation materials,

they do not apply to documents relating to the "scope" of Fox Rothschild's work on behalf of Lannett, such as any engagement letter(s) between Lannett and the firm.  Third, it argues that the attorney-client privilege applies only to communications between outside counsel and specific corporate employees, such that UPRRS is entitled to the contents of Fox Rothschild's interviews with certain Lannett employees.  Finally, it contends that Defendants waived any attorney-client privilege or work product protection by putting the internal investigation "at issue" through their public statements and in their responses to UPRRS's Complaint.

### A.  The Attorney-Client Privilege and Work Product Doctrine Apply

At the threshold, UPRRS argues that the attorney-client privilege and work product doctrine cannot apply in the present case, for two reasons.  First, it maintains that the attorney-client privilege is inapplicable, because Defendants fail to establish that the investigation was conducted for the purpose of providing legal advice.  Second, it argues that work product protection cannot apply, because materials generated during the course of the internal investigation were not prepared in anticipation of the current securities fraud litigation.

In *Upjohn*, the Supreme Court held that the attorney-client privilege applies to confidential employee communications made during the course of an internal investigation conducted by corporate counsel.  *Upjohn*, 449 U.S. at 392.  Here, however, UPRRS broadly asserts that the attorney-client privilege cannot apply to communications between Fox Rothschild and Lannett's employees, in light of Lannett's public statement that it "conducted the [internal] review, in part, to demonstrate to our stockholders and employees that we have acted in compliance with all applicable rules and regulations regarding the pricing of digoxin." UPRRS appears to be asking—without citation to legal authority—that the Court infer from this statement that Fox Rothschild was retained by Lannett primarily for the business, rather than

legal, purpose of demonstrating to investors that the company was not involved in wrongdoing.

It is true that confidential communications between an attorney and client are privileged only where the primary purpose of the communication is to solicit or render legal advice or services. *Rhône-Poulenc*, 32 F.3d at 862. But the public statement cited by UPRRS itself suggests that the aim of the internal investigation was to ensure Lannett's "compliance with the law," *see Upjohn*, 449 U.S. at 392, and UPRRS alleges in its Complaint that the internal investigation was conducted "to determine if Lannett engaged in anticompetitive conduct with respect to the pricing of [d]igoxin." Moreover, Attorney Egan states that Fox Rothschild was retained to provide legal advice regarding the Connecticut AG investigation; that the firm was, as part of that request for legal advice, retained to conduct an internal review; that it was retained to provide legal services regarding the additional interrogatories and subpoenas; and that its interviews and correspondence with current and former Lannett employees were all to aid counsel in providing legal advice to Lannett. Defendants thus "adequately demonstrate[] that the 'primary purpose' of [Fox Rothschild's] internal investigation was 'the provision of legal advice' such that the [attorney-client] privilege should apply." *Cicel (Beijing) Sci. & Tech. Co., Ltd. v. Misonix, Inc.*, 331 F.R.D. 218, 231 (E.D.N.Y. 2019) (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp.3d 521, 530 (S.D.N.Y. 2015)) (relying on attorney declaration to find that outside counsel was retained in an internal investigation primarily to provide corporation with legal advice).

UPRRS next contends that materials generated during the course of the internal investigation cannot qualify for work product protection, because Lannett has not established that the internal investigation materials UPRRS seeks were prepared by Fox Rothschild in anticipation of *this* litigation, which was filed over two years after the investigation commenced.

Contrary to UPRRS's position, the work product doctrine requires only "that the material be prepared in anticipation of *some* litigation, not necessarily in anticipation of the *particular* litigation in which [protection] is being sought." *In re Ford*, 110 F.3d at 967.[4]  In this Circuit, the relevant standard for determining whether a document was prepared in anticipation of litigation is whether, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990) (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979)).  For a document to be protected under the doctrine, "the preparer's anticipation of litigation [must] be objectively reasonable." *In re Processed Egg Prods. Antitrust Litig.*, 278 F.R.D. 112, 119 (E.D. Pa. 2011) (alteration in original) (quoting *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993)).

