**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN UTESCH, et al.,**<br>    **Plaintiffs,**<br><br>    v.<br><br>**LANNETT COMPANY, INC., ARTHUR P. BEDROSIAN, MARTIN P. GALVAN,**<br>    **Defendants.** | **CIVIL ACTION**<br><br><br>**NO.  16-5932** |

## OPINION

In this proposed securities fraud class action against Defendants Lannett Company, Inc., Arthur P. Bedrosian (Lannett's former chief executive officer) and Martin P. Galvan (its former chief financial officer) (collectively, "Defendants"), Lead Plaintiff University of Puerto Rico Retirement System ("UPRRS") and Plaintiffs Ironworkers Locals 40, 361, and 417 Union Security Funds (collectively "Plaintiffs") assert securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 against all Defendants, and claims against the individual defendants under Section 20(a) of the Exchange Act.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a).

Plaintiffs now move to certify a class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), to be appointed class representatives, and for the appointment of class counsel.  Both Plaintiffs and Defendants seek to exclude the opposing party's expert report for failure to comply with the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For the following reasons, the motions to exclude will be denied and the class certification motion will be granted.

## I.    BACKGROUND AND PROCEDURAL HISTORY

During the presented class period – July 15, 2014, to October 31, 2017 – Plaintiffs allege

that they purchased Lannett's common stock at prices that were artificially inflated because of Defendants' false and misleading statements concerning the pricing of generic drugs and investigations into price-fixing in the generic drug market.

Plaintiffs allege that anticompetitive conduct among Lannett's competitors caused price increases for five generic drugs which together accounted for most of Lannett's total annual sales from 2013 to 2016.  Lannett publicly disclosed that it received a subpoena and interrogatories from the Connecticut Attorney General in connection with an investigation of anticompetitive conduct in the generic drug industry at the start of the class period in July 2014, and grand jury subpoenas in connection with a federal investigation in November and December 2014. However, say Plaintiffs, "[e]ven as it began to be revealed during the Class Period that several of Lannett's competitors were implicated in illegal price-fixing and anti-competitive conduct, Defendants assured investors that Lannett's past financial results were the product of competitive market forces; and, that the Company's pricing strategy and future results would not be impacted by regulatory scrutiny of anticompetitive conduct in the industry, or the threat of being implicated in any price-fixing or anticompetitive scheme."  More specifically, Plaintiffs contend that Defendants' statements during the class period in public regulatory filings, press releases, and by the individual defendants during earnings calls and other public events were materially false or misleading in that: (1) "Defendants misrepresented to Class members that Lannett's growth was the result of competitive market forces that afforded an opportunity for Lannett's aggressive pricing campaign," whereas Lannett's price increases in actuality were caused by "extensive price-fixing schemes and anticompetitive conduct throughout that generic drug industry that directly implicated Lannett's competitors in markets for key Lannett products"; (2) "[a]s regulatory scrutiny into price-fixing and anticompetitive conduct increased, Defendants

issued a series of misleading statements and omissions of material fact that misled Plaintiffs and

Class members regarding the risk that Lannett would be implicated in price-fixing and

anticompetitive conduct"; and, (3) Defendants' statements that the company had complied with

the law in the pricing of its products "created the false impression that [] Lannett . . . had

conducted a complete and thorough investigation as to whether Lannett engaged in

anticompetitive conduct, and the risk that Lannett would be implicated in an action alleging

anticompetitive conduct," but in actuality Lannett's "internal investigation was no[t] completed,

and had a limited focus."

Throughout the class period, Lannett's stock price fell as information became public that

revealed potential anticompetitive conduct in the generic drug industry and Lannett's potential

exposure to liability.  Plaintiffs allege that Lannett's stock value fell 13% in December 2014 after

Lannett disclosed that it had received the federal grand jury subpoenas, and fell 26% following

the publication of a *Bloomberg* article in November 2016 describing the possibility that criminal

charges would be filed against pharmaceutical companies, including Lannett.  At the close of the

class period, on October 31, 2017, Lannett's stock price dropped 14% after the Connecticut

Attorney General filed a complaint alleging a conspiracy among generic drugs makers, including

Lannett, to engage in anticompetitive conduct and price-fixing.

Plaintiffs now move to certify the following damages class:

All persons and entities who purchased or acquired the publicly traded common
stock of Lannett Company, Inc. . . . during the period from July 15, 2014 and
October 31, 2017, inclusive[,] . . . and who were damaged thereby. . . .[1]

---

[1] Excluded from the Class are Defendants, the officers and directors of Lannett, at all relevant times, members of
their immediate families and their legal representatives, heirs, successors or assigns and any entity in which
Defendants have or had a controlling interest.

## II.      LEGAL STANDARDS

"The class-action device is an exception to the rule that litigation is usually conducted by and on behalf of the individual named parties only.  Accordingly, the party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quotation marks and citations omitted).  To proceed as a certified class action, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Marcus v. BMW of N. Am.*, *LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (citation omitted).  Failure to satisfy any of these requirements precludes certification.  *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "Rather, a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation marks and citation omitted).  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008) (citations omitted).

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *Id.* at 309 (quotation marks and citation omitted).  In conducting this analysis, "the court cannot be bashful."  *Marcus*, 687 F.3d at 591.  "[T]he district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties."  *Hydrogen Peroxide*, 552 F.3d at 307

4

(citations omitted).

Accordingly, the evaluation of whether a plaintiff has satisfied the requirements of Rule 23 can, as necessary, "delve beyond the pleadings" to the factual record, *id.* at 316 (quotation marks and citation omitted), and it is appropriate to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action," *Marcus*, 687 F.3d at 591 (quotation marks and citation omitted).  Indeed, as "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," rigorous analysis "frequently . . . entail[s] some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart*, 564 U.S. at 351 (quotation marks and citation omitted).  The merits of a plaintiff's claims may be considered, however, "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citations omitted); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) ("[A] district court has limited authority to examine the merits when conducting the certification inquiry").

In this case, as we shall see *infra*, there is some need to look into the merits of Plaintiffs' claims – specifically, the reliance element of a Section 10(b) and Rule 10b-5 claim – thus, the prima facie elements of those claims are set forth here:[2] To recover damages for violations of Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or

---

[2]In addition to these and the Section 20(a) claims, the Complaint also asserts that Defendants violated Subsections (a) and (c) of Rule 10b-5, which respectively make it unlawful to "employ any device, scheme, or artifice to defraud" and "engage in any act, practice, or course of business which operates . . . as a fraud."  17 C.F.R. § 240.10b-5(a), (c).  Claims under these subsections are referred to as "'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."  *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011), *abrogated on other grounds by Amgen*, 568 U.S. at 465.  Plaintiffs' Motion and briefing in support of their Motion do not raise the scheme liability claim of the Complaint for class certification.  Accordingly, this claim will not be certified for class treatment.

omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 267 (2014) (quotation marks and citation omitted).

## III.   DISCUSSION

### A.   Rule 23(a) Pre-Requisites

"The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).  To satisfy Rule 23(a), the proponent of class certification must establish that (1) "the class is so numerous that joinder of all members is impracticable" (numerosity); (2) "there are questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and, (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy of representation).  Fed. R. Civ. P. 23(a). Defendants do not dispute that Plaintiffs have established numerosity and commonality, but do argue that Plaintiffs have failed to establish typicality and adequacy.  Nevertheless, in the interests of completion, each requirement is considered below.