Here, Attorney Egan states that further government investigations and future civil litigation arising from the pricing of digoxin were anticipated at the time Fox Rothschild initiated the internal review.  Defendants' anticipation of future litigation was objectively reasonable, given that internal investigations into alleged corporate wrongdoing are often "shaped by the specter of litigation," *see Gen. Motors*, 80 F. Supp.3d at 532, such as future securities and

---

[4] UPRRS cites to *Marrical v. Allstate Ins. Co.*, 1992 WL 365521 (E.D. Pa. Dec. 2, 1992), for the proposition that work product protection applies only if materials were "prepared 'in anticipation of the litigation in the case in which protection is sought.'"  *Id.* at *1 (quoting *Aamco Transmissions, Inc. v. Marino*, 1991 WL 193502, at *4 (E.D. Pa. Sept. 24, 1991)).  Initially, this holding is supported neither by the Third Circuit's understanding of the work product doctrine, *see In re Ford*, 110 F.3d at 967, nor the express language of Federal Rule of Civil Procedure 26, which requires only that materials be "prepared in anticipation of litigation" and imposes no condition that these materials be prepared specifically for the litigation in which protection is sought, *see* Fed. R. Civ. P. 26(b)(3)(A).  In any event, *Marrical* is distinguishable from the present case.  In *Marrical*, the district court held that an insurance adjustor's report on an auto accident was not protected as work product prepared in anticipation of unrelated litigation involving defamation claims.  *See Marrical*, 1992 WL 365521, at *1.  Here, Lannett's internal review concerned Lannett's alleged anticompetitive conduct, which is the same conduct that is now at issue in the current securities fraud litigation.

derivative suits premised on the alleged misconduct.  Indeed, courts regularly find investigation

materials entitled to work product protection despite being prepared prior to the case at hand, as

UPRRS's own authority demonstrates.  *See Cicel*, 331 F.R.D. at 232-33 (finding internal

investigation materials covered by the work product doctrine because future civil litigation was

anticipated at the time the materials were generated); *see also In re Linerboard*, 237 F.R.D. at

381 ("Generally, documents created as part of an internal investigation . . . are considered to be

made in anticipation of litigation for the purposes of the work product doctrine."); *Faloney v.

Wachovia Bank, N.A.*, 254 F.R.D. 204, 214-16 (E.D. Pa. 2008) (requiring a party to anticipate a

specific litigation would border on requiring omniscience, and investigation materials were

protected against disclosure as work product).  Thus, investigatory materials generated by Fox

Rothschild during the course of the internal investigation—such as, for instance, the firm's

memoranda, summaries, and reports—are protected from disclosure under the work product

doctrine.

### B.  Documents Concerning the Factual Circumstances of the Relationship Between Fox Rothschild and Lannett Are Discoverable

UPRRS next contends that Defendants have improperly refused to produce documents

concerning the so-called "scope" of Fox Rothschild's activities on behalf of Lannett, such as the

engagement letter(s) whereby Lannett retained Fox Rothschild to perform the internal review.  It

cites to *Cohen v. Uniroyal, Inc.*, 80 F.R.D. 480 (E.D. Pa. 1978), in support, a case in which the

district court explained, in the context of a motion to compel answers to interrogatories, that

"[t]he attorney-client privilege, strictly construed, need not foreclose inquiry into the general

nature of a lawyer's activities on behalf of a client, the conditions of the lawyer's employment,

or any of the other external trappings of the relationship."  *Id.* at 483.  Rather, the privilege "is

concerned only with confidential communications, not with the structural framework within

which they are uttered." *Id.* Such unprotected information, argues UPRRS, includes the identity

of the lawyers, the identity of the persons retaining, supervising, or consulting with those

lawyers, the identity of documents recording or referring to the lawyers or certain of their work,

the dates that services were rendered, and the hours spent and the overall duration of the

attorney-client relationship. *See id.*; *see also Montgomery Cty. v. MicroVote Corp.*, 175 F.3d

296, 304 (3d Cir. 1999) (observing that engagement letters are not shielded by the attorney-client

privilege or work product doctrine).