#### i.   Numerosity

Although "[t]here is no minimum number of members needed for a suit to proceed as a class action," generally the numerosity requirement is satisfied if the named plaintiff demonstrates greater than 40 potential plaintiffs.  *Marcus*, 687 F.3d at 595 (citation omitted). "Mere speculation is insufficient," however, and "Rule 23(a)(1) requires the examination of the specific facts of each case."  *Id.* at 595-96 (quotation marks and citations omitted).  The plaintiff

need not "offer direct evidence of the exact number and identities of the class members[, b]ut in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Id.* at 596.  Here, Lannett's common stock traded on the New York Stock Exchange, there were a minimum of 35.6 million shares of Lannett's common stock outstanding during the class period, and an average of approximately 12% of Lannett's outstanding shares were traded on a weekly basis during the class period.  This is sufficient to establish by a preponderance of the evidence that there are greater than 40 persons in the proposed class who "purchased or acquired the publicly traded common stock of Lannett Company" during the class period, and therefore that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).

### ii. Commonality

The commonality requirement of Rule 23(a)(2) demands that class members' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.  Rule 23(a)(2) "does not require identical claims or facts among class members." *Marcus*, 687 F.3d at 597 (quotation marks, brackets, and citation omitted).  Instead, commonality is established "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal*, 43 F.3d at 56 (citations omitted).  Here, the commonality requirement is satisfied.  To succeed on their securities fraud claims Plaintiffs must establish that Lannett made material misrepresentations or omissions and did so with scienter.  The inquiry would necessarily focus on Lannett's actions, and the answers to questions raised in the inquiry would be answered

not from the perspective of each prospective class member, but from an examination of what Lannett did and said. The "classwide answers" to these questions lead inexorably to the conclusion that the commonality requirement of Rule 23(a) is met. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) (citation omitted).

### iii.   Adequacy

Plaintiffs similarly meet Rule 23(a)'s adequacy requirement. "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir. 2015) (citation omitted). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id.* (quotation marks and citation omitted). "The adequacy inquiry has two components designed to ensure that absentees' interests are fully pursued," *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 601-02 (3d Cir. 2009) (quotation marks and citation omitted): "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001) (citations omitted).

Turning first to the adequacy of Plaintiffs' proposed class counsel, Abraham, Fruchter & Twersky, LLP: Plaintiffs have established that their counsel is "qualified, experienced, and generally able to conduct the proposed litigation," and is therefore adequate. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (quotation marks and citation omitted). The law firm resumé of Plaintiffs' proposed class counsel illustrates that counsel has substantial experience in litigating securities fraud class actions. Furthermore, Plaintiffs' proposed counsel, appointed as lead counsel in this action in March 2017, has vigorously

litigated the case including through opposition to motions to dismiss and in discovery disputes.[3]

The named Plaintiffs also establish that they have "the ability and the incentive to represent the claims of the class vigorously . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988) (citations omitted).[4]  Plaintiffs' and class members' interests are aligned in that they all purchased or acquired and lost money on Lannett's artificially inflated common stock during the class period.[5]  Accordingly, adequacy is satisfied.

### iv.  Typicality

Defendants argue that the representative parties are not typical of the class because they

---

[3] Rule 23(g) provides that "a court that certifies a class must appoint class counsel," and sets out a non-exhaustive list of factors governing the appointment of class counsel, including: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and, (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1).  For the reasons set forth above, Abraham, Fruchter & Twersky, LLP, satisfies the criteria of Rule 23(g), and will be appointed class counsel.

[4] Defendants contend that adequacy is not established because both UPRRS and Ironworkers "lack even a basic understanding of the facts underlying this action" and defer to counsel in making decisions about the case.  But, "[a] class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (quotation marks and citation omitted).  The deposition testimony of Plaintiffs' designated Rule 30(b)(6) witnesses demonstrate that Plaintiffs understand the nature of their causes of action – to wit, that this is a class action lawsuit against Lannett and its executives premised on their false and misleading statements about drug pricing which caused investors, including Plaintiffs and class members, to lose money.  There is no need for Plaintiffs to have mastered the factual and legal issues presented in the case to satisfy the adequacy requirement, because their representation of the class will be accomplished through adequate counsel.  *See, e.g.*, *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982), *abrogated on other grounds by Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991); *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 273 (3d Cir. 2020).

[5] Defendants also contest adequacy on the grounds that UPRRS is underfunded, arguing that UPRRS's "precarious financial position raises serious concerns about potential conflicts of interest and whether it could represent the putative class if it is forced to declare bankruptcy or faces an immediate liquidity crunch."  To preclude class certification, a conflict of interest "must be fundamental" and cannot be "unduly speculative."  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (quotation marks and citations omitted).  "A fundamental conflict exists where some class members claim to have been harmed by the same conduct that benefitted other members of the class" and "touches the specific issues in controversy."  *Id.* (quotation marks, brackets, and citations omitted).  Although Defendants suggest that UPRRS's financial status could pressure UPRRS to settle the case, this does not constitute a fundamental conflict as the Third Circuit has defined it.  Further, UPRRS has vigorously litigated the case since its appointment as lead plaintiff over four years ago.  Potential adverse consequences of UPRRS's financial situation are speculative, and do not render UPRRS inadequate.

are subject to unique defenses as to the element of reliance in their Section 10(b) claim.  *See*

*Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810 (2011).

### a.  Unique Defense: Legal Precepts

On a motion for class certification, the proposed class representatives must meet the

typicality requirements of Rule 23(a) by showing that the "claims or defenses" of proposed class

representatives are "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This

requirement "ensur[es] that the class representatives are sufficiently *similar* to the rest of the

class – in terms of their legal claims, factual circumstances, and stake in the litigation – so that

certifying those individuals to represent the class will be fair to the rest of the proposed class."

*Schering Plough*, 589 F.3d at 597 (citations omitted).  Accordingly, "a proposed class

representative is not 'typical' under Rule 23(a)(3)" if (1) "the representative is subject to a

unique defense" that (2) "is likely to become a major focus of the litigation."  *Id.* at 598

(quotation marks and citation omitted).[6]  As with typicality generally, the atypicality of a

potential defense depends on "the attributes of the proposed representatives, the class as a whole,

and the similarity between the proposed representatives and the class."  *Id.* at 597.  It is the

defendant's burden to show that a unique defense defeats typicality.  *See Beck v. Maximus*, 457

F.3d 291, 300 (3d Cir. 2006).  Merely "seeking to disqualify the representative [by raising] a

speculative defense" is insufficient to meet this burden.  *Id.* at 301.

It is not necessary for a defendant to show that a prospective class representative is the

---

[6] One focus of the typicality inquiry is "the extent to which the proposed representative may face significant unique or atypical defenses to her claims."  *Id.* at 597-98 (citation omitted).  Even where a proposed class representative's claims are the same as those of class members, its individual factual circumstances may allow a defendant to assert a unique or atypical defense to the proposed representative's claims – that is, a "defense[] against it which would not be applicable to the class as a whole."  *Zenith Lab'ys, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976). If the proposed representative faces a defense that is unique to them, "the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class."  *Schering Plough,* 589 F.3d at 598 (quotation marks and citation omitted).

*only* member of the proposed class who is subject to a "unique defense."  Indeed, typicality may be defeated where a defense is "inapplicable to many members of the class."  *Schering Plough*, 589 F.3d at 599.  If, however, a defense is broadly applicable to the class, then the defense is not "unique or atypical" to the proposed representative and will not defeat certification.  *Id.* at 598; *see also* 1 *Newberg on Class Actions* § 3:45 ("[A] defense will not defeat typicality if . . . it applies to all members of the proposed class" because "the defense's application to the proposed class representative in that situation renders her situation typical of the rest of the class").