There is, however, a distinction to be made between production of documents that open a

window into the "structural framework" of an attorney-client relationship and documents, or

parts of documents, containing descriptions of the work performed by Fox Rothschild on

Lannett's behalf. While documents relating to "the factual circumstances surrounding the

attorney-client relationship," *see Cohen*, 80 F.R.D. at 483, are discoverable and must be

produced if responsive to Plaintiff's discovery requests, it is nevertheless foreseeable that such

documents—for instance, Fox Rothschild's billing records and time narratives—might also

contain privileged information, such as information relating to the firm's litigation strategy. *See*

*Leach v. Quality Health Servs.*, 162 F.R.D. 499, 501 (E.D. Pa. 1995) (observing that attorney

billing records, while unprotected by the work product doctrine, "are protected by the attorney-

client privilege . . . to the extent that they reveal litigation strategy and/or the nature of services

performed"). Indeed, although Plaintiff broadly suggests that any documents containing

"description[s] of the work performed" for Lannett by Fox Rothschild are discoverable, the Third

Circuit has expressly observed that information "reveal[ing] the nature of the services" rendered

by an attorney is privileged. *Montgomery Cty.*, 175 F.3d at 304 (finding billing records

privileged where those records "reveal[ed] the nature of the services [the attorney] rendered").

Accordingly, if Defendants' otherwise responsive, nonprivileged documents contain some privileged information—such as information concerning Fox Rothschild's litigation strategy or the nature of the services provided by Fox Rothschild—Defendants may redact those portions of the documents prior to production.

Finally, UPRRS attempts to shoehorn into its "scope" discussion a request for a list of all individuals interviewed by Fox Rothschild during the course of the internal investigation. Initially, it is not clear that Fox Rothschild has prepared such a document, and Defendants are of course not obligated to create documents containing certain information merely because such information is sought by UPRRS via its document requests.  Regardless, UPRRS cites no case law supporting the assertion that a list of individuals interviewed by outside counsel during the course of an internal investigation falls within the ambit of the "factual circumstances" governing the attorney-client relationship.  The only case it cites is *United States v. Amerada Hess Corp.*, 619 F.2d 980 (3d Cir. 1980), which held that the attorney-client privilege does not apply to a list of employee interviewees generated by counsel based on the "control group" test adopted by the Third Circuit in *In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir. 1979), *see Amerada*, 619 F.2d at 986, a test which, as discussed below, has since been rejected.  Further, even if *Amerada*'s holding regarding the inapplicability of the attorney-client privilege to lists of employee interviewees remains good law, such a list, if generated by Fox Rothschild pursuant to its internal review, would still constitute work product—perhaps not opinion work product, but work product nonetheless.  *See id.* at 987-88.  UPRRS has not even attempted to make the requisite showing of substantial need and undue hardship to obtain such a document.  Thus, a list of those interviewed generated by Fox Rothschild (if extant) need not be produced at this time.

With these caveats firmly in place, the engagement letter(s) and similar documents concerning the factual circumstances surrounding the attorney-client relationship between Lannett and Fox Rothschild are not privileged.  Accordingly, Defendants shall produce such documents to UPRRS, redacted as necessary to protect material that, in accordance with the principles set forth *supra*, is otherwise privileged.

### C.  The Contents of Fox Rothschild's Investigation Interviews Are Protected

Next, UPRRS argues that it is entitled to the contents of investigation interviews conducted by Fox Rothschild as part of the internal investigation.  Specifically, UPRRS requests the contents of interviews between Fox Rothschild and those Lannett employees outside the company's "control group," *i.e.*, those employees who have the ability "to take discretionary action upon the attorney's advice."  *See In re Grand Jury*, 599 F.2d at 1234.  Alternatively, UPRRS requests the contents of any interviews between Fox Rothschild and Lannett's former, as opposed to its current, employees.