Regardless, only a defense that will become a "major focus" of the litigation precludes certification.  *Beck*, 457 F.3d at 300 (citations omitted).  To pose a risk of becoming a "major focus," the defense must present a risk that the class representative will be preoccupied with litigating the defense to the detriment of litigating issues common to the class on behalf of absent class members.  *See Schering Plough*, 589 F.3d at 598; *see also Beck*, 457 F.3d at 301 (the "major focus" standard operates to "protect[] class members from a representative who is not focused on common concerns of the class").  Considerations in evaluating whether a defense will become a major focus of the litigation include whether the unique defense is unlikely to be meritorious; whether challenging the defense will impose exacting requirements on the proposed class representative; and, if meritorious, whether the defense would completely dispose of the proposed class representative's claims.  *See Beck*, 457 F.3d at 300 ("If a court determines an asserted unique defense has no merit, the defense will not preclude class certification"); *Zenith*, 530 F.2d at 512 (defense could "divert much of [the plaintiff's] attention from the suit as a whole"); *Schering Plough*, 589 F.3d at 599 (defense could "bar[]" the plaintiff from suing the defendant).

b. <u>Unique Defense: Analysis</u>

Plaintiffs' claims arise "from the same event, practice or course of conduct" as that of the class members and are "based on the same legal theory as the claims of the class." *Marcus*, 687 F.3d at 598 (citation omitted). Plaintiffs' and class members' claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 arise from the same set of alleged misrepresentations, and the same set of allegations that they purchased Lannett's stock at artificially inflated prices and were injured when the stock price dropped after the alleged fraud was revealed. Accordingly, absent a finding that Defendants have defenses that are unique to the Plaintiff representatives, Plaintiffs are typical of the class. *See, e.g.*, *Hoxworth*, 980 F.2d at 923 (3d Cir. 1992) (typicality satisfied where plaintiffs' claim "for damages stemm[ed] solely from [defendant's] course of conduct" in violation of securities laws).

But Defendants, focusing on the reliance element of a cause of action for violations of Section 10(b) and Rule 10b-5, contend that Plaintiffs did not rely on the alleged misstatements and omissions alleged in the Complaint and therefore are susceptible to defenses that are atypical of the putative class. Specifically, Defendants contend that Plaintiffs' designated corporate representatives have admitted under oath at their depositions that Plaintiffs had no input on the decision to buy, hold, or sell Lannett common stock during the putative class period; rather, investment decisions were made by their investment managers without Plaintiffs' oversight or guidance. They further contend that the investment managers agreed that they placed no reliance on the alleged misstatements when making their investment decisions. Accordingly, Defendants' argument is that because Plaintiffs did not participate in the investment decisions and because Plaintiffs' investment managers did not rely on the alleged misrepresentations, Plaintiffs are not typical of the putative class they seek to have certified.

12

As a preliminary matter, Plaintiffs respond by citation to two cases for the proposition that reliance on an investment manager or broker does not constitute a unique defense, as it is "quite likely" that other class members similarly relied on a manager or broker.  *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at \*5 (N.D. Ill. 2020); *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 127 (D.D.C. 2017).  Other than citing them, Plaintiffs make no argument and provide no rationale as to why this Court should adopt wholesale the holdings of these non-precedential out-of-circuit cases.

They do, however, persuade the Court that insofar as they are relying on a fraud-on-the-market presumption of reliance, such presumption applies equally to all potential class members. To set the stage for this argument: In a securities fraud action, reliance on misrepresentations can be established directly or indirectly.  A plaintiff can prove direct reliance by establishing that "they were aware of, and directly misled by, an alleged misrepresentation."  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) (citation omitted).  A plaintiff also can prove reliance indirectly via the fraud-on-the-market theory, pursuant to which "a plaintiff in a securities action is generally entitled to a rebuttable presumption of reliance if he or she purchased or sold securities in an efficient market."  *Id.* (citation omitted).  As *Basic Inc. v. Levinson* explained, the premise of the fraud-on-the-market theory is that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  485 U.S. 224, 241 (1988) (quotation marks and citation omitted).  Accordingly, in such a market, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  *Id.* at 241-42 (quotation marks and citation omitted).  "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.

13

Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Id.* at 247.  Thus, where the fraud-on-the-market theory applies, "the court presumes . . . that the plaintiff actually relied on the market price of the security as an indicator of its value," and therefore that the plaintiff relied on the defendant's misrepresentations. *Semerenko*, 223 F.3d at 178-79 (citation omitted).

"The fraud on the market theory of reliance, however, creates only a presumption, which a defendant may rebut by raising any defense to actual reliance." *Id.* at 179 (citation omitted). "Any showing that severs the link between the alleged misrepresentation and . . . [the plaintiff's] decision to trade at a fair market price . . . [is] sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248.  A party's presumptive reliance on misrepresentations can be rebutted "by showing that the investor would have purchased or sold the securities at [the market] price even with full knowledge of the misrepresentation, that the investor traded in the securities based on an actual belief that the market price was inaccurate, or that the investor's decision to trade was based on some factor other than the market price." *Semerenko*, 223 F.3d at 179 n.7 (citations omitted).  The defendant has the burden of persuasion to rebut presumptive reliance by a preponderance of the evidence. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, ---- U.S. ----, 2021 WL 2519035, at *7 (2021).  If presumptive reliance is rebutted, then the "plaintiff would have to prove that he directly relied on the defendant's misrepresentation in buying or selling the stock." *Halliburton II*, 573 U.S. at 269.

Here, Defendants do not dispute that the fraud-on-the-market theory applies, and thus that class members are entitled to a rebuttable presumption of reliance.[7]  Instead, they contend that

---

[7] To invoke the *Basic* presumption of reliance, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the

the evidentiary record rebuts the presumption of reliance as to Plaintiffs UPRRS and Ironworkers and that they are therefore subject to unique defenses which render them atypical of the class. Plaintiffs of course argue otherwise.  In evaluating each of their arguments, it is necessary to dip a toe into the merits of the matter.

### 1.   Post-Disclosure Purchases

Defendants first argue that UPRRS and Ironworkers are subject to a unique defense because they purchased Lannett stock after "corrective disclosures," each of which are mentioned in the Complaint: (1) a July 16, 2014 regulatory filing disclosing Lannett's receipt of a subpoena and interrogatories from the Connecticut Attorney General regarding Lannett's pricing of a generic drug; (2) a November 6, 2014 regulatory filing disclosing a federal grand jury subpoena served on a Lannett executive arising out of an antitrust investigation of the pharmaceutical industry; (3) a December 8, 2014 regulatory filing disclosing Lannett's receipt of a federal grand jury subpoena arising out of the investigation; (4) a November 3, 2016 *Bloomberg* article concerning an ongoing federal antitrust investigation into price-fixing of generic drugs; and, (5) an October 31, 2017 complaint filed by the Connecticut Attorney General alleging a price-fixing conspiracy by generic drug makers.  The records of UPRRS's and Ironworkers' transactions in Lannett stock establish that both purchased Lannett stock for the first time after the first three of these disclosures and purchased more stock after the fourth disclosure.

---

stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 277-78 (citations omitted).  Plaintiffs need not demonstrate materiality to establish that the fraud-on-the-market theory applies at class certification.  *Amgen*, 568 U.S. at 459-60.  Here, as to the remaining elements, Plaintiffs allege misrepresentations that were publicly known, including in public regulatory filings, press releases, and public statements, Plaintiffs purchased stock during the class period, and Lannett's common stock traded on a quintessential efficient market, the New York Stock Exchange.  *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[I]n an open and developed securities market like the New York Stock Exchange, the price of a company's stock is determined by all available material information regarding the company and its business").  Plaintiffs thus have satisfied the pre-requisites required to establish that the *Basic* presumption of reliance applies for purposes of class certification.

Defendants posit that the timing of these purchases rebuts the presumption of reliance for both Plaintiffs because their post-disclosure purchases are "strong evidence" that they would have, and did, purchase Lannett stock regardless of the alleged fraud. But, if after class certification Defendants try to rebut Plaintiffs' presumption of reliance based on the timing of Plaintiffs' stock transactions, the issues litigated will be broadly applicable to the class. The putative class includes all persons and entities that purchased Lannett stock from July 15, 2014, to October 31, 2017. The first three corrective disclosures occurred in the first six months of the class period, and the fourth corrective disclosure occurred approximately one year before the end of the class period. Because these disclosures were made early in or in the midst of the class period, many other class members likely will have purchased Lannett stock after these disclosures, just as Plaintiffs did. The question of whether the purchase of stock before or after a corrective disclosure defeats reliance is one that is salient across the class and is not unique to the named Plaintiffs.