The starting point for analyzing UPRRS's first request is the Supreme Court's decision in *Upjohn*.  In that case, Upjohn's auditors had discovered that questionable payments had been made by one of Upjohn's foreign subsidiaries for the benefit of foreign government officials to secure government business.  *Upjohn*, 449 U.S. at 386.  What followed is very much the same as what happened in this case.  The company's in-house counsel consulted with outside counsel.  *Id.*  It was determined that an internal investigation should be conducted.  *Id.*  A questionnaire was developed by the attorneys.  *Id.*  It was sent out over the Chairman's signature.  *Id.*  Responses were to be sent directly to in-house counsel.  *Id.* at 387.  Managers were told to treat the investigation as highly confidential and not to discuss it with anyone other than Upjohn employees who might be helpful in providing the requested information.  *Id.*  Upjohn voluntarily

16

submitted a preliminary report to the SEC and the Internal Revenue Service ("IRS") disclosing certain questionable payments. *Id.* The IRS began an investigation. *Id.* It issued a subpoena seeking written questionnaires sent to Upjohn managers as well as memoranda and notes of interviews conducted with officers and employees of Upjohn. *Id.* at 387-88. Upjohn objected on the basis of attorney-client privilege and the work product doctrine. *Id.* at 388.

At the time the case came before the Supreme Court, the Third Circuit, in considering the application of the attorney-client privilege in the corporate context, had adopted the so-called "control group" test articulated by Judge Kirkpatrick in *Philadelphia v. Westinghouse Electric Corp.*, 210 F. Supp. 483 (E.D. Pa. 1962), whereby only senior management were deemed sufficiently identified with the corporation as a whole and, as such, only communications between them and counsel could fall within the privilege. *See In re Grand Jury*, 599 F.2d at 1234. In *Upjohn*, the Supreme Court specifically declined to adopt the Third Circuit's "control group" test. *Upjohn*, 449 U.S. at 393-94.

Although *Upjohn*'s rejection of the control group test is old hat—it occurred nearly 40 years ago—the Court recites its findings at length only because UPRRS seems to be arguing that the control group test is still alive and kicking in the Third Circuit. Specifically, UPRRS cites to *In re Grand Jury Investigation* for the proposition that "under the 'control group test' adopted by the Third Circuit, the attorney-client privilege applies only to communications with those employees who have the ability 'to take discretionary action upon the attorney's advice.'" UPRRS is wrong. The control group test has no viability following *Upjohn*. To the contrary, the Supreme Court held that whenever an attorney is collecting information from lower-level employees in order to provide legal advice to a corporate entity, those communications also fall

under the attorney-client privilege.  *Upjohn*, 449 U.S. at 390-92.[5]  As applied here, *Upjohn*

stands for the proposition that if communications made in the course of Lannett's internal

investigation were "made by [Lannett] employees to counsel for [Lannett] acting as such, at the

direction of corporate superiors in order to secure legal advice from counsel," they are protected

by the attorney-client privilege.  *Id*. at 394.

UPRRS goes on to argue that the Supreme Court and Third Circuit have yet to establish

that the attorney-client privilege extends to communications with former employees.  The

Supreme Court in *Upjohn* specifically did not address the question of whether the privilege

would apply to interviews of former employees concerning the activities during their period of

employment (because the issue had not been raised by the parties in the lower courts), *see id.* at

394 n.3, and lower courts have since struggled with the issue, *see, e.g.*, *In re Flonase Antitrust*

*Litig.*, 723 F. Supp.2d 761, 765 (E.D. Pa. 2010) (finding the attorney-client privilege applicable

to communications between counsel and former employee, where the employee's "testimony

concerned matters within the scope of her former responsibilities with defendant corporation and

because her conversations with defense counsel may be relevant to defendant's legal strategy");

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 340 F. Supp.2d 554, 558 (E.D. Pa. 2004)

(limiting the attorney-client privilege to communications with former employees "that either:

(1) concerned knowledge obtained or conduct that occurred during the course of the former

employee's employment; or (2) related to communications which were themselves privileged

---

[5] UPRRS reads Defendants to be arguing that the attorney-client privilege applies because corporate counsel provided each employee with an "*Upjohn* warning."  An *Upjohn* warning, however, is meant to inform employees that they are not being represented by corporate counsel, and to avoid establishing an attorney-client relationship. *See, e.g.*, *In re Grand Jury Investigation*, 2019 WL 2179116, at *16 (D.D.C. Mar. 4, 2019).  While informative as to whether an interview was being conducted for the purpose of providing legal advice, an *Upjohn* warning is not dispositive of whether the attorney-client privilege applies.  *See B.L. v. Schuhmann*, 2020 WL 6293582, at *8 (W.D. Ky. Oct. 27, 2020) ("Louisville Metro has provided no case law indicating that the use of *Upjohn* warnings is dispositive of whether the attorney-client privilege applied, nor is the Court aware of any.").

and which occurred during the employment relationship").  Outside this Circuit, courts have found that the attorney-client privilege extends to communications between corporate counsel and former employees.  *See, e.g.*, *In re Allen*, 106 F.3d 582, 606 (4th Cir. 1997); *In re Coordinated Pretrial Proceedings in Petroleum Prods.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981).