### 2. *Ironworkers' Investment Advisor*

Defendants next argue that Ironworkers' presumption of reliance is rebutted because the testimony of the designated corporate representative of Ironworkers' investment manager, Snow Capital Management ("SCM"), proves that SCM would have decided to buy Lannett stock "even if the alleged misstatements had never been made." This argument, however, is countermanded by *Peil v. Speiser*, which explained that a party's failure to directly rely on misrepresentations fails to rebut the presumption of reliance because it "misses the point of the fraud on the market theory, under which a plaintiff may prevail even if he was entirely unaware of the alleged misrepresentations." 806 F.2d 1154, 1163 (3d Cir. 1986).

Defendants next argue that SCM's views were "atypical of the putative class" because

SCM believed Lannett stock was undervalued due to concerns that Lannett would be implicated in price-fixing, whereas the Complaint alleges that Defendants' misrepresentations "created the false impression among investors . . . [that] there was no risk that Lannett would be implicated . . . [in] any illegal price-fixing scheme."  Certainly SCM's corporate representative testified that after "spen[ding] considerable time" researching Lannett, SCM concluded that the market price of Lannett's stock was "cheap" because of "surrounding pressures that were possibly impacting the company's valuation," including "pricing erosion" – that is, decreasing drug prices – "in the generic industry" and "investigations by the Department of Justice and Attorney Generals . . . of various states into various generic drug manufacturers."  But that some members of the class were focused on undervalued stock and others were not does not defeat *Basic*'s presumption of reliance which extends to "value investors," who "believe[] that certain stocks are undervalued or overvalued and attempt[] to 'beat the market' by buying the undervalued stocks and selling the overvalued ones."  *Halliburton II*, 573 U.S. at 273.  *Halliburton II* rejected the argument that value investors do not rely on the market price of a security because they "implicitly rel[y] on the fact that a stock's market price will eventually reflect material information," thereby allowing the investor to make a profit.  *Id.*  The value investor "tries to estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud."  *Id.* at 274.  "[T]o indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, [the value investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period."  *Id.*

### 3.   UPRRS's Investment Advisor

Defendants next argue that UPRRS's presumptive reliance is rebutted because the testimony of Roger Porter – the designated corporate representative of UPRRS's investment

manager, Thompson, Siegel, and Walmsley ("TSW") – and internal e-mails between TSW employees prove that "TSW did not rely on the alleged misstatements or the integrity of the market price" in deciding to invest in Lannett stock.  Defendants' first argument, that TSW invested in Lannett because it believed Lannett stock was undervalued, fails for the same reason set forth above.[8]

Similarly, Defendants' argument that the presumption is undercut because TSW did not directly rely on the statements of the individual defendants has no traction because, as discussed *supra*, arguments premised on a party's failure to directly rely on misrepresentations do not necessarily rebut the presumption of reliance.  *See Peil*, 806 F.2d at 1163.[9]

Defendants next argue that UPRRS's presumptive reliance is rebutted because TSW would have invested in Lannett regardless of whether TSW knew that Lannett's price increases on generic drugs were the result of anticompetitive conduct in the generic drug industry, which the alleged fraud purportedly concealed.  This argument is not supported by the record.  For evidentiary support, Defendants point to June 2015 e-mails between Porter and TSW research analysts discussing the prospects of Lannett's stock – specifically, Porter explains that, in his opinion, the "real driver" for the growth in Lannett's stock would be management and

---

[8] Porter testified that TSW has a "value shop" investment approach and tries "to buy companies for some value below their intrinsic value and hopefully sell them at their intrinsic value or above."  As to TSW's purchase of Lannett stock, Porter testified that TSW "took a position in Lannett . . . thinking that [it] had a favorable risk/reward relationship," explaining further that Lannett had "large cash position, a backlog of generic drugs that hadn't been approved yet, the opportunity to deploy their balance sheet for M&A opportunities," and other opportunities.  As to potential "negatives" in investing in Lannett, Porter agreed that "one of the primary risks" included "price erosion" in the pricing of generic drugs.

[9] Further, the testimony cited by Defendants fails to establish that TSW did not directly rely on the misrepresentations of the individual defendants alleged in the Complaint.  In this testimony, when asked if TSW "generally" relied on what Bedrosian said about Lannett, Porter testified that he "wouldn't say we rely" because "we really rely on ourselves" by "collect[ing] information" and "form[ing] our own risk/reward analysis."  Porter then explained that TSW "listen[s]" to "management's discussions about risks and opportunities" and "factor that into our case."  In other words, Porter confirmed that companies' management's statements are a factor in TSW's decision to trade in a security.

acquisitions because "gross margins" on Lannett drugs "are clearly coming down."  Although these e-mails are evidence that at least some TSW employees – Porter and the two research analysts – believed that Lannett's drug price increases would not be a continuing source of growth for the company, these e-mails do not discuss the suspected causes of Lannett's drug price increases, let alone attribute these price increases to anticompetitive conduct.

Defendants finally argue that UPRRS's presumptive reliance is rebutted because TSW "fully appreciated" the risk that Lannett would be implicated in government investigations and enforcement actions.  In essence, Defendants argue that TSW saw through Defendants' alleged fraud but invested anyway, "sever[ing] the link between the alleged misrepresentation" and the "decision to trade at a fair market price."  *Basic*, 485 U.S. at 248.  Neither does the record support this argument.  Defendants rely on a series of November 2016 e-mails in which two TSW research analysts and other TSW employees received a third-party research report that analyzed the risks posed by the Department of Justice's probe of price-fixing in the generic drugs market and identified subpoenas of persons at Lannett as an "unfavorable" factor in evaluating the strength of the government's case.  The e-mails between the two TSW research analysts indicate that far from fully appreciating the risks, the employees dismissed the potential case as a "big overshoot" and questioned whether there was "enough circumstantial evidence to suggest that an illegal pricing action has taken place."  This correspondence fails to show that TSW invested in Lannett despite knowing the risks that Lannett would be implicated in government investigations and enforcement actions.

*************

For the reasons set forth above, Defendants have not met their burden to show by a preponderance of the evidence that the named Plaintiffs are subject to a unique or atypical

defense that is likely to become a major focus of the litigation.  Because UPRRS and Ironworkers have satisfied each of the requirements of Rule 23(a), they will be appointed as representatives of the class.  *See* Fed. R. Civ. P. 23(a) ("One or more members of a class may sue . . . as representative parties" where Rule 23(a) pre-requisites are satisfied).

### B.  Rule 23(b) Requirements

Having determined that Plaintiffs have established numerosity, commonality, adequacy and typicality as required by Federal Rule of Civil Procedure 23(a), the question is now whether they can meet the requirements of Rule 23(b)(3), to wit that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance); and, (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).  Fed. R. Civ. P. 23(b)(3).  In addition, the concept of ascertainability is an implied additional requirement of Rule 23(b)(3), because "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  *Marcus*, 687 F.3d at 593.

Here, Defendants do not dispute that Plaintiffs have established superiority and ascertainability.  They do argue, however, that Plaintiffs have not established predominance specifically because they have failed to comply with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  First, however, again in the interest in clearing away the brush before reaching the core of that challenge, a quick analysis of the superiority and ascertainability requirements is warranted.

### i.  Superiority

"The superiority requirement [of Rule 23(b)(3)] asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods

of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004)

(quotation marks and citation omitted). The Rule provides a "nonexhaustive list of factors"

relevant to evaluating the superiority of adjudication via class action, *Amchem Prods., Inc. v.