There is no need, however, to wade into this dispute now, because what UPRRS presently seeks are Fox Rothschild's employee "interviews or notes," which would constitute attorney work product, regardless of whether the interviews were conducted with current or former Lannett employees.  *See, e.g.*, *In re Grand Jury*, 599 F.2d at 1231 (employee questionnaires and interview memoranda prepared by corporation and its counsel during an internal investigation entitled to qualified work product protection); *In re Linerboard*, 237 F.R.D. at 386 ("There can be no doubt that notes prepared by an attorney or his agent of oral interviews with witnesses are core work product." (quoting *United States v. Urban Health Network, Inc.*, 1993 WL 12811, at *3 (E.D. Pa. Jan. 19, 1993))).  While UPRRS urges that it "is not seeking those portions of the interviews or notes that reveal counsel's impressions or legal assessments," it nevertheless contends that it is entitled to the "underlying facts" contained within these documents—in other words, Fox Rothschild's fact work product.  Not so.  Again, to obtain work product, UPRRS bears the burden of establishing both that it has a substantial need for the protected material and that it cannot obtain the material elsewhere without incurring undue hardship.  *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).  It does not even attempt to make such a showing.  Accordingly, materials prepared in connection with Fox Rothschild's investigatory interviews of current or former Lannett employees need not be produced at this time.

### D.  Defendants Have Not Impliedly Waived Attorney-Client Privilege or Work Product Protection

UPRRS's final argument is that Defendants waived attorney-client privilege and work

product protection with regard to the results of the internal investigation by: (1) denying allegations in the Complaint concerning the results of the internal review; and (2) invoking, in various public statements issued outside this litigation, Fox Rothschild's report to Lannett's Board of Directors when denying any wrongdoing related to the government investigations. What UPRRS primarily seeks by way of this waiver argument is access to the investigatory report(s) prepared by Fox Rothschild and presented to Lannett's Board of Directors.[6]

"Waivers come in various sizes and shapes." *In re Keeper of Records*, 348 F.3d 16, 22 (1st Cir. 2003). Express waiver, for instance, generally occurs where a party discloses a confidential communication to a nonprivileged third party, or discloses work product materials in such a way as to "enable an adversary to gain access to the information." *Westinghouse*, 951 F.2d at 1428 (finding attorney-client privilege and work product protection waived as to internal investigation materials voluntarily produced to government agencies investigating alleged misconduct). Defendants have done neither of these things, as far as the Court is aware.[7] Instead, UPRRS contends that Defendants *impliedly* waived the attorney-client privilege and work product protection by placing the results of the internal investigation "at issue," both prior to and during the present litigation.

---

[6] In its reply brief, UPRRS suggests that Defendants, in addition to waiving any protections as to the results of the internal review, also waived any protections as to the "scope" of the review via Defendants' public statements. Specifically, UPRRS takes issue with a statement by Lannett which, according to UPRRS, suggests that the internal review was completed as of September 16, 2014, when subsequent public statements allegedly indicate that the review continued beyond this date. Further, UPRRS takes issue with Lannett's alleged inconsistent statements regarding which drugs were investigated during the course of the review. The Court need not consider arguments raised for the first time in a reply brief. *See Manasse v. United States*, 2016 WL 7130916, at *4 (D.N.J. Dec. 7, 2016) ("'It is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted' and that new arguments 'cannot be raised for the first time in reply briefs.'" (quoting *Elizabethtown Water Co. v. Hartford Cas. Ins. Co.*, 998 F. Supp. 447, 458 (D.N.J. 1998))). In any event, the statements cited by UPRRS make no reference to any confidential attorney-client communications or work product, and UPRRS is not entitled to protected documents and communications merely because the substance of these materials may be relevant to its theory of liability. *See Rhône-Poulenc*, 32 F.3d at 864.