Windsor*, 521 U.S. 591, 615 (1997), including: (1) "the class members' interests in individually

controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any

litigation concerning the controversy already begun by or against class members"; (3) "the

desirability or undesirability of concentrating the litigation of the claims in the particular forum";

and, (4) "the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3).

Here, absent the class action device many potential claims would not be filed: Numerous

potential plaintiffs with small damages claims would not be warranted in litigating a lengthy

securities fraud action such as this, while others, who may have more at stake, would flood the

courts with individual cases seeking damages on the same theory. Certainly, class members

would have no ability to control the prosecution of separate actions. Further, concentration of

the case in a class action would be an efficient use of limited judicial resources. Adjudication by

class action presents no obvious manageability problems, as common questions of law and fact

are central to each class member's claims. As such, a class action is superior to alternative

methods for adjudicating the case.

### ii. *Ascertainability*

To establish ascertainability, the proponent of class certification must prove by a

preponderance of the evidence that "(1) the class is defined with reference to objective criteria;

and (2) there is a reliable and administratively feasible mechanism for determining whether

putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (quotation marks

and citations omitted). They need not "be able to identify all class members at class certification

– instead, a plaintiff need only show that class members *can* be identified." *Id.* (quotation marks and citation omitted).  Here, Plaintiffs propose a definite class relying on objective criteria: all persons and entities (excluding Defendants and their officers and directors) that purchased or acquired Lannett's publicly traded common stock from July 15, 2014, to October 31, 2017.  Plaintiffs explain and Defendants do not dispute that class members can be identified using records of shareholder acquisitions.  Thus, the ascertainability requirement is met.

### iii.   Preliminary Issues Concerning the Predominance Inquiry

Before determining whether Plaintiffs have satisfied the predominance requirement, two preliminary issues must be resolved: first, whether, as Defendants argue, the Supreme Court's decision in *Comcast v. Behrend*, 569 U.S. 27 (2013) precludes certification here; and, second, whether the opinions of the parties' respective damages experts should be excluded for failure to satisfy the *Daubert* standard.

#### a.   Applicability of *Comcast v. Behrend*

Defendants raise only one argument in their predominance challenge.  Relying on *Comcast v. Behrend*, they argue that Plaintiffs fail to put forward a damages model that is consistent with their theory of liability.  Contrary to Defendants' position, *Comcast* does not move the needle.

*Comcast* was an antitrust case, brought by subscribers to Comcast's cable-television services.  569 U.S. at 29-30.  These subscribers alleged that Comcast was engaged in a scheme to buy up competitor cable providers in Philadelphia and the surrounding area, which enabled the company to hold cable prices in this region at supra-competitive levels.  *Id.*

The plaintiffs sought to certify a class under Rule 23(b)(3).  To establish predominance, the district court required plaintiffs to show both "(1) that the existence of individual injury

resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of

proof at trial through evidence that [was] common to the class rather than individual to its

members'; and (2) that the damages resulting from that injury were measurable 'on a class-wide

basis' through use of a 'common methodology.'" *Id.* (quoting *Behrend v. Comcast Corp.*, 264

F.R.D. 150, 154 (E.D. Pa. 2010)).  The plaintiffs offered four theories of antitrust impact, only

one of which – their so-called "overbuilder" theory – was accepted by the district court as

capable of class-wide proof.  *Id.* at 31.  Under this theory, Comcast's conduct reduced

competition from "overbuilders," companies that build competing cable networks in regions

where an incumbent cable provider operates.  *Id.*

      The plaintiffs maintained that their damages could be measured on a class-wide basis,

pursuant to a regression model which compared actual prices in the region affected by the

alleged anticompetitive conduct with hypothetical prices in an unaffected region.  *Id.* at 32.

Importantly, the model purported to measure the cumulative effect of the plaintiffs' four antitrust

impact theories on cable subscription prices, and was incapable of isolating damages attributable

to plaintiffs' sole surviving liability theory.  *Id.*

      Neither the district court nor the Third Circuit saw this as a predominance-defeating

issue, but the Supreme Court did.  According to the Supreme Court, if the plaintiffs were to:

> prevail on their claims, they would be entitled only to damages resulting from
> reduced overbuilder competition, since that is the only theory of antitrust impact
> accepted for class-action treatment by the District Court.  It follows that a model
> purporting to serve as evidence of damages in this class action must measure only
> those damages attributable to that theory.  If the model does not even attempt to do
> that, it cannot possibly establish that damages are susceptible of measurement
> across the entire class for purposes of Rule 23(b)(3).

*Id.* at 35.  The Court noted that "[f]or all we know, subscribers in Gloucester County may have

been overcharged" not because of reduced overbuilder competition, but because of Comcast's

"alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof)." *Id.* Because the plaintiffs' proposed damages model could not "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding, Rule 23(b)(3) [could not] authorize treating subscribers . . . as members of a single class." *Id.* at 38.

Lower courts have since spilt much ink attempting to decipher *Comcast*'s impact on the Rule 23(b)(3) predominance analysis. *See, e.g.*, Alex Parkinson, *Comcast Corp. v. Behrend and Chaos on the Ground*, 81 U. Chi. L. Rev. 1213, 1225-38 (2014) (describing chaos among the lower courts as to *Comcast*'s implications). In *Neale v. Volvo Cars of North America, LLC*, the Third Circuit limited *Comcast* to its unique facts, finding the case "inapposite" to the predominance analysis in a products liability action. 794 F.3d 353, 374 (3d Cir. 2015). There, plaintiffs sought certification of six state-wide damages classes composed of consumers who alleged that Volvo sold vehicles with a uniform design defect. *Id.* at 357. The district court granted the plaintiffs' request and Volvo appealed, arguing that certification was inappropriate under *Comcast*.

The Third Circuit disagreed, interpreting the *Comcast* decision thus: "Comcast held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class action treatment." *Id.* at 374; *see also Suboxone*, 967 F.3d at 270 (*Comcast* held "that class certification was inappropriate when a damages model reflected injury from four antitrust injuries, but only one viable theory of antitrust liability and injury remained in the case"). The court explained: "Because [the *Comcast* plaintiffs'] evidence could not translate the relevant legal theory of the harmful event into an analysis of the economic impact of that event, [the Supreme Court]

determined that common questions could not predominate over individual ones." *Neale*, 794 F.3d at 374 (quotation marks, italics, and citation omitted).  In *Neale*, however, there was no question that the class members' damages flowed from the defendant's conduct that created the legal liability; thus, *Comcast* did not apply.  *See id.*; *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("Unlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit").

Plaintiffs suggest that neither does *Comcast* apply to this securities action, where Plaintiffs propose to measure out-of-pocket damages based on the difference in the amount of artificial inflation in Defendants' stock price at the time of purchase and at the time of sale. There is some merit to this assertion: Unlike in *Comcast*, where the plaintiffs offered multiple different theories of how the defendant's conduct violated federal antitrust law, here in this securities fraud case Plaintiffs (having toyed with various other theories during this litigation)[10] now focus on a single theory of liability – that the Defendants made material misrepresentations or omissions; that Defendants' misrepresentations artificially inflated Lannett's stock price; and the stock price declined when the truth emerged causing financial loss to Plaintiffs and the class. Although the Complaint alleges many misrepresentations about various, interrelated topics, because each of Defendants' alleged misrepresentations is part of their broader alleged concealment of the lack of competition in the generic drug market and the potential adverse

---

[10] The Complaint does, at points, mention Lannett's potential involvement in anticompetitive conduct.  However, to the extent that Plaintiffs' Complaint might have espoused a theory of liability that Lannett concealed its own involvement in anticompetitive conduct, this Court's May 15, 2019 Opinion put paid to that theory.  *See Utesch v. Lannett Co., Inc.*, 385 F.Supp.3d 408, 417 n.4 (E.D. Pa. 2019) ("Defendants' arguments as to this theory [went] without response from Plaintiffs, and therefore the theory [was] waived").

consequences on Lannett's business, each misrepresentation is categorically part of the same, single theory.  *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("individual alleged misstatements . . . relat[ing] to different aspects of a larger problem" were part of "a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie").