[7] Attorney Egan confirms in his declaration that the investigatory materials generated by Fox Rothschild from its internal review, including its memoranda, summaries, and reports, were not shared with the government regulators.

Where there has been no express waiver, a party may nevertheless impliedly waive attorney-client privilege and work product protection through his or her actions.  *In re Human Tissue Prods. Liab. Litig.*, 255 F.R.D. 151, 158 (D.N.J. 2008).  But the circumstances in which such an implied waiver might occur are limited.  *See In re Keeper*, 348 F.3d at 23 (observing that because "the attorney-client privilege is highly valued[,] . . . courts should be cautious about finding implied waivers").  A party impliedly "waives the [attorney-client] privilege only when he or she 'has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue.'"  *U.S. Fire Ins. Co v. Asbestospray, Inc.*, 182 F.3d 201, 212 (3d Cir. 1999) (quoting *Rhône-Poulenc*, 32 F.3d at 863).  "The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."  *Rhône-Poulenc*, 32 F.3d at 863.  In the work product context, a party might impliedly waive protection by, for instance, making "affirmative use of the work product to advance the claimant's interests."  *In re Lott*, 139 F. App'x 658, 660 (6th Cir. 2005) (quoting *In re Perrigo Co.*, 128 F.3d 430, 445 (6th Cir. 1997)).

"Claims of implied waiver must be evaluated in light of principles of logic and fairness," *In re Keeper*, 348 F.3d at 23, and such waivers should be narrowly construed, *In re Teleglobe*, 493 F.3d at 379.  "Whether fairness requires disclosure is decided 'on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted.'"  *In re Human Tissue*, 255 F.R.D. at 159-60 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000)).  Factors to evaluate when determining whether an implied waiver has occurred include whether:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege

> would have denied the opposing party access to information vital to
> his defense.

*Id.* at 159 (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)).  The party seeking to compel production bears the burden of establishing waiver.  *See Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 418, 423 (E.D. Pa. 2001) (work product doctrine); *Sampson v. Sch. Dist. of Lancaster*, 262 F.R.D. 469, 478 (E.D. Pa. 2008) (attorney-client privilege).

Here, UPRRS contends that Defendants impliedly waived attorney-client privilege and work product protection as to the investigatory report(s) prepared by Fox Rothschild by putting the results of the internal investigation at issue via Defendants' responses to UPRRS's Complaint.  It points to Defendants' Answer, in which Defendants denied that any statements concerning the internal investigation were false or misleading.[8]  But contrary to UPRRS's position, parties do not impliedly waive the attorney-client privilege or work product protection merely by denying allegations in a complaint.  *See Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987) ("To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations.").  Rather, implied waiver occurs where the party claiming privilege "voluntarily inject[s]" protected information into the litigation, *see id.*, by, for example, asserting reliance on the advice of counsel as an affirmative defense to liability, *see Rhône-Poulenc*, 32 F.3d at 863.[9]

---

[8] Specifically, UPRRS points to Defendants' responses to Paragraphs 89, 93, 97, 101, 104, 109, 115, 121, 126, 133, 136, 137, 142, 148, 154, 157, 158, 159, and 168 of the Complaint.

[9] UPRRS also appears to suggest that Defendants impliedly waived protection for any investigatory reports by referencing the internal investigation in their prior briefing.  Specifically, UPRRS cites to Defendants' motion to dismiss, in which Defendants argued that Lannett's "decision to undertake [the internal] investigation cuts against an inference of scienter."  This argument, however, makes no reference to the results of the internal investigation, and cannot be fairly read as "voluntarily injecting" the contents of Fox Rothschild's investigatory report(s) into this litigation.  *See Lorenz*, 815 F.2d at 1098.