Comcast is "inapposite" here because the numerical mismatch between damages model (one model) and liability theory (four theories) at issue in that case is not present here.  To recap, the *Comcast* plaintiffs pursued four liability theories prior to certification, and their damages expert developed a model that calculated damages based on all four theories.  The district court rejected three of these theories at class certification, after the damages model had been developed.  This resulted in a mismatch between the sole theory of liability remaining at class certification and the damages model, which calculated damages as if all four liability theories remained.  Here, at class certification, Plaintiffs advance a single theory of liability, as delineated by their proposed damages expert, Chad Coffman, thus:

> Defendants repeatedly issued materially false or misleading statements and financial results throughout the Class Period, even as the details of the price-fixing scheme under investigation came to light and as the investigation widened to include Lannett itself.  The Complaint alleges that through a series of corrective disclosures, the market finally learned the truth about Lannett's fraudulent scheme, and once revealed, the price of Lannett Common Stock fell, harming investors who bought at inflated prices.

Coffman employed that theory in his expert report and testified unequivocally during the hearing on Defendants' motion to exclude his opinion that he did not incorporate Plaintiffs' prior theories of liability at any point in drafting his report.  The issue that led to a mismatch between damages model and liability theory fatal to certification in *Comcast – i.e.*, that the expert damages opinion was prepared to measure damages for four different theories of liability, and could not

disaggregate damages for the one remaining theory of liability after three theories were rejected – is, accordingly, not presented here.  That said, the Supreme Court's explanation that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*" does have application to the predominance analysis which application will be explored *infra.  Comcast*, 569 U.S. at 38 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).

b.  *Daubert* Motions

Coffman's report focuses on whether the market for Lannett common stock was efficient during the class period and whether calculating damages is subject to a common methodology under Section 10(b) and Rule 10b-5.  He concludes that the answer to both questions is yes.  In response, Defendants submitted a report by Jennifer Marietta-Westberg ("the Marietta-Westberg Report") opining to the contrary that Coffman did not put forth a methodology for calculating damages on a class-wide basis in a manner consistent with Plaintiffs' theory of liability.  Both parties argue that the other party's expert fails to satisfy the *Daubert* standard for the admission of expert evidence.  Thus, before finally getting to the predominance analysis it is necessary to address the parties' respective *Daubert* motions.

1.  *Daubert Standard*

Federal Rule of Evidence 702, which codified the *Daubert* standard and governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The *Daubert* standard "has three major requirements: (1) the proffered

witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters

requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's

testimony must assist the [finder] of fact, *i.e.*, fit."  *United States v. Schiff*, 602 F.3d 152, 172 (3d

Cir. 2010) (quotation marks, brackets, and citation omitted).  The party offering the expert must

satisfy each requirement by a preponderance of the evidence.  *In re TMI Litig.*, 193 F.3d 613,

663 (3d Cir. 1999).

To satisfy the qualification requirement, an expert must possess "specialized knowledge

regarding the area of testimony."  *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327

(3d Cir. 2002) (quotation marks and citation omitted).  "The basis of this specialized knowledge

can be practical experience as well as academic training and credentials."  *Waldorf v. Shuta*, 142

F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted).  The qualification

requirement is interpreted "liberally," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir.

2008), and "a broad range of knowledge, skills, and training qualify an expert as such," *In re

Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted).  The expert need

not "be the best qualified or . . . have the specialization that the court considers most

appropriate," *Pineda*, 520 F.3d at 244, and "[i]f the expert meets liberal minimum qualifications,

then the level of the expert's expertise goes to credibility and weight, not admissibility,"

*Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) (citation omitted).

To satisfy the reliability requirement, "the expert must have good grounds for his or her

belief," not "subjective belief or unsupported speculation."  *Paoli*, 35 F.3d at 742 (quotation

marks and citation omitted).  Expert opinion need not possess the "best foundation, or even . . .

the best methodology or unassailable research.  Rather, the test is whether the particular opinion

is based on valid reasoning and reliable methodology." *TMI*, 193 F.3d at 665 (quotation marks

and citation omitted).  "The evidentiary requirement of reliability is lower than the merits

standard of correctness," and Plaintiffs seeking introduction of expert evidence do not "have to

prove their case twice – they do not have to demonstrate to the judge by a preponderance of the

evidence that the assessments of their experts are *correct*, they only have to demonstrate by a

preponderance of evidence that their opinions are reliable." *Paoli*, 35 F.3d at 744.  *Daubert*

offers multiple factors to evaluate reliability, including, *inter alia*, "whether the method is

generally accepted" and "the qualifications of the expert witness testifying based on the

methodology." *Id.* at 742 n.8 (citations omitted).  However, there is "considerable leeway in

deciding in a particular case how to go about determining whether particular expert testimony is

reliable," and the "reasonable measures of reliability in a particular case is a matter that the law

grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

152, 153 (1999) (citation omitted).

  The final requirement of Rule 702 demands that "expert testimony . . . fit the issues in the

case." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  "In

assessing whether an expert's proposed testimony fits, we are asking whether the expert

testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in resolving

a factual dispute." *Schiff*, 602 F.3d at 173 (quotation marks, ellipses, and citation omitted).

"[T]his is a question of relevance, and Rule 702, which governs the admissibility of expert

testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of

fact." *Id.* (quotation marks and citations omitted).  "The standard is not that high, but is higher

than bare relevance." *Id.* (internal quotation marks and citation omitted).  However, "[e]xpert

testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

*Daubert*, 509 U.S. at 591 (quotation marks and citations omitted).

Here, in addition to the questions regarding qualifications, reliability, and fit, there is an additional overlay – the expert's relevance to the class certification determination – that must be considered.  Specifically, under *In re Blood Reagents Antitrust Litigation*, where a party relies on expert testimony to meet class certification requirements the court must evaluate any *Daubert* challenges to such expert testimony in deciding the class certification motion.  783 F.3d 183 (3d Cir. 2015).  That is because the proponent of certification must satisfy Rule 23(b) with "evidentiary proof," and "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot . . . establish through evidentiary proof that Rule 23(b) is satisfied."  *Id.* at 187 (quotation marks and citations omitted).  Accordingly, "a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*."  *Id.* (quotation marks and citation omitted).

*Blood Reagents* sets out a two-step process for addressing *Daubert* challenges in the context of class certification proceedings.  The first question to be answered is whether the "aspects of plaintiffs' expert testimony offered to satisfy Rule 23" are "critical to class certification."  *Id.* at 187-88.  If they are, then the Court turns to deciding whether the expert evidence is admissible under *Daubert*.  *Id.* at 188.  If they are not, there is no need to address the *Daubert* challenge in that the expert testimony would have no bearing on whether the class should be certified.

## 2.   The Coffman Report

Defendants contend that Coffman's opinion fails to satisfy the *Daubert* standard because it is unreliable and fails to fit the facts of the case, but do not contend that he is unqualified to

serve as an expert.

Coffman opines that although damages "calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on [his] expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, . . . damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole," to wit, the out-of-pocket damages methodology.  Under this method, "damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale."  After artificial inflation – that is, the increase in Lannett's stock price caused by the fraudulent misrepresentations – is "quantified on each day during the class period," calculating damages "for each class member is formulaic based upon information collected in the claims process," including the record of each class member's purchase and sale of a security.