UPRRS further argues that Defendants put the internal investigation at issue by informing the public, outside the present litigation, that the reported results of the investigation found no wrongdoing, and by stating in various SEC filings that "[b]ased on reviews performed to date by outside counsel, [Lannett] currently believes that it has acted in compliance with all applicable laws and regulations" with respect to its pricing practices.  Again, however, UPRRS does not argue that Defendants *actually* disclosed any confidential communications or work product through these public statements.[10]  And under UPRRS's own authority, the extrajudicial disclosure of privileged communications waives privilege only as to the protected information "actually revealed."  *See In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) (finding limited implied waiver as to certain confidential communications actually disclosed, with the client's consent, in an attorney-authored book).

In any event, Defendants' public statements referencing the results of the internal investigation are only "at issue" in this case because UPRRS alleges these statements are misleading and, accordingly, actionable under the securities laws.  UPRRS acknowledges this point, arguing that the attorney-client privilege and work product protection were waived as to the investigatory report(s) because UPRRS's own "allegations concerning the veracity of Defendants' statements about the investigation report put the report's conclusion directly at issue" in this litigation.  This is not how implied waiver works.  Protected information is not "at issue" for waiver purposes merely because the information may be relevant to the claims of the party seeking production.  *See Rhône-Poulenc*, 32 F.3d at 864.  Rather, the party claiming privilege—in this case, Defendants—must itself effectuate waiver by affirmatively making

---

[10] For this reason, the case law cited by UPRRS involving actual disclosures of protected information is inapposite. *See In re Linerboard*, 237 F.R.D. at 389 (observing that the actual disclosure of work product to a government agency does not waive protection as to all information related to or underlying the work product).

protected information relevant to the litigation, such that the opposing party would suffer legal prejudice absent production of the information. *See In re Human Tissue*, 255 F.R.D. at 159; *see also In re von Bulow*, 828 F.2d at 103 ("Disclosures made in public rather than in court—even if selective—create no risk of *legal* prejudice until put at issue in the litigation by the privilege-holder.").

Thus, in *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996), a case cited by UPRRS, the court found waiver as to outside counsel's investigation report and underlying interview documents, where the defendant corporation "ha[d] repeatedly proffered the [report] not merely as a signal of its own good faith, but as a reliable, if not authoritative, source of data on which the court should rely in reaching whatever conclusion would favor the company." *Id.* at 472. Because it would be unfair to allow the *Kidder* defendants to "use the substance of the documents as a sword while at the same time invoking the privilege as a shield to prevent disclosure of the very materials that [defendant] ha[d] repeatedly invited the courts to rely upon," the court found that the defendant had waived protection as to these investigatory materials. *Id.* at 473. UPRRS, however, cites to no facts indicating that Defendants have invoked the investigatory report(s) in such a manner in the present litigation. Accordingly, the Court cannot say that Defendants have impliedly waived protection as to the investigatory report(s) at this time.

In sum, UPRRS fails to meet its burden of establishing implied waiver as to the investigatory report(s) prepared by Fox Rothschild and presented to Lannett's Board of Directors. This finding is, however, made without prejudice to UPRRS raising this issue again in the future, should Defendants choose to rely on the investigatory report(s)—or any other specific communication or work product relating to the internal review—in support of their defense. *See*

*Cicel*, 331 F.R.D. at 237-38.

## IV.    CONCLUSION

For the foregoing reasons, Defendants must produce the engagement letter(s) and any other responsive documents concerning the factual circumstances of the attorney-client relationship between Lannett and Fox Rothschild, within the parameters outlined above. Defendants need not at this time produce any investigatory report(s) prepared by Fox Rothschild for Lannett's Board of Directors or the contents of Fox Rothschild's interviews with current or former Lannett employees.

Defendants must produce all relevant, non-protected documents responsive to Request Nos. 16, 17, 18, and 19 within thirty days of this opinion.  Consistent with Federal Rule of Civil Procedure 26, Defendants shall provide UPRRS with a privilege log at the time of production for all investigatory materials withheld.  This log shall "describe the nature of the documents, communications, or tangible things not produced or disclosed [in such a manner] that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).  The parties shall continue to comply with this Court's procedures in any future discovery disputes.

An appropriate order follows.

December 9, 2020                                    BY THE COURT:


/s/Wendy Beetlestone, J.


_____

WENDY BEETLESTONE, J.


25