In response to Defendants' *Daubert* motion to exclude Coffman's opinion, Plaintiffs, interestingly, contend that there is no need to go beyond the first step of the *Blood Reagents* analysis and that, accordingly, there is no need to decide the motion.  Specifically, they suggest that Coffman's opinion is "helpful, but not critical to showing that damages can be calculated consistent with Plaintiffs' theory of liability,"[11] because the out-of-pocket damages method is widely recognized as standard in securities fraud cases.  However, it cannot be presumed that Rule 23 is satisfied merely because a case involves securities fraud claims.  *See Hydrogen Peroxide*, 552 F.3d at 322.  Something more is required and, in the absence of other evidence, the Coffman Report is critical to certification and must meet the *Daubert* standard.

---

[11] But this suggestion is directly contradicted by (1) other portions of their briefing in which they argue that "the Coffman Report demonstrates that damages in this action are capable of being calculated on a class-wide basis using the out-of-pocket damages methodology"; and, (2) that they offer no other "evidentiary proof" in support of this proposition.

Turning now to the *Daubert* analysis.  As stated, it is not disputed that Coffman possesses the requisite specialized knowledge to be qualified as an expert.  He holds advanced degrees in economics and public policy, is a certified chartered financial analyst, and has substantial experience in securities valuation and damages analysis.  Specifically, he is currently president of Global Economics Group, which he founded in 2008 and which "specializes in the application of economics, finance, statistics, and valuation principles" in a variety of contexts, including securities litigation.  He was previously employed for 12 years at Chicago Partners LLC, during which he conducted and managed analysis of securities valuation and damages.  He testified during his deposition that he has served as an expert in between 50 and 100 securities class actions, and his resume reflects that he regularly serves as a damages expert in such cases.

With respect to the reliability requirement, that too is satisfied.  Coffman's opinion that "damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole" is based on his expertise and experience in dozens of similar matters, understanding of the nature of the claims in this case, and explanation of the out-of-pocket method.  As noted, Coffman has ample experience as a damages expert in securities fraud cases. *See Paoli*, 35 F.3d at 742 n.8 (recognizing that "the qualifications of the expert witness testifying based on the methodology" supports reliability).  Further, he explains that the out-of-pocket method "has been applied in virtually every matter in which [he has] observed or participated in" as an expert, and correctly states that the out-of-pocket damages methodology is a "standard and well-accepted method for calculating class wide damages" for claims under Section 10(b), as are at issue here. *See e.g.*, 7 Newberg on Class Actions § 22:81 (5th ed.) (explaining that "most courts utiliz[e] an 'out of pocket' damage measurement that similarly applies across the class" to calculate damages for Section 10 and Rule 10b-5 claims).  Moreover, Coffman's report,

deposition testimony, and testimony at the *Daubert* hearing clearly show Coffman examined and relied on the case-specific allegations of the Complaint in this matter.[12]  Lastly, Coffman describes how the out-of-pocket method works,[13] including how damages are calculated (as the difference in the artificial inflation of Lannett's stock at the time of purchase and sale) across the class (that is, by calculating for each class member the difference in artificial inflation when they bought and sold Lannett stock using purchase and sale information gathered during the claims process).[14]  Coffman's experience, expertise, understanding of Plaintiffs' claims, and explanation of the out-of-pocket method render him reliable.[15]

---

[12] Defendants suggest that Coffman conducted no case-specific analysis in support of his opinion, making much of his testimony that the language of the damages section of the Coffman Report was "language [he'd] used before" in past cases and that the "language describing the out-of-pocket damages methodology and the rationale behind it . . . doesn't change from report to report."  That Coffman is a frequent flyer in these kinds of cases in the context of this *Daubert* motion cuts in favor of his reliability rather than against it.

[13] Defendants argue that Coffman's opinion is unreliable because he does not propose a damages method, but instead offers only a definition of out-of-pocket loss.  But he does more than that – he proposes a method of calculating damages on a class-wide basis.  He also summarizes, albeit in general terms, the steps by which out-of-pocket losses would be calculated for the class (that is, by quantifying levels of inflation of Lannett's stock during the class period, then performing a "formulaic" calculation of class members' damages by subtracting the level of inflation of Lannett's stock at the time of each investor's sale from the level of inflation at the time of purchase). *See also, e.g.*, 4 Newberg on Class Actions § 12:5 (5th ed.) (listing "common methods" of proving class-wide damages, including a "formula derived from the facts of the case that can be applied generally to all class members").

[14] Coffman concedes that Plaintiffs have more work to do to calculate damages using the out-of-pocket method.  Specifically, his report explains, to calculate the level of inflation of Lannett's stock caused by Defendants' fraud, which is the "input" for the out-of-pocket method, Plaintiffs will have to perform a "detailed" analysis "informed by information learned in discovery."  His report identifies multiple frequently-used methods and techniques to calculate artificial inflation and distinguish "confounding" sources of increases or decreases in a stock price from the impact of an alleged fraud.  Although the Report does not identify the specific methods or techniques to be deployed here, the method of determining the inflation of Lannett's stock price caused by the alleged fraud is common to the class.  Moreover, a plaintiff's "damages model does not need to be exact" at class certification.  *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 261 (3d Cir. 2016) (citation omitted).  Thus, Coffman need not support his opinion with a damages model specifying precisely how Plaintiffs will measure the price impact of the various misrepresentations and corrective disclosures alleged here, nor specify exactly how Plaintiffs will distinguish the impact of various other factors to be uncovered in discovery that may have affected Lannett's stock price during the class period.

[15] Defendants also challenge Coffman's opinion as unreliable and not fitting the case based on an event study model Coffman used to assess market efficiency for purposes of determining if the *Basic* presumption of reliance applies.  Because, Defendants argue, this event study model can measure only the impact on Lannett's stock price of news specific to Lannett, and not the impact of news concerning Lannett's competitors, the event study model cannot support Coffman's damages opinion and does not fit the facts of the case.  However, this event study is not the basis

Coffman's opinion also satisfies the fit requirement.  In opining that damages "in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole," the Coffman Report is squarely relevant to the dispute at issue: whether Plaintiffs have established by a preponderance of the evidence for purposes of certification that damages will be susceptible to class-wide measurement.  It is therefore helpful for purposes of resolving "the particular disputed factual issues in the case."  *TMI*, 193 F.3d at 670 (citation omitted).

Because Coffman is qualified as a damages expert, and his opinion is reliable and fits with this case, Coffman's opinion meets the *Daubert* standard and Defendants' motion to exclude will be denied.

### 3.   The Marietta-Westberg Report

Plaintiffs move to exclude Marietta-Westberg's opinion, contending that Marietta-Westberg is unqualified, her opinion is unreliable, and that it fails to fit the issues presented at class certification.

Marietta-Westberg opines that Coffman "has not put forth an appropriate methodology that can measure damages in a manner consistent with Plaintiffs' theory of liability." Specifically, she opines that Coffman has not adequately explained how Plaintiffs will calculate (1) the impact on Lannett's stock price of the alleged misrepresentations and corrective disclosures; (2) the impact on Lannett's stock price of Defendants' alleged risk-related misrepresentations (that is, misrepresentations of Lannett's risk of being implicated in government investigations and enforcement actions against anticompetitive conduct) and the materialization of these risks; and, (3) "time-varying inflation" (that is, how the level of

---

of Coffman's opinion: the Coffman Report's section on damages explicitly states that "[t]he event study [he] performed for th[e] report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation" of Lannett's stock price.

fraudulent inflation of Lannett's stock varied during the class period).  She further goes on to state that "there is reason to believe" that the drop in Lannett's stock price after the alleged corrective disclosures cannot be a "reliable measure" of the inflation in Lannett's stock because the drop is attributable to factors other than revelations of Defendants' alleged fraud.

However, her report challenges neither the use of the out-of-pocket method in this case nor that this method could be applied on a class-wide basis.  To the contrary, she testified during the *Daubert* hearing that she "does not dispute the out-of-pocket method," but instead "disputes . . . the lack of detail in the damages method."  In other words, her report does not challenge the central premise of Plaintiffs' argument for why predominance is satisfied as to damages – that is, because damages can be calculated on a class-wide basis using the out-of-pocket method – but only raises issues regarding the details of how this method will be applied.  Indeed, Marietta-Westberg concurred during the *Daubert* hearing that the artificial inflation of Lannett's stock price will "be determined based upon proof that is common to all class members," and similarly that an analysis of the drop in Lannett's stock price following alleged corrective disclosures would not differ as to particular Plaintiffs or class members.  She is correct: each of the issues raised in her report concern a matter entirely common to the class, to wit, whether Plaintiffs will be able to accurately calculate how much of the increase or decrease in Lannett's stock price is attributable to Defendants' alleged fraud, and the revelation of that fraud, rather than other potential factors.

Although "[w]eighing conflicting expert testimony at the certification stage . . . may be integral to the rigorous analysis Rule 23 demands," *Hydrogen Peroxide*, 552 F.3d at 323, "a court should not address merits-related issues beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof," *Harnish v.*

*Widener Univ. Sch. of L.*, 833 F.3d 298, 305 (3d Cir. 2016) (quotation marks and citation

omitted).  Undoubtedly at the merits stage of this litigation Marietta-Westberg and Coffman will

go head-to-head regarding the viability of Plaintiffs' damages model.  Certainly, the soundness

of Coffman's analysis can be appropriately challenged at the merits stage of this litigation, but it

is not necessary to address it here.  *See, e.g.*, *Amgen*, 568 U.S. at 466 ("Rule 23 grants courts no

license to engage in free-ranging merits inquiries at the certification stage").  Because Plaintiffs'

answers for these issues will be the same for each class member, their resolution is not necessary

to determine if Plaintiffs have satisfied the predominance requirement.[16]  Accordingly, because

predominance – the sole disputed class certification requirement for which the Marietta-

Westberg Report is offered – does not turn on her report, it is not critical to class certification,

*see Blood Reagents*, 783 F.3d at 187, and therefore, Plaintiffs' *Daubert* challenge need not be

addressed.

### iv.  Predominance

Now that the preliminary issues – the applicability (or rather non-applicability) of

*Comcast v. Behrend* to this matter and the parties' respective *Daubert* motions – are resolved,

what remains is to determine if Plaintiffs have shown that "questions of law or fact common to

class members predominate over any questions affecting only individual members."  Fed. R. Civ.

P. 23(b)(3).

Defendants do not dispute that predominance is satisfied as to Defendants' <u>liability</u> for

Plaintiffs' claims.  They do, however, argue that Plaintiffs have failed to establish that damages

---

[16] Further, to the extent that Marietta-Westberg is opining that Plaintiffs will be unable to prove that class members' losses were not "caused by factors other than the revelation of a misrepresentation" such as "changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," this is squarely an issue of loss causation, and Plaintiffs need not prove loss causation at class certification.  *Halliburton I*, 563 U.S. at 812-813 (quotation marks and citations omitted).

can be calculated consistent with Plaintiffs' theory of liability.  Their challenge to predominance

arises in the context of their discussion of the applicability of *Comcast*.  And, while, as discussed

*supra*, *Comcast* is distinguishable, its central and uncontroversial premise – that "[t]he first step

in a damages study is the translation of the *legal theory of the harmful event* into an analysis of

the economic impact *of that event*" – drives the predominance inquiry here.  *Comcast*, 569 U.S.

at 38 (quotation marks and citation omitted)).

The predominance analysis "look[s] first to the elements of the plaintiffs' underlying

claims and then, through the prism of Rule 23, undertake[s] a rigorous assessment of the

available evidence and the method or methods by which the plaintiffs propose to use the

evidence to prove those elements."  *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir.

2018) (quotation marks, brackets, and citations omitted).  "Because the nature of the evidence

that will suffice to resolve a question determines whether the question is common or individual, a

district court must formulate some prediction as to how specific issues will play out in order to

determine whether common or individual issues predominate in a given case."  *Hydrogen*

*Peroxide*, 552 F.3d at 311 (quotation marks and citations omitted).

"An individual question is one where members of a proposed class will need to present

evidence that varies from member to member, while a common question is one where the same

evidence will suffice for each member to make a prima facie showing or the issue is susceptible

to generalized, class-wide proof."  *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016)

(quotation marks, brackets, and citation omitted).  If "proof of the essential elements of the cause

of action requires individual treatment, then class certification is unsuitable."  *Newton*, 259 F.3d

at 172.  However, if "the common, aggregation-enabling, issues in the case are more prevalent or

important than the non-common, aggregation-defeating, individual issues," the predominance

requirement is satisfied.  *Tyson Foods*, 577 U.S. at 453 (quotation marks and citations omitted).

Because "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct," *Sullivan*, 667 F.3d at 298, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud," *Amchem*, 521 U.S. at 625 (citation omitted); *see also Sullivan*, 667 F.3d at 297-300 (explaining that "the presence of . . . questions stemming solely from [the defendant's] asserted behavior" is an "apt illustration" of why predominance is "readily met" in cases alleging fraud (quotation marks and citations omitted)).

Plaintiffs have established by a preponderance of the evidence that the predominance requirement is satisfied as to damages.  Here, they have adequately established that damages are susceptible to class-wide proof by showing that damages can be measured on a class-wide basis. As set out in the Coffman Report, Plaintiffs propose to calculate damages using a damages methodology that is applicable to the entire class: the out-of-pocket method.  The Coffman Report explains how, after calculating the impact of Defendants' misrepresentations on Lannett's stock price, calculating damages under the out-of-pocket method is "formulaic" for each class member based on a simple calculation of the difference between the amount of fraud-induced inflation of Lannett's stock price at the time of purchase and sale.  As Plaintiffs contend, calculating damages using the out-of-pocket method is standard in securities fraud class actions, and Defendants have not contended to the contrary.  *See also, e.g.*, *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991); *Levy v. Gutierrez*, 448 F.Supp.3d 46, 65 (D.N.H. 2019) (explaining that "courts have found that Coffman's [out-of-pocket damages] methodology . . . provides a workable method for measuring damages" in securities fraud class actions, and collecting cases).  Further, the out-of-pocket method is consistent with Plaintiffs' liability theory.

As Plaintiffs explain, their theory of liability is that "Defendants' misrepresentations artificially inflated Lannett stock, and that the stock price declined when the truth emerged causing financial loss to those who purchased at inflated prices."  Plaintiffs' proposal of the out-of-pocket method to measure this loss is consistent with their theory of liability.

Plaintiffs concede that calculating damages using the out-of-pocket damages method will require individual damages calculations based on the record of each class member's transactions in Lannett stock.  Individual class members' damages will differ depending on when and how much Lannett stock they purchased or sold.  However, such individualized damages calculations do not defeat predominance.  *See, e.g.*, *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 305-06 (3d Cir. 2005) ("Although the calculation of individual damages is necessarily an individual inquiry, . . . the necessity of this inquiry does not preclude class action treatment where class issues predominate" (citations omitted)).  As it is undisputed that common issues will predominate as to Defendants' liability, and because Plaintiffs have adequately established that damages can be calculated on a class-wide basis and that the necessity of individualized damages calculations for each class member does not defeat predominance, the predominance requirement is satisfied.

*************

Accordingly, Plaintiffs have satisfied each of the superiority, ascertainability, and predominance requirements of Rule 23(b), as well as each of the class action pre-requisites of Rule 23(a).  The case therefore may proceed as a certified class action.

## IV.    CONCLUSION

For the foregoing reasons, the *Daubert* motions will be denied, the motion for class certification will be granted, UPRRS and Ironworkers will be appointed class representatives,

and Abraham, Fruchter & Twersky, LLP will be appointed class counsel.  An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.